UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE BANK OF NEW YORK, as
Indenture Trustee

                    Plaintiff,

          v.

TYCO INTERNATIONAL GROUP, S.A.,
and TYCO INTERNATIONAL, LTD

                    Defendants.

Docket No. 07 CV 4659 (SAS)

# MEMORANDUM OF LAW IN SUPPORT OF NOTEHOLDERS' MOTION TO INTERVENE AND JOIN PARTIES

Paul, Weiss, Rifkind, Wharton & Garrison, LLP
1285 Avenue of the Americas
New York City, New York
(212) 373-3000

*Attorneys for Proposed Intervenor-Plaintiffs*

# TABLE OF CONTENTS

Page

Preliminary Statement ..................................................................................................1

Statement of the Case ...................................................................................................2

Argument .....................................................................................................................22

I.      THIS COURT SHOULD GRANT INTERVENTION AS
        OF RIGHT UNDER RULE 24(a)(2)..................................................................23

II.     THIS COURT SHOULD ALLOW JOINDER OF  TYCO ELECTRONICS,
        TEGSA, COVIDIEN, CIFSA, AND TIFSA UNDER RULE 20(a) .....................24

Conclusion ...................................................................................................................27

# TABLE OF AUTHORITIES

## CASES

*Broadview Chem. Corp.* v. *Loctite Corp.*,
    417 F.2d 998 (2d Cir. 1969) ...............................................................................25

*Congress Fin. Corp.* v. *J-K Coin Op Equp. Co.*,
    353 F.2d 683 (7th Cir. 1965) .............................................................................26

*Decatur Coca-Cola Bottling Co.* v. *Variety Vending Corp.*,
    277 F. Supp. 393 (D. Ga. 1967)..........................................................................26

*Diduck* v. *Kaszycki & Sons Contractors, Inc.*,
    149 F.R.D. 55 (S.D.N.Y. 1993) .........................................................................23

*Lumbermens Mut. Cas. Co.* v. *Borden Co.*,
    241 F. Supp. 683 (S.D.N.Y. 1965) ...............................................................25, 26

*Minneapolis Brewing Co.* v. *Merritt*,
    143 F. Supp. 146 (D.N.D. 1956).........................................................................26

*Oneida Indian Nation of Wisconsin* v. *New York*,
    732 F.2d 261 (2d Cir. 1984) ...............................................................................23

*Sharon Steel Corp.* v. *The Chase Manhattan Bank*,
    691 F.2d 1039 (2d Cir. 1982) .....................................................................*passim*

*The Jean Cotou Group (PJC) Inc.* v. *Wells Fargo Bank, N.A.*,
    06 Civ. 14301 (JGK), 2007 U.S. Dist. LEXIS 2909 (Jan. 12, 2007) ...................24

*Trbovich* v. *United Mine Workers of America*,
    404 U.S. 528 (1972)............................................................................................23

*Viada* v. *Osaka Health Spa, Inc.*,
    235 F.R.D. 55 (S.D.N.Y. 2006) ....................................................................25, 27

## STATUTES

Fed. R. Civ. P. 13(a) ...................................................................................................28

Fed. R. Civ. P. 20(a) ...................................................................................................24

Fed. R. Civ. P. 24(a)(2)................................................................................................23

## Preliminary Statement

Certain public lenders (the "Noteholders") to defendant Tyco International Group, S.A. (the "Company") wish to intervene in this action as plaintiffs and to join additional parties defendant. The Noteholders have the right to intervene, and the additional defendants are appropriately joined.

This is an action by the Trustee under Indentures dated 1998 and 2003 pursuant to the terms of which the Company borrowed $5.6 billion from the public, including the Noteholders. The Trustee seeks a declaratory judgment on whether it should sign supplements to these 1998 and 2003 Indentures, proposed by the Company to enable the Company to effect perhaps the largest asset-stripping scheme in American corporate history. To date, the Trustee has taken no position on whether the proposed supplements are consistent (as they must be) with the existing Indentures. The Noteholders seek to intervene as of right to establish that the Trustee may not sign.

When it raised the $5.6 billion from the public, the Company was a global conglomerate comprised of diverse businesses. In going to the public markets to borrow, the Company promised the Noteholders that it would never transfer all or substantially all of its assets to someone else unless the transferee assumed the obligation to pay the Notes. This promise is embodied in Indentures dated 1998 and 2003 that govern the Notes. The Company is now poised to break that promise.

The Company and its parent, defendant Tyco International, Ltd. ("Tyco"), were among the more infamous exemplars of corporate dishonesty, lawlessness, and unaccountability in the business scandals in the United States at the century's turn. In more recent times, the Company's management and board have made substantial progress in helping the Company recover from this dark chapter in its history. Today, the

Company's Mission Statement aspires to adhere "to the highest standards of corporate governance by establishing processes and practices that promote integrity, compliance, and accountability." The Company's current treatment of its public lenders belies this worthy aspiration.

On January 13, 2006, the Company announced a plan to liquidate itself. This plan of liquidation, scheduled to take effect by late June 2007, involves breaking up the Company into three separate public companies and the accompanying dissolution of the Company that borrowed the $5.6 billion in Notes. In this "Asset-Stripping Transaction," Tyco intends to distribute tens of billions of dollars in assets to its own shareholders for free. To do so, however, the Company needs to change the promise it made in the 1998 and 2003 Indentures, and has demanded that plaintiff The Bank of New York, as Trustee under the Indentures, approve the Company's scheme by signing the supplemental indentures. A majority of the current holders of the Notes – including fiduciaries for pension plans, retirees, and other investors – have directed the Trustee not to sign because the Company's Asset-Stripping Transaction violates the Indentures. The Noteholders intervene to request a declaratory judgment to that effect.

