*S/LIE/N/ICN2*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE BANK OF NEW YORK, as
Indenture Trustee,
                    Plaintiff,

                v.

TYCO INTERNATIONAL GROUP, S.A.
and TYCO INTERNATIONAL, LTD.,
                    Defendants.

---

UNUM LIFE INSURANCE COMPANY
OF AMERICA, FIRST UNUM LIFE
INSURANCE COMPANY, PROVIDENT
LIFE AND ACCIDENT INSURANCE
COMPANY, KNIGHTS OF COLUMBUS,
NEW YORK LIFE INSURANCE
COMPANY, NEW YORK LIFE
INSURANCE AND ANNUITY
CORPORATION, SUNAMERICA LIFE
INSURANCE COMPANY, and THE
VARIABLE ANNUITY LIFE
INSURANCE COMPANY,
                    Intervenor-
                    Plaintiffs,

                v.

TYCO INTERNATIONAL GROUP, S.A.,
TYCO INTERNATIONAL, LTD., and
TYCO INTERNATIONAL FINANCE
S.A.,

                    Defendants.

---

Docket No. 07 CV 4659 (SAS)

**RULE 15(a) STIPULATION**



RECEIVED
CHAMBERS OF

OCT 1 8 2007

JUDGE SCHEINDLIN

---

        IT IS HEREBY STIPULATED by and between counsel to the parties

hereto, that pursuant to Federal Rule of Civil Procedure 15(a), plaintiff may file the

amended complaint attached hereto.

The parties further stipulate that the defendants' time to answer, move against, or otherwise respond to the amended complaint shall be November 15, 2007.


Dated:  New York, New York
        October 17, 2007


DECHERT LLP

By: _Kevin O'Brien_ /rs
Kevin O'Brien
Glenn Siegel
Alissa Rossman


30 Rockefeller Plaza
New York, New York 10112
(212) 698-3500

*Counsel for the Plaintiff*


GIBSON, DUNN & CRUTCHER LLP

By: _Marshall King_ /rs
Wesley G. Howell
Marshall R. King

200 Park Avenue, 47th Floor
New York, New York 10166
(212) 351-4000


SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By: _Joseph Sacca_ /rs
Jonathan J. Lerner
Joseph N. Sacca

4 Times Square
New York City, New York 10036
(212) 735-3000


*Co-Counsel for the Defendants*


PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP

By: _Andrew Gordon_ /rs
Gerard E. Harper
Andrew G. Gordon
Andrew N. Rosenberg


1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000

*Counsel for the Intervenor-Plaintiffs*


SO ORDERED:

_____
Shira A. Scheindlin
U.S.D.J.


Dated:  New York, New Yor
        October 18 , 2007

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Docket No. 07 CV 4659 (SAS)

THE BANK OF NEW YORK, as
Indenture Trustee,
                    Plaintiff,

v.

TYCO INTERNATIONAL GROUP, S.A.,
TYCO INTERNATIONAL, LTD., and
TYCO INTERNATIONAL FINANCE
S.A.,
                    Defendants.

**FIRST AMENDED COMPLAINT**

Plaintiff The Bank of New York, as Indenture Trustee (the "Trustee")

under the Indentures dated as of June 9, 1998 and November 12, 2003 (the "Indentures"),

by its undersigned attorneys, alleges on its own knowledge or otherwise on information

and belief:

### Nature of the Action

1.      This is an action to recover damages of over $4.1 billion for a

breach of the Indentures by Tyco International, Ltd. and its subsidiaries.

2.      In 1998 and again in 2003, defendant Tyco International Group,

S.A. (the "Company") borrowed in excess of $5.6 billion from the public. At the time,

the Company was a global conglomerate comprised of diverse businesses. In going to

the public markets to borrow, the Company promised the public that it would never

transfer all or substantially all of its assets to someone else unless the transferee assumed

the obligation to pay the Notes. This promise is embodied in Indentures dated 1998 and

2003 that govern the Notes. The Company is now breaking that promise.

1

3.      On January 13, 2006, the Company announced a plan to liquidate itself. This plan of liquidation took effect in late June 2007, and, as confirmed by the most recent 10-Q of the Company's parent, Tyco International, Ltd. ("Tyco"), the plan involved both breaking up the Company into three separate public companies and the liquidation of the Company that borrowed the $5.6 billion in Notes. In this "Asset-Stripping Transaction," Tyco distributed tens of billions of dollars in assets to its own shareholders.

4.      To do so, however, the Company needed to change the basic promise it made in the 1998 and 2003 Indentures, and demanded that plaintiff The Bank of New York, as Trustee under the Indentures, approve the Asset-Stripping Transaction by signing supplemental indentures. The Trustee's signature on the supplemental indentures is required under the Indentures for the Asset-Stripping Transaction to occur. A majority of the current holders of the Notes – including fiduciaries for pension plans, retirees, and other investors – directed the Trustee not to sign.

5.      Despite never receiving the requisite signatures on those supplemental indentures, the Company nonetheless completed the Asset-Stripping Transaction anyway, now claiming that the Trustee's failure to sign was inconsequential and that Tyco was allowed to proceed with the Asset-Stripping Transaction at will, notwithstanding clear contractual language to the contrary. Tyco thus spun off its two strongest businesses on June 29, 2007.    Tyco continues, however, to request the Trustee's signatures on the supplemental indentures. The Trustee therefore also seeks a declaratory judgment that it may not provide these required signatures.

