UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE BANK OF NEW YORK, as
Indenture Trustee,

                    Plaintiff,

          v.

TYCO INTERNATIONAL GROUP, S.A.,
TYCO INTERNATIONAL, LTD., and
TYCO INTERNATIONAL FINANCE
S.A.,

                    Defendants.

Docket No. 07 CV 4659 (SAS)


# MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT


Dechert LLP
30 Rockefeller Plaza
New York, New York 10112
(212) 698-3500

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000

*Attorneys for Plaintiff*

<u>**TABLE OF CONTENTS**</u>

Page

Statement of the Case ................................................................................................5

    The Parties ......................................................................................................5

    The Notes .........................................................................................................6

    The Make-Whole Provisions .........................................................................7

    The Successor Obligor Clauses .....................................................................8

    The Asset-Stripping Transaction ...................................................................9

    The Coercive Tender Offer .............................................................................9

    The Securities Action ...................................................................................12

    The Breach of Contract ................................................................................13

    This Action ....................................................................................................15

Argument ................................................................................................................16

THE COURT SHOULD GRANT PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT ...........................................................................................................16

    A.    The Asset-Stripping Transaction Violates the Successor Obligor Clauses ...........16

        1.    Defendants' Position Cannot Be Reconciled With *Sharon Steel* .............. 16

        2.    The Company Transferred the Notes Without Transferring All or
              Substantially All of the Assets ................................................................. 19

        3.    The Transfer of the Subsidiaries' Stock to Tyco Also Violated the
              Successor Obligor Clause ........................................................................ 20

    B.    The Company Failed To Obtain The Trustee's Signature On The
        Supplemental Indentures ...........................................................................21

    C.    The Company's Breach of the Indenture is an Event of Default, Entitling
        Defendants to the Make-Whole ................................................................23

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*June* v. *Town of Westfield*,
370 F.3d 255 (2d Cir. 2004)...................................................................................16

*Omni Quartz, Ltd.* v. *CVS Corp.*,
287 F.3d 61 (2d Cir. 2002).....................................................................................16

*Sharon Steel Corp.* v. *Chase Manhattan Bank, N.A.*,
691 F.2d 1039 (2d Cir. 1982)............................................................................ *passim*

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(c) ...............................................................................................16

Local Rule 56.1 ..........................................................................................................5

This Court should grant summary judgment to plaintiff Trustee Bank of New York (the "Trustee") against defendant Tyco International Group, S.A. (the "Company"), as obligor, and defendant Tyco International Ltd. ("Tyco"), as guarantor, in the amount of the total principal, accrued but unpaid interest, plus the contractual premium now due and owing on Notes the Company sold to the public.

So to rule would be to keep faith with the Second Circuit's seminal decision in *Sharon Steel Corp.* v. *Chase Manhattan Bank*, 691 F.2d 1039 (2d Cir. 1982), in which the Court of Appeals held that boilerplate successor obligor clauses prohibit the issuer of public debt from engaging in a coordinated and wholesale disposition of its assets – basically, breaking the company apart – and then assigning the public debt to whatever the company had left behind.

No genuine issue of material fact would burden such a ruling here. No dispute exists that:

- In 1998 and 2003, the Company, then a diversified conglomerate, sold Notes to the public, of which $3.7 billion in principal remain outstanding.

- In "Successor Obligor Clauses," the Indentures which govern these Notes prohibit their transfer unless the transferee also obtains all or substantially all of the Company's assets.

- The Indentures enable the Company to transfer "all or substantially all" of its assets to another entity without transfer of the Notes by allowing the Company prematurely to redeem the Notes by paying their holders (in addition to principal and accrued but unpaid interest) a redemption premium set forth in the Notes.

- In January 2006, Tyco announced a plan to divide the Company into three new separate public companies, and to spin off two of these new companies to Tyco's stockholders for free.

- Rather than exercise its right to redeem the Notes for the price set forth in the Notes, in April 2007, the Company made a coercive tender offer for the Notes at a price below the contractual premium, which if successful would have stripped the Indentures of the Successor Obligor Clauses.

- The Company's offer failed to elicit the tenders necessary to strip the Indentures of the Successor Obligor Clauses.

- Despite this, in May 2007, the Company asked the Trustee to sign supplemental indentures enabling the Company to effect the transaction for which the Company had tried and failed to obtain consent from the Noteholders, which the Trustee declined to do.

- Nevertheless, in June 2007, the Company implemented the plan by transferring all its assets into three new subsidiaries and transferring all those assets to its parent Tyco without properly transferring the Notes pursuant to a supplemental indenture signed by the Trustee.

- Tyco gave away two of its three companies to its stockholders, companies that represented well over half of Tyco's assets as of January 2006.

- In the same transaction, the Company unilaterally purported, again without a supplemental indenture signed by the Trustee, to name as a co-obligor on the Notes Tyco's newly formed and one remaining subsidiary, which represented no more than a third of Tyco's value as of January 2006.

•    Thereafter, Tyco liquidated the Company, which was still properly the sole issuer of and obligor on the Notes.

