**EXHIBIT G**

Exhibit 4.4

TYCO INTERNATIONAL GROUP S.A.

TYCO INTERNATIONAL LTD.


SUPPLEMENTAL INDENTURE NO. 3

$500,000,000

7% Notes due 2028

THIS SUPPLEMENTAL INDENTURE NO. 3, dated as of June 9, 1998, among TYCO INTERNATIONAL GROUP S.A., a Luxembourg company (the "Company"), TYCO INTERNATIONAL LTD., a Bermuda company ("Tyco") and THE BANK OF NEW YORK, a New York banking corporation, as trustee (the 'Trustee").

W I T N E S S E T H:
- - - - - - - - - -

WHEREAS, the Company and Tyco have heretofore executed and delivered to the Trustee an Indenture, dated as of June 9, 1998 (the "Indenture"), providing for the issuance from time to time of one or more series of the Company's Securities;

WHEREAS, Article Seven of the Indenture provides for various matters with respect to any series of Securities issued under the Indenture to be established in an indenture supplemental to the Indenture; and

WHEREAS, Section 7.1(e) of the Indenture provides that the Company, Tyco and the Trustee may enter into an indenture supplemental to the Indenture to establish the form or terms of Securities of any series as permitted by Sections 2.1 and 2.4 of the Indenture.

NOW THEREFORE:

In consideration of the premises and the issuance of the series of Securities provided for herein, the Company, Tyco and the Trustee mutually covenant and agree for the equal and proportionate benefit of the respective Holders of the Securities of such series as follows:

ARTICLE ONE

RELATION TO INDENTURE; DEFINITIONS

SECTION 1.1    This Supplemental Indenture No. 3 constitutes an integral part of the Indenture.

SECTION 1.2    For all purposes of this Supplemental Indenture No. 3:

Security register, such record date to be not less than five days preceding the date of payment of such defaulted interest.

SECTION 2.5    PLACE OF PAYMENT.  The place of payment where the Notes may be presented or surrendered for payment, where the principal of and interest and any other payments due on the Notes are payable, where the Notes may be surrendered for registration of transfer or exchange and where notices and demands to and upon the Company in respect of the Notes and the Indenture may be served shall be in the Borough of Manhattan, The City of New York, and the office or agency maintained by the Company for such purpose shall initially be the Corporate Trust Office of the Trustee.

At the option of the Company, interest on the Notes may be paid (i) by check mailed to the address of the Person entitled thereto as such address shall appear in the register of Holders of the Notes or (ii) at the expense of the Company, by wire transfer to an account maintained by the Person entitled thereto as specified in writing to the Trustee by such Person by the applicable record date.

SECTION 2.6    REDEMPTION.  The Notes are redeemable, in whole or in part, at the option of the Company at any time at a redemption price equal to the greater of (i) 100% of the principal amount of such Notes, and (ii) as determined by the Quotation Agent, the sum of the present values of the remaining scheduled payments of principal and interest thereon (not including any portion of such payments of interest accrued as of the date of redemption) discounted to the date of redemption on a semiannual basis (assuming a 360-day year consisting of twelve 30-day months) at the Adjusted Redemption Treasury Rate plus 15 basis points plus, in each case, accrued interest thereon to the date of redemption.

The Notes are also subject to redemption to the extent described in Article Twelve of the Indenture.

The Company shall have no obligation to redeem or purchase the Notes pursuant to any sinking fund or analogous provisions or upon the happening of any specified event or at the option of any Holder of the Notes.

SECTION 2.7    DENOMINATION.  The Notes shall be issued in denominations of $1,000 and integral multiples thereof.

SECTION 2.8    CURRENCY.  Principal and interest on the Notes shall be payable in United States dollars.

SECTION 2.9    NOTES TO BE ISSUED IN GLOBAL FORM; EXCHANGE FOR CERTIFICATED NOTES.  The Notes will be initially represented by one or more Notes in global from (the "Global Note").  The Company hereby designates The Depository Trust Company as the initial Depositary for the Global Note.  The Global Note will be deposited with the Trustee, as custodian for the Depositary.  Unless and until it is exchanged in whole or in part for Notes in certificated form, the Global Note may not be transferred except as a whole by the Depositary to a nominee of the Depositary or by a nominee of the Depositary to the Depositary or another nominee of the

-4-

Source: TYCO INTERNATIONAL L, POS AM, June 09, 1998

1

TYCO INTERNATIONAL GROUP S.A.

TYCO INTERNATIONAL LTD.

SUPPLEMENTAL INDENTURE NO. 6

$400,000,000

6.125% Notes due 2008

THIS SUPPLEMENTAL INDENTURE NO. 6, dated as of November 2, 1998, among TYCO INTERNATIONAL GROUP S.A., a Luxembourg company (the "Company"), TYCO INTERNATIONAL LTD., a Bermuda company ("Tyco"), and THE BANK OF NEW YORK, a New York banking corporation, as trustee (the "Trustee").

W I T N E S S E T H :
- - - - - - - - - -

WHEREAS, the Company and Tyco have heretofore executed and delivered to the Trustee an Indenture, dated as of June 9, 1998 (the "Indenture"), providing for the issuance from time to time of one or more series of the Company's Securities;

WHEREAS, Article Seven of the Indenture provides for various matters with respect to any series of Securities issued under the Indenture to be established in an indenture supplemental to the Indenture; and

WHEREAS, Section 7.1(e) of the Indenture provides that the Company, Tyco and the Trustee may enter into an indenture supplemental to the Indenture to establish the form or terms of Securities of any series as permitted by Sections 2.1 and 2.4 of the Indenture.

NOW THEREFORE: In consideration of the premises and the issuance of the series of Securities provided for herein, the Company, Tyco and Tyco mutually covenant and agree for the equal and proportionate benefit of the respective Holders of the Securities of such series as follows:

ARTICLE ONE

RELATION TO INDENTURE; DEFINITIONS; RULES OF CONSTRUCTION

SECTION 1.1 RELATION TO INDENTURE. This Supplemental Indenture No. 6 constitutes an integral part of the Indenture.

SECTION 1.2 DEFINITIONS. For all purposes of this Supplemental Indenture No. 6, the following terms shall have the respective meanings set forth below:

"ADJUSTED REDEMPTION TREASURY RATE" means, with respect to any redemption date, the annual rate equal to the semiannual equivalent yield to

Source: TYCO INTERNATIONAL L, 10-K405, December 10, 1998

9

been paid or duly provided for. Interest shall be computed on the basis of a 360-day year consisting of twelve 30-day months.

The interest payable on any Note which is punctually paid or duly provided for on any Interest Payment Date shall be paid to the Person in whose name such Note is registered at the close of business on the April 15 or October 15 (in each case, whether or not a Business Day), respectively, immediately preceding such Interest Payment Date (each, a "Regular Record Date"). Interest payable on any Note which is not punctually paid or duly provided for on any Interest Payment Date therefor shall forthwith cease to be payable to the Person in whose name such Note is registered at the close of business on the Regular Record Date immediately preceding such Interest Payment Date, and such interest shall instead be paid to the Person in whose name such Note is registered at the close of business on the record date established for such payment by notice by or on behalf of the Company to the Holders of the Notes mailed by first-class mail not less than 15 days prior to such record date to their last addresses as they shall appear upon the Security register, such record date to be not less than five days preceding the date of payment of such defaulted interest.

The Company and Tyco shall notify the Trustee within five Business Days after each and every date (an "EVENT DATE") on which an event occurs in respect of which Additional Interest is required to be paid. The obligation to pay Additional Interest shall be deemed to accrue from and including the day following the applicable Event Date. Additional Interest shall be paid by depositing with the Trustee for the benefit of the Holders of the Notes entitled to receive such Additional Interest, on or before the applicable Interest Payment Date, immediately available funds in sums sufficient to pay the Additional interest then due. Additional Interest shall be payable to the Person otherwise entitled to be paid the interest payable on the Notes on such Interest Payment Date.

SECTION 2.6 PLACE OF PAYMENT. The place of payment where the Notes may be presented or surrendered for payment, where the principal of and interest and any other payments due on the Notes are payable, where the Notes may be surrendered for registration of transfer or exchange and where notices and demands to and upon the Company in respect of the Notes and the Indenture may be served shall be in the Borough of Manhattan, The City of New York, and the office or agency maintained by the Company for such purpose shall initially be the Corporate Trust Office of the Trustee.

At the option of the Company, interest on the Notes may be paid (i) by check mailed to the address of the Person entitled thereto as such address shall appear in the register of Holders of the Notes or (ii) at the expense of the Company, by wire transfer to an account maintained by the Person entitled thereto as specified in writing to the Trustee by such Person by the applicable record date.

SECTION 2.7 REDEMPTION. The Notes are redeemable, in whole or in part, at the option of the Company at any time at a redemption price equal to the greater of (i) 100% of the principal amount of such Notes, and (ii) as determined by the Quotation Agent, the sum of the present values of the remaining scheduled payments of principal and interest thereon (not including any portion of such payment of interest accrued as of the date of redemption)

9

Source: TYCO INTERNATIONAL L, 10-K405, December 10, 1998

10

discounted to the date of redemption on a semiannual basis (assuming a 360-day year consisting of twelve 30-day months) at the Adjusted Redemption Treasury Rate plus 25 basis points plus, in each case, accrued interest thereon to the date of redemption.

The Notes are also subject to redemption to the extent described in Article Twelve of the Indenture.

The Company shall have no obligation to redeem or purchase the Notes pursuant to any sinking fund or analogous provisions or upon the happening of any specified event or at the option of any Holder of the Notes.

SECTION 2.8 CURRENCY. Principal and interest on the Notes shall be payable in United States dollars.

SECTION 2.9 TRANSFER AND EXCHANGE.

(a) TRANSFER AND EXCHANGE OF GLOBAL NOTES.

A Global Note may not be transferred as a whole except by the Depositary to a nominee of the Depositary, by a nominee of the Depositary to the Depositary or to another nominee of the Depositary, or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary. All Global Notes will be exchanged by the Company for Definitive Notes if (i) the Company delivers to the Trustee notice from the Depositary that it is unwilling or unable to continue to act as Depositary or that it is no longer a clearing agency registered under the Exchange Act and, in either case, a successor Depositary is not appointed by the Company within 90 days after the date of such notice from the Depositary; or (ii) the Company in its sole discretion determines that the Global Notes (in whole but not in part) should be exchanged for Definitive Notes and delivers a written notice to such effect to the Trustee; provided that in no event shall the Regulation S Global Note be exchanged by the Company for Definitive Notes prior to the expiration of the Restricted Period. Global Notes may also be, subject to compliance with the terms of this Section 2.9, exchanged for Definitive Notes (x) upon the request of any holder of Notes if an Event of Default has occurred and is continuing for a period of at least 180 days or (y) in connection with any transfer of an interest in the Global Note to an Institutional Accredited Investor. Upon the occurrence of any of the preceding events, Definitive Notes shall be issued in such names as the Depositary shall instruct the Trustee. Global Notes also may be exchanged or replaced, in whole or in part, as provided in Sections 2.10 and 2.12 of the Indenture.

(b) TRANSFER AND EXCHANGE OF BENEFICIAL INTERESTS IN THE GLOBAL NOTES.

The transfer and exchange of beneficial interests in the Global Notes shall be effected through the Depositary, in accordance with the provisions of the Indenture and the Applicable Procedures. Transfers of beneficial interests in the Global Notes also shall require

10

Source: TYCO INTERNATIONAL L, 10-K405, December 10, 1998

Exhibit 4.6

TYCO INTERNATIONAL GROUP S.A.

TYCO INTERNATIONAL LTD.

SUPPLEMENTAL INDENTURE NO. 7

$400,000,000

6 1/8% Notes due 2009

THIS SUPPLEMENTAL INDENTURE NO. 7, dated as of January 12, 1999, among TYCO INTERNATIONAL GROUP S.A., a Luxembourg company (the "Company"), TYCO INTERNATIONAL LTD., a Bermuda company ("Tyco"), and THE BANK OF NEW YORK, a New York banking corporation, as trustee (the "Trustee").

