UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE BANK OF NEW YORK, as
Indenture Trustee,

               Plaintiff,

        v.

TYCO INTERNATIONAL GROUP S.A.,
TYCO INTERNATIONAL, LTD., and
TYCO INTERNATIONAL FINANCE
S.A.,

               Defendants.

Docket No. 07 CV 4659 (SAS)

---

## PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, plaintiff The Bank of New York, as Indenture Trustee under the Indentures dated as of June 9, 1998 and November 12, 2003, submits this statement of material facts as to which there can be no dispute:

**The Parties**

1.      Defendant Tyco International Ltd. ("Tyco") is a publicly traded company organized under the laws of Bermuda with its principal place of business in Bermuda. (*See* 12/11/06 10-K of Tyco International Ltd. ("12/11/06 10-K"), at 1, Declaration of Andrew G. Gordon in Support of Plaintiff's Motion for Summary Judgment ("Gordon Decl.") Exhibit A.)

2.      Defendant Tyco International Group S.A. ("TIGSA" or the "Company") is a wholly-owned subsidiary of Tyco. TIGSA is a company incorporated under the laws of Luxembourg with its principal place of business located in Luxembourg. Prior to the transaction that is the subject of this motion, TIGSA was a holding company that held, directly or indirectly, the stock of Tyco's operating subsidiaries. Therefore, through its subsidiaries, TIGSA "own[ed]

1

substantially all of the assets, and engage[d] in substantially all of the businesses, owned or engaged in by Tyco." (2/25/99 Prospectus, $800,000,000 Tyco International Group S.A. Offer to Exchange Up to $400,000,000 5.875% Notes Due 2004 For Any and All Outstanding 5.875% Notes Due 2004 and Up to $400,000,000 6.125% Notes Due 2008 for Any and All Outstanding 6.125% Notes Due 2008 Fully and Unconditionally Guaranteed by Tyco International Ltd. ("2/25/99 Prospectus"), at 3, Gordon Decl. Ex. B; *see also* First Amended Complaint dated October 18, 2007 (Am. Cmplt.), at ¶ 19.)

3.     Defendant Tyco International Finance S.A. ("TIFSA") is a company incorporated under the laws of Luxembourg with its principal place of business located in Luxembourg. (*See* Am. Cmplt., at ¶ 21.)

4.     The Bank of New York ("BNY") is a New York banking corporation with its principal place of business in New York, New York. (*See id.* at ¶ 18.)

**The Company's Business Prior to June 29, 2007**

5.     Prior to June 29, 2007, Tyco, through TIGSA and its operating subsidiaries, was "a diversified manufacturing and service company" operating in over one hundred countries that, through its subsidiaries, engaged in four principal lines of business:

     a.     designing, manufacturing and distributing electrical and electronic components and related solutions (the "Electronics Business");

     b.     developing, manufacturing and distributing medical devices and supplies, imaging agents, pharmaceuticals and adult incontinence and infant care products (the "Healthcare Business");

2

c.       designing, manufacturing, installing, monitoring, and servicing electronic security and fire protection systems (the "Fire and Security Business"); and

d.       designing, manufacturing, distributing, and servicing engineered products, including, for example, industrial valves and controls, as well as steel tubular goods (the "Engineered Products and Services Business").

(*See* 3/26/2004 Prospectus, Tyco International Group S.A. Offer to Exchange New 6% Notes Due 2013 for All $1,000,000,000 of Outstanding 6% Notes Due 2013 Fully and Unconditionally Guaranteed by Tyco International Ltd., at 1, Gordon Decl. Ex. C.)

6.       In fiscal year 2006, the Electronics and Healthcare Businesses together generated $4.0 billion in operating income, or 68% of Tyco's positive operating income, while its Fire and Security and Engineered Products and Services Businesses generated $1.87 billion in operating income, or 32% of the total.  (12/11/06 10-K, at 152, Gordon Decl. Ex. A.)

7.       In fiscal year 2006, the Electronics and Healthcare Businesses together generated $22.365 billion in revenue, or 54.6% of total revenue, while Tyco's Fire and Security and Engineered Products and Services Businesses generated $18.595 billion in revenue, or 45.4% of the total.  (*Id.*)

**The Notes and the Indentures**

8.       Between 1998 and 2003, Tyco, through its wholly-owned subsidiary, TIGSA, borrowed in excess of $5.6 billion from the public by the sales of certain notes governed by indentures between the Company, Tyco, and BNY as Trustee.  (*See* 10/2/07 Transcript of Proceedings ("10/2/07 Tr."), at 16.)

9.     Beginning in 1998, the Company issued six series of notes (collectively, the "1998 Notes"):

a.     $400,000,000 of 6.125% unsecured notes due 2008 (CUSIP No. 902118AM0);

b.     $400,000,000 of 6.125% unsecured notes due 2009 (CUSIP No. 902118AJ7);

c.     $1,000,000,000 of 6.75% unsecured notes due 2011 (CUSIP No. 902118AY4);

d.     $1,500,000,000 of 6.375% unsecured notes due 2011 (CUSIP No. 90211BC1);

e.     $500,000,000 of 7.0% unsecured notes due 2028 (CUSIP No. 902118AC2); and

f.     $800,000,000 of 6.875% unsecured notes due 2029 (CUSIP No. 902118AK4).