### Statement of the Case

The following facts are based on the allegations in the proposed intervenor complaint, a copy of which is attached to the declaration accompanying this motion.

**Plaintiff**

Plaintiff The Bank of New York (the "Trustee") is a New York banking corporation with its principal place of business in New York City, New York. The Bank serves as Indenture Trustee for both the 1998 and 2003 Indentures. The Trustee has no economic stake in the outcome of this action (other than recovery of its fees). Only the

2

Noteholders and their fellow bondholders (and those they represent as fiduciaries) have a financial interest in the outcome. To date, the Trustee has taken no position on whether the Company's Asset-Stripping Transaction violates the Indentures. The only parties with the incentive to do so are the Noteholders.

**Defendants**

Defendant Tyco International Group, S.A. (again, the "Company") is a Luxembourg company that is a wholly-owned subsidiary of Tyco International Ltd., a Bermuda corporation ("Tyco") with its principal place of business in Princeton, New Jersey. Tyco is the guarantor of the Notes pursuant to the 1998 and 2003 Indentures.

The Company, which operates in over one hundred countries, is a diversified manufacturing and service company that engages in four lines of business. These are: (a) designing, manufacturing and distributing engineered electronic components, network solutions and wireless systems (the "Electronics Business"); (b) developing, manufacturing and distributing medical devices and supplies, diagnostic imaging agents and pharmaceuticals for use in clinical and home settings (the "Healthcare Business"); (c) designing, manufacturing, installing and servicing fire detection and suppression systems, as well as installing, monitoring and maintaining electronic security systems (the "Fire and Security Business"); and (d) manufacturing and distributing products such as industrial valves and controls, metal conduit and other items in the engineering design, electrical, fire protection, infrastructure and water/wastewater markets (the "Engineered Products and Services Business"). The Asset-Stripping Transaction contemplates breaking these businesses into three new, separate public companies.

One of these is proposed joinder defendant Tyco Electronics, Ltd. ("Tyco Electronics"), a Bermuda corporation with its principal place of business Berwyn, Pennsylvania. Proposed joinder defendant Tyco Electronics Group S.A. ("TEGSA"), a wholly-owned subsidiary of Tyco Electronics, is a Luxembourg corporation with its principal place of business in Luxembourg. The Company plans to transfer its Electronics Business to Tyco Electronics as part of the Asset-Stripping Transaction, after which Tyco intends to distribute the shares of Tyco Electronics to Tyco's shareholders. The creation of Tyco Electronics and the stripping of the Company's assets to give the same to Tyco's shareholders are integral to the Asset-Stripping Transaction.

The second new entity is proposed joinder defendant Covidien Ltd. ("Covidien"), a Bermuda corporation with its principal place of business in Mansfield, Massachusetts. Proposed joinder defendant Covidien International Finance S.A. ("CIFSA"), a wholly-owned subsidiary of Covidien, is a Luxembourg corporation with its principal place of business in Luxembourg. The Company plans to transfer its Healthcare Business to Covidien as part of the Asset-Stripping Transaction, after which Tyco intends to distribute the shares of Covidien to Tyco's shareholders. The creation of Covidien and the stripping of the Company's assets to give the same to Tyco's shareholders are integral to the Asset-Stripping Transaction.

The third new entity is proposed joinder defendant Tyco International Finance, S.A. ("TIFSA"), a Luxembourg corporation that is a wholly-owned subsidiary of Tyco with its principal place of business in Luxembourg. The Company plans to transfer its Fire and Security and Engineered Products and Services Businesses to TIFSA as part of the Asset-Stripping Transaction. The Company also intends to transfer the

Notes to TIFSA, and have TIFSA assume the obligations under the Notes, as part of the same Transaction. The creation of TIFSA is integral to the Asset-Stripping Transaction.

**Intervenor-Plaintiffs**

Each of the Noteholders is a member of an Ad-Hoc Committee of Noteholders which collectively owns or controls over $2.7 billion of Notes. Together, members of the Ad Hoc Committee own or control over 73% percent of the Notes, that is, about $2.7 billion in aggregate face amount out of the total of $3.7 billion of Notes that are still outstanding under the 1998 and 2003 Indentures.

These Noteholders are:

- Unum Life Insurance Company of America, which is a Maine corporation with its principal place of business in Portland, Maine. Unum Life Insurance Company of America is a holder of Notes under the 1998 Indenture.

- First Unum Life Insurance Company, which is a New York corporation with its principal place of business in New York, New York. First Unum Life Insurance Company is a holder of a Note under the 1998 Indenture.

- Provident Life and Accident Insurance Company, which is a Tennessee corporation with its principal place of business in Chattanooga, Tennessee. Provident Life and Accident Insurance Company is a holder of Notes under both the 1998 and 2003 Indentures.

- Knights of Columbus, which is a specially-chartered Connecticut corporation with its principal place of business in New Haven, Connecticut. Knights of Columbus is a holder of Notes under both the 1998 and 2003 Indentures.

●       New York Life Insurance Company, which is a New York mutual insurance company with its principal place of business in New York, New York. New York Life Insurance Company is a holder of Notes under both the 1998 and 2003 Indentures.