2

6.      Although the Company announced its Asset-Stripping Transaction over a year ago, its plan to ignore the Indentures is a recent development. On April 27, 2007, the Company filed an Offer to Purchase and Consent Solicitation Statement with the SEC. These "Solicitation Documents" offered to acquire the Notes for a below-contract price, and also solicited the consent of the Company's bondholders to so-called "clarifying amendments" to section 8.1 of the 1998 Indenture and section 10.01 of the 2003 Indenture. Each of these two sections – identical boilerplate provisions known as "Successor Obligor Clauses" – forbids the Company from transferring "all or substantially all" of its assets unless the transferee assumes the Notes. The Solicitation Documents asked the bondholders to change the Successor Obligor Clauses to allow the Company to transfer the Notes – to make the bondholders involuntary lenders to, and their multi-billion-dollar debt obligation solely reliant on – the Company's least healthy business, which holds only a modest fraction of the Company's assets.

7.      The Solicitation Documents were misleading in characterizing the changes as mere "clarifying amendments" and stating that the Company could do as it pleased even if the bondholders did not consent. Controlling authority in this Circuit – *Sharon Steel Corp.* v. *The Chase Manhattan Bank*, 691 F.2d 1039 (2d Cir. 1982) – holds that whether a transaction implicates the Successor Obligor Clause depends on the transaction as a whole. When one bondholder sued claiming that the Solicitation Documents violated the federal securities laws in failing to disclose *Sharon Steel* (the "Securities Action"), the Company quietly issued a corrective disclosure and, at this Court's strong suggestion, ultimately extended the date by which bondholders could tender or retract their Notes and consents.

3

8.     The market commonly refers to the Company's tender offer/consent solicitation as a "coercive tender." Each bondholder who tendered its Notes had to deliver a consent to the proposed "clarifying amendments"; otherwise the Company would not accept the tender. The *tendering* bondholders of course do not care what the consent says because the Company is buying them out. The process is coercive because the consent is so damaging to *non-tendering* bondholders. Bondholders are placed under enormous pressure to forfeit what is rightfully theirs (the contract price) because, if 50.01% of them tender and the "clarifying amendments" are approved, the non-tendering bondholders are stuck as lenders to the Company's least healthy business and their Notes substantially devalued. The Company thus gave its public lenders a Hobson's choice:  tender at a below-contract price, or else become an unwilling creditor of a new entity lacking the many billions of dollars in assets of the Company to which the bondholders initially agreed to lend and most of which the Company has given away, for free, to Tyco's shareholders – the very people who benefited from the money that the Company borrowed from the bondholders.

9.     The 1998 Indenture provides for six different series of Notes, some comparatively short-term (with maturity dates between 2008 and 2013) and others longer term (with maturity dates of 2028 and 2029). Despite the varying terms, each Note is treated equally in a consent solicitation for voting purposes: one dollar, one vote. Both the 1998 Indenture and the 2003 Indenture, as supplemented, enable the Company to redeem the Notes at a fixed contractual price (the outstanding principal amount of the Notes, plus accrued but unpaid interest and the make-whole amount under the Notes), financing for which redemption the Company already has in place. Rather than simply

4

offer this price, however, the Company offered less than the contractual price for each series of Notes. In the hope of dividing and conquering, the Company offered better (but still below contract) prices for the short-term Notes than for the long-term Notes (the short-term Notes being cheaper to redeem than the long-term Notes). In this way, the Company sought to attract the short-term bondholders (who hold the majority of outstanding Notes) to consent – to get the more than 50% of all bondholders required to change the Indentures – to the detriment of its long-term public lenders.

10.     The Company's coercive tender failed, however. Barely one third of the bondholders tendered their Notes and consented to the "clarifying" amendments. Because the "clarifying" amendments could not be implemented without a majority vote and because a great majority of the bondholders opposed the Asset-Stripping Transaction absent full payment of the Notes under the terms of the Indentures, the Company could not modify the Indentures and hence could not proceed with its proposed transfer of the Notes without violating the Successor Obligor Clauses.

11.     But the Company proceeded anyway.     In the Solicitation Documents, the Company said that, notwithstanding the Successor Obligor Clauses (and the Company's failed effort to "clarify" them), it was free to carry out the Asset-Stripping Transaction, as it was initially structured, without the consent of the bondholders, by simply transferring the Notes to one of the three new companies – the one that is qualitatively and quantitatively the least desirable. This was so, says the Company, because after shedding its identity as a diversified conglomerate and spinning off its most lucrative businesses to its owners who benefited from the $5.6 billion the public lent the Company, the remnants of the Company would hold "all or substantially all" of the

5

Company's assets. Thus, the Company claimed that it could simply assign the Notes to a newly-formed entity called Tyco International Finance, S.A. ("TIFSA"), which would hold these remnants. The Company is incorrect.

12.    In *Sharon Steel*, the U.S. Court of Appeals for the Second Circuit interpreted successor obligor clauses that were substantively identical to those in the 1998 and 2003 Indentures. Considering the effect of the clauses in the context (as here) of a liquidation plan, the Second Circuit held "that boilerplate successor obligor clauses do not permit assignment of public debt to another party in the course of a liquidation unless 'all or substantially all' of the assets of the company *at the time the plan of liquidation is determined upon* are transferred to a single purchaser." 691 F.2d at 1051 (emphasis added). Here, the Company initially planned to spin off its most profitable assets and then transfer "substantially all" of its assets and the Notes to an entity that would receive only its remaining least desirable business. The assets that would remain after the spin-off would certainly not constitute "substantially all" of the Company's assets as of January 13, 2006, the date the Asset-Stripping Transaction was announced. *What's more, the Company has already announced that the liquidation is ongoing and it intends to liquidate yet another 10% of the remaining Company assets.*

13.    The transactions that the Company first described in the Solicitation Documents were substantively identical in sequence and structure to those that *Sharon Steel* ruled impermissible under the Successor Obligor Clauses – a point made (successfully) in the Securities Action that forced the Company to correct its disclosures. Recognizing as much, the Company changed the form, but not the substance, of its Asset-Stripping Transaction by, first, transferring all of its assets to three

6

newly-formed and different subsidiaries, then transferring the stock of those subsidiaries to Tyco all at once, and, finally, spinning off two of the three new companies. The Company's submissions to the Trustee, and the Trustee's present understanding of the Asset-Stripping Transaction, as it was ultimately carried out, show that the Company tried to change the timing and sequence of the Asset-Stripping Transaction in an attempt to evade the holding of *Sharon Steel*.