•    The Company had to transfer all of its assets and be liquidated to avoid a mammoth tax liability in the Company's country of origin, Luxembourg, the imposition of which would have made Tyco's break-up plan economically infeasible.[1]

These undisputed (and indisputable) facts entitle the Trustee to summary judgment. In *Sharon Steel*, the Second Circuit ruled, as a matter of law, that "boilerplate successor obligor clauses do not permit assignment of the public debt to another party in the course of a liquidation unless 'all or substantially all' of the assets of the company at the time the plan of liquidation is determined upon are transferred to a single purchaser." The Court of Appeals held further, again as a matter of law, that assets comprising 51% of the issuer's total assets "at the time the plan of liquidation [was] determined" were not "even close" to representing "all or substantially all" of the issuer's assets, and therefore the issuer could not assign its public debt to the company holding those assets. Accordingly, the Court determined that the indenture trustees were entitled to summary judgment in the full amount of the principal on the notes, the accrued but unpaid interest, plus the premium that the issuer should have paid for premature redemption of the notes.

*Sharon Steel* is not only controlling authority; its holding is common sense. The then-new question for the Second Circuit was whether Successor Obligor Clauses permitted an issuer of public debt, in a series of related transactions, to dispose of substantial assets and then dump the debt on what was left, all on the theory that the remaining assets after the initial transfers constituted "all or substantially all" of the assets. In *Sharon Steel*, the issuer announced

---

[1] *See* Plaintiff's Local Rule 56.1 Statement of Undisputed Facts in Support of its Motion for Summary Judgment ("56.1 Statement") at ¶¶ 62-64.

a plan to sell all its assets, which it did in three phases – selling one business, then a second, and then leaving its notes with the third business for sale. To try to harmonize these related transactions with the Successor Obligor Clauses, the issuer argued – in a self-fulfilling argument Tyco echoes here – that the remainder was by definition "all or substantially all" of the company's assets, because all the other assets were gone. For the *Sharon Steel* Court, this argument was not "even close": an issuer cannot sell off valuable assets as part of a coordinated plan of disposition and then claim freedom to assign its public debt to the residue, even if, as there, the balance comprised over half of the issuer's initial pre-disposition assets.

This law and this logic apply with even greater force here. As in *Sharon Steel*, Tyco's transformative transaction was part of a plan of liquidation. More important, whether or not a formal liquidation was required or convenient, the Company planned a coordinated disposition of valuable assets to break apart the Company. It tried to evade *Sharon Steel* with a tender offer that did not work. Then it asked the Trustee to ignore its failed tender and bless the transaction. When the Trustee resisted, the Company went ahead with its plans anyway. Not the Successor Obligor Clauses, not *Sharon Steel*, not a failed tender, not a Trustee refusal to sign, could stop the Company from completing its plan to give away valuable assets as part of a series of related transactions and to dump billions of dollars of public debt on the entity that was left.

The result is the largest asset-stripping transaction in American corporate history – and a breach of trust unknown in the public markets in almost three decades. Not since *Sharon Steel* has an issuer of public debt, each of which is subject to the same boilerplate Successor Obligor Clause, tried to split itself into pieces in this manner without the consent of its public creditors. Noteholders that made loans (some of which, here, for thirty years) to a $60 billion conglomerate boasting of how its diversity could allocate risk over this decades long period now

find themselves the unwilling creditors of a new company concededly confined to limited business lines valued, at best, at a third of the Company to which the Noteholders lent their money. Such is precisely the consequence that *Sharon Steel* disallowed.

The material facts are undisputed. The Indentures are clear and unambiguous. The Successor Obligor Clauses "do not permit assignment of the public debt to another party in the course of a liquidation unless 'all or substantially all' of the assets of the company at the time the plan of liquidation is determined" are acquired by the transferee. Fifty percent of a company's assets at the time of a plan of liquidation is not even close to "all or substantially all" of its assets. Here, through a series of related transactions to liquidate the Company, the Notes ended up being improperly assigned, without Trustee consent, to entities holding far less than fifty percent of the Company's assets at the time the plan of liquidation was announced. Under *Sharon Steel*, therefore, the Company breached the Successor Obligor Clauses. This Court should grant summary judgment in the Trustee's favor.

### Statement of the Case

**The Parties**

Plaintiff The Bank of New York is a New York banking corporation with its principal place of business in New York City, New York. Plaintiff serves as Indenture Trustee for the two indentures at issue – one, dated June 9, 1998 (the "1998 Indenture"), the other dated November 12, 2003 (the "2003 Indenture," and, with the 1998 Indenture, the "Indentures"). (*See* Plaintiff's Local Rule 56.1 Statement of Undisputed Facts in Support of its Motion for Summary Judgment ("56.1 Statement") at ¶¶ 8, 10, 12.)

Defendant Tyco International Group, S.A. (the "Company") is a Luxembourg company that was a wholly-owned subsidiary of Defendant Tyco International Ltd. ("Tyco"), a Bermuda corporation with its principal place of business in Bermuda. (*See id.* at ¶¶ 1, 2.) Tyco

is the guarantor of the Notes pursuant to the 1998 and 2003 Indentures. (*See id.* at ¶¶ 10, 12.) The final defendant – Tyco International Finance, S.A., or "TIFSA" – is a newly-formed Luxembourg corporation that is a wholly-owned subsidiary of Tyco. (*See id.* at ¶ 3.)