W I T N E S S E T H:

WHEREAS, the Company and Tyco have heretofore executed and delivered to the Trustee an Indenture, dated as of June 9, 1998 (the "Indenture"), providing for the issuance from time to time of one or more series of the Company's Securities;

WHEREAS, Article Seven of the Indenture provides for various matters with respect to any series of Securities issued under the Indenture to be established in an indenture supplemental to the Indenture; and

WHEREAS, Section 7.1(e) of the Indenture provides that the Company, Tyco and the Trustee may enter into an indenture supplemental to the Indenture to establish the form or terms of Securities of any series as permitted by Sections 2.1 and 2.4 of the Indenture.

NOW THEREFORE:

In consideration of the premises and the issuance of the series of Securities provided for herein, the Company, Tyco and the Trustee mutually covenant and agree for the equal and proportionate benefit of the respective Holders of the Securities of such series as follows:

Source: TYCO INTERNATIONAL L, POS AM, January 26, 1999

has been paid or duly provided for, as the case may be, until the principal amount of the Notes has been paid or duly provided for. Interest shall be computed on the basis of a 360-day year consisting of twelve 30-day months.

The interest rate borne by the Notes will be 6 1/8% per annum until the Notes are paid in full.

The interest payable on any Note which is punctually paid or duly provided for on any Interest Payment Date shall be paid to the Person in whose name such Note is registered at the close of business on the January 1 or July 1 (in each case, whether or not a Business Day), respectively, immediately preceding such Interest Payment Date (each, a "Regular Record Date"). Interest payable on any Note which is not punctually paid or duly provided for on any Interest Payment Date therefor shall forthwith cease to be payable to the Person in whose name such Note is registered at the close of business on the Regular Record Date immediately preceding such Interest Payment Date, and such interest shall instead be paid to the Person in whose name such Note is registered at the close of business on the record date established for such payment by notice by or on behalf of the Company to the Holders of the Notes mailed by first-class mail not less than 15 days prior to such record date to their last addresses as they shall appear upon the Security register, such record date to be not less than five days preceding the date of payment of such defaulted interest.

SECTION 2.5. PLACE OF PAYMENT. The place of payment where the Notes may be presented or surrendered for payment, where the principal of and interest and any other payments due on the Notes are payable, where the Notes may be surrendered for registration of transfer or exchange and where notices and demands to and upon the Company in respect of the Notes and the Indenture may be served shall be in the Borough of Manhattan, The City of New York, and the office or agency maintained by the Company for such purpose shall initially be the Corporate Trust Office of the Trustee.

At the option of the Company, interest on the Notes may be paid (i) by check mailed to the address of the Person entitled thereto as such address shall appear in the register of Holders of the Notes or (ii) at the expense of the Company, by wire transfer to an account maintained by the Person entitled thereto as specified in writing to the Trustee by such Person by the applicable record date.

SECTION 2.6. REDEMPTION. The Notes are redeemable, in whole or in part, at the option of the Company at any time at a redemption price equal to the greater of (i) 100% of the principal amount of such Notes, and (ii) as determined by the Quotation Agent, the sum of the present values of the remaining scheduled payments of principal and interest thereon (not including any portion of such payments of interest accrued as of the date of redemption) discounted to the date of redemption on a semiannual basis (assuming a 360-day year consisting of twelve 30-day months) at the Adjusted Redemption Treasury Rate plus 25 basis points plus, in each case, accrued interest thereon to the date of redemption.

-4-

Source: TYCO INTERNATIONAL L, POS AM, January 26, 1999

The Company shall have no obligation to redeem or purchase the Notes pursuant to any sinking fund or analogous provisions or upon the happening of any specified event or at the option of any Holder of the Notes.

SECTION 2.7. ADDITIONAL AMOUNTS; CERTAIN TAX PROVISIONS. For purposes of the Notes, Sections 12.1 and 12.2 of the Indenture are amended in their entirety to read as follows:

"SECTION 12.1. REDEMPTION UPON CHANGES IN WITHHOLDING TAXES. The Notes may be redeemed, as a whole but not in part, at the election of the Company, upon not less than 30 nor more than 60 days notice (which notice shall be irrevocable), at a redemption price equal to 100% of the principal amount thereof, together with accrued interest, if any, to the redemption date and Additional Amounts (as defined in Section 12.2), if any, if as a result of any amendment to, or change in, the laws or regulations of Luxembourg or Bermuda or any political subdivision or taxing authority thereof or therein having power to tax (a "Taxing Authority"), or any change in the application or official interpretation of such laws or regulations which amendment or change is announced and becomes effective after the date the Notes are issued, the Company or Tyco has become or will become obligated to pay Additional Amounts, on the next date on which any amount would be payable with respect to the Notes, and such obligation cannot be avoided by the use of reasonable measures available to the Company or Tyco, as the case may be; PROVIDED, HOWEVER, that (a) no such notice of redemption may be given earlier than 60 days prior to the earliest date on which the Company or Tyco, as the case may be, would be obligated to pay such Additional Amounts, and (b) at the time such notice of redemption is given, such obligation to pay such Additional Amounts remains in effect. Prior to the giving of any notice of redemption described in this paragraph, the Company shall deliver to the Trustee (i)(I) a certificate signed by two directors of the Company stating that the obligation to pay Additional Amounts cannot be avoided by the Company taking reasonable measures available to it or (II) a certificate signed by two executive officers of Tyco stating that the obligation to pay Additional Amounts cannot be avoided by Tyco taking reasonable measures available to it, as the case may be, and (ii) a written opinion of independent legal counsel to the Company or Tyco, as the case may be, of recognized standing to the effect that the Company or Tyco, as the case may be, has or will become obligated to pay Additional Amounts as a result of a change, amendment, official interpretation or application described above and that the Company or Tyco, as the case may be, cannot avoid the payment of such Additional Amounts by taking reasonable measures available to it.

SECTION 12.2. PAYMENT OF ADDITIONAL AMOUNTS. All payments made by the Company, Tyco and any other Guarantor under or with respect to the Notes and the Guarantees will be made free and clear of and without withholding or deduction for or on account of any present or future taxes, duties, levies, imposts, assessments or governmental charges of whatever nature imposed or levied by or on behalf of any Taxing Authority ("Taxes"), unless the Company, Tyco or such Guarantor, as the case may be, is required to withhold or deduct Taxes by law or by the interpretation or administration thereof. In the event that the Company, Tyco or such Guarantor is required to so withhold or deduct any amount for or on account of any Taxes from any

-5-

Source: TYCO INTERNATIONAL L, POS AM, January 26, 1999

Exhibit 4.7

TYCO INTERNATIONAL GROUP S.A.

TYCO INTERNATIONAL LTD.

SUPPLEMENTAL INDENTURE NO. 8

$800,000,000

6 7/8% Notes due 2029

THIS SUPPLEMENTAL INDENTURE NO. 8, dated as of January 12, 1999, among TYCO INTERNATIONAL GROUP S.A., a Luxembourg company (the "Company"), TYCO INTERNATIONAL LTD., a Bermuda company, ("Tyco") and THE BANK OF NEW YORK, a New York banking corporation, as trustee (the "Trustee").

WHEREAS, the Company and Tyco have heretofore executed and delivered to the Trustee an Indenture, dated as of June 9, 1998 (the "Indenture"), providing for the issuance from time to time of one or more series of the Company's Securities;

WHEREAS, Article Seven of the Indenture provides for various matters with respect to any series of Securities issued under the Indenture to be established in an indenture supplemental to the Indenture; and

WHEREAS, Section 7.1(e) of the Indenture provides that the Company, Tyco and the Trustee may enter into an indenture supplemental to the Indenture to establish the form or terms of Securities of any series as permitted by Sections 2.1 and 2.4 of the Indenture.

NOW THEREFORE:

In consideration of the premises and the issuance of the series of Securities provided for herein, the Company, Tyco and the Trustee mutually covenant and agree for the equal and proportionate benefit of the respective Holders of the Securities of such series as follows:

ARTICLE 1

RELATION TO INDENTURE; DEFINITIONS

Source: TYCO INTERNATIONAL L, POS AM, January 26, 1999

consisting of twelve 30-day months.

The interest rate borne by the Notes will be 6 7/8% per annum until the Notes are paid in full.

The interest payable on any Note which is punctually paid or duly provided for on any Interest Payment Date shall be paid to the Person in whose name such Note is registered at the close of business on the January 1 or July 1 (in each case, whether or not a Business Day) respectively, immediately preceding such Interest Payment Date (each, a "Regular Record Date"). Interest payable on any Note which is not punctually paid or duly provided for on any Interest Payment Date therefor shall forthwith cease to be payable to the Person in whose name such Note is registered at the close of business on the Regular Record Date immediately preceding such Interest Payment Date, and such interest shall instead be paid to the Person in whose name such Note is registered at the close of business on the record date established for such payment by notice by or on behalf of the Company to the Holders of the Notes mailed by first-class mail not less than 15 days prior to such record date to their last addresses as they shall appear upon the Security register, such record date to be not less than five days preceding the date of payment of such defaulted interest.

SECTION 2.5  PLACE OF PAYMENT.  The place of payment where the Notes may be presented or surrendered for payment, where the principal of and interest and any other payments due on the Notes are payable, where the Notes may be surrendered for registration of transfer or exchange and where notices and demands to and upon the Company in respect of the Notes and the Indenture may be served shall be in the Borough of Manhattan, The City of New York, and the office or agency maintained by the Company for such purpose shall initially be the Corporate Trust Office of the Trustee.

At the option of the Company, interest on the Notes may be paid (i) by check mailed to the address of the Person entitled thereto as such address shall appear in the register of Holders of the Notes or (ii) at the expense of the Company, by wire transfer to an account maintained by the Person entitled thereto as specified in writing to the Trustee by such Person by the applicable record date.

SECTION 2.6  REDEMPTION.  The Notes are redeemable, in whole or in part, at the option of the Company at any time at a redemption price equal to the greater of (i) 100% of the principal amount of such Notes, and (ii) as determined by the Quotation Agent, the sum of the present values of the remaining scheduled payments of principal and interest thereon (not including any portion of such payments of interest accrued as of the date of redemption) discounted to the date of redemption on a semiannual basis (assuming a 360-day year consisting of twelve 30-day months) at the Adjusted Redemption Treasury Rate plus 25 basis points plus, in each case, accrued interest thereon to the date of redemption.

The Company shall have no obligation to redeem or purchase the Notes pursuant to any

-4-

Source: TYCO INTERNATIONAL L, POS AM, January 26, 1999

sinking fund or analogous provisions or upon the happening of any specified event or at the option of any Holder of the Notes.

SECTION 2.7 ADDITIONAL AMOUNTS; CERTAIN TAX PROVISIONS. For purposes of the Notes, Sections 12.1 and 12.2 of the Indenture are amended in their entirety to read as follows:

"SECTION 12.1. REDEMPTION UPON CHANGES IN WITHHOLDING TAXES. The Notes may be redeemed, as a whole but not in part, at the election of the Company, upon not less than 30 nor more than 60 days notice (which notice shall be irrevocable), at a redemption price equal to 100% of the principal amount thereof, together with accrued interest, if any, to the redemption date and Additional Amounts (as defined in Section 12.2), if any, if as a result of any amendment to, or change in, the laws or regulations of Luxembourg or Bermuda or any political subdivision or taxing authority thereof or therein having power to tax (a "Taxing Authority"), or any change in the application or official interpretation of such laws or regulations which amendment or change is announced and becomes effective after the date the Notes are issued, the Company or Tyco has become or will become obligated to pay Additional Amounts, on the next date on which any amount would be payable with respect to the Notes, and such obligation cannot be avoided by the use of reasonable measures available to the Company or Tyco, as the case may be; provided, however, that (a) no such notice of redemption may be given earlier than 60 days prior to the earliest date on which the Company or Tyco, as the case may be, would be obligated to pay such Additional Amounts, and (b) at the time such notice of redemption is given, such obligation to pay such Additional Amounts remains in effect. Prior to the giving of any notice of redemption described in this paragraph, the Company shall deliver to the Trustee (i)(I) a certificate signed by two directors of the Company stating that the obligation to pay Additional Amounts cannot be avoided by the Company taking reasonable measures available to it or (II) a certificate signed by two executive officers of Tyco stating that the obligation to pay Additional Amounts cannot be avoided by Tyco taking reasonable measures available to it, as the case may be, and (ii) a written opinion of independent legal counsel to the Company or Tyco, as the case may be, of recognized standing to the effect that the Company or Tyco, as the case may be, has or will become obligated to pay Additional Amounts as a result of a change, amendment, official interpretation or application described above and that the Company or Tyco, as the case may be, cannot avoid the payment of such Additional Amounts by taking reasonable measures available to it.