(*See* 4/27/07 Tyco International Group S.A. Offer to Purchase and Solicitation of Consents for Any and All of Its Outstanding Securities (the "Offer to Purchase"), at i, Gordon Decl. Ex. D.)

10.     The 1998 Notes were issued under, and are thus governed by, an indenture, dated as of June 9, 1998 (as supplemented from time to time, the "1998 Indenture"), among the Company, Tyco, as guarantor, and BNY, as trustee. (*See id.* at ii.)

11.     In 2003, the Company issued another series of notes: $1,000,000,000 of 6.0% unsecured notes due 2013 (CUSIP No. 902118BK3) (the "2003 Notes"). (*See id.* at i.)

12.     The 2003 Notes were issued under, and are thus governed by, an indenture, dated as of November 12, 2003  (as supplemented, the "2003 Indenture"), among the Company, Tyco, as guarantor, and BNY, as trustee.  (*See id.* at ii.)

13.     The 1998 and 2003 Indentures (together, the "Indentures") provide that they and the 1998 and 2003 Notes (together, the "Notes") are governed by New York State law. (*See* 1998 Indenture, at § 10.8, Gordon Decl. Ex. E; 2003 Indenture, at § 13.04, Gordon Decl. Ex. F.)

**SPECIFIC INDENTURE PROVISIONS**

14.     There is no dispute about the authenticity of the Indentures or their terms, and either side may quote therefrom in their papers.

<u>**Remedies of the Trustee and Noteholders in the Event of Default**</u>

15.     Section 4.1(d) of the 1998 Indenture provides that an "Event of Default" means:

> default in the performance, or breach, of any covenant or agreement of the Issuer, Tyco or any other Guarantor in respect of the Securities of such series and related Guarantees (other than a covenant or agreement in respect of the Securities of such series and related Guarantees a default in whose performance or whose breach is elsewhere in this Section specifically dealt with), and continuance of such default or breach for a period of 90 days after the date on which there has been given, by registered or certified mail, to the Issuer by the Trustee or to the Issuer and the Trustee by the Holders of at least 25% in principal amount of the Outstanding Securities of all series affect thereby, a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a 'Notice of Default' hereunder . . . .

(1998 Indenture, at § 4.1(d), Gordon Decl. Ex. E.)

16.    Section 6.01(4) of the 2003 Indenture provides that an "Event of Default"

means:

> default in the performance, or breach, of any covenant or agreement of Tyco or the Company in respect of the Securities of such series and, if applicable, the related Guarantee (other than a covenant or agreement in respect of the Securities of such series and, if applicable, the related Guarantee a default in whose performance or whose breach is elsewhere in this Section specifically dealt with), and continuance of such default or breach for a period of 90 days after the date on which there has been given, by registered or certified mail, to Tyco and the Company by the Trustee or to Tyco, the Company and the Trustee by the Holders of at least 25% in principal amount of the Outstanding Securities of all series affected thereby, a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a 'Notice of Default' hereunder . . . .

(2003 Indenture, at § 6.01(4), Gordon Decl. Ex. F.)

17.    Section 4.8 of the 1998 Indenture provides that:

> no right or remedy herein conferred upon or reserved to the Trustee or to the Securityholders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given [under the 1998 Indenture] or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy [under the 1998 Indenture], or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

(1998 Indenture, at § 4.8, Gordon Decl. Ex. E.)

18.    Section 6.05 of the 2003 Indenture provides that:

> all powers and remedies given by this Article VI to the Trustee or to the Securityholders, to the extent permitted by law, shall be deemed cumulative and not exclusive of any other powers and remedies available to the Trustee  or to the holders of the Securities, by judicial proceedings or otherwise, to enforce the performance or observance of the covenants and agreements

6

contained in this Indenture or otherwise established with respect to
such Securities.

(2003 Indenture, at § 6.05, Gordon Decl. Ex. F.)

**The Supplemental Indenture Provisions**

19.    The 1998 Indenture provides that the Company and Tyco may under
certain circumstances enter into supplemental indentures without the consent of the Noteholders.