●       New York Life Insurance and Annuity Corporation, which is a Delaware corporation with its principal place of business in New York, New York. New York Life Insurance and Annuity Company is a holder of Notes under both the 1998 and 2003 Indentures.

●       SunAmerica Life Insurance Company, which is an Arizona corporation with its principal place of business in Los Angeles, California. SunAmerica Life Insurance Company is a holder of Notes under both the 1998 and 2003 Indentures.

●       The Variable Annuity Life Insurance Company, which is a Texas corporation with its principal place of business in Houston, Texas. The Variable Annuity Life Insurance Company is a holder of Notes under the 1998 Indenture.

**The Notes**

There are six series of notes issued under an indenture dated June 9, 1998 between the Company and the Trustee (as supplemented, the "1998 Indenture"): 6.125% unsecured notes due 2008 (CUSIP No. 902118AM0); 6.125% unsecured notes due 2009 (CUSIP No. 902118AJ7); 6.75% unsecured notes due 2011 (CUSIP No. 902118AY4); 6.375% unsecured notes due 2011 (CUSIP No. 90211BC1); 7.0% unsecured notes due 2028 (CUSIP No. 902118AC2); and 6.875% unsecured notes due 2029 (CUSIP No. 902118AK4).

The remainder of the Notes were issued under an indenture dated November 12, 2003 between the Company and the Trustee (as supplemented, the "2003 Indenture," collectively with the 1998 Indenture, the "Indentures"): 6.0% unsecured notes due 2013 (CUSIP No. 902118BK3).

There are, then, five series of Notes with comparatively near-term maturities ('08, '09, '11, '11, and '13) and two with long-term maturities ('28 and '29). For each, the Indentures provide a so-called "make-whole" premium in the event that the Company wishes to pay off the Notes before their maturity dates. This make-whole premium – an amount in excess of the principal amount of a Note plus accrued but unpaid interest – is intended to compensate the bondholder for prematurely forgoing the amounts that would otherwise be earned if the Company awaited the maturity dates based on discounted present value of the forfeited amount.

Consistent with market practice, the make-whole premium required by the Indentures represents the net present value of all remaining principal and interest payments through the scheduled maturity. This amount is determined by using a discount rate equal to the current U.S. Treasury Notes of comparable maturities plus a pre-set number of basis points above the Treasury rate. This discount rate is commonly expressed in terms of "T" plus the number of basis points added to the Treasury rate. Thus, the expression "T+25" means that the Noteholder is entitled, as compensation for premature redemption of the Notes, to the sum of all amounts payable under the Notes through maturity discounted to present value using a discount rate equal to the interest rate under a U.S. Treasury Note of comparable maturity plus 25 basis points. The lower

the number of added basis points – that is, the closer to the Treasury rate – the higher the make-whole premium.

This make-whole premium is built into the contracts between the Company and its public lenders. It is the contract price for early redemption of the Notes. The contract price for the 6.125% Notes due November 1, 2008 and January 15, 2009, as well as the 6.875% Notes due January 15, 2029 and 6.0% Notes due November 15, 2013, is T+25. The contract price for the 6.75% Notes due October 15, 2011 is T+35, and for the 7.0% Notes due June 15, 2028, T+15. Payment of this make-whole premium is part of the promise, part of the trust, between the borrowing Company and its lending bondholders if, for whatever reason (including to benefit the Company's shareholders, whose interests are and should be subordinate to the contract rights of its lenders), the Company wants to redeem or must redeem the Notes before the Notes would otherwise be due. As the term "make-whole premium" suggests, the formula simply makes the Noteholders "whole" – nothing more.

**The Successor Obligor Clauses**

The Company issued over $4.6 billion of public debt under the 1998 Indenture and over $1 billion of public debt under the 2003 Indenture.

Under the Indentures governing the Notes, the Company cannot sell, transfer or convey "all or substantially all" of its assets to another entity unless that transferee entity assumes the Company's obligations under the Notes. Each of the Indentures specifically includes a Successor Obligor Clause, which says that the Company:

> will not merge or consolidate with any other Person *or sell or convey all or substantially all of its assets to any Person*, unless (i) either the Issuer

8

or such Guarantor, as the case may be, shall be the continuing entity, or the successor entity or the Person which acquires by sale or conveyance substantially all the assets of the Issuer or such Guarantor, as the case may be (if other than the Issuer or such Guarantor, as the case may be) *shall expressly assume the due and punctual payment* of the principal of and interest on all the Securities or the obligations under the Guarantees, as the case may be, according to their tenor, and the due and punctual performance and observance of all of the covenants and agreements of this Indenture to be performed or observed by the Issuer or such Guarantor, as the case may be, by supplemental indenture satisfactory to the Trustee, execute and delivered to the Trustee by such corporation. . . .

(1998 Indenture, at § 8.1; 2003 Indenture, at § 10.01 (emphasis added).)

These Successor Obligor Clauses are intended to serve the interests of both borrower and lender. Each Successor Obligor Clause allows the borrower (here, the Company), to liquidate or otherwise transform its business free of debt, while at the same time assuring the lenders (here, among others, the Noteholders) a continuity of the assets on which they extended credit. The Successor Obligor Clauses therefore protect bondholders from the disposition of substantially all of a company's assets unless the Notes follow those assets. Failing to follow the terms of the Successor Obligor Clauses by permanently transferring substantially all of the Company's assets without also assigning the Notes to the transferee(s) receiving those assets is a breach of these Successor Obligor Clauses.