14.    But, whatever the precise steps the Company took to get there, the end result is the same. At the conclusion of the Asset-Stripping Transaction, the Company, the issuer of the Notes, will be gone; three new entities will hold all of its assets; and only one of these entities – the least desirable, the smallest of the three, and the one most likely to be a leveraged buy-out candidate (which would further subordinate the Notes) – will alone have assumed the obligation to the bondholders. This poses grave questions under the Indentures and *Sharon Steel's* controlling precedent.

15.    The Company may not engineer a path around the Successor Obligor Clauses. The Indentures do not allow the Company or Tyco to effect the Asset-Stripping Transaction without the consent of the majority of bondholders. And the Company could not revamp its Asset-Stripping Transaction to avoid the need for the Trustee to act. Supplemental indentures signed by the Trustee are still required for the completion of the Asset-Stripping Transaction.

16.    Under the Successor Obligor Clauses, the Notes must be assumed by the entities acquiring all or substantially all of those assets. Yet the Company has done just the opposite. The Company has structured its Asset-Stripping Transaction in a

way such that the Notes were not, and in fact could not have been assigned, in connection with the transfer of substantially all of its assets. Its plan was structured in an attempt to allow the Company fundamentally to change the nature of its business as a diversified conglomerate and spin off substantially all of its assets in a manner that disregards the Indentures.

17.     Accordingly, the Trustee, as Indenture Trustee, seeks a judicial determination that the Company's Asset-Stripping Transaction is unlawful under the controlling law of this jurisdiction and a violation of the Indentures, and that as a result, the bondholders are entitled to damages in excess of $4.1 billion.

## The Parties

**Plaintiff**

18.     Plaintiff The Bank of New York (the "Trustee") is a New York banking corporation with its principal place of business in New York City, New York. The Bank serves as Indenture Trustee for both the 1998 and 2003 Indentures.

**Defendants and Related Parties**

19.     Defendant Tyco International Group, S.A. (again, the "Company") is a Luxembourg company that is a wholly-owned subsidiary of Tyco International Ltd. ("Tyco"), a Bermuda corporation with its principal place of business in Princeton, New Jersey. Tyco is the guarantor of the Notes pursuant to the 1998 and 2003 Indentures.

20.     Before the completion of the Asset Stripping Transaction, the Company, which operates in over one hundred countries, was a diversified manufacturing

8

and service company that engaged in four lines of business. These were: (a) designing, manufacturing and distributing engineered electronic components, network solutions and wireless systems (the "Electronics Business"); (b) developing, manufacturing and distributing medical devices and supplies, diagnostic imaging agents and pharmaceuticals for use in clinical and home settings (the "Healthcare Business"); (c) designing, manufacturing, installing and servicing fire detection and suppression systems, as well as installing, monitoring and maintaining electronic security systems (the "Fire and Security Business"); and (d) manufacturing and distributing products such as industrial valves and controls, metal conduit and other items in the engineering design, electrical, fire protection, infrastructure and water/wastewater markets (the "Engineered Products and Services Business"). Transforming itself from a conglomerate with widely-diversified earnings, the Company, through the Asset-Stripping Transaction, has now broken these businesses into three new, separate public companies, thereby changing the fundamental character of the Company.

21.    One of these new companies is defendant Tyco International Finance, S.A. ("TIFSA"), a Luxembourg corporation that is a wholly-owned subsidiary of Tyco with its principal place of business in Luxembourg. The Company transferred its Fire and Security and Engineered Products and Services Businesses to TIFSA as part of the Asset-Stripping Transaction. The Company also purports to have unilaterally made TIFSA a co-obligor on the Notes. These steps involving the creation of TIFSA were integral to the Asset-Stripping Transaction.

22.    The second new entity is Tyco Electronics, Ltd. ("Tyco Electronics"), a Bermuda corporation with its principal place of business in Berwyn,

9

Pennsylvania. Tyco Electronics Group S.A. ("TEGSA"), a wholly-owned subsidiary of Tyco Electronics, is a Luxembourg corporation with its principal place of business in Luxembourg. The Company transferred its Electronics Business to Tyco Electronics as part of the Asset-Stripping Transaction, and then Tyco distributed the shares of Tyco Electronics to Tyco's shareholders. The creation of Tyco Electronics and the stripping of the Company's assets to give the same to Tyco's shareholders were integral to the Asset-Stripping Transaction.

23.    The third new entity is Covidien Ltd. ("Covidien"), a Bermuda corporation with its principal place of business in Mansfield, Massachusetts. Covidien International Finance S.A. ("CIFSA"), a wholly-owned subsidiary of Covidien, is a Luxembourg corporation with its principal place of business in Luxembourg. The Company transferred its Healthcare Business to Covidien as part of the Asset-Stripping Transaction, and then Tyco distributed the shares of Covidien to Tyco's shareholders. The creation of Covidien and the stripping of the Company's assets to give the same to Tyco's shareholders were integral to the Asset-Stripping Transaction.

### Jurisdiction & Venue

24.    Jurisdiction over the subject matter is based on 28 U.S.C. §§ 1332 and 2201(a). This action is between a citizen of a State and a citizen or subject of a foreign state, and involves an amount-in-controversy that exceeds the sum or value of $75,000.

25.    Venue in this district is proper pursuant to 28 U.S.C. § 1391(a).

10

26.    Section 10.8 of the 1998 Indenture and Section 13.04 of the 2003 Indenture provide that New York State law governs the Indentures and the Notes.