As of January 2006, Tyco, operating in over one hundred countries, was a diversified manufacturing and service company that engaged in four lines of business. These were: (a) designing, manufacturing and distributing electrical and electronic components and related solutions (the "Electronics Business"); (b) developing, manufacturing and distributing medical devices and supplies, imaging agents, pharmaceuticals and adult incontinence and infant care products (the "Healthcare Business"); (c) designing, manufacturing, installing, monitoring, and servicing electric security and fire protection systems (the "Fire and Security Business"); and (d) designing, manufacturing, distributing, and servicing engineered products, including, for example, industrial valves and controls, as well as steel tubular goods (the "Engineered Products and Services Business"). (*See id.* at ¶ 5.)

**The Notes**

Under the 1998 and 2003 Indentures, the Company issued in excess of $5.6 billion of public debt. (*See id.* at ¶ 6.)  In the Prospectuses for these and other offerings, Tyco boasted of being a "diversified manufacturing and service company." (*See, e.g., id.* at ¶ 5.)

There are six series of Notes issued under the 1998 Indenture: 6.125% unsecured notes due 2008 (CUSIP No. 902118AM0); 6.125% unsecured notes due 2009 (CUSIP No. 902118AJ7); 6.75% unsecured notes due 2011 (CUSIP No. 902118AY4); 6.375% unsecured notes due 2011 (CUSIP No. 90211BC1); 7.0% unsecured notes due 2028 (CUSIP No. 902118AC2); and 6.875% unsecured notes due 2029 (CUSIP No. 902118AK4).  The remainder of the Notes were issued under the 2003 Indenture: 6.0% unsecured notes due 2013 (CUSIP No. 902118BK3).  (*Id.* at ¶¶ 9, 11.)  All told, the Company issued over $4.6 billion of public debt

under the 1998 Indenture and over $1 billion of public debt under the 2003 Indenture. (*See id.* at ¶¶ 9, 11.)

**The Make-Whole Provisions**

In the event the Company elects to redeem the Notes before their respective maturity dates, the Company is obligated to pay Noteholders the principal and the future interest on the Notes, discounted to present value at a set rate. (*See id.* at ¶ 26.) For example, the 7.0% Unsecured Notes due 2028 issued under the 1998 Indenture contain a Make-Whole Provision, which says:

> The Notes are redeemable, in whole or in part, at the option of the Company at any time at a redemption price equal to the greater of (i) 100% of the principal amount of such Notes, and (ii) as determined by the Quotation Agent, the sum of the present values of the remaining scheduled payments of principal and interest thereon (not including any portion of such payments of interest accrued as of the date of redemption) discounted to the date of redemption on a semiannual basis (assuming a 360-day year consisting of twelve 30-day months) at the Adjusted Redemption Treasury Rate plus 15 basis points plus, in each case, accrued interest thereon to the date of redemption.

(*Id.* at ¶ 26.)

In its simplest terms, this "make-whole premium" is intended to compensate the Noteholders for prematurely forfeiting the Notes (that is, the attendant interest stream). It does so by giving the Noteholders the difference between (1) the interest rate on the Notes and (2) the interest rate on a Treasury note of comparable duration plus a fixed number of basis points. The other Notes contain a similar provision, except that the number of "basis points" to be added to the "Adjusted Redemption Treasury Rate" differ. The applicable number of "basis points" – in common parlance, T+25 – is 25 basis points for the 6.125% unsecured notes due 2008, the 6.125% unsecured notes due 2009, the 6.75% unsecured notes due 2011, the 6.875% unsecured notes due 2029, and the 6.0% unsecured notes due 2013. The number of basis points is 35 basis points for the 6.375% unsecured notes due 2011. (*See id.* at ¶ 27.)

7

**The Successor Obligor Clauses**

> The Indentures, which are governed by New York law, are standard boilerplate contracts defining the rights and obligations of the Company, the Trustee, and the Noteholders. (*See id.* at ¶ 13.) Under the Indentures, the Company cannot sell, transfer or convey "all or substantially all" of its assets to another entity unless that transferee entity assumes the Company's obligations under the Notes. (*Id.* at ¶¶ 23-25.) Each of the Indentures specifically includes a Successor Obligor Clause, which provides that the Company:

> > **will not merge or consolidate with any other Person** *or sell or convey all or substantially all of its assets to any Person,* **unless** (i) either the Issuer or such Guarantor, as the case may be, shall be the continuing entity, or **the successor entity** or the Person which acquires by sale or conveyance substantially all the assets of the Issuer or such Guarantor, as the case may be (if other than the Issuer or such Guarantor, as the case may be) *shall expressly assume the due and punctual payment* of the principal of and interest on all the Securities or the obligations under the Guarantees, as the case may be, according to their tenor, and the due and punctual performance and observance of all of the covenants and agreements of this Indenture to be performed or observed by the Issuer or such Guarantor, as the case may be, by supplemental indenture satisfactory to the Trustee, executed and delivered to the Trustee by such corporation . . . .

> (*Id.* at ¶¶ 24-25 (emphasis added).)

> These Successor Obligor Clauses are intended to serve the interests of both borrower and lender. Each Successor Obligor Clause allows the borrower (here, the Company) to liquidate or otherwise transform its business free of debt, while at the same time assuring the lenders (here, the Noteholders) a continuity of the assets on which they extended credit. The Successor Obligor Clauses therefore protect the Noteholders from the disposition of substantially all of a company's assets unless the Notes follow those assets. Failing to follow the terms of the Successor Obligor Clauses by permanently transferring substantially all of the Company's assets without also assigning the Notes to the transferee(s) receiving those assets is a breach of these Successor Obligor Clauses. (*See id.* at ¶¶ 23-25.)