"SECTION 12.2. PAYMENT OF ADDITIONAL AMOUNTS. All payments made by the Company, Tyco and any other Guarantor under or with respect to the Notes and the Guarantees will be made free and clear of and without withholding or deduction for or on account of any present or future taxes, duties, levies, imposts, assessments or governmental charges of whatever nature imposed or levied by or on behalf of any Taxing Authority ("Taxes"), unless the Company, Tyco or such Guarantor, as the case may be, is required to withhold or deduct Taxes by law or by the interpretation or administration thereof. In the event that the Company, Tyco or such Guarantor is required to so withhold or deduct any amount for or on account of any Taxes from any

-5-

Source: TYCO INTERNATIONAL L, POS AM, January 26, 1999

EXHIBIT 4.3

TYCO INTERNATIONAL GROUP S.A.

TYCO INTERNATIONAL LTD.

SUPPLEMENTAL INDENTURE NO. 16

$1,000,000,000

6.750% Notes due 2011

THIS SUPPLEMENTAL INDENTURE NO. 16, dated as of February 21, 2001, among TYCO INTERNATIONAL GROUP S.A., a Luxembourg company (the "COMPANY"), TYCO INTERNATIONAL LTD., a Bermuda company ("TYCO"), and THE BANK OF NEW YORK, a New York banking corporation, as trustee (the "TRUSTEE").

W I T N E S S E T H:
- - - - - - - - - -

WHEREAS, the Company and Tyco have heretofore executed and delivered to the Trustee an Indenture, dated as of June 9, 1998 (the "INDENTURE"), providing for the issuance from time to time of one or more series of the Company's Securities;

WHEREAS, Article Seven of the Indenture provides for various matters with respect to any series of Securities issued under the Indenture to be established in an indenture supplemental to the Indenture; and

WHEREAS, Section 7.1(e) of the Indenture provides that the Company, Tyco and the Trustee may enter into an indenture supplemental to the Indenture to establish the form or terms of Securities of any series as permitted by Sections 2.1 and 2.4 of the Indenture;

NOW, THEREFORE, in consideration of the premises and the issuance of the series of Securities provided for herein, the Company, Tyco and the Trustee mutually covenant and agree for the equal and proportionate benefit of the respective Holders of the Securities of such series as follows:

ARTICLE 1

RELATION TO INDENTURE; DEFINITIONS

SECTION 1.1 INTEGRAL PART. This Supplemental Indenture No. 16 constitutes an integral part of the Indenture.

Source: TYCO INTERNATIONAL L, POS EX, February 28, 2001

SECTION 2.6 REDEMPTION. The Notes are redeemable, in whole or in part, at
the option of the Company at any time at a redemption price equal to the greater
of (i) 100% of the principal amount of such Notes, and (ii) as determined by the
Quotation Agent, the sum of the present values of the remaining scheduled
payments of principal and interest thereon (not including any portion of such
payments of interest accrued as of the date of redemption) discounted to the
date of redemption on a semiannual basis (assuming a 360-day year consisting of
twelve 30-day months) at the Adjusted Redemption Treasury Rate plus 25 basis
points plus, in each case, accrued interest thereon to the date of redemption.

The Company shall have no obligation to redeem or purchase the Notes
pursuant to any sinking fund or analogous provisions or upon the happening of
any specified event or at the option of any Holder of the Notes.

SECTION 2.7 ADDITIONAL AMOUNTS; CERTAIN TAX PROVISIONS. For purposes of
the Notes, Sections 12.1 and 12.2 of the Indenture are amended in their entirety
to read as follows:

"SECTION 12.1. REDEMPTION UPON CHANGES IN WITHHOLDING TAXES. The Notes may
be redeemed, as a whole but not in part, at the option of the Company, upon not
less than 30 nor more than 60 days' notice (which notice shall be irrevocable),
at a redemption price equal to 100% of the principal amount thereof, together
with accrued interest, if any, to the redemption date and Additional Amounts (as
defined in Section 12.2), if any, if as a result of any amendment to, or change
in, the laws or regulations of Luxembourg or Bermuda or any political
subdivision or taxing authority thereof or therein having power to tax (a
"TAXING AUTHORITY"), or any change in the application or official interpretation
of such laws or regulations which amendment or change is announced or becomes
effective after the date the Notes are issued, the Company or Tyco has become or
will become obligated to pay Additional Amounts, on the next date on which any
amount would be payable with respect to the Notes, and such obligation cannot be
avoided by the use of reasonable measures available to the Company or Tyco, as
the case may be; provided, however, that (a) no such notice of redemption may be
given earlier than 60 days prior to the earliest date on which the Company or
Tyco, as the case may be, would be obligated to pay such Additional Amounts, and
(b) at the time such notice of redemption is given, such obligation to pay such
Additional Amounts remains in effect. Prior to the giving of any notice of
redemption described in this paragraph, the Company shall deliver to the Trustee
(i)(I) a certificate signed by two directors of the Company stating that the
obligation to pay Additional Amounts cannot be avoided by the Company taking
reasonable measures available to it or (II) a certificate signed by two
executive officers of Tyco stating that the obligation to pay Additional Amounts
cannot be avoided by Tyco taking reasonable measures available to it, as the
case may be, and (ii) a written opinion of independent legal counsel to the
Company or Tyco, as the case may be, of recognized standing to the effect that
the Company or Tyco, as the case may be, has or will become obligated to pay
Additional Amounts as a result of a change, amendment, official interpretation
or application described above and that the Company or Tyco, as the case may be,
cannot avoid the payment of such Additional Amounts by taking reasonable
measures available to it.

5

Source: TYCO INTERNATIONAL L, POS EX, February 28, 2001

EXHIBIT 4.4

TYCO INTERNATIONAL GROUP S.A.

TYCO INTERNATIONAL LTD.

SUPPLEMENTAL INDENTURE NO. 20

$1,500,000,000

6.375% Notes due 2011

THIS SUPPLEMENTAL INDENTURE NO. 20, dated as of October 26, 2001, among
TYCO INTERNATIONAL GROUP S.A., a Luxembourg company (the "Company"), TYCO
INTERNATIONAL LTD., a Bermuda company ("Tyco"), and THE BANK OF NEW YORK, a New
York banking corporation, as trustee (the "Trustee").

W I T N E S S E T H:
--------------------

WHEREAS, the Company and Tyco have heretofore executed and delivered to the
Trustee an Indenture, dated as of June 9, 1998 (the "Indenture"), providing for
the issuance from time to time of one or more series of the Company's
Securities;

WHEREAS, Article Seven of the Indenture provides for various matters with
respect to any series of Securities issued under the Indenture to be established
in an indenture supplemental to the Indenture; and

WHEREAS, Section 7.1(e) of the Indenture provides that the Company, Tyco
and the Trustee may enter into an indenture supplemental to the Indenture to
establish the form or terms of Securities of any series as permitted by Sections
2.1 and 2.4 of the Indenture;

NOW, THEREFORE, in consideration of the premises and the issuance of the
series of Securities provided for herein, the Company, Tyco and the Trustee
mutually covenant and agree for the equal and proportionate benefit of the
respective Holders of the Securities of such series as follows:

ARTICLE 1

RELATION TO INDENTURE; DEFINITIONS

SECTION 1.1 Integral Part. This Supplemental Indenture No. 20 constitutes
            -------------
an integral part of the Indenture.

SECTION 1.2 General Definitions. For all purposes of this Supplemental
            -------------------
Indenture No. 20:

Source: TYCO INTERNATIONAL L, POS EX, November 02, 2001

The interest payable on any Note which is punctually paid or duly provided for on any Interest Payment Date shall be paid to the Person in whose name such Note is registered at the close of business on April 1 or October 1 (in each case, whether or not a Business Day), respectively, immediately preceding such Interest Payment Date (each, a "Regular Record Date"). Interest payable on any Note which is not punctually paid or duly provided for on any Interest Payment Date therefor shall forthwith cease to be payable to the Person in whose name such Note is registered at the close of business on the Regular Record Date immediately preceding such Interest Payment Date, and such interest shall instead be paid to the Person in whose name such Note is registered at the close of business on the record date established for such payment by notice by or on behalf of the Company to the Holders of the Notes mailed by first-class mail not less than 15 days prior to such record date to their last addresses as they shall appear upon the Security register, such record date to be not less than five days preceding the date of payment of such defaulted interest.

SECTION 2.5 Place of Payment. The place of payment where the Notes may be presented or surrendered for payment, where the principal of and interest and any other payments due on the Notes are payable, where the Notes may be surrendered for registration of transfer or exchange and where notices and demands to and upon the Company in respect of the Notes and the Indenture may be served shall be in the Borough of Manhattan, The City of New York, and the office or agency maintained by the Company for such purpose shall initially be the Corporate Trust Office of the Trustee.

At the option of the Company, interest on the Notes may be paid (i) by check mailed to the address of the Person entitled thereto as such address shall appear in the register of Holders of the Notes or (ii) at the expense of the Company, by wire transfer to an account maintained by the Person entitled thereto as specified in writing to the Trustee by such Person by the applicable record date.

SECTION 2.6 Redemption. The Notes are redeemable, in whole or in part, at the option of the Company at any time at a redemption price equal to the greater of (i) 100% of the principal amount of such Notes, and (ii) as determined by the Quotation Agent, the sum of the present values of the remaining scheduled payments of principal and interest thereon (not including any portion of such payments of interest accrued as of the date of redemption) discounted to the date of redemption on a semiannual basis (assuming a 360-day year consisting of twelve 30-day months) at the Adjusted Redemption Treasury Rate plus 35 basis points plus, in each case, accrued interest thereon to the date of redemption.

The Company shall have no obligation to redeem or purchase the Notes pursuant to any sinking fund or analogous provisions or upon the happening of any specified event or at the option of any Holder of the Notes.

SECTION 2.7 Additional Amounts; Certain Tax Provisions. For purposes of the Notes, Sections 12.1 and 12.2 of the Indenture are amended in their entirety to read as follows:

SECTION 12.1. Redemption Upon Changes in Withholding Taxes. The Notes may be redeemed, as a whole but not in part, at the option of the Company, upon not less than 30 nor more than 60 days' notice (which notice shall be irrevocable), at a redemption price equal to

4

**EXHIBIT H**

**Exhibit 4.2**

TYCO INTERNATIONAL GROUP S.A.,
as Issuer

AND

TYCO INTERNATIONAL LTD.,
as Guarantor

AND

THE BANK OF NEW YORK,
as Trustee

FIRST SUPPLEMENTAL INDENTURE
Dated as of November 12, 2003

$1,000,000,000 of 6% Notes due 2013

Securities subject to certain exceptions described in the Registration Rights Agreement. The rate of Additional Interest will be one quarter of one percent (0.25%) per annum of the principal amount of such Securities with respect to the first 90−day period during which one or more Registration Defaults is continuing, and thereafter at a rate equal to one−half of one percent (0.5%) per annum of the principal amount of such Securities for the duration one or more Registration Defaults is continuing.