Section 7.1 of the 1998 Indenture thus provides:

> The Issuer, Tyco and any other Guarantor when authorized by
> resolutions of their respective Board of Directors, and the Trustee
> may from time to time and at any time enter into an indenture or
> indentures supplemental hereto for one or more of the following
> purposes:
> . . . .
>
> (b) to evidence the succession of another corporation to the Issuer
> or any Guarantor, or successive successions, and the assumption
> by the successor Person of the covenants, agreements and
> obligations of the Issuer pursuant to Article Eight;
> . . . .
>
> (d) to cure any ambiguity or to correct or supplement any provision
> contained herein or in any supplemental indenture which may be
> defective or inconsistent with any other provision contained herein
> or in any supplemental indenture; or to make such other provisions
> in regard to matters or questions arising under this Indenture or
> under any supplemental indenture as the Board of Directors of the
> Issuer may deem necessary or desirable and which shall not
> adversely affect the interests of the Holders of the Securities in any
> material respect;
> . . . .
>
> The Trustee is hereby authorized to join with the Issuer, Tyco and
> any other Guarantor in the execution of any such supplemental
> indenture, to make any further appropriate agreements and
> stipulations which may be therein contained and to accept the
> conveyance, transfer, assignment, mortgage or pledge of any
> property thereunder, but the Trustee shall not be obligated to enter
> into any such supplemental indenture which affects the Trustee's
> own rights, duties or immunities under this Indenture or otherwise.

(1998 Indenture, at § 7.1, Gordon Decl. Ex. E.)

7

20.    The 2003 Indenture provides that the Company and Tyco may under certain circumstances enter into supplemental indentures without the consent of the Noteholders. Section 9.01 of the 2003 Indenture thus provides:

> Tyco, the Company and the Trustee from time to time and at any time may enter into an indenture or indentures supplemental hereto (which shall conform to the provisions of the Trust Indenture Act as then in effect), without the consent of the Securityholders, for one or more of the following purposes:
>
> (a)    to cure any ambiguity, defect, or inconsistency herein or in the Securities of any series, including making such changes as are required for this Indenture to comply with the Trust Indenture Act, or to make such other provisions in regard to matters or questions arising under this Indenture or under any supplemental indenture as the Board of Directors of the Company may deem necessary or desirable, and which shall not in either case adversely affect the interests of the Holders of the Securities in any material respects;
>
> (b)    to evidence the succession of another Person to Tyco or the Company, or successive successions, and the assumption by the successor Person of the covenants, agreements and obligations of Tyco or the Company, as the case may be, pursuant to Article X;
> . . . .
>
> (h)    to make any other change that does not adversely affect the rights of any Securityholder of Outstanding Securities in any material respect
> . . . .
>
> Upon the request of the Company, accompanied by Board Resolutions authorizing the execution of any such supplemental indenture, and upon receipt by the Trustee of the documents described in Section 9.05, the Trustee shall join with Tyco and the Company in the execution of any such supplemental indenture, and to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee shall not be obligated to enter into any such supplemental indenture that affects the Trustee's own rights, duties or immunities under this Indenture or otherwise.

(2003 Indenture, at § 9.01, Gordon Decl. Ex. F.)

21.    The 1998 Indenture also provides that the Company and Tyco may under certain circumstances enter into supplemental indentures with the consent of the Noteholders. Section 7.2 of the 1998 Indenture thus provides:

> With the consent . . . of the Holders of not less than a majority in aggregate principal amount of the Securities at the time outstanding of all series affected by such supplemental indenture (voting as one class), the Issuer, Tyco and any other Guarantor, when authorized by resolutions of their respective Boards of Directors, and the Trustee may, from time to time and at any time, enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or of any supplemental indenture or of modifying in any manner the rights of the Holders of the Securities of each such series; provided, that no such supplemental indenture shall (a) extend the final maturity of any Security, or reduce the principal amount thereof, or reduce the rate or extend the time of payment of interest thereon, or reduce any amount payable on redemption thereof or reduce the amount of the principal of an Original Issue Discount Security that would be due and payable upon an acceleration of the maturity thereof pursuant to Section 4.1 or the amount thereof provable in bankruptcy pursuant to Section 4.2, or impair or affect the right of any Securityholder to institute suit for the payment thereof or, if the Securities provide therefor, any right of repayment at the option of the Securityholder without the consent of the Holder of each Security so affected or, (b) reduce the aforesaid percentage of Securities of any series, the consent of the Holders of which is required for any such supplemental indenture, without the consent of the Holders of each Security so affected.

(1998 Indenture, at § 7.2, Gordon Decl. Ex. E.)

22.    The 2003 Indenture also provides that the Company and Tyco may under certain circumstances enter into supplemental indentures with the consent of the Noteholders. Section 9.02 of the 2003 Indenture thus provides:

> With the consent . . . of the holders of not less than a majority in aggregate principal amount of the Securities of each series at the time Outstanding affected by such supplemental indenture or indentures, Tyco and the Company, when authorized by Board Resolutions, and the Trustee from time to time and at any time may enter into an indenture or indentures supplemental hereto . . .

for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or of any supplemental indenture or of modifying in any manner not covered by Section 9.01 the rights of the holders of the Securities of such series under this Indenture; provided, however, that no such supplemental indenture, without the consent of the holders of each Security then Outstanding and affected thereby, shall (i) extend a fixed maturity of or any installment of principal of any Securities of any series or reduce the principal amount thereof or reduce the amount of principal of any original issue discount security that would be due and payable upon declaration of acceleration of the maturity thereof, (ii) reduce the rate of or extend the time for payment of interest on any Security of any series; (iii) reduce the premium payable upon the redemption of any Security; (iv) make any Security payable in Currency other than that stated in the Security; (v) impair the right to institute suit for the enforcement of any payment on or after the fixed maturity thereof (or in the case of redemption, on or after the redemption date); or (vi) reduce the aforesaid percentage of Securities, the holders of which are required to consent to any such supplemental indenture or indentures.