**The Asset-Stripping Transaction**

On January 13, 2006, the Company announced a plan to separate the Company's portfolio of diverse businesses into three new, independent, publicly-traded companies: "one for its healthcare business (Covidien); one for its electronics businesses (Tyco Electronics); and a third for its fire and security and engineered products and

9

services business," initially the Company, which is then to transfer the business to TIFSA.

Although the Company announced its Asset-Stripping Transaction over a year ago, its intention to betray the Noteholders is a recent development. On April 27, 2007, the Company filed an Offer to Purchase and Consent Solicitation Statement with the SEC. These "Solicitation Documents" say that the first step of the Asset-Stripping Transaction involves the transfer of the Company's Healthcare and Electronics Businesses to two newly formed entities – respectively, Covidien and Tyco Electronics. According to the Company, this means that the two new entities will assume 73% of the Company's contingent and corporate liabilities and assets: Covidien will assume 42% of its contingent and corporate liabilities and assets, and Tyco Electronics will assume 31% of contingent and corporate liabilities and assets. The Company then intends to spin off these two new entities to Tyco's shareholders.

The next step of the Asset-Stripping Transaction involves the transfer of all of the Company's remaining assets – its Fire and Security and Engineered Products and Services Businesses – to a third newly formed entity, TIFSA, and the assumption of the Notes by TIFSA. This is to be followed by the liquidation of the Company.

The Solicitation Documents consisted of an offer to purchase the Notes (the "Tender Offer") and a consent solicitation statement seeking the noteholders' consent to certain proposed amendments to the Indentures (the "Proposed Amendments"). The two were intertwined insofar as the Company's obligation to purchase the Notes pursuant to the Tender Offer was purportedly conditioned upon the bondholders' consent to the Proposed Amendments.

10

In the Proposed Amendments, the Company sought to reconcile the Asset-Stripping Transaction – by which the Company will transfer its Notes to a newly formed entity – TIFSA – that is qualitatively and quantitatively inferior to the other two businesses that will be spun off – with the Indentures' Successor Obligor Clauses, which prohibit the transfer of the Notes unless the Company sells "all or substantially all" of its assets to the transferee. In relevant part, the Proposed Amendments provided:

> In connection with the Separation Transactions (as defined in Section 8.1(c)), the provisions of Section 8.1(a) shall be interpreted as follows:
>
> (i) the transfer of a portion of the Issuer's assets to Tyco Electronics (as defined in Section 8.1(c)) and a portion of the Issuer's assets to Covidien (as defined in Section 8.1(c)), as contemplated by the Separation Transactions, shall be deemed **not** to be a sale or conveyance of all or substantially all of the Issuer's assets or Tyco's assets;
>
> (ii) **the transfer of a portion of the Issuer's assets to Tyco International Finance S.A. (as defined in Section 8.1(c)), as contemplated by the Separation Transactions, shall be deemed to be a conveyance of substantially all of the Issuer's assets to Tyco International Finance S.A.** and be deemed not to be a sale or conveyance of all or substantially all of Tyco's assets; and
>
> (iii) the distribution by Tyco to its shareholders of the shares of Covidien Ltd. and Tyco Electronics Ltd. shall be deemed **not** to be a sale or conveyance of all or substantially all of Tyco's assets.
>
> (Solicitation Documents, at A-1 (emphasis added).)

These allegedly "clarifying" Proposed Amendments rewrote the Successor Obligor Clauses solely to suit the Asset-Stripping Transaction. The Proposed Amendments were intended to be nothing more than an agreed upon fiction between the Company and the tendering noteholders, who upon acceptance of the tender would no longer have any pecuniary interest in the Company or the assets because they would have accepted the offer and hence would not care what the consequences of the proposed amendments would be.

11

The Company sought the "clarifying" amendments to bless its Asset-Stripping Transaction but thereby exposed only its duplicity. The Company sought to have the transfer of assets to Tyco Electronics and Covidien deemed *not* to be a transfer of "all or substantially all" of the Company's assets, even though through those transfers the Company will cease being a diversified conglomerate and spin off businesses representing 66% to 80% of its assets to its shareholders. At the same time, according to the Company, the subsequent transfer of the Notes to TIFSA, which will include the qualitatively and quantitatively least desirable remaining businesses, representing as little as 20% to 33% of its assets, is a transfer of "all or substantially all" of the Company's assets for purposes of the Successor Obligor Clauses because only that portion would remain after the initial transfers. The Company is of the view that the "all or substantially all" determination should be made only *after* the first two steps of the Asset-Stripping Transaction are complete, its most profitable businesses are spun off, and the diversified conglomerate is reduced to the qualitatively and quantitatively inferior Fire and Security and Engineered Products and Services Businesses.

### *Sharon Steel*

The Solicitation Documents were egregiously misleading in characterizing the changes as mere "clarifying" amendments and stating that the Company could do as it pleased even if the bondholders did not consent. Controlling authority in this Circuit – *Sharon Steel Corp.* v. *The Chase Manhattan Bank*, 691 F.2d 1039 (2d Cir. 1982) – holds that the Company's plan for transfer of the Notes in the Asset-Stripping Transaction violates the Successor Obligor Clauses of the 1998 and 2003 Indentures. When one bondholder sued claiming that the Solicitation Documents violated the federal securities

laws in failing to disclose *Sharon Steel* (the "Securities Action"), the Company quietly issued a corrective disclosure and, at this Court's strong suggestion, grudgingly extended the date by which bondholders could tender or retract their Notes and consents.