## Factual Background

**The Notes**

27.    There are six series of notes issued under an indenture dated June 9, 1998 between the Company and the Trustee (as supplemented, the "1998 Indenture"): 6.125% unsecured notes due 2008 (CUSIP No. 902118AM0); 6.125% unsecured notes due 2009 (CUSIP No. 902118AJ7); 6.75% unsecured notes due 2011 (CUSIP No. 902118AY4); 6.375% unsecured notes due 2011 (CUSIP No. 90211BC1); 7.0% unsecured notes due 2028 (CUSIP No. 902118AC2); and 6.875% unsecured notes due 2029 (CUSIP No. 902118AK4).

28.    The remainder of the Notes were issued under an indenture dated November 12, 2003 between the Company and the Trustee (as supplemented, the "2003 Indenture," collectively with the 1998 Indenture, the "Indentures"): 6.0% unsecured notes due 2013 (CUSIP No. 902118BK3).

29.    There are, then, five series of Notes with comparatively near-term maturities ('08, '09, '11, '11, and '13) and two with long-term maturities ('28 and '29). For each, the Indentures provide a so-called "make-whole" amount in the event that the Company wishes to pay off the Notes before their maturity dates. This make-whole amount – an amount in excess of the principal amount of a Note plus accrued but unpaid interest – is intended to compensate the bondholder for prematurely forgoing the amounts

11

that would otherwise be earned if the Company awaited the maturity dates based on discounted present value of the forfeited amount.

30.     Consistent with market practice, the make-whole amount required by the Indentures represents the net present value of all remaining principal and interest payments through the scheduled maturity. This amount is determined by using a discount rate equal to the current U.S. Treasury Notes of comparable maturities plus a pre-set number of basis points above the Treasury rate.  This discount rate is commonly expressed in terms of "T" plus the number of basis points added to the Treasury rate. Thus, the expression "T+25" means that the bondholder is entitled, as compensation for premature redemption of the Notes, to the sum of all amounts payable under the Notes through maturity discounted to present value using a discount rate equal to the interest rate under a U.S. Treasury Note of comparable maturity plus 25 basis points.  The lower the number of added basis points – that is, the closer to the Treasury rate – the higher the make-whole amount.

31.     This make-whole amount was built into the contracts between the Company and its public lenders.  It is the contract price for early redemption of the Notes. The contract price for the 6.125% Notes due November 1, 2008 and January 15, 2009, as well as the 6.875% Notes due January 15, 2029 and 6.0% Notes due November 15, 2013, is T+25.  The contract price for the 6.75% Notes due October 15, 2011 is T+35, and for the 7.0% Notes due June 15, 2028, T+15.  Payment of this make-whole amount is part of the promise, part of the trust, between the borrowing Company and its lending bondholders if, for whatever reason (including to benefit the Company's shareholders, whose interests are and should be subordinate to the contract rights of its lenders), the

12

Company wants to redeem or must redeem the Notes before the Notes would otherwise be due. As the term "make-whole amount" suggests, the formula simply makes the bondholders "whole" – nothing more.

**The Successor Obligor Clauses**

32.    The Company issued over $4.6 billion of public debt under the 1998 Indenture and over $1 billion of public debt under the 2003 Indenture.

33.    Under the Indentures governing the Notes, the Company cannot sell, transfer or convey "all or substantially all" of its assets to another entity unless that transferee entity assumes the Company's obligations under the Notes. Each of the Indentures specifically includes a Successor Obligor Clause, which says that the Company:

> **will not merge or consolidate with any other Person *or sell or convey all or substantially all of its assets to any Person*, unless** (i) either the Issuer or such Guarantor, as the case may be, shall be the continuing entity, or **the successor entity** or the Person which acquires by sale or conveyance substantially all the assets of the Issuer or such Guarantor, as the case may be (if other than the Issuer or such Guarantor, as the case may be) *shall expressly assume the due and punctual payment* of the principal of and interest on all the Securities or the obligations under the Guarantees, as the case may be, according to their tenor, and the due and punctual performance and observance of all of the covenants and agreements of this Indenture to be performed or observed by the Issuer or such Guarantor, as the case may be, by supplemental indenture satisfactory to the Trustee, execute and delivered to the Trustee by such corporation . . . .

(1998 Indenture, at § 8.1; 2003 Indenture, at § 10.01 (emphasis added).)

13

34.    These Successor Obligor Clauses are intended to serve the interests of both borrower and lender. Each Successor Obligor Clause allows the borrower (here, the Company), to liquidate or otherwise transform its business free of debt, while at the same time assuring the lenders (here, among others, the bondholders) a continuity of the assets on which they extended credit. The Successor Obligor Clauses therefore protect bondholders from the disposition of substantially all of a company's assets unless the Notes follow those assets. Failing to follow the terms of the Successor Obligor Clauses by permanently transferring substantially all of the Company's assets without also assigning the Notes to the transferee(s) receiving those assets is a breach of these Successor Obligor Clauses.

**The Asset-Stripping Transaction, As Initially Planned**

35.    On January 13, 2006, the Company announced a plan to separate the Company's portfolio of diverse businesses into three new, independent, publicly-traded companies: "one for its healthcare business (Covidien); one for its electronics businesses (Tyco Electronics); and a third for its fire and security and engineered products and services business," initially the Company, which was then to transfer the business to TIFSA.

36.    The Solicitation Documents, issued on April 27, 2007, said that the first step of the Asset-Stripping Transaction, as then planned, involved the transfer of the Company's Healthcare and Electronics Businesses to two newly formed entities – respectively, Covidien and Tyco Electronics. According to the Company, this meant that the two new entities would assume 73% of the Company's contingent and corporate

14

liabilities and assets: Covidien would assume 42% of its contingent and corporate liabilities and assets, and Tyco Electronics would assume 31% of contingent and corporate liabilities and assets. The Company then intended to spin off these two new entities to Tyco's shareholders.