**The Asset-Stripping Transaction**

On January 13, 2006, the Company announced a plan to separate the Company's portfolio of diverse businesses into three new, independent, publicly-traded companies. (*See id.* at ¶ 28.)  As initially planned, the first step of this "Asset-Stripping Transaction" was to involve the transfer of the Company's Healthcare and Electronics Businesses to two newly formed entities – respectively, Covidien International Finance, S.A. ("Covidien"), and Tyco Electronics Group, S.A. ("Tyco Electronics").  The Company then intended to spin off these two new entities to Tyco's shareholders through tax-free dividends. (*See id.* at ¶ 30.)

The next step of the Asset-Stripping Transaction involved the transfer of the Company's remaining, and least attractive, assets – its Fire and Security and Engineered Products and Services Businesses – to a third newly formed entity, defendant TIFSA, and the assumption of the Notes by TIFSA. (*See id.* at ¶ 31.)

**The Coercive Tender Offer**

On April 27, 2007, the Company launched a coercive tender offer aimed at short-changing those Noteholders who accepted the tender, while simultaneously obtaining the consents necessary to rewrite the Indentures to facilitate its objectives over the non-tendering Noteholders' objections. (*See id.* at ¶ 32.)

The Solicitation Documents the Company issued consisted of an offer to purchase the Notes (the "Tender Offer") and a consent solicitation statement seeking the Noteholders' consent to certain proposed amendments to the Indentures (the "Proposed Amendments").  The two were intertwined insofar as the Company's obligation to purchase the Notes pursuant to the Tender Offer was conditioned upon the Noteholders' consent to the Proposed Amendments. (*Id.* at ¶ 34.)

In the Proposed Amendments, the Company sought to reconcile the Asset-Stripping Transaction – by which the Company would transfer its Notes to a newly formed entity, TIFSA – with the Indentures' Successor Obligor Clauses. Despite characterizing the Proposed Amendments as merely "clarifying" the Indentures, and despite insisting that the Proposed Amendments were entirely gratuitous (surely a first in the history of consent solicitations), the Company aimed to rewrite the Successor Obligor Clauses to suit the Asset-Stripping Transaction. (*See id.* at ¶¶ 35-36.)

In relevant part, the Solicitation Documents said:

While Tyco and the Company believe that the various steps in the Proposed Separation are not prohibited by the [Indentures], Tyco and the Company believe it is desirable, prior to completing the Proposed Separation but after completion of the Tender Offers, to eliminate any uncertainty by amending . . . the [Indentures] to clarify that:

·      the contribution of the Company's assets and liabilities relating to Tyco's electronics businesses to Tyco Electronics and the Company's assets and liabilities relating to Tyco's healthcare businesses to Covidien *will not constitute the sale or conveyance of all or substantially all* of Tyco's or the Company's assets;

·      the contribution of the Company's assets and liabilities relating to Tyco's *fire and security and engineered products and services business to TIFSA will constitute the conveyance of substantially all of the Company's assets* (but not all or substantially all of Tyco's assets) to TIFSA;

·      upon compliance with the conditions precedent set forth in [the Indentures], TIFSA will be *the successor obligor to the Company under the Indenture[s] and the Notes and the Company will be discharged from its obligations under the Indenture[s] and the Notes and may be liquidated and dissolved*; and

·      the distribution to Tyco's shareholders of all of the shares of capital stock of Tyco Electronics and Covidien *will not constitute the sale or conveyance of all or substantially all of Tyco's assets*.

(*Id.* at ¶ 36 (emphasis added).)

10

In other words, on the Company's view, the transfer of its most substantial businesses – healthcare and electronics – was *not* an "all or substantially all" transfer, while at the same time the transfer of its weakest business to TIFSA *was* an "all or substantially all" transfer.

The Company's proposed "steps" mirrored those in *Sharon Steel*. The Company would spin-off the bulk of the assets in the initial two steps. It would then transfer the remaining assets and all of the $5.6 billion in Notes to a newly formed entity – presumably on the discredited theory that such assets constituted all or substantially all of the assets remaining after the initial transfer. Thus, the Proposed Amendments were intended to be nothing more than an agreed upon fiction between the Company and the tendering Noteholders, who upon acceptance of the tender would no longer have any pecuniary interest in the Company or the assets because they would have accepted the offer and would not care what the consequences of the amendments would be.

The market commonly refers to the Company's tender offer/consent solicitation as a "coercive tender." Each Noteholder who tendered its Notes had to deliver a consent to the proposed "clarifying amendments"; otherwise the Company would not accept the tender. The *tendering* Noteholders of course do not care what the consent says because the Company is buying them out. The process is coercive because the consent is so damaging to *non-tendering* Noteholders. Noteholders are placed under enormous pressure to forfeit what is rightfully theirs (the contract redemption price) because, if 50.01% of them tender and the "clarifying amendments" are approved, the non-tendering Noteholders are stuck as lenders to the Company's least healthy business and their Notes substantially devalued.