2. <u>Method of Payment</u>. The Company will pay interest on the Securities (except defaulted interest), if any, to the persons in whose name such Securities are registered at the close of business on the regular record date referred to on the facing page of this Security for such interest installment. In the event that the Securities or a portion thereof are called for redemption and the Redemption Date is subsequent to a regular record date with respect to any Interest Payment Date and prior to such Interest Payment Date, interest on such Securities will be paid upon presentation and surrender of such Securities as provided in the Indenture. The principal of and the interest on the Securities shall be payable in the coin or currency of the United States of America that at the time is legal tender for public and private debt, at the office or agency of the Company maintained for that purpose in accordance with the Indenture.

3. <u>Paying Agent and Registrar</u>. Initially, The Bank of New York, the Trustee, will act as paying agent and Security Registrar. The Company may change or appoint any paying agent or Security Registrar without notice to any Securityholder. Tyco, the Company or any of their Subsidiaries may act in any such capacity.

4. <u>Indenture</u>. The terms of the Securities include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939 ("TIA") as in effect on the date the Indenture is qualified. The Securities are subject to all such terms, and Securityholders are referred to the Indenture and TIA for a statement of such terms. The Securities are unsecured general obligations of the Company and constitute the series designated on the face hereof as the "6% Notes due 2013", initially limited to $1,000,000,000 in aggregate principal amount.

The Company will furnish to any Securityholder upon written request and without charge a copy of the Base Indenture and the First Supplemental Indenture. Requests may be made to: Tyco International Group S.A., 17 Boulevard Grande Dutchesse Charlotte, L−1331 Luxembourg, Attention: The Managing Directors.

5. <u>Optional Redemption</u>. The Securities will be subject to redemption at the option of the Company on any date prior to the maturity date, in whole or from time to time in part, in $1,000 increments (<u>provided</u> that any remaining principal amount thereof shall be at least the minimum authorized denomination thereof), on written notice given to the Securityholders thereof not less than 30 days nor more than 60 days prior to the date fixed for redemption in such notice (the "Redemption Date"), at a redemption price equal to the greater of (i) 100% of the principal amount of such Securities to be redeemed and (ii) as determined by the Quotation Agent and delivered to the Trustee, the sum of the present values of the remaining scheduled payments of principal and interest thereon due on any date after the Redemption Date (excluding the portion of interest that will be accrued and unpaid to and including the Redemption Date) discounted from their scheduled date of payment to the Redemption Date (assuming a 360−day

year consisting of twelve 30–day months) at the Adjusted Redemption Treasury Rate plus 25 basis points (such greater amount is referred to herein as the "Redemption Price"), plus, in either the case of clause (i) or clause (ii), accrued and unpaid interest and Additional Interest, if any, thereon to the Redemption Date. This Security is also subject to redemption to the extent provided in Article XIV of the Indenture.

If the giving of the notice of redemption is completed as provided in the Indenture, interest on such Securities or portions of Securities shall cease to accrue on and after the Redemption Date, unless the Company shall default in the payment of such Redemption Price and accrued interest with respect to any such Security or portion thereof.

The Company shall not be required to make mandatory redemption or sinking fund payments with respect to the Securities.

6. <u>Denominations, Transfer, Exchange</u>. The Securities are in registered form without coupons in the denominations of $1,000 or any integral multiple of $1,000. The transfer of Securities may be registered and Securities may be exchanged as provided in the Indenture. The Securities may be presented for exchange or for registration of transfer (duly endorsed or with the form of transfer endorsed thereon duly executed if so required by the Company or the Security Registrar) at the office of the Security Registrar or at the office of any transfer agent designated by the Company for such purpose. No service charge will be made for any registration of transfer or exchange, but a Securityholder may be required to pay any applicable taxes or other governmental charges. If the Securities are to be redeemed, the Company will not be required to: (i) issue, register the transfer of, or exchange any Security during a period beginning at the opening of business 15 days before the day of mailing of a notice of redemption of less than all of the outstanding Securities of the same series and ending at the close of business on the day of such mailing; (ii) register the transfer of or exchange any Security of any series or portions thereof selected for redemption, in whole or in part, except the unredeemed portion of any such Security being redeemed in part; nor (iii) register the transfer of or exchange a Security of any series between the applicable record date and the next succeeding Interest Payment Date.

7. <u>Persons Deemed Owners</u>. The registered Securityholder may be treated as its owner for all purposes.

8. <u>Repayment to Tyco or the Company</u>. Any funds or Governmental Obligations deposited with any paying agent or the Trustee, or then held by Tyco or the Company, in trust for payment of principal of, premium, if any, or interest on the Securities of a particular series that are not applied but remain unclaimed by the holders of such Securities for at least two years after the date upon which the principal of, premium, if any, or interest on such Securities shall have respectively become due and payable, shall be repaid to Tyco or the Company, as applicable, on the last Business Day of each fiscal year of Tyco or the Company, as applicable, or (if then held by Tyco or the Company) shall be discharged from such trust. After return to the Company or Tyco, Holders entitled to the money or securities must look to the Company or Tyco, as applicable, for payment as unsecured general creditors.

9. <u>Amendments, Supplements and Waivers</u>. The Base Indenture contains provisions permitting the Company, Tyco and the Trustee, with the consent of the holders of not less than a

Source: TYCO INTERNATIONAL L, 10–Q, February 17, 2004

**EXHIBIT I**

# Investor Relations
# Press Release

**Tyco Announces Intent to Separate Into Three Publicly Traded Companies**

PEMBROKE, Bermuda, Jan 13, 2006 /PRNewswire-FirstCall via COMTEX News Network/ -- Tyco International Ltd. (NYSE: TYC; BSX: TYC) today announced that its Board of Directors has approved a plan to separate the company's current portfolio of diverse businesses into three separate, publicly traded companies - Tyco Healthcare, one of the world's leading diversified healthcare companies; Tyco Electronics, the world's largest passive electronic components manufacturer, and the combination of Tyco Fire & Security and Engineered Products & Services (TFS/TEPS), a global business with leading positions in residential and commercial security, fire protection and industrial products and services.

The company intends to accomplish the separation through tax-free stock dividends to Tyco shareholders, after which they will own 100% of the equity in three publicly traded companies. Each company will have its own independent Board of Directors and strong corporate governance standards. Tyco expects to complete the transactions during the first quarter of calendar 2007.

According to Tyco Chairman and Chief Executive Officer Ed Breen, "In the past several years, Tyco has come a long way. Our balance sheet and cash flows are strong and many legacy financial and legal issues have been resolved. We are fortunate to have a great mix of businesses with market- leading positions. After a thorough review of strategic options with our Board of Directors, we have determined that separating into three independent companies is the best approach to enable these businesses to achieve their full potential. Healthcare, Electronics and TFS/TEPS will be able to move faster and more aggressively -- and ultimately create more value for our shareholders -- by pursuing their own growth strategies as independent companies."

Tyco's Board of Directors and senior leadership have evaluated a broad range of strategic alternatives, including continuation of Tyco's current operating strategy, sales of select businesses, and separation of only one of the businesses. The company and Board concluded that separating into three businesses is the best way to position these market-leading companies for sustained growth and value creation.

Three Leading Global Companies

TYCO HEALTHCARE

With 2005 revenue of nearly $10 billion, Tyco Healthcare is one of the foremost global providers of healthcare products and services. The company is well-positioned to capitalize on the attractive dynamics of the healthcare industry and to realize more robust growth. Its product portfolio includes advanced surgical instruments and supplies, respiratory care products, contrast media and diagnostic imaging products, needles and syringes, vascular therapies, sutures and wound care products, and generic pharmaceuticals. Healthcare has more than 40,000 employees.

This proposed separation will create a leading stand-alone healthcare company, which is expected to benefit from a focused and independent healthcare culture to help attract top industry talent and strategic partners, as well as increasing access to emerging healthcare-related technologies. This business will continue to be led by current Tyco Healthcare President Rich Meelia, who will become the company's Chief Executive Officer. Chief Operating Officer Kevin Gould and Chief Financial Officer Chuck Dockendorff will also continue in their current leadership positions with the company.

TYCO ELECTRONICS

Tyco Electronics is one of the world's largest suppliers of electronic components, including connectors, switches, relays, circuit protection devices, touch screens, magnetics, resistors, wire and cable, as well as fiber-optic and wireless components and systems. Electronics has 88,000 employees worldwide.

As a $12 billion stand-alone enterprise, Tyco Electronics will be positioned to move quickly and strategically as competition requires, and will be better able to participate in ongoing electronics industry consolidation. The company's Chief Executive Officer will be Tom Lynch -- current President of Tyco's Engineered Products & Services segment -- who brings broad experience in the communications and electronics industries. Dr. Juergen Gromer, who has led Tyco Electronics since 1999, will continue as President, and will also assume additional responsibilities as Vice Chairman. Jacki Heisse will continue to serve as the company's Chief Financial Officer.

TYCO FIRE & SECURITY/ENGINEERED PRODUCTS & SERVICES

TFS/TEPS will be led by Tyco International Chairman and CEO Ed Breen as well as Tyco International's Chief Financial Officer, Chris Coughlin. TFS/TEPS is an $18 billion world leader in electronic security solutions for residential, business, and governmental customers, fire protection and sprinkler systems, and industrial valves and controls. With more than 118,000 employees, TFS/TEPS has a large, stable recurring revenue base and generates strong cash flow. Dave Robinson will continue to serve as President of Tyco Fire & Security. Naren Gursahaney will succeed Tom Lynch as President of Engineered Products & Services.

Breen added, "We believe this separation is a logical next step in Tyco's evolution and we are absolutely convinced that this is the right decision for the long-term success of our businesses, employees and shareholders."

Transaction Details

It is anticipated that all three companies will be capitalized to provide financial flexibility to take advantage of future growth opportunities. They are expected to have financial policies, balance sheets and credit metrics that are commensurate with solid investment grade credit ratings. Tyco will continue to follow financial policies that are consistent with its current credit ratings until the planned transactions take place. The company's existing debt is expected to be allocated among the three companies or refinanced. Any existing or potential liabilities that cannot be associated with a particular entity will be allocated appropriately to each of the businesses, and a sharing arrangement among the three companies will be established.

The three entities together are initially expected to pay a dividend that is equal in sum to the current Tyco dividend. Until the planned transactions are completed, Tyco expects to pay its current quarterly dividend of $0.10 per share.

One-time transaction costs are expected to total approximately $1.0 billion -- largely for tax and debt refinancing. Under the proposed transaction structure, each of the companies is expected to remain incorporated in Bermuda.

Consummation of the proposed separations is subject to certain conditions, including final approval by the Tyco International Board of Directors, receipt of a tax opinion of counsel, and the filing and effectiveness of registration statements with the Securities and Exchange Commission. The separations are also subject to the completion of any necessary refinancings. Approval by Tyco International shareholders is not required.

First Quarter and Full-Year 2006 Update

Tyco expects first quarter 2006 earnings per share (EPS) from continuing operations -- excluding special items -- to be about $0.38 per share compared to its previous guidance of $0.40 to $0.42 per share. Organic growth will be approximately 4 percent for the quarter, with 7 to 8 percent organic growth in Electronics and Engineered Products & Services partially offset by flat organic growth in Fire & Security and Healthcare.

In Fire & Security, revenue and margins were adversely impacted by weakness in the commercial security and Worldwide Fire Services businesses, partially offset by improved performance in residential security. In Healthcare, strong growth in revenue and operating profit in International was offset by revenue and profit shortfalls in the Imaging and Respiratory businesses, primarily due to the impact of product recalls and regulatory compliance issues, as well as capacity limitations in the Pharmaceuticals business. The issues in Imaging and Respiratory have been identified and are in the process of being resolved. The company expects to have additional pharmaceutical capacity coming on-line in the second quarter.