(2003 Indenture, at § 9.02, Gordon Decl. Ex. F.)

**The Successor Obligor Clauses**

23.     The 1998 and 2003 Indentures each contains a successor obligor clause

forbidding the Company from transferring "all or substantially all" of its assets to anyone, unless

the transferee assumes the obligation to pay the Notes. (*See* 10/2/07 Tr., at 16.)

24.     The 1998 Indenture provides that:

Each of the [TIGSA], Tyco, and any other Guarantors, if any, covenants that it will not merge or consolidate with any other Person or sell or convey all or substantially all of its assets to any Person, unless (i) either the [TIGSA] or such Guarantor, as the case may be, shall be the continuing entity, or the successor entity or the Person which acquires by sale or conveyance substantially all the assets of the [TIGSA] or such Guarantor, as the case may be (if other than the [TIGSA] or such Guarantor, as the case may be) shall expressly assume the due and punctual payment of the principal of and interest on all the Securities or the obligations under the Guarantees, as the case may be, according to their tenor, and the due and punctual performance and observance of all of the

10

covenants and agreements of this Indenture to be performed or observed by the [TIGSA] or such Guarantor, as the case may be, by supplemental indenture satisfactory to the Trustee, executed and delivered to the Trustee by such corporation, and (ii) the [TIGSA] or such Guarantor, as the case may be, or such successor corporation, as the case may be, shall not, immediately after such merger or consolidation, or such sale or conveyance, be in default in the performance of any such covenant or agreement.

(1998 Indenture, at § 8.1, Gordon Decl. Ex. E.)

25.    The 2003 Indenture provides that:

Each of Tyco and the Company, covenants that it will not merge or consolidate with any other Person or sell or convey all or substantially all of its assets to any Person, unless (i) either Tyco or the Company, as the case may be, shall be the continuing entity, or the successor entity or the Person which acquires by sale or conveyance substantially all the assets of Tyco or the Company, as the case may be (if other than Tyco or the Company, as the case may be), (A) shall expressly assume the due and punctual payment of the principal of, premium, if any, and interest on all the Securities or, if applicable, the obligations under any Guarantee, as the case may be, according to their tenor, and the due and punctual performance and observance of all of the covenants and agreements of this Indenture to be performed or observed by Tyco or the Company, as the case may be, by supplemental indenture satisfactory to the Trustee, executed and delivered to the Trustee by such Person and (B) is an entity treated as a "corporation" for United States tax purposes or Tyco or the Company, as the case may be, obtains either (x) an opinion, in form and substance reasonably acceptable to the Trustee, of tax counsel of recognized standing reasonably acceptable to the Trustee, which counsel shall include Gibson, Dunn & Crutcher LLP, or (y) a ruling from the United States Internal Revenue Service, in either case to the effect that such merger or consolidation or such sale or conveyance, will not result in an exchange of the Securities for new debt instruments for United States federal income tax purposes; and (ii) no Event of Default and no event that, after notice or lapse of time or both, would become an Event of Default shall be continuing immediately after such merger or consolidation, or such sale or conveyance.

(2003 Indenture, at § 10.01, Gordon Decl. Ex. F.)

**The Make-Whole Provisions**

26.    The Notes are subject to a redemption provision.  Thus, for example, Supplemental Indenture No. 3 provides that the $500,000,000 7.0% unsecured notes due 2028 issued under the 1998 Indenture:

> are redeemable, in whole or in part, at the option of the Company at any time at a redemption price equal to the greater of (i) 100% of the principal amount of such Notes, and (ii) as determined by the Quotation Agent, the sum of the present values of the remaining scheduled payments of principal and interest thereon (not including any portion of such payments of interest accrued as of the date of redemption) discounted to the date of redemption on a semiannual basis (assuming a 360-day year consisting of twelve 30-day months) at the Adjusted Redemption Treasury Rate plus 15 basis points plus, in each case, accrued interest thereon to the date of redemption.

(*See* Supplemental Indenture No. 3, $500,000,000 7% Notes Due 2028, Gordon Decl. Ex. G.)