The Second Circuit's decision in *Sharon Steel* concerned an asset-stripping transaction that is materially indistinguishable from the Asset-Stripping Transaction here. In *Sharon Steel*, the Second Circuit Court of Appeals held that successor obligor clauses "do not permit assignment of the public debt to another party in the course of a liquidation unless 'all or substantially all' of the assets of the company *at the time the plan of liquidation is determined upon* are transferred to a single purchaser." *Id.* at 1051 (emphasis added). Under the law of this Circuit, therefore, the "all or substantially all" determination must be made as of January 13, 2006, when the Company approved the Asset-Stripping Transaction. As of that date, the assets that the Company plans to transfer to TIFSA clearly did not constitute "all or substantially all" of the Company's assets. Attempting to assign the Notes after a piecemeal restructuring of the Company to the successor entity receiving the least substantial portion of the Company's current assets is a clear violation of *Sharon Steel*.

The Company knows as much. Notwithstanding its previous public disclosure of the transaction steps in the Solicitation Documents, the Company has now embarked on a shell game to obscure the *Sharon Steel* parallel. Among other things, it appears that rather than have the new TIFSA entity assume the Notes and receive the Company's assets at the same time as contemplated in the Solicitation Documents, the new structure contemplates debt assumption on May 30 and asset transfers on June 1. The end result is still the same. At the conclusion of these transactions, the Company that

13

borrowed from the public will be liquidated, three *new* entities will hold all of its assets and only one of the new entities – the least desirable of the three – will assume the Notes. This result is a violation of both the Indentures and *Sharon Steel*'s controlling precedent – regardless of the path that the Company takes to get there.

**The Coercive Tender Offer**

        The Company's efforts tell the story of a company plotting to deny its bondholders their contractual rights.    That is apparent from the Company's characterization of the Proposed Amendments as mere "clarifying" amendments, and its insistence that the Proposed Amendments were entirely gratuitous – surely a first in the history of consent solicitations.

        The market commonly refers to the Company's tender offer/consent solicitation as a "coercive tender."   Each bondholder who tendered its Notes had to deliver a consent to the proposed "clarifying amendments"; otherwise the Company would not accept the tender.  The *tendering* bondholders of course do not care what the consent says because the Company is buying them out.  The process is coercive because the consent is so damaging to *non-tendering* bondholders.  Bondholders are placed under enormous pressure to forfeit what is rightfully theirs (the contract price) because, if 50.01% of them tender and the "clarifying amendments" are approved, the non-tendering bondholders are stuck as lenders to the Company's least healthy business and their Notes substantially devalued.  The Company thus gave its public lenders a Hobson's choice: tender at an unfair below-contract price, or else become an unwilling creditor of a new entity lacking the many billions of dollars in assets of the Company to which the bondholders initially agreed to lend and most of which the Company has given away, for

free, to Tyco's shareholders – the very people who benefited from the money that The Company borrowed from the bondholders.

In this coercive tender, the Company further tried to tighten the vise on its public lenders through the prices it offered for the Notes. The 1998 Indenture provides for six different series of Notes, some comparatively short-term (with maturity dates between 2008 and 2013) and others longer term (with maturity dates of 2028 and 2029). Despite the varying terms, each Note is treated equally in a consent solicitation for voting purposes: one dollar, one vote. Both the 1998 Indenture and the 2003 Indenture, as supplemented, enable the Company to redeem the Notes at a fixed contractual price (the make-whole premium under the Indentures), financing for which redemption the Company already has in place. Rather than simply offer this price, however, the Company offered less than the contractual price for each series of Notes. In the hope of dividing and conquering, the Company offered better (but still below contract) prices for the short-term Notes than for the long-term Notes (the short-term Notes being cheaper to redeem than the long-term Notes). In this way, the Company sought to lure the short-term bondholders (who hold the majority of outstanding Notes) to consent – to get the more than 50% of all bondholders required to change the Indentures – to the detriment of its long-term public lenders.

Despite its calculated coercion, the Company's unseemly strategy failed. Barely one third of the bondholders tendered their Notes and consented to the "clarifying" amendments. Because the "clarifying" amendments cannot be implemented without a majority vote and because a great majority of the bondholders oppose the Asset-Stripping Transaction absent full payment of the Notes under the terms of the

Indentures, the Company could not modify the Indentures and hence cannot proceed with its proposed transfer of the Notes without violating the Successor Obligor Clauses.

**The Securities Action**

On May 9, 2007, less than two weeks after the Company's filing of the Solicitation Documents, a bondholder commenced the Securities Action to reveal the parallel between *Sharon Steel* and the Asset-Stripping Transaction. Two days later the Company issued a corrective disclosure explaining the Securities Action, but in tactics designed to limit the impact of this news the Company failed to mention the disclosure on its website or in a lengthy and an otherwise detailed press release, prominently displayed on its website, describing the status of its Tender Offer.

The Company, it seems, was confident that the coercive nature of the Tender Offer coupled with its pricing would assure the Tender Offer's success. The majority of the Notes under the 1998 Indenture, and all those under the 2003 Indenture, bear relatively short-term maturity dates. Each Indenture says that a simple majority of bondholders under each may amend the Indentures. To induce a split among the bondholders, the Company offered to pay holders of the shorter-term Notes a price more closely approaching the contractual price than the more substantial sums required to approach or match the contract price on the longer-term Notes. The Company hoped that the short-term bondholders, who would receive close to the amount owed to them under the Indentures, would abandon the long-term bondholders in favor of consenting to the "clarifying" amendments, thereby giving the Company the simple majority needed to effect its scheme.