37.    The next step of the Asset-Stripping Transaction involved the transfer of all of the Company's remaining assets – its Fire and Security and Engineered Products and Services Businesses – to a third newly formed entity, TIFSA, and the assumption of the Notes by TIFSA. This was to be followed by the liquidation of the Company.

38.    The Solicitation Documents consisted of an offer to purchase the Notes (the "Tender Offer") and a consent solicitation statement seeking the bondholders' consent to certain proposed amendments to the Indentures (the "Proposed Amendments"). The two were intertwined insofar as the Company's obligation to purchase the Notes pursuant to the Tender Offer was purportedly conditioned upon the bondholders' consent to the Proposed Amendments.

39.    In the Proposed Amendments, the Company sought to reconcile the Asset-Stripping Transaction – by which the Company would transfer its Notes to a newly formed entity, TIFSA, that is qualitatively and quantitatively inferior to the other two businesses that would be spun off – with the Indentures' Successor Obligor Clauses, which prohibit the transfer of the Notes unless the Company sells "all or substantially all" of its assets to the transferee. In relevant part, the Proposed Amendments provided:

In connection with the Separation Transactions (as defined in Section 8.1(c)), the provisions of Section 8.1(a) shall be interpreted as follows:

(i) the transfer of a portion of the Issuer's assets to Tyco Electronics (as defined in Section 8.1(c)) and a portion of the Issuer's assets to Covidien (as defined in Section 8.1(c)), as contemplated by the Separation Transactions, shall be deemed **not** to be a sale or conveyance of all or substantially all of the Issuer's assets or Tyco's assets;

(ii) **the transfer of a portion of the Issuer's assets to Tyco International Finance S.A. (as defined in Section 8.1(c)), as contemplated by the Separation Transactions, shall be deemed to be a conveyance of substantially all of the Issuer's assets to Tyco International Finance S.A.** and be deemed not to be a sale or conveyance of all or substantially all of Tyco's assets; and

(iii) the distribution by Tyco to its shareholders of the shares of Covidien Ltd. and Tyco Electronics Ltd. shall be deemed **not** to be a sale or conveyance of all or substantially all of Tyco's assets.

(Solicitation Documents, at A-1 (emphasis added).)

40. These allegedly "clarifying" Proposed Amendments rewrote the Successor Obligor Clauses solely to suit the Asset-Stripping Transaction as it was then structured. The Proposed Amendments were intended to be nothing more than an agreed upon fiction between the Company and the tendering bondholders, who upon acceptance of the tender would no longer have any pecuniary interest in the Company or the assets because they would have accepted the offer and hence would not care what the consequences of the proposed amendments would be.

41. In fact, the Company sought the "clarifying" amendments to bless its Asset-Stripping Transaction. The Company sought to have the transfer of assets to Tyco Electronics and Covidien deemed *not* to be a transfer of "all or substantially all" of the Company's assets, even though through those transfers the Company would cease to

16

be a diversified conglomerate and spin off businesses representing 66% to 80% of its assets to its shareholders. At the same time, according to the Company, the subsequent transfer of assets to TIFSA, which would include the qualitatively and quantitatively least desirable remaining businesses, representing as little as 20% to 33% of its assets, would have been a transfer of "all or substantially all" of the Company's assets for purposes of transferring the Notes under the Successor Obligor Clauses because only that portion would remain after the initial transfers. The Company was of the view that the "all or substantially all" determination should be made only *after* the first two steps of the Asset-Stripping Transaction were complete, its most profitable businesses were spun off, and the diversified conglomerate was reduced to the qualitatively and quantitatively inferior Fire and Security and Engineered Products and Services Businesses.

**The Coercive Tender Offer**

42.     On May 9, 2007, less than two weeks after the Company's filing of the Solicitation Documents, a bondholder commenced the Securities Action to reveal the parallel between *Sharon Steel* and the Asset-Stripping Transaction. Two days later, the Company issued a corrective disclosure explaining the Securities Action, but the Company failed to mention the disclosure on its website or in a lengthy and otherwise detailed press release, prominently displayed on its website, describing the status of its Tender Offer.

43.     The Company, it seems, was confident that the coercive nature of the Tender Offer coupled with its pricing would assure the Tender Offer's success. The majority of the Notes under the 1998 Indenture, and all those under the 2003 Indenture,

17

bear relatively short-term maturity dates.  Each Indenture says that a simple majority of bondholders under each may amend the Indentures.   To induce a split among the bondholders, the Company offered to pay holders of the shorter-term Notes a price more closely approaching the contractual price than the more substantial sums required to approach or match the contract price on the longer-term Notes.   The Company hoped that the short-term bondholders, who would receive close to the amount owed to them under the Indentures, would abandon the long-term bondholders in favor of consenting to the "clarifying" amendments, thereby giving the Company the simple majority needed to effect the Asset-Stripping Transaction.

44.    For the Company, the parent of which had a market capitalization at the time in excess of $60 billion, the difference between fulfilling its promise to its public lenders and the coercive course the Company chose was, depending on Treasury rate fluctuations, a relatively modest amount of about $95 million – a tiny fraction as compared to the tens of billions being distributed to shareholders.  The majority of this difference came at the expense of the long-term bondholders.   Nonetheless, the Company's attempt to buy off the short-term bondholders did not work.  Scarcely a third of the bondholders under each Indenture tendered their Notes to the Company.

45.    This overwhelming rejection, coupled with the obvious likeness of the Asset-Stripping Transaction, as originally structured, to the one that violated the successor obligor clauses in *Sharon Steel*, sent the Company back to rewrite a script to deny its bondholders their rightful contractual price.