11

In this coercive tender, the Company further tried to tighten the vise on its public lenders through the differing prices it offered for the Notes. The 1998 Indenture provides for six different series of Notes, some comparatively short-term (with maturity dates between 2008 and 2013) and others longer term (with maturity dates of 2028 and 2029). Despite the varying terms, each Note is treated equally in a consent solicitation for voting purposes: one dollar, one vote. As already noted, both the 1998 and 2003 Notes enable the Company to redeem the Notes at a fixed contractual price (the "make-whole premium"). (*See id.* at ¶¶ 26, 27.) Rather than simply offer this price, however, the Company offered less than the contractual price for each series of Notes. In the hope of dividing and conquering, the Company offered better (but still below contract) prices for the short-term Notes than for the long-term Notes (the short-term Notes being cheaper to redeem than the long-term Notes). (*See id.* at ¶ 32) In this way, the Company sought to lure the short-term Noteholders (who hold the majority of the outstanding Notes) to consent – to get the more than 50% of all Noteholders required to change the Indentures – to the detriment of its long-term public lenders.

The Company thus gave its public lenders a Hobson's choice: tender at a below-contract price, or else become an unwilling creditor of a new entity lacking the many billions of dollars in diversified assets of the Company to which the Noteholders initially agreed to lend and most of which the Company has given away, for free, to Tyco's shareholders – the very people who benefited from the money that the Company borrowed from the Noteholders.

**The Securities Action**

On May 9, 2007, less than two weeks after the Company's filing of the Solicitation Documents, a Noteholder commenced the Securities Action to reveal the parallel between *Sharon Steel* and the Asset-Stripping Transaction. The next day, the Company issued a corrective disclosure explaining the Securities Action, but in tactics designed to limit the impact

of this news the Company failed to mention the disclosure on its website or in a lengthy and an otherwise detailed press release, prominently displayed on its website, describing the status of its Tender Offer. (*See id.* at ¶¶ 37-39.)

Nonetheless, the Company's attempt to buy off the short-term Noteholders did not work. Scarcely a third of the Noteholders under each Indenture tendered their Notes to the Company and consented to the "clarifying" amendments. (*See id.* at ¶ 40.) Because the "clarifying" amendments could not be implemented without a majority vote and because a great majority of the Noteholders opposed the Asset-Stripping Transaction absent full payment of the Notes under the terms of the Indentures, the Company could not modify the Indentures and hence could not proceed with its proposed transfer of the Notes without violating the Successor Obligor Clauses.

This overwhelming rejection, coupled with the obvious likeness of the Asset-Stripping Transaction, as originally structured, to the one that violated the successor obligor clauses in *Sharon Steel*, sent the Company back to try to rewrite a script to deny its Noteholders their rightful contractual price.

**The Breach of Contract**

In the Securities Action, the Company admitted that the "form" but not the "substance" of its transaction was the same as *Sharon Steel*. In the wake of that action, the Company tried to engineer the steps of the Asset-Stripping Transaction to elevate the "form" over the "substance." To this end, rather than spinning off its assets in distinct initial steps, leaving those now held by TIFSA as the sole remnants of the former conglomerate, the Company first transferred all of its operating assets (and liabilities) in three different steps to three separate new entities – first to Covidien, then to Tyco Electronics and finally to TIFSA. (*See id.* at ¶ 46.) The last initial step was that the Company transferred all of the obligations on the Notes to

TIFSA, leaving the two other entities free of the debt. (*See id.* at ¶ 46.) These initial steps followed the same order as those described in the Solicitation Documents.

Specifically, pursuant to the Contribution Agreement between TIGSA and Covidien, Tyco Electronics, and TIFSA, dated as of May 31, 2007, the Company agreed "to transfer its entire business" to Covidien, Tyco Electronics, and TIFSA "in the following sequence":

a.    *first*, TIGSA contributed "all of its right, title and interest in the . . . [Healthcare Business] Assets and Liabilities to [Covidien] in exchange for the issue to [TIGSA] on the Issue Date of 10,000,000 (ten million) shares by [Covidien]";

b.    *second*, TIGSA contributed "all of its right, title and interest in the . . . [Electronics Business] Assets and Liabilities to [Tyco Electronics] in exchange for the issue to [TIGSA] on the Issue Date of 10,000,000 (ten million) shares by [Tyco Electronics]"; and

c.    *finally*, TIGSA contributed "all of its right, title and interest in the . . . [Fire and Security Business and the Engineered Products and Services Business] Assets and Liabilities to [TIFSA] in exchange for the issue to [TIUGSA] on the Issue Date of 10,000,000 (ten million) shares by [TIFSA]."

(*Id.* at ¶ 46.)

The stock of the new entities was then transferred to Tyco. (*See id.* at ¶ 51.) According to the Tyco's 10-Q, the Company was then "put in liquidation." (*See id.* at ¶ 58.) Subsequently, Covidien and Tyco Electronics were spun off to their shareholders, leaving only TIFSA. (*See id.* at ¶ 59.) Tyco and TIFSA, according to Tyco, have since become co-obligors

on the Notes, although neither the Noteholders nor the Trustee ever approved any of these changes. (*See id.* at ¶¶ 41-59.)

The end results of the Asset-Stripping Transaction, as it was ultimately carried out, are identical to those first proposed. Tyco's two most successful businesses have been spun off to shareholders, and the Notes have been dumped on the newly-formed TIFSA, the only remaining business. The Company's efforts to reorder the particular steps and sequence were purely an attempt to engineer a solution to the problem posed by *Sharon Steel*. The end result is still the same. At the conclusion of these transactions, the Company that borrowed from the public was liquidated, three *new* entities hold all of its assets and only one of the new entities – the least desirable of the three – purported to assume the Notes. This result is a violation of both the Indentures and *Sharon Steel*'s controlling precedent – regardless of the path that the Company took to get there.