For the full year 2006, the company is now expecting EPS from continuing operations excluding special items to be in the range of $1.85 to $1.92 per share. The change from the company's previous guidance is mostly due to the items in Fire & Security and Healthcare noted above. The estimated transaction costs related to the separations will be treated as special items and are therefore excluded from this guidance. EPS from continuing operations excluding special items and organic revenue growth are non-GAAP financial measures and are described below.

As previously announced, the company will release its full first quarter results on Feb. 2, 2006.

About Tyco

Tyco is a global, diversified company that provides vital products and services to customers in five business segments: Fire & Security, Electronics, Healthcare, Engineered Products & Services, and Plastics & Adhesives. With 2005 revenue of $40 billion, Tyco employs approximately 250,000 people worldwide. More information on Tyco can be found at http://www.tyco.com.

CONFERENCE CALL AND WEBCAST

The company will hold a conference call for investors today beginning at 10:00 a.m. ET. The call can be accessed in two ways:

- At Tyco's website: http://investors.tyco.com. A replay of the call will be available through Tues., Jan. 31, 2006 at the same website.
- By telephone: For both "listen-only" participants and those participants who wish to take part in the question-and-answer portion of the call, the telephone dial-in number in the United States is (877) 531-2987. The telephone dial-in number for participants outside the United States is (612) 332-0819.

An audio replay of the conference call will be available beginning at 3:15 p.m. ET on Fri., Jan. 13, 2006 and ending at 11:59 p.m. ET on Fri., Jan. 20, 2006. The dial-in number for participants in the United States is (800) 475-6701. For participants outside the United States, the replay dial-in number is (320) 365-3844. The replay access code for all callers is 814596.

NON-GAAP MEASURES

"EPS from continuing operations excluding special items" and "organic growth" are non-GAAP measures and should not be considered replacements for GAAP results.

The company has forecast its EPS from continuing operations results excluding special items related to divestitures, early retirement of debt, transaction costs related to the separations, and other income or charges that may mask the underlying results and trends and make it difficult to give investors perspective on underlying business results. Because the company cannot predict the amount and timing of such items and the associated charges or gains that will be taken, it is difficult to include the impact of those items in the forecast.

"Organic revenue growth" is a useful measure used by the company to measure the underlying results and trends in the business. The difference between reported net revenue growth (the most comparable GAAP measure) and organic revenue growth (the non-GAAP measure) consists of the impact from foreign currency, acquisitions and divestitures, and other changes that do not reflect the underlying results and trends (for example, revenue reclassifications and changes to the fiscal year).

Organic revenue growth is a useful measure of the company's performance because it excludes items that: i) are not completely under management's control, such as the impact of foreign currency exchange; or ii) do not reflect the underlying growth of the company, such as acquisition and divestiture activity, or revenue reclassification. It is also a component of the company's compensation programs. The limitation of this measure is that it excludes items that have an impact on the company's revenue. This limitation is best addressed by using organic revenue growth in combination with the GAAP numbers.

FORWARD-LOOKING STATEMENTS

This release may contain certain "forward-looking statements" within the meaning of the United States Private Securities Litigation Reform Act of 1995. These statements are based on management's current expectations and are subject to risks, uncertainty and changes in circumstances, which may cause actual results, performance or achievements to differ materially from anticipated results, performance or achievements. All statements contained herein that are not clearly historical in nature are forward-looking and the words "anticipate," "believe," "expect," "estimate," "plan," and similar expressions are generally intended to identify forward-looking statements. The forward-looking statements in this release include statements addressing the following subjects: future financial condition and operating results. Economic, business, competitive and/or regulatory factors affecting Tyco's businesses are examples of factors, among others, that could cause actual results to differ materially from those described in the forward-looking statements. Tyco is under no obligation to (and expressly disclaims any such obligation to) update or alter its forward-looking statements whether as a result of new information, future events or otherwise. More detailed information about these and other factors is set forth in Tyco's Annual Report on Form 10-K for the fiscal year ended Sept. 30, 2005.

SOURCE Tyco International Ltd.

Sheri Woodruff of Tyco International Ltd., +1-609-720-4399, swoodruff@tyco.com; or Investor Relations, Ed Arditte, +1-609-720-4621, or John Roselli, +1-609-720-4624, or Karen Chin, +1-609-720-4398, all for Tyco International Ltd.

**EXHIBIT J**

STEP 6.1

# CONTRIBUTION AGREEMENT

31 MAY 2007

Between

Tyco International Group S.A.

as Contributor

and

Covidien International Finance S.A.

Tyco Electronics Group S.A.

Tyco International Finance S.A.

as Contributees

relating to the contribution of all the assets and all the liabilities of Tyco International Group S.A. to Covidien International Finance S.A., Tyco Electronics Group S.A. and Tyco International Finance S.A.

## ALLEN & OVERY

ALLEN & OVERY LLP

LUXEMBOURG

CONFIDENTIAL

TYC_00001

THIS AGREEMENT is made as of 31 May 2007,

BETWEEN:

(1)     Tyco International Group S.A., a public limited liability company (*société anonyme*), incorporated under the laws of the Grand-Duchy of Luxembourg, having its registered office at 58, rue Charles Martel, L-2134 Luxembourg, and registered with the Luxembourg Trade and Companies Register under the number B 69.939 (the Contributor);

AND

(2)     Covidien International Finance S.A., a public limited liability company (*société anonyme*), incorporated under the laws of the Grand-Duchy of Luxembourg, having its registered office at 17, boulevard Grande Duchesse Charlotte, L-1331 Luxembourg, and registered with the Luxembourg Trade and Companies Register under the number B 123.527 (H S.A.);

(3)     Tyco Electronics Group S.A., a public limited liability company (*société anonyme*), incorporated under the laws of the Grand-Duchy of Luxembourg, having its registered office at 17, boulevard Grande Duchesse Charlotte, L-1331 Luxembourg, and registered with the Luxembourg Trade and Companies Register under the number B 123.549 (E S.A.); and

(4)     Tyco International Finance S.A., a public limited liability company (*société anonyme*), incorporated under the laws of the Grand-Duchy of Luxembourg, having its registered office at 17, boulevard Grande Duchesse Charlotte, L-1331 Luxembourg, and registered with the Luxembourg Trade and Companies Register under the number B 123.550 (T S.A.),

(together the Contributees and each a Contributee).

The Contributor and the Contributees are hereinafter individually referred to as a Party and collectively as the Parties.

WHEREAS:

(A)     This Agreement (as defined below) is being entered into as part of the corporate restructuring steps required to implement the plan of Tyco International Ltd., the Contributor's ultimate parent company, to separate itself into three separate publicly-traded companies, as publicly announced on 13 January 2006.

(B)     The Contributor wishes to transfer its entire business (as defined under Business below) to the Contributees on the terms set out in this Agreement.

(C)     As between the Contributor and the Contributees the contribution by the Contributor of the Business shall be deemed to have taken effect as at the Effective Time (as defined below).

IT IS AGREED as follows:

1.      DEFINITIONS AND INTERPRETATION

1.1     Defined Terms

In this Agreement:

Agreed Form means the form agreed by the Parties;

3

15137-00558 CO:5428904.2

CONFIDENTIAL

TYC_00003

**Agreement** means this agreement;

**Assets and Liabilities** means all the assets and liabilities of the Contributor;

**Assumed Contracts** means all Contracts which have been entered into by the Contributor (or any predecessor in title of the Contributor) or to which the Contributor has become a party and the Assumed Contracts include, but are not limited to, the Bridge Facilities and all Contracts ancillary thereto, all Contracts entered into in connection with the Public Debt, those Contracts entered into by the Contributor as listed in Parts A, B and C respectively of the separate Agreed Form document headed "Assumed Contracts" and the TIL Guarantee Agreement;

**Assumed Liabilities** means all liabilities (whether actual, contingent or otherwise) and all claims of any kind of or against the Contributor arising or accruing before or at the Effective Time (whether or not invoiced, assessed or otherwise claimed as at the Effective Time and whether or not due and payable as at the Effective Time), including, without limitation, the Tax Liabilities and all liabilities arising in connection with the Bridge Facilities and the Public Debt and the burden of the Assumed Contracts and the Guarantees;

**Bridge Facilities** means the following 364-Day Senior Bridge Loan Agreements entered into by the Contributor on April 25, 2007:

(a)     364-Day Senior Bridge Loan Agreement (Healthcare Businesses) among the Contributor, Tyco International Ltd., H S.A., Covidien Ltd., the lenders party thereto and Citibank, N.A., as Administrative Agent;

(b)     364-Day Senior Bridge Loan Agreement (Electronics Businesses) among the Contributor, Tyco International Ltd., E S.A., Tyco Electronics Ltd., the lenders party thereto and Bank of America, N.A., as Administrative Agent; and

(c)     364-Day Senior Bridge Loan Agreement (Fire & Safety and Engineered Products Businesses) among the Contributor, Tyco International Ltd., T S.A., the lenders party thereto and Citibank, N.A., as Administrative Agent.

**Business** means all the assets generally whatsoever and without exception owned (whether legally or beneficially) by the Contributor and all the liabilities generally whatsoever and without exception held or assumed by the Contributor (whether actual, contingent or otherwise), as well as any and all additional assets and liabilities (if any) held by the Contributor that exist at the Effective Time whether, mentioned or not, known or unknown, which are contributed with all rights, titles, commitments and obligations, known or unknown, attached thereto in any manner whatsoever, including (without limitation):

(a)     the following assets of the Contributor (the Business Assets and each a Business Asset):

    (i)      the H Business;

    (ii)     the E Business;

    (iii)    the T Business;

    (iv)    all Claims;

    (v)     all Participations and Interests;

    (vi)    all Debts;

    (vii)   the benefit of the Assumed Contracts;

4

15137-00558 CO:5428904.2

CONFIDENTIAL

TYC_00004

(viii)    the Business Cash;

(ix)    all receivables (whether owed by third parties or intra-group receivables);

(x)    all other personal property, advances, prepayments and undertakings;

(xi)    the benefit of the guarantees held or entered into for the benefit of the Contributor;

(xii)    all work in progress;

(xiii)    the Business Information; and

(xiv)    all other assets of the Contributor,

whether or not included in the Initial Completion Balance Sheet or the Completion Balance Sheet; and

(b)    the following liabilities of the Contributor (the **Business Liabilities** and each a **Business Liability**):

(i)    the Assumed Liabilities including without limitation:

(aa)    the burden of the Assumed Contracts;

(bb)    the burden of the Guarantees;

(cc)    the burden of the Bridge Facilities;

(dd)    the Public Debt;

(ee)    the Tax Liabilities; and

(ii)    any other liabilities of the Contributor including, without limitation, all accrued expenses and accounts payable and other payables,

whether or not recorded in the Initial Completion Balance Sheet or the Completion Balance Sheet;

**Business Assets** has the meaning set forth under paragraph (a) of the definition of the term "Business";

**Business Cash** means all cash of the Contributor at Completion, whether held in the bank or in hand;

**Business Information** means all of the following if and to the extent it is in the custody or control of the Contributor: information, know-how and records (whether or not confidential and no matter in what form held) including (without limitation) all formulae, designs, specifications, drawings, data and all customer lists, sales information, business plans and forecasts, and all computer software and all accounting and tax records, correspondence, orders and enquiries;

**Business Liabilities** has the meaning set out under paragraph (b) of the definition of the "Business";

**CET** means Central European Time;

**Claim** means the benefit of any right or claim of the Contributor to the extent that such right or claim does not constitute a Debt;

5

15137-00558 CO:5428904.2

CONFIDENTIAL

TYC_00005

Completion means completion of the contribution of the Business pursuant to Clause 4 (Completion);

Completion Balance Sheet means the final balance sheet of the Business as at 00:00 CET on 31 May 2007 prepared and delivered for the purposes of this Agreement by the Contributor in accordance with Clause 10 (Adjustments);

Consideration Shares means the aggregate of:

(a)    10,000,000 (ten million) shares of H S.A. having a nominal value of USD 0.05 (point zero five United States Dollars) each and an aggregate nominal value of USD 500,000 (five hundred thousand        United States Dollars) to be issued pursuant to and in accordance with Clauses 2.1 and 4.2 on the occasion of an increase in the share capital of H S.A.;

(b)    10,000,000 (ten million) shares of E S.A. having a nominal value of USD 0.05 (point zero five United States Dollars) each and an aggregate nominal value of USD 500,000 (five hundred thousand United States Dollars) to be issued pursuant to and in accordance with Clauses 2.1 and 4.2 on the occasion of an increase in the share capital of E S.A.; and

(c)    10,000,000 (ten million) shares of T S.A. having a nominal value of USD 0.05 (point zero five United States Dollars) each and an aggregate nominal value of USD 500,000 (five hundred thousand United States Dollars) to be issued pursuant to and in accordance with Clauses 2.1 and 4.2 on the occasion of an increase in the share capital of T S.A.

each such issue of shares to occur on the Issue Date;

Contracts means all contracts, agreements, engagements and comfort letters of any kind to which the Contributor is a party including, without limitation, supply and distribution agreements and all leases, hirings and hire purchase agreements relating to equipment or other goods used by the Contributor;

Debts means the book and other debts and receivables accruing or owing to the Contributor (whether or not due and payable) including, without limitation, amounts accruing or owing to the Contributor in respect of bills discounted, debts factored or goods supplied or other forms of trade finance owing by any bank or other financial institution to the Contributor and the Debts include, but are not limited to, those debts and receivables set out in the Initial Completion Balance Sheet as adjusted by the Completion Balance Sheet;

E Assets and Liabilities means all the assets and liabilities of the Contributor relating to its E Business that exist at the Effective Time, known or unknown, mentioned or not, which are contributed with all rights, titles, commitments and obligations, known or unknown, attached in any manner whatsoever;

E Business means all the assets and liabilities whatsoever and without exception, whether known or unknown, mentioned or not, relating to that part of the business of the Contributor which relates to the engineered electronics components, network solution and wireless systems business of the Tyco group, such assets and liabilities to include without limitation, the Business Assets and the Business Liabilities to the extent to which they relate to or are used in that part of the business of the Contributor as at the Effective Time and the E Business includes (or is deemed for the purposes of this Agreement to include), but is not limited to, those assets and liabilities set out in the "Electronics" column of the Initial Completion Balance Sheet as adjusted by the Completion Balance Sheet;

Effective Time means 00:01 a.m. CET on 31 May 2007 or such other time and/or date as shall be mutually agreed between the Parties being the date on which the contribution of the Business by the

15137-00558 CO:5428904.2

CONFIDENTIAL

TYC_00006

Contributor to the Contributees in accordance with the terms of this agreement shall (as between the Contributor and the Contributees) be deemed to have been made;

GAAP means generally accepted accounting principles and practices in Luxembourg;

GBP means British Pounds Sterling;

Guarantees means any and all guarantees, indemnities and performance bonds issued by the Contributor in respect of obligations and liabilities of subsidiaries (direct or indirect) of the Contributor and the Guarantees include, but are not limited to the guarantees issued by the Contributor to be assumed by H S.A., E S.A. and T S.A. as listed in Parts X, Y and Z respectively of the separate Agreed Form document headed "Guarantees";

H Assets and Liabilities means all the assets and liabilities of the Contributor relating to its H Business that exist at the Effective Time, known or unknown, mentioned or not, which are contributed with all rights, titles, commitments and obligations, known or unknown, attached in any manner whatsoever;

H Business means all the assets and liabilities whatsoever and without exception, whether known or unknown, mentioned or not, relating to that part of the business of the Contributor which relates to the healthcare business of the Tyco group, such assets and liabilities to include without limitation, the Business Assets and the Business Liabilities to the extent to which they relate to or are used in that part of the business of the Contributor as at the Effective Time and the H Business includes (or is deemed for the purposes of this Agreement to include), but is not limited to, those assets and liabilities set out in the "Healthcare" column of the Initial Completion Balance Sheet as adjusted by the Completion Balance Sheet;

Initial Completion Balance Sheet means the estimated balance sheet of the Business (including individual balance sheets for the H Business, the E Business and the T Business) as at 00:00 CET on 31 May 2007 which has been prepared for the purposes of this Agreement in the Agreed Form;

Issue Date means the date of issue of the Consideration Shares, that is the date of the extraordinary meetings of the shareholder of the Contributees to be held before a notary on or around the date of this Agreement;

Net Assets means the aggregate amount of the assets less the aggregate amount of the liabilities of each of the H Business, the E Business and the T Business, as the case may be;

Participations and Interests means the shares, quotas, interests and rights whether actual or contingent, options, subscription rights, and assimilated rights in, or in respect of, entities which are owned (whether legally or beneficially) by the Contributor as at the Effective Time and includes, but is not limited to, the shares held by the Contributor in the entities listed in Schedule 1;

Public Debt means those outstanding notes and debentures issued by the Contributor set out in Schedule 2 which have not been purchased by the Contributor pursuant to the tender offers launched by the Contributor on 27 April 2007 and 30 April 2007;

T Assets and Liabilities means all the assets and liabilities of the Contributor relating to its T Business that exist at the Effective Time, known or unknown, mentioned or not, which are contributed with all rights, titles, commitments and obligations, known or unknown, attached in any manner whatsoever;

T Business means all the assets and liabilities whatsoever and without exception, whether known or unknown, mentioned or not, relating to that part of the business of the Contributor which relates to the fire & security business and the engineered products and services business of the Tyco group,

7

16137-00558 CO:5428004.2

CONFIDENTIAL

TYC_00007

such assets and liabilities to include without limitation, the Business Assets and the Business Liabilities to the extent they relate to or are used in that part of the business of the Contributor as at the Effective Time and the Public Debt and the T Business includes (or is deemed for the purposes of this Agreement to include), but is not limited to, those assets and liabilities set out in the "Topaz" column of the Initial Completion Balance Sheet as adjusted by the Completion Balance Sheet;

**Tax Liabilities** means any obligation of the Contributor in respect of any taxation, levy, duty, charge, contribution, withholding or impost of whatever nature (including, without limitation, taxes on gross or net income, profits or gains and taxes on receipts, sales, use, occupation, franchise, transfer, value added and personal property, together with all related fines, penalties, surcharges and interest) imposed, collected or assessed by, or payable to, a Tax Authority which arises or accrues before or at the Effective Time (whether or not invoiced, assessed or otherwise claimed as at the Effective Time and whether or not due and payable as at the Effective Time);

**Tax Authority** means any government, state or municipality or any local, state, federal or other authority, body or official anywhere in the world exercising a fiscal, revenue, customs or excise function;

**TIL Guarantee Agreement** means the guarantee agreement dated as of June 9 1998 between Tyco International Ltd and the Contributor; and

**USD** means United States Dollars.

1.2     **References**

In this Agreement, unless the context otherwise requires, any reference to:

    (a)     a statute or statutory provision includes any consolidation, re-enactment, modification or replacement of the same, any statute or statutory provision of which it is a consolidation, re-enactment, modification or replacement and any subordinate legislation in force under any of the same from time to time;

    (b)     writing shall include any modes of reproducing words in a legible and non-transitory form;

    (c)     an agreement or other document is to that document as varied, supplemented or replaced from time to time; and

    (d)     any reference to the singular includes the plural where the context so requires and vice-versa.

1.3     **Contents and Headings**

In this Agreement the contents page and headings are for convenience only and shall not affect the interpretation or construction of this Agreement.

1.4     **No Restrictive Interpretation**

In this Agreement general words shall not be given a restrictive interpretation by reason of them being preceded or followed by words indicating a particular class of acts, matters or things.

2.     **CONTRIBUTION**

2.1     The Contributor shall contribute all of its right, title and interest in the Business to the Contributees by contributing the Business in the following sequence:

15137-00558 CO:5428904.2

CONFIDENTIAL

TYC_00008

(a)  the H Assets and Liabilities to H S.A. in exchange for the issue to the Contributor on the Issue Date of 10,000,000 (ten million) shares by H S.A. in accordance with clause 4.2(a) and in the proportion set out in Schedule 3;

(b)  the E Assets and Liabilities to E S.A. in exchange for the issue to the Contributor on the Issue Date of 10,000,000 (ten million) shares by E S.A. in accordance with clause 4.2(b) and in the proportion set out in Schedule 3; and

(c)  the T Assets and Liabilities to T S.A. in exchange for the issue to the Contributor on the Issue Date of 10,000,000 (ten million) shares by T S.A in accordance with clause 4.2(c) and in the proportion set out in Schedule 3,

each such contribution referred to in Clauses 2.1(a), (b) and (c) being conditional upon the other two contributions taking place.  For the purposes of determining the subscription price for the Consideration Shares (subject to adjustment in accordance with clause 10.2), the value of the:

(i)  H Business shall be USD23,983,988,000 (twenty three billion, nine hundred and eighty three million, nine hundred and eighty eight thousand US dollars);

(ii)  E Business shall be USD16,122,857,533 (sixteen billion, one hundred and twenty two million, eight hundred and fifty seven thousand, five hundred and thirty three US dollars); and

(iii)  T Business shall be USD23,196,986,625 (twenty three billion, one hundred and ninety six million, nine hundred and eighty six thousand, six hundred and twenty five US dollars),

as set out in the Initial Completion Balance Sheet and subject to adjustment in the Completion Balance Sheet.

Notwithstanding any other provision of this Agreement, as between the Contributor and the Contributees, the contribution of the Business shall have effect, including, without limitation, in terms of the benefit, burden and risk of the Business, as at the Effective Time.  In particular, without limitation, any provision of this Agreement which relates to the need to obtain third party consents for the effective transfer of any part of the Business to the relevant Contributee or Contributees shall apply as between the Contributor and the relevant third party and shall not in any way limit the contribution and assumption of that part of the Business as between the Contributor and the relevant Contributee or Contributees.

2.2  The Contributor shall contribute, grant or transfer to the Contributees only such right, title or interest (whether legal, beneficial or economic) in the Assets and Liabilities which the Contributor has in the H Business, the E Business, and the T Business. Such contribution shall be free from any mortgage, charge, pledge, lien, encumbrance, option, right of pre-emption, assignment by way of security or similar restriction, save for any lien, charge or other encumbrance to which any such asset may be subject in the ordinary course of business or by operation of law.

2.3  Subject to Clause 2.4 in respect of certain Tax Liabilities and except as otherwise expressly provided elsewhere in this Agreement in relation to other assets and liabilities, any assets and liabilities of the Contributor that are not comprised in the H Business, the E Business or the T Business, whatsoever and without exception, known or unknown, mentioned or not, shall be deemed to be part of the T Business for the purposes of this Agreement and shall be contributed by the Contributor to T S.A. at the same time and on the same terms and conditions as the contribution of the T Business to T S.A. under this agreement.

2.4  Any Tax Liabilities which are not comprised in the H Business, the E Business or the T Business shall be contributed by the Contributor to the Contributees as follows:

9

15137-00558 CO:5428904.2

CONFIDENTIAL

**4.5**    **Continuing Effect**

Each provision of this Agreement shall continue in full force and effect after the Issue Date, unless such provision has been performed fully on or before the Issue Date.

**5.**    **THIRD PARTY CONSENTS**

**5.1**    **Contribution of the H Business, the E Business and the T Business Conditional on Consent**

Where any consent, confirmation, approval, authorisation or agreement of any third party is required for the effective transfer of any asset or liability of the H Business, the E Business or the T Business and such consent, confirmation, approval, authorisation or agreement has not been obtained, at or prior to Completion, the contribution of that asset or liability shall, notwithstanding Completion, be conditional upon that consent, confirmation, approval, authorisation or agreement (save where full, or substantially full, enjoyment of such asset or liability can be afforded to the relevant Contributee without receipt of the relevant consent, confirmation, approval, authorisation or agreement, by a lawful method reasonably available to the Parties) and the Contributor and the Contributees shall each for itself, before and after Completion, use its best efforts to obtain all such consents, confirmations, approvals, authorisations and agreements (or procure that they shall be obtained) as soon as possible.