27.    The other Notes are subject to substantially similar provisions, which differ in the number of "basis points" which are to be added to the "Adjusted Redemption Treasury Rate."  Thus:

a.    Supplemental Indenture No. 6, governing the $400,000,000 of 6.125% unsecured notes due 2008 issued under the 1998 Indenture, provides for "25 basis points" to be added to the "Adjusted Redemption Treasury Rate";

b.    Supplemental Indenture No. 7, governing the $400,000,000 of 6.125% unsecured notes due 2009 issued under the 1998 Indenture, provides for "25 basis points" to be added to the "Adjusted Redemption Treasury Rate";

c.    Supplemental Indenture No. 8, governing the $800,000,000 of 6.875% unsecured notes due 2029 issued under the 1998 Indenture, provides for "25 basis points" to be added to the "Adjusted Redemption Treasury Rate";

       d.     Supplemental Indenture No. 16, governing the $1,000,000,000 of 6.75% unsecured notes due 2011 issued under the 1998 Indenture, provides for "25 basis points" to be added to the "Adjusted Redemption Treasury Rate";

       e.     Supplemental Indenture No. 20, governing the $1,500,000,000 of 6.375% unsecured notes due 2011 issued under the 1998 Indenture, provides for "35 basis points" to be added to the "Adjusted Redemption Treasury Rate"; and

       f.     First Supplemental Indenture, governing the $1,000,000,000 of 6.0% unsecured notes due 2013 issued under the 2003 Indenture, provides for "25 basis points" to be added to the "Adjusted Redemption Treasury Rate."

(*See id.;* Gordon Decl. Ex. H.)

**Tyco Announces Its "Plan to Separate"**

       28.     On January 13, 2006, Tyco issued a press release. (1/13/06 Press Release, Gordon Decl. Ex. I.)

       29.     In that press release, Tyco announced its "intent to separate into three publicly traded companies" (the "Proposed Separation"). Specifically, Tyco stated that "its Board of Directors [had] approved a plan to separate the company's current portfolio of diverse businesses into three separate, publicly traded companies – Tyco Healthcare, one of the world's leading diversified healthcare companies; Tyco Electronics, the world's largest passive electronic components manufacturer, and the combination of Tyco Fire & Security and

Engineered Products & Services (TFS/TEPS), a global business with leading positions in residential and commercial security, fire protection and industrial products and services." (*Id.*)

30.    Tyco further stated that it intended "to accomplish the separation through tax-free stock dividends to Tyco shareholders, after which they [would] own 100% of the equity in three publicly traded companies." (*Id.*)

31.    Tyco also disclosed that "[t]he company's existing debt is expected to be allocated among the three companies or refinanced. Any existing or potential liabilities that cannot be associated with a particular entity will be allocated appropriately to each of the businesses, and a sharing arrangement among the three companies will be established." Tyco also stated that the three companies were "expected to have financial policies, balance sheets and credit metrics that are commensurate with solid investment grade credit ratings." (*Id.*)

**The Company's Tender Offer**

32.    On April 27, 2007, in connection with an attempt to repurchase the Notes at issue in this matter, the Company filed an Offer to Purchase and Consent Solicitation Statement with the SEC (the "Offer to Purchase"). The Offer to Purchase consisted of both an offer to purchase the Notes at issue in this matter (the "Tender Offer") and a consent solicitation statement seeking the Noteholders' consent to certain proposed amendments to the Indentures (the "Proposed Amendments"). (*See* Offer to Purchase, Gordon Decl. Ex. D.)

33.    In the Offer to Purchase, TIGSA described in general terms the transaction that was intended to take place. The Company disclosed to the Noteholders that it planned to "contribute the assets and liabilities relating to its electronic businesses to Tyco Electronics, and the assets and liabilities relating to its healthcare business to Covidien. The assets and liabilities

14

relating to its fire and security and engineered products and services businesses will be contributed to TIFSA, and TIFSA will assume the liabilities of the Company under its indentures and under any of the Company's public debt that remains outstanding upon completion of the Tender Offers and the similar offers referred to above." The Company also stated that "after the contribution of all of its assets and liabilities, the Company will liquidate and, as a final liquidating distribution, will distribute to Tyco all of the outstanding shares of capital stock of TIFSA, Tyco Electronics and Covidien. Tyco will then distribute the shares of Tyco Electronics and Covidien to its shareholders." (*Id.* at 6.)

34. The Tender Offer and Proposed Amendments were intertwined insofar as the Company's obligation to purchase the Notes pursuant to the Tender Offer was conditioned upon the Noteholders' consent to the Proposed Amendments. (*See id.* at iv ("the Company's obligation to accept for purchase, and to pay for, any Notes validly tendered and not validly withdrawn pursuant to each of the Tender Offers is conditioned upon . . . the receipt of the applicable Requisite Consents . . . .").)

35. In the Company's words, the Proposed Amendments were meant to "clarify the applicability of Article Eight [of the 1998 Indenture, which contains the Successor-Obligor Clause] to the Proposed Separation." (*Id.* at 9.)