For the Company, the parent of which has a market capitalization in excess of $60 billion, the difference between fulfilling its promise to its public lenders and the coercive course the Company chose was, depending on Treasury rate fluctuations, a relatively modest amount of about $95 million – a tiny fraction as compared to the tens of billions being distributed to shareholders. The majority of this difference came at the expense of the long-term bondholders. Nonetheless, the Company's cynical attempt to buy off the short-term bondholders did not work. Scarcely a third of the bondholders under each Indenture tendered their Notes to the Company.

This overwhelming rejection, coupled with the obvious likeness of the Asset-Stripping Transaction to the one that violated the successor obligor clauses in *Sharon Steel*, sent the Company back to rewrite a script to deny its bondholders their rightful contractual price. Short of aborting the Asset-Stripping Transaction, however, nothing the Company does can avoid the Successor Obligor Clauses.

**The Company's Proposed Breaches**

The Company's Asset-Stripping Transaction violates the Successor Obligor Clauses in at least two distinct ways. The first and most transparent is that, no matter the timing or sequence of the Company's asset-stripping exercise, the substance of the Company's Asset-Stripping Transaction is exactly what *Sharon Steel* held that a public borrower may not do – unburden itself of public debt through a calculated plan of piecemeal dispositions. The second, and equally violative of the Successor Obligor Clauses, is the transfer of Tyco Electronics and Covidien, for no consideration, to Tyco's shareholders.

The Company claims that the assets being transferred to Tyco Electronics and Covidien do not constitute "all or substantially all" of the Company's assets, such that the transfer and assumption of the Notes at that step in the Asset-Stripping Transaction is neither required nor permitted. Any relevant qualitative or quantitative measure of those assets demonstrates the opposite.

Qualitatively, through its Asset-Stripping Transaction, the Company plans drastically to change the nature of its business, spinning off substantially all of the assets that originally induced noteholders to invest in the Company. When the Company went to the public markets to borrow over $5.6 billion, the Company emphasized its status as "a diversified manufacturing and service company." The Company touted its strength as a global conglomerate in marketing the Notes issued under both the 1998 and 2003 Indentures, stressing the broad range of assets available to support the Notes. According to the offering documents marketing the Notes, the Company's strategy was to expand in a variety of businesses that would insulate lenders from the vagaries of the market. The Company stressed its being a "low-cost, high quality producer and provider in each of its markets," and "promot[ing] its leadership and position by investing in existing businesses, developing new markets and acquiring complementary businesses and products."

The Solicitation Documents, by contrast, indicate that the Company has abandoned the operating strategy it used when borrowing in the first place. Instead, the Company is now saying that it is creating three new "independent, focused companies," spinning off most attractive and successful businesses to two of them and is trying to

force its public lenders to become involuntary lenders of the least attractive and successful of the resulting companies.

Such a radical transformation of a company, regardless of the precise percentage of assets transferred, indicates that, at least qualitatively, a disposition of substantially all assets will have taken place to transferees that will not assume the Notes. Successor obligor clauses are designed to ensure the continuity of assets by maintaining the connection between the principal operating assets that induced an investment and the investment itself. The Company's plan to spin off its most successful and substantial principal assets without those transferees assuming the outstanding Notes violates these principles and the terms of the Indentures.

Indicative of its scheme to dump the Company's assets into the least attractive asset, the Company has chosen to transfer the Notes to what will likely be its most highly leveraged business. An April 23, 2007 report by Morgan Stanley Research North America entitled "Tyco International Ltd. – A Close Look at Tyco's Post-Breakup Pieces: Low Risk With Substantial Upside" (the "Tyco Report") explains that "[w]hile [TIFSA] will be highly levered with $4B of debt, [Covidien] and [Tyco Electronics] will each be recapitalized." TIFSA will be saddled with approximately $4.0 billion of debt, resulting in a debt/EBIT ratio of 2.7x. By contrast, Tyco Electronics will have $2.8 billion of debt and a comparatively low debt/EBIT ratio of 1.5x, and Covidien will have $3.2 billion in debt and an even lower debt/EBIT ratio of 1.4x.

That is not all. The bondholders will also be stuck lending to an entity with significantly lower profit margins than the Company in which they had initially invested. The Tyco Report highlights a significant disparity in operating margins, which

are much higher at Covidien and Tyco Electronics than at TIFSA. For the fiscal year 2006, Covidien's Healthcare Business enjoyed an overall operating margin of 22.2%, while the Tyco Electronics Business enjoyed an overall operating margin of 13.6%. During the same period, TIFSA's Fire and Security and Engineered Products and Services Businesses' operating margin was only 8.0%. This disparity is expected to persist. By 2008, the Tyco Report estimates that Covidien's operating margin will remain steady at 20.9%, Tyco Electronics' will rise slightly to 15.0%, and TIFSA's will rise to only 9.9%.

Finally, the bondholders will be stuck with the business with the bleakest prospects for growth. The Tyco Report explains that two of the main business lines within TIFSA – ADT and Security Products – are tied to residential construction and that "near term growth forecasts are tempered by expected weakness" in this market. By contrast, Covidien's prospects "are fundamentally strong and provide stability . . . as the company participates in markets that are relatively consistent [in] demand and are mostly oligopolistic in nature," while Tyco Electronics "has a generally stable revenue base that is not tied to any one or two cyclical end markets."