18

46.     Short of abandoning the Asset-Stripping Transaction, however, nothing the Company did could avoid the Successor Obligor Clauses. Yet the Company did proceed.

**The Asset-Stripping Transaction, As Actually Completed**

47.     The problems with Tyco's initial plans for the Asset-Stripping Transaction were revealed during the course of the Securities Action. In addition to making a corrective disclosure, Tyco made certain alterations to its plans before carrying them out. Rather than spinning off its assets in distinct initial steps, leaving those now held by TIFSA as the sole remnants of the former conglomerate, the Company first, in the words of Tyco's most recent 10-Q, "contributed" all of its operating assets (and liabilities) to three separate new entities – Covidien, Tyco Electronics and TIFSA – without, as the Company was required to do, having those entities assume the Notes. The stock of these subsidiaries was then transferred to Tyco, along, it seems, with the Notes, a transfer that purportedly occurred, seemingly like magic, without the Trustee's approval. According to Tyco's 10-Q, the Company was then "put in liquidation." Subsequently, Covidien and Tyco Electronics were spun off to their shareholders, leaving only TIFSA. Tyco and TIFSA, according to Tyco, have since become co-obligors on the Notes, although neither the bondholders nor the Trustee ever approved any of these changes.

48.     The end results of the Asset-Stripping Transaction, as it was ultimately carried out, are identical to those first proposed. Tyco's two most successful businesses have been spun off to shareholders, with the Company getting nothing in return, and the Notes have been purportedly transferred to TIFSA, the only remaining

business.  The Company's efforts to reorder the particular steps and sequence were purely

an attempt to engineer a solution to the problem posed by *Sharon Steel*.  Nevertheless, as

the end result is the same, the legal determinations must also be the same.  Regardless of

the individual actions, the Asset-Stripping Transaction, as ostensibly completed, is a

violation of both the Indentures and *Sharon Steel*'s controlling precedent.

**Sharon Steel**

49.     The Company's Asset-Stripping Transaction, if fully consummated

through execution of supplemental indentures, would violate the Successor Obligor

Clauses as the controlling legal authority interprets them in this jurisdiction.  The Second

Circuit's decision in *Sharon Steel* concerned an asset-stripping transaction that is

materially indistinguishable from the Asset-Stripping Transaction that has occurred here.

In *Sharon Steel*, the Second Circuit Court of Appeals held that successor obligor clauses

"do not permit assignment of the public debt to another party in the course of a

liquidation unless 'all or substantially all' of the assets of the company at the time the

plan of liquidation is determined upon are transferred to a single purchaser."  *Id*. at 1051

(emphasis added).  Under the law of this Circuit, therefore, the "all or substantially all"

determination must be made as of January 13, 2006, when the Company approved the

Asset-Stripping Transaction.  As of that date, the assets that the Company planned to

transfer to TIFSA clearly did not constitute "all or substantially all" of the Company's

assets.

50.     The Company knows as much.  Notwithstanding its previous

public disclosure of the transaction steps in the Solicitation Documents, the Company has

since embarked on a shell game to obscure the *Sharon Steel* parallel. Among other things, it appears that with respect to the revised Asset-Stripping Transaction, rather than have the new TIFSA entity assume the Notes and receive the Company's remaining post-Spin-Off Transaction assets at the same time, as contemplated in the Solicitation Documents, the new structure scheduled the assumption of the Notes to take place on May 30, 2007 and the asset transfers to take place a day later on June 1. The result is still the same. At the conclusion of these transactions, the Company that borrowed from the public will be liquidated, three *new* entities will hold all of its assets and only one of the new entities – the least desirable of the three – will purport to assume the Notes. This result, if permitted, is a violation of both the Indentures and *Sharon Steel*'s controlling precedent – regardless of the path that the Company takes to get there.

**The Company's Breaches**

51.    The Company's Asset-Stripping Transaction as it supposedly occurred violates the Indentures in a variety of ways. The first and most transparent is that, no matter the timing or sequence of the Company's asset-stripping exercise, the substance of the Company's Asset-Stripping Transaction is exactly what *Sharon Steel* held that a public borrower may not do – unburden itself of public debt through a calculated plan of piecemeal dispositions. Another is that assets were initially transferred within Tyco without transfer of the Notes. Yet a third is that Notes were purportedly transferred without the Trustee's approval of a supplemental indenture. Finally, and equally violative, is the transfer of Tyco Electronics and Covidien, for no consideration, to Tyco's shareholders.

21

52.    The Company claims that the assets being transferred to Tyco Electronics and Covidien do not constitute "all or substantially all" of the Company's assets, such that the transfer and assumption of the Notes at that step in the Asset-Stripping Transaction was neither required nor permitted. Any relevant qualitative or quantitative measure of those assets demonstrates the opposite.

53.    Qualitatively, through its Asset-Stripping Transaction, the Company planned drastically to change the nature of its business, spinning off substantially all of the assets that originally induced bondholders to invest in the Company. When the Company went to the public markets to borrow over $5.6 billion in 1998 and 2003, the Company emphasized its status as "a diversified manufacturing and service company." The Company touted its strength as a global conglomerate in marketing the Notes that it issued under both the 1998 and 2003 Indentures, stressing the broad range of assets and diversified cash flows available to support the Notes. According to the offering documents marketing the Notes, the Company's strategy was to expand in a variety of businesses that would insulate lenders from the vagaries of the market. The Company stressed its being a "low-cost, high quality producer and provider in each of its markets," and "promot[ing] its leadership and position by investing in existing businesses, developing new markets and acquiring complementary businesses and products."

54.    The Solicitation Documents, by contrast, indicate that the Company abandoned the operating strategy it used when borrowing in the first place. Instead, the Company now said that it was creating three new "independent, focused companies," spinning off the most attractive and successful businesses to two of them.

The Company effectively tried to force its public lenders to become involuntary lenders of the least attractive and successful of the resulting companies.