**This Action**

To effect the Asset-Stripping Transaction, the Company was required to obtain the Trustee's signature to a supplemental indenture, which the Trustee could only provide if the supplemental indenture was "satisfactory." Certain Noteholders requested that the Trustee refrain from signing the supplemental indentures on the ground that the Asset-Stripping Transaction would breach the Indentures. The Trustee filed this declaratory judgment action to clarify its obligations. The Company, unilaterally (and unprecedently) deciding that the Trustee was without authority to refuse to sign (thereby rendering the Indentures' requirement meaningless), deemed the supplemental indentures approved and put the Company into liquidation. On November 8, 2007, the Trustee sent the Company a Notice of Default under the Indentures. (*Id.* at ¶ 47.)

15

## Argument

### THE COURT SHOULD GRANT
### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff is entitled to summary judgment because, as a matter of law, defendants breached the Indentures by engaging in the Asset-Stripping Transaction. The pleadings and materials supporting this motion "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *June* v. *Town of Westfield*, 370 F.3d 255, 257 (2d Cir. 2004). Because the proper interpretation of an unambiguous contract is a question of law, a dispute on interpretation may be resolved by summary judgment. *See Omni Quartz, Ltd.* v. *CVS Corp.*, 287 F.3d 61, 64 (2d Cir. 2002). Summary judgment is particularly appropriate here because the Second Circuit has held that the particular boilerplate contractual language at issue has a defined and unambiguous meaning irreconcilable with defendants' actions.

**A.    The Asset-Stripping Transaction Violates the Successor Obligor Clauses**

**1.    Defendants' Position Cannot Be Reconciled With *Sharon Steel***

Here, as in *Sharon Steel,* the Company has unloaded its burdensome debt onto a hodge-podge of remnant assets least able to bear the debt's weight, while gifting its most profitable assets, freshly laundered of such debt, to its shareholders.

Defendants' apparent interpretation of the Successor Obligor Clauses – and the conduct that flowed from that flawed interpretation – are flatly contrary to the Second Circuit's definitive interpretation of such provisions in *Sharon Steel*. The Court held, in plain and certain terms, that:

> boilerplate successor obligor clauses do not permit assignment of the public debt to another party in the course of a liquidation unless 'all or substantially all' of the assets of the company at the time the plan of liquidation is determined upon are transferred to a single purchaser.

16

691 F.2d at 1051.

In *Sharon Steel*, the obligor adopted a plan of liquidation pursuant to which it sold off its assets piecemeal, ultimately transferring its outstanding corporate debt together with the final remaining asset. The obligor and the transferee of the debt contended that, because the final transferred asset represented "all or substantially all" of the debtor's assets at the time of the transfer, the transfer of the notes with that asset was consistent with the successor obligor clauses in the indentures.

The Second Circuit ruled as a matter of law that the successor obligor clauses barred the obligor's transfer of all of its outstanding notes with its final remaining asset, affirming the district court's grant of summary judgment. As a threshold matter, the Court held that the meaning of the boilerplate successor obligor clause was a "matter of law rather than fact." *Id.* at 1048. The Court explained that "[b]oilerplate provisions are . . . not the consequence of the relationship of particular borrowers and lenders and do not depend upon particularized intentions of the parties to an indenture." *Id.* Thus, the Court held, "[t]here are no adjudicative facts relating to the parties to the litigation for a jury to find." *Id.* The Court observed the strong policy arguments as well – the uniform interpretation of boilerplate being vital to the efficiency of the capital markets. *Id.*

On the substantive question, the Court ruled that successor obligor clauses prohibit the transfer of a liquidating debtor's entire public debt to a transferee acquiring less than "all or substantially all of" the debtor's assets, even if those assets are all of the debtor's then-remaining assets. *Id.* at 1051. The Court reasoned that, if nothing else, successor obligor clauses afford lenders protection by assuring that the obligor's liabilities will follow its assets – or be redeemed. *Id.* Accordingly, the Court stated that, while borrowers "are enabled to sell entire

17

businesses and liquidate, to consolidate or merge with another corporation, or to liquidate their operating assets and enter a new field free of free debt," "[l]enders . . . are assured a degree of continuity of assets." *Id.*[2]

The Court further held that the "appropriate reference date" for determining what comprises "all or substantially all" of the obligor's assets is the date the obligor's liquidation plan is approved, not the date of the last step of the liquidation process. Adopting a contrary reading, the Court stated, "would severely impair the interests of lenders." *Id.*

Applying this holding to the facts, the Court ruled, as a matter of law, that the final asset the obligor transferred with its entire debtload – an asset that accounted for 13% of the obligor's operating profit and, with cash and liquid assets, at most 51% of the obligor's book value – did not represent "all or substantially all" of the debtor's assets. *Id.* at 1051-52. The question, the Court stated, was not "even close." *Id.*

---

[2]  The significance of successor obligor clauses in protecting Noteholders' rights was highlighted in the commentary to the model indenture on which contemporary successor obligor boilerplate language was based.  As stated in American Bar Foundation's *Commentaries on Model Debenture Indenture Provisions* (1971),

> The decision to invest in the debt obligations of a corporation is based on the repayment potential of a business enterprise possessing specific financial characteristics.  The ability of the enterprise to produce earnings often depends on particular assets which it owns.  Obviously, if the enterprise is changed through consolidation with or merged into another corporation or through disposition of assets, the financial characteristics and repayment potential on which the lender relied may be altered adversely.  Furthermore, in the case of a consolidation or a merger into another corporation, the borrowing corporation will, in fact, disappear.  For these reasons, and because the lender may also expect to be paid from the physical assets of the enterprise if financial difficulty does arise, debenture indentures often contain some limitations on consolidations, mergers and dispositions of assets by the borrowing enterprise.