**5.2**    **If Consent Not Obtained**

If the third party consent or agreement referred to in Clause 5.1 is refused or is not obtained on or before the first anniversary of the date of this Agreement (or such later date as the Contributor and the Contributees may determine) in respect of any asset or liability of the H Business, the E Business or the T Business and there is no lawful method reasonably available to the Parties by which full, or substantially full, enjoyment of such asset or liability can be afforded to the relevant Contributee, the relevant Contributee and the Contributor shall consider what action to take in relation to that asset or liability and in relation to the consideration paid in respect of that asset or liability and:

(a)    in the case of an asset the enjoyment of which cannot be afforded to the relevant Contributee, the Contributor shall indemnify the relevant Contributee against any and all loss arising from the failure to transfer the benefit of the asset to the relevant Contributee; and

(b)    in the case of a liability the burden of which cannot be afforded to the relevant Contributee, the relevant Contributee shall indemnify the Contributor against any and all loss arising from the failure to transfer the burden of the liability to the Contributees.

**5.3**    **Where Third Party Consent Required and Clauses 7 and/or 8 Apply**

Where a third party consent is required, pursuant to applicable laws or regulations, to transfer an asset or liability in accordance with this Clause 5 and the provisions of Clauses 7 and/or 8 apply in relation to that asset or liability, the provisions of Clauses 7.2 and 7.3 and/or Clause 8.2 shall apply, to the extent permissible, in accordance with the laws or regulations which require the third party consent.

**6.**    **TITLE**

**6.1**    **Title capable of passing on delivery**

Unless otherwise agreed between the Contributor and the Contributees, title to the assets and liabilities of the H Business, the E Business and the T Business which are capable of transfer by delivery shall pass on delivery and such delivery shall, as between the Contributor and the

12

15137-00558 CO:5428904.2

CONFIDENTIAL

TYC_00012

to it, and, in each case, shall pay and perform the relevant Assumed Liabilities, as the same fall due for payment and performance, notwithstanding that the request for payment may be directed to the Contributor. With effect from the Effective Time, T S.A. shall indemnify the Contributor and keep the Contributor fully and effectively indemnified from and against all costs, claims, damages, liabilities and expenses which may be made against or suffered or incurred by the Contributor in respect of the Public Debt and the relevant Contributee shall indemnify the Contributor and keep the Contributor fully and effectively indemnified from and against all costs, claims, damages, liabilities and expenses which may be made against or suffered or incurred by the Contributor in respect of the Assumed Liabilities relevant to the H Business, the E Business or the T Business as the case may be.

9.2     **Assumed Liabilities Requiring Consent**

This Agreement shall not constitute an assumption or a purported assumption of any Assumed Liability in respect of which performance by the relevant Contributee would require the consent or agreement of any third party if such assumption or purported assumption would constitute a breach of any agreement or any applicable law or regulation pursuant to which the obligation arises. The relevant Contributee shall, as relevant and to the extent that the same would not result in any breach of any such agreement or any applicable law or regulation, perform as the Contributor's sub-contractor all the obligations of the Contributor in respect of such Assumed Liability. Each Contributee shall indemnify the Contributor in connection with such Contributee acting as sub-contractor pursuant to this Clause 9.2.

9.3     **Assignment of Bridge Facilities**

The Contributor and each Contributee shall use best efforts to complete all formalities necessary or desirable in order to provide for or complete:

(a)     the assumption by such Contributee of all the liabilities and obligations of the Contributor under the relevant one of the Bridge Facilities to which such Contributee is a party (the **Relevant Bridge Facility**) and ancillary Contracts thereto ; and

(b)     the release of the Contributor from all its liabilities and obligations relating to the Relevant Bridge Facility and ancillary Contracts thereto.

9.4     **Assignment of Public Debt**

The Contributor and T S.A. shall use best efforts to complete all formalities necessary or desirable in order to provide for or complete the release or indemnification of the Contributor from all its liabilities and obligations relating to the Public Debt.

10.     **ADJUSTMENTS**

10.1    **Preparation of Completion Balance Sheet**

As soon as reasonably practicable following Completion, the Contributees shall together prepare and deliver to the Contributor the Completion Balance Sheet. The Completion Balance Sheet shall be prepared in the same format as the Initial Completion Balance Sheet and in accordance with the same accounting policies, principles, practices, evaluation rules, categorisations, procedures, techniques, methods and bases adopted by the Contributor in the preparation of the Initial Completion Balance Sheet.

10.2    **Adjustments arising from Completion Balance Sheet**

As soon as practicable following the delivery of the Completion Balance Sheet, to the extent that the Completion Balance Sheet varies from the Initial Completion Balance Sheet:

15

15137-00558 CO:5428904.2

CONFIDENTIAL

TYC_00015

**EXHIBIT K**

QuickLinks -- Click here to rapidly navigate through this document

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Quarterly Period Ended June 29, 2007**

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**001-13836**
(Commission File Number)

# TYCO INTERNATIONAL LTD.
(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Bermuda** | **98-0390500** |
| (Jurisdiction of Incorporation) | (I.R.S. Employer Identification Number) |

**Second Floor, 90 Pitts Bay Road, Pembroke, HM 08, Bermuda**
(Address of Registrant's principal executive offices)

**441-292-8674**
(Registrant's telephone number)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer" and "large accelerated filer" in Rule 12b-2 of the Exchange Act (check one):

Large accelerated filer ☒        Accelerated filer ☐        Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐ No ☒

The number of common shares outstanding as of August 2, 2007 was 497,135,302.

Source: TYCO INTERNATIONAL L, 10-Q, August 09, 2007

TYCO INTERNATIONAL LTD.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)

1.  **Basis of Presentation, Restatement and Summary of Significant Accounting Policies**

*Basis of Presentation*—The unaudited Consolidated Financial Statements include the consolidated results of Tyco International Ltd., a company organized under the laws of Bermuda, and its subsidiaries (Tyco and all its subsidiaries, hereinafter collectively referred to as the "Company" or "Tyco").

Effective June 29, 2007, Tyco completed the spin-offs of Covidien and Tyco Electronics, formerly Healthcare and Electronics businesses, respectively, into separate, publicly traded companies (the "Separation") in the form of a distribution to Tyco shareholders. The distribution was made on June 29, 2007, to Tyco shareholders of record on June 18, 2007, the record date. Each Tyco shareholder received 0.25 of a common share of each of Covidien and Tyco Electronics for each Tyco common share held on the record date. Tyco shareholders received cash in lieu of fractional shares for amounts of less than one Covidien or Tyco Electronics common share. The distribution was structured to be tax-free to Tyco shareholders except to the extent of cash received in lieu of fractional shares. While we are a party to Separation and Distribution, Tax Sharing and certain other agreements, we have determined that there is no significant continuing involvement between us and Covidien or Tyco Electronics as discussed in Statement of Financial Accounting Standards ("SFAS") No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," and EITF Issue No. 03-13, "Applying the Conditions of Paragraph 42 of SFAS No. 144 in Determining Whether to Report Discontinued Operations." Therefore, we have classified Covidien and Tyco Electronics as discontinued operations in all periods presented.

Additionally, on the distribution date, the Company, as approved by its Board of Directors, effected a reverse stock split of Tyco's common shares, at a split ratio of one for four. Shareholder approval for the reverse stock split was obtained at the March 8, 2007 Special General Meeting of Shareholders. Share and per share data for all periods presented have been adjusted to reflect the reverse stock split.

During the quarters ended June 29, 2007 and June 30, 2006, the Company incurred pre-tax costs related to the Separation, including loss on early extinguishment of debt, of $830 million and $56 million, respectively, related primarily to debt refinancing, tax restructuring, professional services and employee-related costs. Of this amount, $28 million and $19 million is included in separation costs, $259 million and $0 million related to loss on early extinguishment of debt is included in other expense, net and $543 million and $37 million is included in discontinued operations, respectively. During the nine months ended June 29, 2007 and June 30, 2006, the Company incurred pre-tax costs related to the Separation, including loss on early extinguishment of debt, of $1,021 million and $89 million, respectively. Of this amount, $85 million and $32 million is included in separation costs, $259 million and $0 million related to loss on early extinguishment of debt is included in other expense, net and $677 million and $57 million is included in discontinued operations, respectively.

Additionally, the quarter ended June 29, 2007 includes tax charges related to the Separation primarily for the write-off of deferred tax assets that will no longer be realizable of $138 million, of which $56 million is included in income taxes and $82 million is included in discontinued operations. The nine months ended June 29, 2007 includes tax charges of $173 million, of which $85 million is included in income taxes and $88 million is included in discontinued operations.

In connection with the Separation, the Company has realigned its management and segment reporting structure. The segment data presented reflects this new segment structure and has been reclassified to exclude the results of discontinued operations. The Company reports financial and operating information in the following five segments, effective March 31, 2007:

  - *ADT Worldwide* designs, sells, installs, services and monitors electronic security systems to residential, commercial, industrial and governmental customers.

5

The estimated aggregate amortization expense on intangible assets currently owned by the Company is expected to be approximately $100 million for the remainder of 2007, $450 million for 2008, $400 million for 2009, $300 million for 2010, $250 million for 2011 and $200 million for 2012.

See Note 1 for change in estimated life of dealer intangibles.

**8.  Debt**

Debt was as follows ($ in millions):

| | June 29, 2007 | September 29, 2006 |
|---|---|---|
| 6.125% Euro denominated public notes due 2007[2] | $ — | $ 762 |
| Revolving bank credit facility due 2007 | — | 700 |
| 364-day senior bridge loan facility due 2008[1] | 367 | — |
| 6.125% public notes due 2008 | 300 | 399 |
| 5.5% Euro denominated notes due 2008 | — | 869 |
| 6.125% public notes due 2009 | 215 | 399 |
| 6.75% public notes due 2011 | 516 | 999 |
| 6.375% public notes due 2011 | 849 | 1,500 |
| 6.5% British Pound denominated public notes due 2011 | — | 373 |
| Revolving senior credit facility due 2012 | 308 | — |
| 6.0% notes due 2013 | 654 | 997 |
| 3.125% convertible senior debentures due 2023 | 24 | 750 |
| 7.0% public notes due 2028 | 437 | 497 |
| 6.875% public notes due 2029 | 723 | 790 |
| 6.5% British Pound denominated public notes due 2031[1][2] | — | 536 |
| Other | 92 | 79 |
| Total debt | 4,485 | 9,650 |
| Less current portion | 384 | 773 |
| Long-term debt | $ 4,101 | $ 8,877 |

*(1)*
    These instruments, plus $17 million of the amount shown as other, comprise the current portion of long-term debt as of June 29, 2007.

*(2)*
    These instruments, plus $11 million of the amount shown as other, comprise the current portion of long-term debt as of September 29, 2006.

*Debt Tenders*

On April 27, 2007, Tyco announced that, in connection with the Separation, Tyco and certain of its subsidiaries that are issuers of its corporate debt had commenced tender offers to purchase for cash substantially all of its outstanding U.S. dollar denominated public debt, aggregating approximately $6.6 billion. Of this amount, approximately $5.9 billion was non-convertible U.S. debt and $750 million was convertible U.S. debt, with maturities from 2007 to 2029. In conjunction with the tender offers, the relevant issuer solicited consents for certain clarifying amendments to the indentures pursuant to which the debt was issued. Tyco received acceptance notices for approximately $2.1 billion, or 36% of its outstanding non-convertible U.S. debt and approximately $726 million or 97% of its outstanding convertible U.S. debt. Debt which was not tendered in an amount of approximately $3.8 billion remains with Tyco.