36. Specifically, the Proposed Amendments would clarify that the applicability of the Successor-Obligor Clauses in the Indenture – *i.e.*, the "all or substantially all" determination – should be made only *after* the first two steps of the Proposed Separation were complete. Accordingly, the Proposed Amendments provided:

In connection with the Separation Transactions (as defined in Section 8.1(c)), the provisions of Section 8.1(a) shall be interpreted as follows:

(i) the transfer of a portion of the Issuer's assets to Tyco Electronics (as defined in Section 8.1(c)) and a portion of the Issuer's assets to Covidien (as defined in Section 8.1(c)), as contemplated by the Separation Transactions, shall be deemed **not** to be a sale or conveyance of all or substantially all of the Issuer's assets or Tyco's assets;

(ii) **the transfer of a portion of the Issuer's assets to Tyco International Finance S.A. (as defined in Section 8.1(c)), as contemplated by the Separation Transactions, shall be deemed to be a conveyance of substantially all of the Issuer's assets to Tyco International Finance S.A.** and be deemed not to be a sale or conveyance of all or substantially all of Tyco's assets; and

(iii) the distribution by Tyco to its shareholders of the shares of Covidien Ltd. and Tyco Electronics Ltd. shall be deemed **not** to be a sale or conveyance of all or substantially all of Tyco's assets.

(*Id.* at A-1 (emphasis added).)

**The Securities Action**

37.     On May 9, 2007, less than two weeks after the Company filed the Offer to Purchase, a Noteholder commenced a securities action in this District, alleging that the Proposed Separation was indistinguishable in substance from the transaction that was found to violate the successor obligor clause at issue in *Sharon Steel Corp.* v. *Chase Manhattan Bank*, 691 F.2d 1039 (2d Cir. 1982) (the "Securities Action").    (*See AIG Global Investment Corp.* v. *Tyco International Group S.A.,* No. 07 Civ. 3693 (S.D.N.Y. May 9, 2007) (Scheindlin, J.).)

38.     The Securities Action further asserted that the Offer to Purchase "violate[d] the federal securities laws" because it failed to disclose the parallels between the Proposed Separation and the transaction that was found to violate successor obligor clauses in *Sharon Steel.*  Indeed, the Offer to Purchase contained no mention of *Sharon Steel* whatsoever.

16

39.    The next day, the Company issued a non-public corrective disclosure to Noteholders which explained the Securities Action and the Noteholder's claim that the Proposed Separation violated *Sharon Steel*. (*See* 5/10/07 Supplement to Offer to Purchase and Consent Solicitation Statement Dated April 27, 2007, Gordon Decl. Ex. N.)

**The Tender Offer Fails**

40.    According to an amendment to the Company's SEC filings related to the Tender Offer, Noteholders representing scarcely a third of the outstanding face value of the bonds under each Indenture tendered their Notes to the Company: Noteholders tendered 33.67% of the $4.6 billion in Notes issued under the 1998 Indenture and 34.39% of the $1.0 billion in Notes issued under the 2003 Indenture. (*See* 5/25/07 Schedule to Tender Offer Statement Under Section 14(d)(1) or 13(e)(1) of the Securities Exchange Act of 1934, at 1, Gordon Decl. Ex. O.)

**The Plan as Effected**

41.    After the Offer to Purchase, TIGSA and Tyco accomplished a transaction to effectuate Tyco's separation into three separate publicly traded companies. The transaction as it actually occurred is described below.

42.    As of May 30, 2007, the Company sought to add TIFSA as a co-obligor of the Notes through supplemental indentures to the Indentures, which it executed with Tyco and TIFSA. (*See* Supplemental Indenture No. 21 (supplementing the 1998 Indenture), at 2, Gordon Decl. Ex. L; Supplemental Indenture No. 2 (supplementing the 2003 Indenture), at 2, Gordon Decl. Ex. L.)

43.    In particular, these supplemental indentures provide:

**Additional Obligor.** TIFSA hereby expressly agrees to become a co-obligor with respect to the due and punctual payment of the principal of, premium, if any, and interest on all the Securities according to their tenor, and the due and punctual performance and observance of all of the covenants and agreements of the Indenture to be performed or observed by the Company. In connection with TIFSA becoming such a co-obligor, the Company shall remain as an obligor and Tyco shall remain as Guarantor under the Indenture with respect to the Securities.

(Supplemental Indenture No. 21, at § 1.1, Gordon Decl. Ex. L; Supplemental Indenture No. 2, at

§ 1.1, Gordon Decl. Ex. L.)

44.    Supplemental Indenture No. 21 also provides:  "Effectiveness:  This Supplemental Indenture No. 21 shall become effective upon execution by the Issuer [TIGSA], TIFSA, Tyco and the Trustee."  (Supplemental Indenture No. 21, at § 2.5, Gordon Decl. Ex. L.) Likewise, Supplemental Indenture No. 2 provides:  "Effectiveness:  This Supplemental Indenture No. 21 shall become effective upon execution by the Company, TIFSA, Tyco and the Trustee." (Supplemental Indenture No. 2, at § 2.5, Gordon Decl. Ex. L.)

45.    Supplemental Indenture No. 21 and Supplemental Indenture No. 2 were delivered to the Trustee on May 30, 2007, along with Officers' Certificates and Opinions of Counsel as provided in the Indentures.  The Trustee has never executed either Supplemental Indenture No. 21 or Supplemental Indenture No. 2.