This is among the reasons why the private equity market has targeted TIFSA as a candidate for a leveraged buy-out, for which the entity is so clearly tailored. Once the three entities are on their own, the Tyco Report's own numbers reflect that TIFSA would be easy prey for a new buyer. Once again, the shareholders would benefit. Once again, the bondholders would only suffer under the onus of additional and undoubtedly senior debt. A quantitative comparison of TIFSA with Covidien and Tyco Electronics confirms this point.

On a quantitative basis, the first two steps of the Proposed Separation Transaction collectively constitute the sale of "all or substantially all" of the Company's assets. Relying entirely on book value, the Company argued previously that its Healthcare and Electronics Businesses account for only 53% of the Company's total assets. Book value – an accounting fiction of marginal relevance to market value – is not the appropriate measure of the Company's various businesses. By various other quantitative metrics, 66% to 80% of the Company's assets will be spun off – "substantially all" of the Company's assets – leaving only 20% to 34% of the Company's assets to support the Notes.

In absolute terms, the Company's Healthcare and Electronics Businesses constituted 80% of the Company's operating income for the first six months of the fiscal year 2007: operating income for the consolidated Company operations was $2.336 billion, while operating income for TIFSA's Fire and Security and Engineered Products and Services Businesses was only $482 million. In fiscal year 2006, the comparable figure was 74%, attesting to a downward spiral for the latter. The Healthcare and Electronics Businesses are estimated to account for $3.924 billion of free cash flow in fiscal year 2007, in comparison to free cash flow of only $1.274 billion for the Fire and Security and Engineered Products and Services for the same period. The Healthcare and Electronics Businesses' free cash flow are therefore projected to comprise 67.5% of the Company's total free cash flow.

In the fiscal year 2006, the Company's consolidated EBITDA was $7.733 billion. The Fire and Security and Engineered Products and Services Businesses generated only $2.682 billion of EBITDA. The Healthcare and Electronics Businesses

therefore generated approximately two-thirds of the Company's consolidated EBITDA during fiscal year 2006.

This range of 66% to 80% is further supported by the Company's own allocations of corporate and contingent liabilities and assets – 73% to Covidien and Tyco Electronics and only 27% to TIFSA. This reflects the Company's views on the values of its three components. Overall, the combination of measurements of operating income, free cash flow and EBIDTA, which reflect that 80%, 67.5% and 66% of these all important measurements of earnings capacity – and hence value – are being transferred, combined with the Company's own allocations of 73% of corporate liabilities and assets being transferred, demonstrate that approximately 66% to 80% of the Company's assets are being transferred to Covidien and Tyco Electronics.

The above quantitative metrics, as well as the qualitative shift in the Company's strategy from being a diversified conglomerate to a business focusing on its slow growing and lowest margin business, clearly indicate that the first steps of the Asset-Stripping Transaction are a sale of "all or substantially all" of the Company's assets. The Noteholders did not expect their Notes to be supported by a shell of the Company's former self. It is fair to say that Tyco's executives – and the professionals who assisted them in shaping the Asset-Stripping Transaction – would not consider 27% of their compensation and fees for this unworthy Transaction to constitute "all or substantially all" of the amounts due them. Neither should the pension funds, retirees and other investors from which the Company borrowed.

## **Argument**

### **I.**

## THIS COURT SHOULD GRANT
## INTERVENTION AS OF RIGHT UNDER RULE 24(a)(2)

A party has a right to intervene in an action where: (1) it has an interest in the subject matter of the action; (2) the disposition of the action as a practical matter may impair or impede the movant's ability to protect that interest; and (3) the existing parties cannot represent the interest adequately. Fed. R. Civ. Proc. 24(a)(2); *Oneida Indian Nation of Wisconsin* v. *New York*, 732 F.2d 261, 263-64 (2d Cir. 1984); *Diduck* v. *Kaszycki & Sons Contractors, Inc.*, 149 F.R.D. 55, 58 (S.D.N.Y. 1993). The Noteholders easily satisfy each of these elements.

That the Noteholders have a substantial interest in the outcome of this action is beyond question. The Ad Hoc Committee of Noteholders own or control over 73% percent of the Notes issued by the Company – approximately $2.7 billion in aggregate face amount of the $3.7 billion of the Notes that remain outstanding under the Indentures. The Noteholders' interests will clearly be impacted by the Asset-Stripping Transaction, through which the Company will spin off "substantially all" of its assets to entities that will not assume the Notes, and ultimately transfer the Notes to the least desirable of its businesses. If the Company is permitted to proceed with the Asset-Stripping Transaction, the Noteholders will lose their rights under the Indenture and their Notes will be substantially devalued.

Intervenors' interests, further, may not be "adequately represented by the existing parties," Fed. R. Civ. P. 24(a)(2), because they, and not the Trustee, have a direct pecuniary interest in the outcome of this action. *Cf. Trbovich* v. *United Mine Workers of America*, 404 U.S. 528, 539 n.9 (1972). Indeed, noteholders were permitted to intervene in the leading case concerning Successor Obligor Clauses, *Sharon Steel Corp.* v. *The*

*Chase Manhattan Bank, N.A.*, 691 F.2d 1039 (2d Cir. 1982). More recently, Judge Koeltl permitted noteholders to intervene in *The Jean Coutu Group (PJC) Inc.* v. *Wells Fargo Bank, N.A.*, 06 Civ. 14301 (JGK), 2007 U.S. Dist. LEXIS 2909, at *2 (Jan. 12, 2007), reasoning that "[t]here is no dispute that the [noteholders] satisfy each of the requirements of Rule 24(a)(2)." The court further noted that "the [indenture] Trustee may not adequately represent the interests of the [noteholders]." *Id.* Here, the Indenture Trustee has made clear that it is not representing the Noteholders, but simply seeking the Court's guidance as to "whether or not the execution of the Proposed Supplements is permitted or authorized under the Indentures."