55.    Such a radical transformation of a company, regardless of the precise percentage of assets transferred, indicates that, qualitatively, a disposition of substantially all assets has taken place to transferees that will not assume the Notes. Successor obligor clauses are designed to ensure the continuity of assets by maintaining the connection between the principal operating assets that induced an investment and the investment itself.    The Company's spin-off of its most successful and substantial principal assets without having those transferees assume the outstanding Notes violated these principles and the terms of the Indentures.

56.    Indicative of its plan to transfer the Company's assets into the least attractive asset, the Company chose to transfer the Notes to what will likely be its most highly leveraged business. An April 23, 2007 report by Morgan Stanley Research North America entitled "Tyco International Ltd. – A Close Look at Tyco's Post-Breakup Pieces: Low Risk With Substantial Upside" (the "Tyco Report") explains that "[w]hile [TIFSA] will be highly levered with $4B of debt, [Covidien] and [Tyco Electronics] will each be recapitalized." TIFSA will be saddled with approximately $4.0 billion of debt, resulting in a debt/EBIT ratio of 2.7x.  By contrast, Tyco Electronics will have $2.8 billion of debt and a comparatively low debt/EBIT ratio of 1.5x, and Covidien will have $3.2 billion in debt and an even lower debt/EBIT ratio of 1.4x.

57.    That is not all.  The bondholders will also be stuck lending to an entity with significantly lower profit margins than the Company in which they had

initially invested. The Tyco Report highlights a significant disparity in operating margins, which are much higher at Covidien and Tyco Electronics than at TIFSA. For the fiscal year 2006, Covidien's Healthcare Business enjoyed an overall operating margin of 22.2%, while the Tyco Electronics Business enjoyed an overall operating margin of 13.6%. During the same period, TIFSA's Fire and Security and Engineered Products and Services Businesses' operating margin was only 8.0%. This disparity is expected to persist. By 2008, the Tyco Report estimates that Covidien's operating margin will remain steady at 20.9%, Tyco Electronics' will rise slightly to 15.0%, and TIFSA's will rise to only 9.9%.

58.    Finally, the bondholders will be stuck with the business with the bleakest prospects for growth. The Tyco Report explains that two of the main business lines within TIFSA – ADT and Security Products – are tied to residential construction and that "near term growth forecasts are tempered by expected weakness" in this market. By contrast, Covidien's prospects "are fundamentally strong and provide stability . . . as the company participates in markets that are relatively consistent [in] demand and are mostly oligopolistic in nature," while Tyco Electronics "has a generally stable revenue base that is not tied to any one or two cyclical end markets."

59.    This is among the reasons why the private equity market has targeted TIFSA as a candidate for a leveraged buy-out, for which the entity is so clearly tailored. Once the three entities are on their own, the Tyco Report's own numbers reflect that TIFSA would be easy prey for a new buyer. Once again, the shareholders would benefit. Once again, the bondholders would only suffer under the onus of additional and

undoubtedly senior debt. A quantitative comparison of TIFSA with Covidien and Tyco Electronics confirms this point.

60.    On a quantitative basis, the spin-off of the Healthcare and Electronics Businesses collectively constitute the sale of "all or substantially all" of the Company's assets. Relying entirely on book value, the Company argued previously that its Healthcare and Electronics Businesses account for only 53% of the Company's total assets. Book value – an accounting fiction of marginal relevance to market value – is not the appropriate measure of the Company's various businesses. By various other quantitative metrics, 66% to 80% of the Company's assets will be spun off – "substantially all" of the Company's assets – leaving only 20% to 34% of the Company's assets to support the Notes.

61.    In absolute terms, the Company's Healthcare and Electronics Businesses constituted 80% of the Company's operating income for the first six months of the fiscal year 2007: operating income for the consolidated Company operations was $2.336 billion, while operating income for TIFSA's Fire and Security and Engineered Products and Services Businesses was only $482 million. In fiscal year 2006, the comparable figure was 74%, attesting to a downward spiral for the latter. The Healthcare and Electronics Businesses are estimated to account for $3.924 billion of free cash flow in fiscal year 2007, in comparison to free cash flow of only $1.274 billion for the Fire and Security and Engineered Products and Services for the same period. The Healthcare and Electronics Businesses' free cash flow are therefore projected to comprise 67.5% of the Company's total free cash flow.

62.     In the fiscal year 2006, the Company's consolidated EBITDA was $7.733 billion. The Fire and Security and Engineered Products and Services Businesses generated only $2.682 billion of EBITDA. The Healthcare and Electronics Businesses therefore generated approximately two-thirds of the Company's consolidated EBITDA during fiscal year 2006.

63.     This range of 66% to 80% is further supported by the Company's own allocations of corporate and contingent liabilities and assets – 73% to Covidien and Tyco Electronics and only 27% to TIFSA. This reflects the Company's views on the values of its three components. Overall, the combination of measurements of operating income, free cash flow and EBITDA, which reflect that 80%, 67.5% and 66% of these all important measurements of earnings capacity – and hence value – are being transferred, combined with the Company's own allocations of 73% of corporate liabilities and assets being transferred, demonstrate that approximately 66% to 80% of the Company's assets are being transferred to Covidien and Tyco Electronics.

64.     The above quantitative metrics, as well as the qualitative shift in the Company's strategy from being a diversified conglomerate to a business focusing on its slow growing and lowest margin business, indicate that the spin-off of the assets now held by Covidien and Tyco Electronics constituted a sale of "all or substantially all" of the Company's assets. The bondholders did not expect their Notes to be supported by a shell of the Company's former self. It is fair to say that Tyco's executives – and the professionals who assisted them in shaping the Asset-Stripping Transaction, in any of its proposed iterations – would not consider 27% of their compensation and fees for this Transaction to constitute "all or substantially all" of the amounts due them. Neither

26

should the pension funds, retirees and other investors from which the Company borrowed.