(*Commentaries*, at 290-91.)

2.    **The Company Transferred the Notes Without Transferring All or Substantially All of the Assets**

The Successor Obligor Clauses in the Indentures here are, for all intents and purposes, identical to those at issue in *Sharon Steel*. Like the obligor in *Sharon Steel*, the Company disposed of the vast bulk of its assets piecemeal – transferring its Healthcare Business, debt-free, to Covidien, and then its Electronics Business, also debt-free, to Tyco Electronics – before ultimately transferring its final remaining assets, its Fire and Security Business and its Engineered Products and Services Business, along with all of its outstanding debt, to the newly formed "successor" entity, TIFSA. The Company then promptly transferred the stock in these entities to Tyco and put into motion the spin-off of Tyco Electronics and Covidien. The very next day after the final transfer, the Company was put into liquidation. Defendants cannot quarrel with these facts – they come from the Company's own filings.

That the assets contributed to TIFSA do not represent "all or substantially all" of the Company's assets as of January 13, 2006 – the date the break-up plan was adopted – is beyond question. In the Contribution Agreement itself, "for the purposes of determining the subscription price for the" shares issued by Covidien, Tyco Electronics, and TIFSA to TIGSA, the Company placed a "value" of $23,983,988,000 on the Healthcare Business (or 37.9% of the total); a "value" of $16,122,857,533 on the Electronics Business (or 25.5% of the total), and a "value" of $23,196,986,625 on the Fire and Security Business and Engineered Products and Services Business (or 36.6% of the total). (*See* 56.1 Statement at ¶ 50.) Thus, defendants themselves have concluded that TIFSA *only* represents less than 40% of the Company's assets.

Moreover, in fiscal year 2006, when the plan was adopted, the Fire and Security Business and the Engineered Products and Services Business together accounted for only 32% of Tyco's operating income. (*See id.* at ¶ 6.) And, when the Company allocated its contingent

assets and liabilities among the three surviving entities, TIFSA received only 27% of those assets and liabilities. (*See id.* at ¶ 7.)

In *Sharon Steel*, the Court held, as a matter of law, that an asset accounting for 38% of the debtor's operating revenue and 51% of its book value was not "even close" to constituting "all or substantially all" of the assets. Defendants cannot credibly claim that the Company transferred "all or substantially all" of its assets to TIFSA when it transferred 100% of its outstanding debt to TIFSA.

### 3.     The Transfer of the Subsidiaries' Stock to Tyco Also Violated the Successor Obligor Clause

Ironically, the last-minute financial legerdemain defendants devised to skirt *Sharon Steel* resulted in a separate and distinct breach of the successor obligor clause. Defendants apparently believed they could circumvent *Sharon Steel* by transferring the stock of each of the three surviving entities up to Tyco, making TIFSA and Tyco co-obligors of the Notes, and then spinning off Tyco Electronics and Covidien in tax-free dividends to the Company's shareholders. If the Notes followed all of the stock up to Tyco, the thinking must have gone, the Asset-Stripping Transaction would not run afoul of *Sharon Steel*.

The financial gamesmanship of this transaction is readily transparent. On May 30, 2007, the Company provided two proposed supplemental indentures to the Trustee. The first proposed that, effective May 31, 2007, TIFSA would instead of assuming the Notes (as provided for in the Contribution Agreement executed the very next day), become a "co-obligor" on the Notes – a distinction without a difference if ever there were one. (*See id.* at 46.) The second proposed that, on June 1, 2007, the surviving entities from the initial transfer would be transferred to Tyco, which would then technically "assume" the Notes that it had already guaranteed. All this is, it seems, was meant to pretend that TIFSA did not "assume" the Notes –

even though every disclosure document and every transactional document expressly says TIFSA has done just that. (*See, e.g.*, 8/9/07 10-Q of Tyco International Ltd. at 21, 39, Gordon Decl. Ex. K (TIFSA "directly and indirectly owns substantially all of the operating subsidiaries of [Tyco], performs treasury operations and has assumed the indebtedness of TIGSA").)

Defendants cannot do in three steps what they could not do in one. They cannot satisfy the Successor Obligor Clauses by transferring all assets and liabilities to Tyco and then, by the same transaction, gifting out the stock in two of the three surviving entities. To hold otherwise would fly in the face of *Sharon Steel*, a decision that, if nothing else, refused to elevate form over substance.

**B.    The Company Failed To Obtain The Trustee's Signature
On The Supplemental Indentures**

Even leaving aside these breaches, the Plaintiff is entitled to summary judgment because defendants did not properly execute the supplemental indentures, essential steps to transferring the obligations on the Notes to anyone. The Indentures require the Company to obtain the Trustee's agreement to a supplemental indenture if all or substantially all of the Company's assets are sold or transferred. The Asset-Stripping Transaction violated the Indentures because the Company did not obtain such signed supplemental indentures. Although the Company initially proposed supplemental indentures to the Trustee, after the Trustee brought the instant suit, the Company ignored its contractual obligations and completed the Asset-Stripping Transaction without the required supplemental indentures. The Company's rejection of the procedure prescribed in the Indentures is a breach of those contracts.