20

Additionally, Tyco International Group S.A., a wholly-owned subsidiary of the Company organized under the laws of Luxembourg ("TIGSA"), commenced on April 30, 2007 tender offers to purchase for cash all of its outstanding Euro and Pound Sterling denominated public debt, aggregating the equivalent of approximately $1.9 billion, with maturities from 2008 to 2031, issued under its Euro Medium Term Note Programme (the "EMTN Notes") and a consent solicitation for certain clarifying amendments to the fiscal agency agreement pursuant to which the EMTN Notes were issued. Tyco received acceptance notices for approximately $1.5 billion, or 80% of its EMTN Notes. The remaining EMTN Notes were repurchased pursuant to an optional redemption.

In connection with the debt tender offers, Tyco incurred a pre-tax charge for the early extinguishment of debt of approximately $647 million, for which no tax benefit is available. This charge consists primarily of premium paid and the write-off of unamortized debt issuance costs and discounts, of which $388 million is included in discontinued operations.

TIGSA's remaining debt was contributed to Tyco International Finance S.A. ("TIFSA"), a wholly owned subsidiary of the company and successor company to TIGSA.

*Bank and Credit Facilities*

On April 25, 2007, Tyco, certain of its subsidiaries and a syndicate of banks entered into three 364-day unsecured bridge loan facilities with an aggregate commitment amount of $10 billion. At the end of May 2007, the aggregate commitment amount under these facilities was increased to $12.5 billion. Tyco borrowed approximately $8.9 billion under the unsecured bridge loan facilities to fund its debt tender offers, repay its existing bank credit facilities and to finance the class action settlement. Of this amount, approximately $4.3 billion and $3.6 billion was assigned to Covidien and Tyco Electronics, respectively. Tyco initially guaranteed the new unsecured bridge loan facilities and Covidien and Tyco Electronics each assumed Tyco's obligations with respect to their unsecured bridge loan facilities upon the Separation. Tyco's aggregate commitment under its unsecured bridge loan facility is $4.7 billion. On June 29, 2007, $367 million remained outstanding under its unsecured bridge loan facility. This facility has a variable interest rate based on LIBOR. The margin over LIBOR payable by TIFSA can vary based on changes in its credit rating.

Additionally, on April 25, 2007, Tyco, certain of its subsidiaries and a syndicate of banks entered into three unsecured revolving credit facilities with an initial aggregate commitment amount of $2.5 billion that increased to $4.25 billion at the time of the Separation. Of the aggregate commitment amount of $4.25 billion, a $1.25 billion commitment is available to Tyco, and a $1.5 billion commitment is available to each of Covidien and Tyco Electronics. The revolving credit facilities will be used for working capital, capital expenditures and other corporate purposes. Tyco initially guaranteed the new revolving credit facilities and Covidien and Tyco Electronics each assumed Tyco's obligations with respect to their revolving credit facilities upon the Separation. At June 29, 2007, Tyco has borrowed $308 million under its unsecured revolving credit facility. This facility has a variable interest rate based on LIBOR. The margin over LIBOR payable by TIFSA can vary based on changes in its credit rating.

The unsecured revolving credit facilities replaced TIGSA's existing $1.0 billion 5-year revolving credit facility, $1.5 billion 3-year revolving bank credit facility and $500 million 3-year unsecured letter of credit facility, which were all terminated by June 1, 2007 prior to their scheduled expiration dates of December 16, 2009, December 21, 2007 and June 15, 2007, respectively. On the date of termination, no amounts were borrowed under the $1.0 billion facility and the $1.5 billion facility, and letters of credit of $494 million were issued under the $500 million facility. On June 21, 2007, Tyco, TIFSA and a

21

of minimum lease payments for non-cancelable leases as of September 29, 2006 follows (dollars in millions):

|  | Operating Leases | | Capital Leases | |
|---|---|---|---|---|
| 2007 | $ | 318 | $ | 12 |
| 2008 | | 251 | | 11 |
| 2009 | | 185 | | 9 |
| 2010 | | 126 | | 8 |
| 2011 | | 83 | | 6 |
| Thereafter | | 213 | | 61 |
| | | 1,176 | | 107 |
| Less: amount representing interest | | — | | 45 |
| | $ | 1,176 | $ | 62 |

In the normal course of business, the Company is liable for contract completion and product performance. In the opinion of management, such obligations will not significantly affect the Company's financial position, results of operations or cash flows.

In connection with the Separation, the Company entered into a liability sharing agreement regarding certain class actions that were pending against Tyco prior to the Separation. Subject to the terms and conditions of the Separation and Distribution Agreement, the Company will manage and control all the legal matters related to assumed contingent liabilities as described in the Separation and Distribution Agreement, including the defense or settlement thereof, subject to certain limitations.

Tyco will assume 27%, Covidien will assume 42% and Tyco Electronics will assume 31% of certain Tyco pre-separation contingent and other corporate liabilities, which include securities class action litigation, ERISA class action litigation, certain legacy tax contingencies and any actions with respect to the spin-offs or the distributions made or brought by any third party. Any amounts relating to these contingent and other corporate liabilities paid by Tyco after the spin-offs that are subject to the allocation provisions of the Separation and Distribution Agreement will be shared among Tyco, Covidien and Tyco Electronics pursuant to the same allocation ratio. As described in the Separation and Distribution Agreement, Tyco, Tyco Electronics and Covidien are jointly and severally liable for all amounts relating to the previously disclosed securities class action settlement. All costs and expenses that Tyco incurs in connection with the defense of such litigation, other than the amount of any judgment or settlement, which will be allocated in the manner described above, will be borne equally by Covidien, Tyco Electronics and Tyco.

*Class Actions and Class Action Settlement*

As a result of actions taken by certain of the Company's former senior corporate management, Tyco, some members of the Company's former senior corporate management, including its former Chief Executive Officer, former Chief Financial Officer, former members of its Board of Directors and former General Counsel are named defendants in a number of purported class actions alleging violations of the disclosure provisions of the federal securities laws. In addition, Tyco, certain of its current and former employees, some members of the Company's former senior corporate management and some former members of the Company's Board of Directors also are named as defendants in

23

Following is a roll forward of the Company's warranty accrual for the quarter and nine months ended June 29, 2007 ($ in millions):

| | For the Quarter Ended June 29, 2007 | For the Nine Months Ended June 29, 2007 |
|---|---|---|
| Balance at beginning of period | $ 173 | $ 186 |
| Warranties issued during the period | 6 | 21 |
| Changes in estimates | (1) | 2 |
| Settlements | (18) | (50) |
| Currency translation | 1 | 2 |
| Balance at June 29, 2007 | $ 161 | $ 161 |

In 2001, a division of Safety Products initiated a Voluntary Replacement Program ("VRP") associated with the acquisition of Central Sprinkler. The VRP relates to the replacement of certain O-ring seal sprinkler heads which were originally manufactured by Central Sprinkler prior to Tyco's acquisition. Under this program, the sprinkler heads are being replaced over a 5-7 year period free of charge to property owners. Settlements during the quarter and nine months ended June 29, 2007 include cash expenditures of $11 million and $28 million, respectively, related to the VRP. On May 1, 2007, the Consumer Products Safety Commission and the Company announced a deadline of August 31, 2007 for filing claims to participate in the VRP. Under these plans, the Company will fulfill all valid claims for replacement of faulty sprinklers received up to August 31, 2007.

**16.  Tyco International Finance S.A.**

TIFSA is a wholly owned subsidiary of the Company. TIFSA, which was formed in December 2006, is a holding company established in connection with the Separation as the successor company to TIGSA. During the quarter ended June 29, 2007, TIGSA's assets and liabilities were contributed to TIFSA, Covidien and Tyco Electronics. TIGSA was put into liquidation on June 1, 2007. TIFSA directly and indirectly owns substantially all of the operating subsidiaries of the Company, performs treasury operations and has assumed the indebtedness of TIGSA. Historically, TIGSA's debt and currently TIFSA's debt is fully and unconditionally guaranteed by Tyco.

The following tables, as restated for the adjustments discussed in Note 1, present condensed consolidating financial information for Tyco, TIFSA and all other subsidiaries. Condensed financial information for Tyco and TIFSA on a stand-alone basis is presented using the equity method of accounting for subsidiaries.

39

Source: TYCO INTERNATIONAL L, 10-Q, August 09, 2007

**Overview**

Effective June 29, 2007, Tyco completed the spin-offs of Covidien and Tyco Electronics, formerly Healthcare and Electronics businesses, respectively, into separate, publicly traded companies (the "Separation") in the form of a distribution to Tyco shareholders. The distribution was made on June 29, 2007, to Tyco shareholders of record on June 18, 2007, the record date. Each Tyco shareholder received 0.25 of a common share of each of Covidien and Tyco Electronics for each Tyco common share held on the record date. Tyco shareholders received cash in lieu of fractional shares for amounts of less than one Covidien or Tyco Electronics common share. The distribution was structured to be tax-free to Tyco shareholders except to the extent of cash received in lieu of fractional shares. As a result of the distribution, the operations of Tyco's former Healthcare and Electronics businesses are now classified as discontinued operations in all periods presented.

Additionally, on the distribution date, the Company, as approved by its Board of Directors, effected a reverse stock split of Tyco's common shares, at a split ratio of one for four. Shareholder approval for the reverse stock split was obtained at the March 8, 2007 Special General Meeting of Shareholders. Share and per share data for all periods presented have been adjusted to reflect the reverse stock split.

We have and will continue to incur separation costs related to debt refinancing, tax restructuring, professional services and employee-related costs. We currently estimate that the total income statement charges will be approximately $1.4 billion, after-tax, much of which will be reflected as discontinued operations. During the quarters ended June 29, 2007 and June 30, 2006, the Company incurred pre-tax costs related to the Separation, including the $647 million loss on early extinguishment of debt in 2007, of $830 million and $56 million, respectively. Of this amount, $28 million and $19 million is included in separation costs, $259 million and $0 million related to loss on early extinguishment of debt is included in other expense, net and $543 million and $37 million in included in discontinued operations, respectively. During the nine months ended June 29, 2007 and June 30, 2006, the Company incurred pre-tax costs related to the Separation, including the $647 million loss on early extinguishment of debt in 2007, of $1,021 million and $89 million, respectively. Of this amount, $85 million and $32 million is included in separation costs, $259 million and $0 million related to loss on early extinguishment of debt is included in other expense, net and $677 million and $57 million in included in discontinued operations, respectively. Most of the remaining charges are expected to be incurred over the next six months.

Additionally, the quarter ended June 29, 2007 includes tax charges related to the Separation primarily for the write-off of deferred tax assets that will no longer be realizable of $138 million, of which $56 million is included in income taxes and $82 million is included in discontinued operations. The nine months ended June 29, 2007 includes tax charges of $173 million, of which $85 million is included in income taxes and $88 million is included in discontinued operations.

On April 27, 2007, in connection with the Separation, Tyco and certain of its subsidiaries that are issuers of its corporate debt commenced tender offers to purchase for cash substantially all of its outstanding U.S. dollar denominated public debt, aggregating approximately $6.6 billion. Tyco received acceptance notices for approximately $2.1 billion, or 36% of its outstanding non-convertible U.S. debt and approximately $726 million or 97% of its outstanding convertible U.S. debt. Debt which was not tendered in an amount of approximately $3.8 billion remains with Tyco.

Additionally, on April 30, 2007, Tyco International Group S.A., a wholly-owned subsidiary of the Company ("TIGSA"), commenced tender offers to purchase for cash all of its outstanding Euro and Pound Sterling denominated public debt, aggregating the equivalent of approximately $1.9 billion. Tyco received acceptance notices for approximately $1.5 billion, or 80% of this debt, and the remainder was repurchased pursuant to an optional redemption.

In connection with the debt tender offers, Tyco incurred a pre-tax charge for the early extinguishment of debt of approximately $647 million, for which no tax benefit is available. The charge

Source: TYCO INTERNATIONAL L, 10-Q, August 09, 2007