46.    Pursuant to a Contribution Agreement between TIGSA, TIFSA,  and two additional TIGSA subsidiaries, Covidien International Finance S.A. ("CIFSA") and Tyco Electronics Group S.A. ("TEGSA"), dated as of May 31, 2007, TIGSA agreed "to transfer its entire business" to these three subsidiaries "in the following sequence":

> a.     TIGSA contributed "all of its right, title and interest in the . . . [assets and liabilities relating to the Healthcare Business] . . . to [CIFSA] in exchange for the issue to [TIGSA] on the Issue Date of 10,000,000 (ten million) shares by [CIFSA] . . . .";
>
> b.     TIGSA contributed "all of its right, title and interest in the . . . [assets and liabilities relating to the Electronics Business] . . . to [TEGSA] in exchange for  the issue to [TIGSA] on the Issue Date of 10,000,000 (ten million) shares by [TEGSA] . . . ."; and,
>
> c.     TIGSA contributed "all of its right, title and interest in the . . . [assets and liabilities relating to the Fire and Security Business and the Engineered Products and Services Business] . . . to [TIFSA] in exchange for  the issue to [TIGSA] on the Issue Date of 10,000,000 (ten million) shares by [TIFSA] . . . ."

(Contribution Agreement, at §§ 1.1, 2.1, Gordon Decl. Ex. J.)

> 47.     Section 5.1 of the Contribution Agreement provides:
>
> > Where any consent, confirmation, approval, authorization or agreement of any third party is required for the effective transfer of any asset or liability . . . and such consent, confirmation, approval, authorization or agreement has not been obtained, at or prior to Completion, the contribution of that asset or liability shall, notwithstanding Completion, be conditional upon that consent, confirmation, approval, authorization or agreement . . . and the Contributor and the Contributees shall each for itself, before and after Completion, use its best efforts to obtain all such consents, confirmations, approvals, authorizations and agreements (or procure that they shall be obtained) as soon as possible.

(*Id.* at § 5.1.)

48.    Section 5.2 of the Contribution Agreement provides:

If the third party consent or agreement referred to in Clause 5.1 is refused or is not obtained on or before the first anniversary of the date of this Agreement (or such later date as the Contributor and the Contributees may determine) . . . and there is no lawful method reasonably available to the Parties by which full, or substantially full, enjoyment of such asset or liability can be afforded to the relevant Contributee, the relevant Contributee and the Contributor shall consider what action to take in relation to that asset or liability and in relation to the consideration paid in respect of that asset or liability . . . .

(*Id.* at § 5.2.)

49.    The Company and TIFSA agreed to "use" their "best efforts to complete all formalities necessary or desirable in order to provide for or complete the release or indemnification of the [Company] from all its liabilities and obligations relating to the Public Debt," which is defined in the Contribution Agreement as the "outstanding notes and debentures issued by [TIGSA] . . . which have not been purchased by the [Company] pursuant to the tender offers launched by [the Company] on 27 April 2007 and 30 April 2007" and which include the Notes at issue in this action. (*Id.* at §§ 1.1, 9.4.)

50.    In the Contribution Agreement, "for the purposes of determining the subscription price for the" shares issued by CIFSA, TEGSA, and TIFSA to TIGSA, the Company placed a "value" of $23,983,988,000 on the Healthcare Business (or 37.9% of the total); a "value" of $16,122,857,533 on the Electronics Business (or 25.5% of the total), and a "value" of $23,196,986,625 on the Fire and Security Business and Engineered Products and Services Business (or 36.6% of the total). (*Id.* at § 2.1.)

51.    TIGSA contributed all of the shares of CIFSA to TIGSA's subsidiary, Covidien International Ltd. ("Covidien"), and all of the shares of TEGSA to another of TIGSA's subsidiaries, Tyco Electronics Ltd. ("Tyco Electronics").

52.    TIGSA then distributed all of its assets, which at this point were reorganized under Covidien, Tyco Electronics, and TIFSA, to Tyco.

53.    As of June 1, 2007, in conjunction with the transfer of TIGSA's assets to Tyco, TIGSA, Tyco and TIFSA executed supplemental indentures stating that Tyco assumed TIGSA's obligations under the Indentures. (*See* Supplemental Indenture No. 22 (supplementing the 1998 Indenture), at 3, Gordon Decl. Ex. L; Supplemental Indenture No. 3 (supplementing the 2003 Indenture), at 3, Gordon Decl. Ex. L.)

54.    In particular, Supplemental Indenture No. 22 provides:

> **Assumption and Succession.**    Upon the Transfer and in accordance with Sections 8.1 and 8.2 of the Indenture, Tyco hereby expressly assumes all of the obligations of [TIGSA] under the Indenture, including the obligation to make the due and punctual payment of the principal of and interest on all the Securities according to their tenor and the due and punctual performance and observance of all the covenants and agreements of the Indenture to be performed or observed by the Issuer, and Tyco shall succeed to, and be substituted for, [TIGSA] with the same effect as if Tyco had been named therein and [TIGSA] shall be discharged from all obligations and covenants under the Indenture and the Securities and may be liquidated and dissolved.