This Court should grant intervention as of right.

## II.

### THIS COURT SHOULD ALLOW JOINDER OF TYCO ELECTRONICS, TEGSA, COVIDIEN, CIFSA, AND TIFSA UNDER RULE 20(a)

The Noteholders also seek to join as defendants in this action Tyco Electronics, TEGSA, Covidien, CIFSA and TIFSA (collectively, the "Spin-off Entities"), the new entities created by Tyco International Group, S.A. (the "Company") in preparation for its Asset-Stripping Transaction. Rule 20 of the Federal Rules of Civil Procedure governs the permissive joinder of parties. In relevant part, the rule provides that:

> All persons may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action.

Fed. R. Civ. Proc. 20(a).

Courts have consistently held that Rule 20 is "to be interpreted liberally to enable the court to promote judicial economy by permitting all reasonably related claims for relief by or against different parties to be tried in a single proceeding." *Viada* v. *Osaka Health Spa, Inc.*, 235 F.R.D. 55, 61 (S.D.N.Y. 2006). In the declaratory judgment context more specifically, the already liberal standard is broadened such that courts look only for a "community of interest in a question of fact or law." *Lumbermens Mut. Cas. Co.* v. *Borden Co.*, 241 F. Supp. 683, 692 (S.D.N.Y. 1965). Here, this community of interest is based on the Asset-Stripping Transaction and the identical legal and factual questions it raises.

Each of the elements required for proper joinder is present here.

The Noteholders have a right to declaratory relief against the Spin-off Entities because in this Circuit, declaratory judgments are appropriate "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Broadview Chem. Corp.* v. *Loctite Corp.*, 417 F.2d 998, 1001 (2d Cir. 1969). Here, the Noteholders are seeking a declaration that the Asset-Stripping Transaction would violate both the law regarding the application of successor obligor clauses in general and also the particular Successor Obligor Clauses in the 1998 and 2003 Indentures. The legal uncertainty surrounding the proposed Asset-Stripping Transaction affects the Spin-off Entities as well, because they will be receiving assets and liabilities pursuant to that plan. A plan that is invalid with respect to the Company is equally invalid with respect to the Spin-off Entities. Joining them in this

action in the first instance will allow the Court to clarify and settle these issues all at once.

In addition, the Noteholders' right to relief against the Spin-off Entities arises out of the exact same transaction as their right to relief against the Company – the proposed Asset-Stripping Transaction. The Company is being challenged for the validity of the Asset-Stripping Transaction overall. The Spin-off Entities are implicated in this challenge because of their particular roles in that transaction. The Noteholders seek to join Tyco Electronics, TEGSA, Covidien, and CIFSA in order to request a declaratory judgment that these entities, which would receive substantially all of the Company's assets pursuant to the Asset-Stripping Transaction, assume and be held liable for the Notes as well. The Noteholders seek to join TIFSA in order to request a corresponding declaratory judgment that TIFSA *not* be allowed to assume the Notes because it will *not* receive substantially all of the Company's assets pursuant to the Asset-Stripping Transaction.

In similar situations, courts have allowed the joinder of guarantors of notes in actions concerning those notes. *See, e.g., Congress Fin. Corp.* v. *J-K Coin Op Equp. Co.*, 353 F.2d 683 (7th Cir. 1965); *Decatur Coca-Cola Bottling Co.* v. *Variety Vending Corp.*, 277 F.Supp. 393 (D. Ga. 1967); *Minneapolis Brewing Co.* v. *Merritt*, 143 F. Supp. 146 (D.N.D. 1956). And courts in this circuit have allowed the joinder of defendants generally involved in the same transaction or occurrence, even though the new defendants have no contractual obligation to the plaintiffs seeking to join them to the case. *See Lumbermens,* 241 F. Supp. 683. Under the "case by case approach [that] is generally pursued" when determining whether claims arise from a single transaction,

permissive joinder would clearly be appropriate here. *See Viada*, 235 F.R.D. at 61 (establishing that "In attempting to affix a definition to 'transaction or occurrence, courts have found Fed. R. Civ. P. 13(a) to be particularly instructive, and have concluded with reference to that Rule that the phrase encompasses 'all logically related claims.'") (internal citations omitted).

Each of the Spin-off Entities is integral to the Company's Asset-Stripping Transaction. As the Noteholders' claims against them arise out of the very same transaction, and raise the same questions concerning the validity of that transaction, there are clearly common questions of law and fact between all defendants. Accordingly, Rule 20 easily allows for their joinder in this action.

## Conclusion

For all the foregoing reasons, this Court should grant the Noteholders' motion to intervene and join parties.

Dated:  New York, New York
        June 25, 2007

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _____
        Gerard E. Harper (GH-0279)
        Andrew G. Gordon (AG-9239)
        Andrew N. Rosenberg (AR-1799)
        Amir Weinberg (AW-3368)

        1285 Avenue of the Americas
        New York City, New York 10019
        (212) 373-3000

        *Attorneys for Intervenor-Plaintiffs*

27