### First Claim for Relief
### (Breach of Contract)

65.    The Trustee repeats and realleges each and every allegation set forth in paragraphs 1 through 64 hereof as though fully set forth herein.

66.    The Indentures are valid and enforceable contracts to which the Company and the Trustee are parties.

67.    The Successor Obligor Clauses of the Indentures require a successor to assume the Company's obligations under the Notes and Indentures in connection with a sale of "all or substantially all" of the Company's assets. Such an assumption of the Notes in connection with a sale of less than "substantially all" of the Company's assets would be a breach of the 1998 and 2003 Indentures.

68.    The Asset-Stripping Transaction as it purportedly occurred on June 29, 2007 violates the Successor Obligor Clauses of the Indentures for a number of reasons.

69.    *First*, under *Sharon Steel*, the "all or substantially all" determination must be made as of January 13, 2006, when the Company approved and announced the Asset-Stripping Transaction. As of that date, the assets that the Company has now transferred to TIFSA did not (and still do not) represent "all or substantially all" of the Company's assets. Nor did the Trustee ever sign, as it was required to do, supplemental indentures authorizing the Asset-Stripping Transaction.

27

70.    *Second*, even if that were not the case, transferring the Company's most profitable assets to Tyco Electronics and Covidien as part of the Asset-Stripping Transaction *does* constitute a sale of "all or substantially all" of the Company's assets, and those transfers without a concurrent assumption of the Notes by such entities renders the Company in breach of the 1998 and 2003 Indentures.

71.    *Third,* the first step in the Transaction effected a transfer of all or substantially all of the Company's assets to newly-formed entities that did not assume the Notes.

72.    *Finally,* the penultimate step in the Transaction purported to transfer the Notes from TIGSA to Tyco without the requisite supplemental indenture.

73.    *Sharon Steel* dictates that such violations of the Successor Obligor Clause result in both (i) an obligation to pay the interest and principal due and owing on the notes, and (ii) the make-whole amounts provided for under the Notes.

74.    Accordingly, the bondholders here are entitled to payment of all principal and accrued but unpaid interest due and owing under the Notes.  In addition, the bondholders are entitled to the make-whole amount set forth in the Notes and calculated thereunder.

### Second Claim for Relief
### (Declaratory Judgment)

75.    The Trustee repeats and realleges each and every allegation set forth in paragraphs 1 through 74 hereof as though fully set forth herein.

76.    The Trustee is entitled to a judgment declaring that the Asset-Stripping Transaction violates the law regarding the application of successor obligor clauses as established by *Sharon Steel*, and violates the Successor Obligor Clauses contained in the 1998 and 2003 Indentures.

77.    Due to the unlawfulness of the Asset-Stripping Transaction, the Trustee is also entitled to a judgment declaring that the Trustee may not sign, as Tyco has demanded and continues to demand, the proposed supplemental indentures.

### Third Claim for Relief
### (Trustee's Fees and Expenses)

78.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 77 hereof as though fully set forth herein.

79.    Section 5.6 of the 1998 Indenture and Section 7.6 of the 2003 Indenture requires Defendants to pay the Trustee reasonable compensation and to pay and reimburse the Trustee for all reasonable expenses, including the fees and expenses of counsel and to indemnify the Trustee against liabilities incurred in connection with administration of its duties under the Indentures.

80.    The Trustee is entitled to a declaratory judgment that Defendants are obligated to pay the Trustee reasonable compensation and to pay

29

and reimburse the Trustee for all reasonable expenses, including the fees and expenses of its counsel incurred in connection with the steps taken by the Company to implement the Asset-Stripping Transaction, including the fees and expenses of counsel incurred resolving the proper interpretation of the Indentures, including those in connection with this action.

### Prayer for Relief

WHEREFORE, the Trustee seeks relief as follows:

(i)     On its First Claim for Relief, awarding the Trustee damages to be distributed to the bondholders and in the amount to be determined by the Court, but which is not less than $4.1 billion dollars;

(ii)    On its Second Claim for Relief, a declaratory judgment that:

(a)     the Asset-Stripping Transaction violates the law regarding the application of Successor Obligor Clauses as established by *Sharon Steel*;

(b)     a declaratory judgment that the Asset-Stripping Transaction violates the Successor Obligor Clauses of the 1998 and 2003 Indentures;

(c)     a declaratory judgment that the Indentures require the Company to obtain the signature of The Bank of New York, as Trustee, on the Company's proposed supplemental indentures in order to effect the Asset Stripping Transaction, and that

30

without the Trustee's signature, the Asset Stripping Transaction is null and void; and

(d)    a declaratory judgment that The Bank of New York, as Trustee under the Indentures, may not properly sign the proposed supplemental indentures to effect the Transaction;

(iii)    On its Third Claim for Relief, a declaratory judgment that Defendants are obligated to pay the Trustee reasonable compensation and to pay and reimburse the Trustee for all reasonable expenses, including the fees and expenses of its counsel incurred in connection with the steps taken by the Company to implement the Asset-Stripping Transaction, including the fees and expenses of counsel incurred resolving the proper interpretation of the Indentures, including those in connection with this action; and

(iv)    Awarding the Trustee such other relief as the Court deems just and proper.

Dated: October ___, 2007

Respectfully submitted,

DECHERT LLP

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP

By: _____
Kevin O'Brien
Glenn Siegel
Alissa Rossman

By: _____
Gerard E. Harper
Andrew G. Gordon
Andrew N. Rosenberg

30 Rockefeller Plaza
New York City, New York 10112
(212) 698-3500

1285 Avenue of the Americas
New York City, New York 10019
(212) 373-3000

*Co-Counsel for the Trustee*

*Co-Counsel for the Trustee*