Under the Indentures, the Company may only transfer all or substantially all of its assets if the transferee assumes the Company's obligations to the Noteholders – a process which must be memorialized "by supplemental indenture *satisfactory to the Trustee*, executed and

21

delivered to the Trustee." (*See* 1998 Indenture § 8.1, Gordon Decl. Ex. E; 2003 Indenture § 10.01, Gordon Decl. Ex. F (emphasis added).)    The Company initially recognized that the Asset-Stripping Transaction would require supplemental indentures and accordingly submitted proposed supplemental indentures to the Trustee – first, adding TIFSA as a co-obligor and, then, adding Tyco as a co-obligor.    Nonetheless, when the Trustee filed the original complaint in this action – seeking the Court's guidance on whether to sign the supplemental indentures – the Company immediately abandoned its obligation to obtain the Trustee's consent and moved forward with the Asset-Stripping Transaction.

Defendants contend that the Trustee could not legally refuse to sign the proposed supplemental indentures and therefore the Company was free to complete the Asset-Stripping transaction without them.    To the extent this theory – be it anticipatory repudiation or "constructive signature" – might otherwise be valid (and it is not), it is inapplicable to the Trustee's position in the instant suit.    Here, the Trustee did not categorically refuse to sign the proposed supplemental indentures, but instead sought to uphold its contractual obligation to determine whether those proposed indentures were "satisfactory" by filing the instant suit. (*See id.*.)

Notably, the Company did not press this Court for expedited treatment of this dispute.    Rather, the Company refused to engage the Trustee's request for clarification and, while purportedly continuing to request the signatures, went forward with a transaction that resulted in the liquidation of the issuer of the Notes without a valid assumption of the Notes by any party. The Company's thumbing its nose at the Indentures' requirements was audacious yet unsurprising, as the Company has from its initial tender offer demonstrated its disdain for its Noteholders and its desire to deny them their contractual rights.

In any event, the Trustee cannot sign the supplemental indentures because the Asset-Stripping Transaction they would facilitate violates the Indentures. It is no accident that the Successor Obligor Clause, the very same provision that protects Noteholders from Transactions like this one, provides that the Trustee may only sign a supplemental indenture transferring the obligations on the Notes if the Trustee, in its independent judgment, deems the supplemental indenture "satisfactory." As a matter of straightforward contractual interpretation, a supplemental indenture cannot be "satisfactory" if it is in service of a Transaction that violates the Successor Obligor Clause. As amply demonstrated above, the Asset-Stripping Transaction perpetrated by defendants is at odds with the Successor Obligor Clause, as interpreted by the Second Circuit, and thus the supplemental indenture cannot be satisfactory. The Trustee cannot sign. This Court should so rule.

**C.    The Company's Breach of the Indenture is an Event of Default, Entitling Defendants to the Make-Whole**

Under the terms of the Indentures, the Company's breach of the successor obligor clauses clearly constitutes an event of default. That being the case, the Company is obligated to pay the Noteholders the applicable make-whole under the redemption provisions of the Notes.

On this issue too, *Sharon Steel* is dispositive. There, the Second Circuit held, as a matter of law, that the issuer was obligated to pay the redemption premium and could not avoid that obligation by taking an affirmative action which caused a default. The Court stated that:

> This is not a case in which a debtor finds itself unable to make required payments. The default here stemmed from the plan of voluntary liquidation . . . followed by the unsuccessful attempt to invoke the successor obligor clauses. The purpose of a redemption premium is to put a price upon the voluntary satisfaction of a debt before the date of maturity. While such premiums may seem largely irrelevant for commercial purposes in times of high interest rates, they nevertheless are part of the contract and would apply in a voluntary liquidation which included plans for payment and satisfaction of the public debt. We believe ***it undermines the plain purpose of the redemption provisions to allow a liquidating debtor to avoid their***

23

> ***terms simply by failing to take the steps necessary to redeem the debentures,
> thereby creating a default.*** We hold, therefore, that the redemption premium
> must be paid.

691 F.2d at 1053 (citations omitted) (emphasis added).

Accordingly, the Company's breach of the successor obligor clauses does not relieve defendants of their obligation to pay the make-whole. To the contrary, this event of default, which was an integral step of the Asset-Stripping Transaction, compels the defendants to honor its redemption obligations under the Notes.

### Conclusion

For all the foregoing reasons, this Court should grant Plaintiff's motion for summary judgment.

Dated: December 4, 2007
New York, New York

Respectfully submitted,

DECHERT LLP

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP

By:  /s/ Kevin O'Brien
Kevin O'Brien
Glenn Siegel
Alissa Rossman

By:  /s/ Gerard E. Harper
Gerard E. Harper
Andrew G. Gordon
Andrew N. Rosenberg

kevin.obrien@dechert.com

gharper@paulweiss.com

30 Rockefeller Plaza
New York City, New York 10112
(212) 698-3500

1285 Avenue of the Americas
New York City, New York 10019
(212) 373-3000

*Co-Counsel for the Trustee*

*Co-Counsel for the Trustee*