(Supplemental Indenture No. 22, at § 1.1, Gordon Decl. Ex. L.)

55.    Supplemental Indenture No. 3 provides:

> **Assumption and Succession.**    Upon the Transfer and in accordance with Sections 10.01 and 10.02 of the Indenture, Tyco hereby expressly assumes all of the obligations of [TIGSA] under the Indenture, including the obligation to make the due and punctual payment of the principal of and interest on all the Securities according to their tenor and the due and punctual

performance and observance of all the covenants and agreements of the Indenture to be performed or observed by the Issuer, and Tyco shall succeed to, and be substituted for, [TIGSA] with the same effect as if Tyco had been named therein and [TIGSA] shall be discharged from all obligations and covenants under the Indenture and the Securities and may be liquidated and dissolved.

(Supplemental Indenture No. 3, at § 1.1, Gordon Decl. Ex. L.)

56.    Supplemental Indenture No. 22 also provides: "Effectiveness: This Supplemental Indenture No. 22 shall become effective upon execution by the Issuer [TIGSA], TIFSA, Tyco and the Trustee." (Supplemental Indenture No. 22, at § 2.5, Gordon Decl. Ex. L.) Supplemental Indenture No. 3 provides: "Effectiveness: This Supplemental Indenture No. 3 shall become effective upon execution by the Company, TIFSA, Tyco and the Trustee." (*Id.* at § 2.5.)

57.    Supplemental Indenture No. 21 and Supplemental Indenture No. 2 were delivered to the Trustee on May 31, 2007, along with Officers' Certificates and Opinions of Counsel as provided in the Indentures. The Trustee has never executed either Supplemental Indenture No. 22 or Supplemental Indenture No. 3.

58.    As Tyco disclosed in its 10-Q for the quarter ended June 29, 2007, "TIGSA was put into liquidation on June 1, 2007." Tyco further disclosed that, following TIGSA's tender offer for the Notes, "Debt which was not tendered in an amount of approximately $3.8 billion remains with Tyco." Tyco further explained that "TIGSA's remaining debt was contributed to [TIFSA], a wholly owned subsidiary of [Tyco] and successor company to TIGSA." Thus, after the completion of the transaction at issue here, TIFSA "directly and indirectly owns substantially all of the operating subsidiaries of [Tyco], performs treasury operations and has assumed the indebtedness of TIGSA." (8/9/07 10-Q of Tyco International Ltd. ("8/9/07 10-Q"), at 21, 39, 51, Gordon Decl. Ex. K.)

59.    On June 29, 2007, Tyco distributed to its shareholders all of its shares in Covidien and Tyco Electronics in the form of tax-free dividends. (*See* 8/9/07 10-Q, at 5, 51, Gordon Decl. Ex. K.)   Tyco further disclosed that Covidien would "assume 42%" and Tyco Electronics would "assume 31% of certain Tyco pre-separation contingent and other corporate liabilities, which include securities class action litigation, ERISA class action litigation, certain legacy tax contingencies and any actions with respect to the spin-offs or the distributions made or brought by any third party." (*Id.* at 23.)

60.    Tyco continues to request the Trustee's signatures on the Supplemental Indentures.

**The Notice of Default**

61.    On November 8, 2007, BNY sent the Company a Notice of Default under the Indentures.

**Governing Luxembourg Law**

62.    Under Luxembourg tax law, dividends, shares of profit and other income allocated in whatever manner on the grounds of shares, participations into the share capital, shares of profit or participations in whatever form in the share capital of a Luxembourg resident company subject to the Luxembourg income tax law pursuant to Article 159 of the Luxembourg law of 4 December 1967 regarding income tax, hereinafter, the "Loi de 1967", are in principle subject in Luxembourg to a withholding tax of 15%. (Seimetz Decl., at 1, Gordon Decl. Ex. M.)

63.    Article 146 of the Loi de 1967 can be overridden by the provisions of any applicable double tax treaty concluded by Luxembourg.  There is no double tax treaty concluded between Luxembourg and Bermuda. (*Id.* at 3.)

64.    There is, however, no withholding tax in Luxembourg on the distribution of liquidation proceeds by an ordinary commercial Luxembourg company being the object of Article 159 of the Loi de 1967.  (*Id*.)


Dated: December 4, 2007

Respectfully submitted,

DECHERT LLP

By: /s/ Kevin O'Brien
Kevin O'Brien
Glenn Siegel
Alissa Rossman

kevin.obrien@dechert.com

30 Rockefeller Plaza
New York City, New York 10112
(212) 698-3500

*Co-Counsel for the Trustee*

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP

By: /s/ Gerard E. Harper
Gerard E. Harper
Andrew G. Gordon
Andrew N. Rosenberg

gharper@paulweiss.com

1285 Avenue of the Americas
New York City, New York 10019
(212) 373-3000

*Co-Counsel for the Trustee*