UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE BANK OF NEW YORK,

        Plaintiff,

    v.

TYCO INTERNATIONAL GROUP S.A., TYCO
INTERNATIONAL LTD., and TYCO
INTERNATIONAL FINANCE S.A.,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

07 Civ. 4659 (SAS)

ECF Case


**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT**


GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 47th Floor
New York, New York 10166-0193
(212) 351-4000

Attorneys for Defendants

January 11, 2008

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 3

A.    The Defendants ..................................................................................... 3

B.    The Notes and the Indentures .............................................................. 4

C.    The Transaction .................................................................................... 6

D.    Tyco's Continuing Assets and Operations............................................ 11

E.    Procedural Background.......................................................................... 12

ARGUMENT ....................................................................................................... 13

THE COURT SHOULD GRANT SUMMARY JUDGMENT IN FAVOR OF
DEFENDANTS .................................................................................................... 13

A.    The Transfer of the Notes from TIGSA to Tyco Complied with the
Indentures............................................................................................. 14

B.    Defendants Did Not Breach the Indentures Because of the Trustee's
Unjustified Failure to Sign the Supplemental Indentures..................... 18

C.    The Reorganization of Tyco's Operating Subsidiaries Did Not Violate
the Indentures........................................................................................ 19

D.    Even if Defendants Breached the Indentures, Plaintiff is Entitled Only
to the Principal Plus Accrued Interest on the Notes ............................. 21

CONCLUSION..................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

## Cases

*3C Assocs. v. IC & LP Realty Co.*,
  137 A.D.2d 439, 524 N.Y.S.2d 701 (1st Dep't 1988) ...................................................... 22, 23

*Charter One Bank, FSB v. Leone*,
  45 A.D.3d 958, 845 N.Y.S.2d 513 (3d Dep't 2007) ................................................................ 23

*Chase Manhattan Bank v. Traffic Stream (BVI) Infrastructure Ltd.*,
  86 F. Supp. 2d 244 (S.D.N.Y. 2000), *aff'd*, 52 F. App'x 528 (2d Cir. 2002) .................... 13, 14

*D.I.S., LLC v. Sagos*,
  38 A.D.3d 543, 832 N.Y.S.2d 581 (2d Dep't 2007) ................................................................ 22

*Ellenberg Morgan Corp. v. Hard Rock Cafe Assocs.*,
  116 A.D.2d 266, 500 N.Y.S.2d 696 (1st Dep't 1986) ............................................................ 19

*George H. Nutman, Inc. v. Aetna Bus. Credit, Inc.*,
  115 Misc. 2d 168, 453 N.Y.S.2d 586 (Sup. Ct. Queens Co. 1982) ......................................... 21

*Geren v. Quantum Chem. Corp.*,
  832 F. Supp. 728 (S.D.N.Y. 1993) .......................................................................................... 18

*Harnickell v. Omaha Water Co.*,
  146 A.D. 693, 131 N.Y.S. 489 (1st Dep't 1911) ..................................................................... 25

*Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*,
  723 F. Supp. 976 (S.D.N.Y. 1989) ............................................................................................ 5

*Hollinger Inc. v. Hollinger Int'l, Inc.*,
  858 A.2d 342 (Del. Ch. 2004) ................................................................................................. 15

*In re LHD Realty Corp.*,
  726 F.2d 327 (7th Cir. 1984) ............................................................................................. 22, 23

*Jeffreys v. City of New York*,
  426 F.3d 549 (2d Cir. 2005) ................................................................................................... 13

*Kilpatrick v. Germania Life Ins. Co.*,
  183 N.Y. 163, 75 N.E. 1124 (1905)......................................................................................... 23

*Law Debenture Trust Co. v. Petrohawk Energy Corp.*,
  No. 2422-VCS, 2007 WL 2248150 (Del. Ch. Aug. 1, 2007) ................................................... 17

*Morgan Stanley High Yield Secs., Inc. v. Seven Circle Gaming Corp.*,
   269 F. Supp. 2d 206 (S.D.N.Y. 2003) ................................................................................ 24

*Northwestern Mut. Life Ins. Co. v. Uniondale Realty Assocs.*,
   11 Misc. 3d 980, 816 N.Y.S.2d 831 (Sup. Ct. Nassau Co. 2006) ....................................... 22, 23

*Orix Fin. Servs., Inc. v. Holmes*,
   No. 06 Civ. 3476 (SAS), 2007 WL 3143707 (S.D.N.Y. Oct. 26, 2007) ................................. 13

*Resnick v. Karmax Camp Corp.*,
   149 A.D.2d 709, 540 N.Y.S.2d 503 (2d Dep't 1989) .............................................................. 20

*Rodgers v. Rainier Nat'l Bank*,
   11 Wash. 2d 232, 757 P.2d 976 (1988) ................................................................................. 22

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*,
   691 F.2d 1039 (2d Cir. 1982) .......................................................................................... passim

*United Merchants & Mfrs., Inc. v. Equitable Life Assurance Soc.*,
   674 F.2d 134 (2d Cir. 1982) .................................................................................................. 22

## Statutes

N.Y. Bus. Corp. Law § 909 ......................................................................................................... 20

## Other Authorities

American Bar Foundation, *Commentaries on Model Debenture Indenture
   Provisions* (1971) ................................................................................................................ 5, 14

## Rules

17 C.F.R. § 210.3-10(c) ................................................................................................................ 4

17 C.F.R. § 240.12h-5 ................................................................................................................... 4

Fed. R. Civ. P. 56(c) .................................................................................................................... 13

## PRELIMINARY STATEMENT

Defendants Tyco International Ltd. ("Tyco"), Tyco International Group S.A. ("TIGSA"), and Tyco International Finance S.A. ("TIFSA") (collectively, "Defendants") respectfully submit this memorandum in opposition to Plaintiff's motion for summary judgment and in support of their cross-motion for summary judgment dismissing portions of the First Amended Complaint.

This dispute arises out of Tyco's separation of its business operations into three independent, publicly traded companies (the "Transaction"), accomplished by spinning off two of its business segments to its shareholders as a dividend. The Transaction caused no harm to the holders of Tyco's public debt securities who did not elect to tender their securities to Tyco, who continue to be creditors of Tyco. Tyco continues to operate its two other business segments, with $32 billion in assets, annual revenues in excess of $18 billion, and nearly $2 billion in net cash from operations, and it continues to be a component of the S&P 500 index. Tyco continues to make timely interest payments to holders of its remaining debt, and these debt securities continue to have investment grade credit ratings.

Not surprisingly, as the interest payment stream continues (and will continue) uninterrupted, Plaintiff Bank of New York ("Plaintiff" or the "Trustee") does not allege that it, or any noteholders, suffered any monetary damage as a result of the Transaction. Nor does the Trustee, on this motion, press the argument that the spin-off of two of Tyco's businesses – the only economic impact resulting from the Transaction – constituted a transfer of "all or substantially all" of Tyco's assets in violation of the indentures.

Instead, the Trustee pursues an argument based on a perceived technicality – contending that, even though the parent company was at all times obligated on the notes, the substitution of one Luxembourg subsidiary by a new Luxembourg subsidiary within Tyco's corporate structure violates the indentures. The Trustee argues that this alleged technical violation entitles it to

accelerate the maturity of the entire $3.7 billion in outstanding public debt, collect interest accrued to date, and, on top of all that, collect a premium that the company would have had to pay only if it had elected to redeem the notes before maturity.

The undisputed facts make clear that no breach of the indentures has occurred. The indentures require only that if either Tyco or its subsidiary, TIGSA, wishes to transfer all or substantially all of its assets, it must also transfer its obligations on the notes to the recipient of its assets. Here, as the step-by-step analysis of the Transaction demonstrates, TIGSA did just that – it transferred its obligation on the notes along with all of its assets to Tyco, in full compliance with the indentures.

The Trustee's argument is premised on two critical flaws:

First, although the basic description of the Transaction is accurately set forth in Plaintiff's Local Rule 56.1 Statement of Undisputed Facts ("Pl. 56.1 Statement"), the Trustee's brief ("Pl. Br.") repeatedly *misstates* those facts – misidentifying the recipient of TIGSA's assets and the obligation on the notes as TIFSA, rather than Tyco. Those assertions are simply wrong, and not supported by the evidence advanced by the Trustee itself.

Second, the Trustee erroneously seeks to equate Tyco's Transaction with the facts underpinning the decision in *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039 (2d Cir. 1982), the only case relied upon by the Trustee in support of any of its substantive points. But the present facts – regardless of whether the facts are as set forth in Plaintiff's 56.1 Statement or the unsupported assertions set forth in the Trustee's brief – are not comparable to those in *Sharon Steel*. *Sharon Steel* involved the sale of assets *to an unrelated third-party as part of a plan to completely liquidate the debtor*, leaving the sole obligor with no operating assets. By contrast, the Transaction involved an internal reorganization of Tyco and its

2

subsidiaries, with Tyco, as the continuing obligor, operating two business segments constituting

a substantial portion of Tyco's pre-Transaction assets and with less than half of its original debt

remaining outstanding.  The substitution of TIFSA for TIGSA as Tyco's main holding company

subsidiary had absolutely no effect on the noteholders, and they have suffered no harm.

Moreover, even if Tyco breached an indenture covenant – and it did not – the Trustee is

not entitled to collect the redemption premium.  Once again, the Trustee places all its eggs in the

basket of *Sharon Steel* and fails to acknowledge or argue against the settled precedent that

precludes a lender from collecting a redemption premium in the event of a default by a borrower.

There can be no basis for the imposition of a punitive redemption premium here, where the

Trustee alleges only a technical breach and noteholders have suffered no harm.

For these reasons and others explained below, Plaintiff's motion for summary judgment

should be denied, and Defendants' cross-motion for summary judgment should be granted.

## STATEMENT OF FACTS[1]

### A.    The Defendants

Defendant Tyco is, and at all relevant times was, a publicly traded corporation that holds

investments in a variety of subsidiary businesses.  Defs. 56.1 Statement ¶ 1.  Just prior to the

Transaction, Tyco's operating subsidiaries engaged in four principal lines of business:

(a) electronics; (b) healthcare; (c) fire and security; and (d) engineered products and services.  Pl.

56.1 Statement ¶ 5.

---

[1]  A full statement of the relevant facts is set forth in the accompanying Defendants' Local Rule
56.1 Statement of Material Facts as to Which There is No Genuine Issue to be Tried ("Defs.
56.1 Statement").

Defendant TIGSA is a Luxembourg company that is a wholly-owned subsidiary of Tyco. Defs. 56.1 Statement ¶ 4. As Tyco reported in its public filings, prior to the Transaction, TIGSA was "a holding company whose only business is to own indirectly a substantial portion of the operating subsidiaries of Tyco and to perform treasury operations for Tyco companies. Otherwise, it conducts no independent business." Gordon Decl., Exs. C & D.

Defendant TIFSA is a Luxembourg company that is a wholly-owned subsidiary of Tyco. Defs. 56.1 Statement ¶ 6. It was created as part of the Transaction in substitution for TIGSA as a holding company and was established "to directly and indirectly own substantially all of the operating subsidiaries of Tyco International Ltd., to issue the notes and to perform treasury operations for [Tyco]. Otherwise, it conducts no independent business." *Id.*

### B.  <u>The Notes and the Indentures</u>

On multiple occasions between 1998 and 2003, Tyco raised money by issuing debt instruments, seven series of which are at issue here (the "Notes"). Pl. 56.1 Statement ¶¶ 8-11. Tyco and TIGSA co-registered the Notes with the SEC and were co-obligors on the Notes, with TIGSA as the "issuer" and Tyco as the "guarantor" giving a full and unconditional guarantee. Defs. 56.1 Statement ¶ 8. As permitted by SEC rules, the documents offering the Notes for sale made extensive disclosures about Tyco, but provided just bare information concerning TIGSA. *Id.* ¶¶ 9-18; 17 C.F.R. § 210.3-10(c) ("[w]hen an operating subsidiary issues securities and its parent company guarantees those securities, the registration statement . . . need not include financial statements of the issuer"). TIGSA, unlike Tyco, was exempted from and did not file periodic reports with the SEC. Defs. 56.1 Statement ¶ 5; 17 C.F.R. § 240.12h-5. The underlying SEC regulatory exemption from any reporting requirement reflects the view of the SEC and the markets that the real obligor on these Notes was and remains Tyco, and therefore detailed information about TIGSA was unnecessary.

4

Despite Plaintiff's assertion that Noteholders "made loans . . . to a $60 billion conglomerate" (Pl. Br. at 4), most of the Notes were issued at a time when Tyco had total assets that were considerably less than $60 billion.  Defs. 56.1 Statement ¶ 19.  Since 1998, when the first Notes were issued, Tyco's asset base fluctuated dramatically, not building up to $60 billion until after five series of Notes were issued.  *Id.* ¶¶ 9-16, 19.  Indeed, four series of the Notes were issued when Tyco's total assets were less than Tyco's assets upon completion of the Transaction ($32.2 billion).  *Id.* ¶¶ 9-13, 19.

The Notes are governed by indentures dated June 9, 1998 (the "1998 Indenture") and November 12, 2003 (the "2003 Indenture" and, together with the 1998 Indenture, the "Indentures"), among Tyco, TIGSA, and the Trustee.  Pl. 56.1 Statement ¶¶ 10, 12.  Although many bond indentures contain provisions prohibiting the issuer from engaging in certain types of restructuring or other transactions, the 1998 and 2003 Indentures contain very few such provisions.  Neither Indenture places any restriction on TIGSA's or Tyco's ability to pay dividends to its shareholders, and neither Indenture limits in any way TIGSA's or Tyco's right to dispose of anything *less* than "substantially all" of its assets.[2]  The sole relevant restriction in the Indentures is the merger covenant, which permits TIGSA (or Tyco) to sell or convey "all or substantially all" of its assets to another person, provided, among other things, that the recipient

---

[2] Provisions imposing such limitations are well known in debt financing, *see* American Bar Foundation, *Commentaries on Model Debenture Indenture Provisions* (1971) ("*Commentaries*"), at 401-31, and, had the parties intended to impose such restrictions, they could have and would have included such provisions in the Indentures.  *See Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*, 723 F. Supp. 976, 992 (S.D.N.Y. 1989) ("[T]he Indenture could easily have been drafted to incorporate expressly the terms the Plaintiffs now urge this court to imply. . . .  Because the risk of a takeover – and the indenture provisions available to limit that risk – were well-known, to imply such provisions could impose on the parties terms they affirmatively excluded from their contract.").

of the assets expressly assumes TIGSA's obligations on the Notes (or Tyco's obligations on its guaranty).  Pl. 56.1 Statement ¶¶ 24-25.

Each of the Indentures provides that an "Event of Default" occurs if, among other things, Tyco or TIGSA breaches any covenant or agreement in the Indenture, and such breach continues for 90 days after notice.  *Id.* ¶¶ 15-16.  In such case, the Indentures provide an express remedy: The Trustee may "declare the entire principal . . . of all Securities then outstanding and interest accrued thereon, if any, to be due and payable immediately."  Defs. 56.1 Statement ¶ 23; *see also id.* ¶ 24.

Here, of course, Plaintiff seeks not only the principal and accrued interest on the Notes, but also an award of the "make-whole," or redemption, premium.  The Indentures do not provide for the redemption premium to be paid upon default, but only, as Plaintiff concedes, if the issuer "elects to redeem the Notes before their respective maturity dates."  Pl. Br. at 7; *see also* Pl. 56.1 Statement ¶ 26 (Notes are only redeemable "at the option of the Company").

**C.    The Transaction**

On January 13, 2006, Tyco announced that it planned to separate into three independent, publicly traded companies:  one for its electronics business; one for its healthcare business; and one for its fire and security and its engineered products and services businesses (the "Separation Plan").  Defs. 56.1 Statement ¶ 29.  The Separation Plan explained simply that Tyco intended to accomplish the separation by stock dividends to its shareholders and made no mention of TIGSA, TIFSA, or any of the many other complexities of the transaction that were yet to be finalized.  *Id.*

Tyco completed the Transaction on June 29, 2007.  *Id.* ¶ 30.  In examining the Trustee's claim, the relevant steps in the Transaction are as follows:



**Opening Position**

(1)    <u>The "Reorganization" Step</u> – Tyco reorganized its operating assets under three subsidiaries, TIFSA, Covidien Ltd. ("Covidien"), and Tyco Electronics Ltd. ("Tyco Electronics"), corresponding to the three, soon-to-be independent companies.  Defs. 56.1 Statement ¶ 30(b); *see also* Pl. 56.1 Statement ¶ 46.  Tyco, through TIGSA, owned the stock of each of these subsidiaries.  TIFSA executed supplemental indentures to the 1998 and 2003 Indentures in which it "agree[d] to become a co-obligor" with respect to payment on the Notes, but TIGSA also remained as an obligor, and Tyco remained as guarantor.  Pl. 56.1 Statement ¶¶ 42-43.

**After Reorganization Step**



    (2)    <u>The "Tyco Transfer" Step</u> – TIGSA then transferred all of its assets – at the time,

consisting entirely of the shares of those three subsidiaries – to its parent, Tyco. Defs. 56.1

Statement ¶ 30(c); Pl. 56.1 Statement ¶ 52. At the same time as the Tyco Transfer, TIGSA also

assigned to Tyco (and Tyco expressly assumed) all of TIGSA's obligations under the Indentures

and on the Notes. Defs. 56.1 Statement ¶ 30(c); Pl. 56.1 Statement ¶ 53.

**After Tyco Transfer Step**



(3)    The "Distribution" Step – Tyco then distributed to its shareholders all of the common shares of Tyco Electronics and Covidien, the two companies comprising the electronics and healthcare businesses.  Defs. 56.1 Statement ¶ 30(d); Pl. 56.1 Statement ¶ 59.



**After Distribution Step**

Tyco continues to own and operate its fire and security and its engineered products and services businesses, just as it did before, with a similar Luxembourg company as its primary subsidiary holding company.  Defs. 56.1 Statement ¶ 33.  Both Tyco and TIFSA are obligated on the remaining Notes – the outstanding principal of which constitutes less than half of Tyco's pre-Transaction public debt – and continue to make interest payments when due.  *Id.* ¶ 34.  Plaintiff does not allege that Tyco and TIFSA will be unable to make all required payments, and Tyco and the Notes continue to enjoy investment grade ratings.  *Id.* ¶ 41; *see also infra* at 11-12.

Although there is no dispute about the basic facts of the Transaction, Plaintiff dwells at length on what it believes was "intended to take place" (Pl. 56.1 Statement ¶ 32), as well as the tender offer that TIGSA made.  *See id.* ¶¶ 32-40; Pl. Br. at 9-13.  Specifically, Plaintiff states that Tyco once considered having *TIFSA*, rather than Tyco, take over TIGSA's obligations on the

Notes and under the Indentures.  Pl. 56.1 Statement ¶ 33.  While this is true, it is also irrelevant: A transaction that did *not* take place simply cannot violate the Indentures.  As the Transaction was actually implemented – as even the facts set forth by Plaintiff establish – TIGSA's obligations on the Notes and all of TIGSA's assets were assigned to Tyco, *not TIFSA*.[3]  Tyco, as guarantor, always remained obligated on the Notes.

While Plaintiff obviously understands what "actually occurred" in the Transaction (Pl. 56.1 Statement ¶ 41), Plaintiff also understands that "[i]f the Notes followed all of the stock up to Tyco, . . . the [Transaction] would not run afoul of *Sharon Steel*."  Pl. Br. at 20.  Accordingly, Plaintiff simply ignores the occurrence of the Tyco Transfer step – even though it is set forth in its own 56.1 Statement – and, on no fewer than eight occasions in its brief, asserts as "fact" that the Notes were assigned to (or "dumped on") TIFSA.  *See* Pl. Br. at 3, 4, 9, 13-14, 15, 19, 20. This is false, and the evidence relied upon by Plaintiff fails to support its assertions.

Plaintiff relies principally on the Contribution Agreement between TIGSA and its three subsidiaries as evidence that TIGSA "transferred all of the obligations on the Notes to TIFSA, leaving the two other entities free of the debt."  Pl. Br. at 13-14.  But the Contribution Agreement, which is binding only upon the parties thereto and does not even purport to bind third parties, provides no such thing.  Rather, the Contribution Agreement was merely an agreement among the parties thereto to allocate assets and liabilities associated with each of Tyco's businesses among the appropriate subsidiaries.  As between TIGSA and its subsidiaries,

---

[3] This change in the details of the Transaction was made, at least in part, as a result of the previous lawsuit initiated by one of the Noteholders.  In that suit, the Noteholder alleged that the form of the Transaction was similar to the form of the transaction in *Sharon Steel*, and was therefore impermissible.  While there was never any question that the *substance* of the Transaction was permissible, Tyco made a change to the *form* so as to eliminate any argument that either the form or the substance was prohibited.  Defs. 56.1 Statement ¶ 30(c).

the parties were free to allocate responsibility for liabilities by operating segment; nothing in the Indentures prohibited that allocation; and nothing in the Contribution Agreement purported to affect the rights of third parties or to "transfer" the debt from the original obligor.  Insofar as TIFSA agreed to become a co-obligor on the Notes, no rights of Noteholders were impaired and the Indentures' successor obligor clauses simply were not implicated, because the agreement did not purport to discharge TIGSA from liability to the Noteholders.  Pl. 56.1 Statement ¶ 43 ("In connection with TIFSA becoming such a co-obligor, [TIGSA] shall remain as an obligor and Tyco shall remain as Guarantor under the Indenture with respect to the Securities.").[4]  Only when TIGSA subsequently transferred all of its assets to Tyco did it "transfer" its obligation on the Notes by supplemental indenture, as indeed it was *required* to do pursuant to the successor obligor clauses.  *See* Pl. 56.1 Statement ¶¶ 54, 55 ("Tyco hereby expressly assumes all of the obligations of [TIGSA] under the Indenture, including the obligation to make the due and punctual payment of the principal of and interest on all the [Notes] . . . and [TIGSA] shall be discharged from all obligations . . . under the Indenture and the [Notes]").

## D.    Tyco's Continuing Assets and Operations

Following the Transaction, Tyco continues to be a substantial company, with total assets in excess of $32 billion.  Defs. 56.1 Statement ¶ 37.  Its operating subsidiaries include companies that are among the world's largest providers of electronic security systems, fire detection and suppression systems, and flow control valves.  *Id.*  As of July 2, 2007 (the first trading date following completion of the Transaction), Tyco had a market capitalization of $26.4 billion.  *Id.* ¶ 39.  Even after the Transaction, Tyco continues to be part of the S&P 500 index.  *Id.* ¶ 40.  For

---

[4]  Tyco's public disclosures are thus perfectly consistent with the Transaction as described above:  TIFSA "assumed the indebtedness of TIGSA" (Pl. 56.1 Statement ¶ 58) without interfering with Noteholders' rights to continue to look to TIGSA for payment.

the year ended September 28, 2007, Tyco's annual revenue (reflecting only the operations of Tyco's continuing businesses) was $18.8 billion and its net cash from operating activities was $1.8 billion. *Id.* ¶ 38. As a result of the successful tender offers, Tyco's total debt at year-end 2007 was $4.5 billion, less than half of its total debt of $9.6 billion at year-end 2006. *Id.* Tyco and TIFSA continue to make all interest payments on the Notes (totaling just $240.9 million annually) and continue to enjoy an investment grade credit rating. *Id.* ¶¶ 34, 41.

The reported historical financial results of Tyco and its various businesses are not disputed. The following chart reflects some of the relative measures of Tyco's continuing business against the two businesses that were distributed in the Transaction (*id.* ¶ 42):

| Relative Metrics (in millions of dollars) | | | | |
|---|---|---|---|---|
| Metric | Healthcare | Electronics | Post-Spin Tyco | Post-Spin Tyco as Pct. of Total |
| Total assets (book value at 6/29/07) | 18,160 | 23,065 | 32,161 | 43.8% |
| Total assets (market value of equity at 7/2/07 plus book value of liabilities at 6/29/07) | 33,200 | 31,900 | 43,300 | 39.9% |
| Net revenue (year ended 9/28/07) | 10,170 | 13,460 | 18,781 | 44.3% |
| Net revenue (year ended 9/29/06) | 9,641 | 12,724 | 18,595 | 45.4% |
| Operating income (year ended 9/29/06) | 2,200 | 1,808 | 1,866 | 31.8% |

## E.    **Procedural Background**

The Trustee commenced this action on June 4, 2007, seeking a declaratory judgment as to whether the supplemental indentures executed by TIGSA, TIFSA, and Tyco were permitted or authorized under the Indentures.[5] At the time, the Trustee did not contend that the Transaction violated the Indentures, did not assert that the supplemental indentures were not "satisfactory," and gave no reason for refusing to sign the supplemental indentures other than that certain Noteholders allegedly "requested" it not to do so.

---

[5] Specifically, the supplemental indentures effectuated (a) the addition of TIFSA as a co-obligor on the Notes, and (b) the assumption by Tyco of all of TIGSA's obligations under the Indentures and on the Notes and the release of TIGSA from such obligations.

The Trustee filed a First Amended Complaint ("Am. Compl.") on October 18, 2007. For the first time, and without any intervening change in the facts or the law, the Trustee asserted that the Transaction violated the Indentures. In addition to seeking declaratory relief, the Amended Complaint asserts a claim for breach of contract and seeks an award consisting of the outstanding principal of the Notes, accrued interest, and the "make-whole" premium.

## ARGUMENT

### THE COURT SHOULD GRANT SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS

Summary judgment is appropriate where the evidence "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party opposing summary judgment "'must do more than simply show that there is some metaphysical doubt as to the material facts,' . . . and they 'may not rely on conclusory allegations or unsubstantiated speculation.'" *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citations omitted).

Here, there is no dispute about the relevant facts. The only questions are (1) whether the Transaction breached the Indentures, and (2) if the Indentures were breached, whether the Trustee's remedy includes the redemption premium.

Plaintiff's claim is for breach of contract. Under New York law, which governs each Indenture (*see* Pl. 56.1 Statement ¶ 13), the four required elements of a breach of contract claim are: "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Orix Fin. Servs., Inc. v. Holmes*, No. 06 Civ. 3476 (SAS), 2007 WL 3143707, at *2 (S.D.N.Y. Oct. 26, 2007) (citation omitted). "In a contract dispute, summary judgment may be granted where the relevant contract language is unambiguous and conveys a definite meaning." *Chase Manhattan Bank v. Traffic Stream (BVI) Infrastructure Ltd.*, 86 F. Supp. 2d

244, 256 (S.D.N.Y. 2000), *aff'd*, 52 F. App'x 528 (2d Cir. 2002).  Where, as here, the relevant language consists of  "boilerplate" indenture provisions, it is particularly appropriate for the Court to determine their meaning as a matter of law.  *Id.*

As the Second Circuit has recognized, the rights of Noteholders are entirely dependent on the words of the governing Indentures:

> There is no governing body of statutory or common law that protects the holder of unsecured debt securities against harmful acts by the debtor except in the most extreme situations. . . .  [T]he debt securityholder can do nothing to protect himself against actions of the borrower which jeopardize its ability to pay the debt unless he . . . establishes his rights through contractual provisions set forth in the . . . indenture.

*Sharon Steel*, 691 F.2d at 1049 (quoting *Commentaries* at 2).

Here, the only provision on which the Trustee can rely is the requirement that Tyco and TIGSA not transfer "all or substantially all" of their assets without a concurrent assumption by the recipient of their obligations under the Indentures.  These Indentures do *not* contain restrictions – as many indentures do – on Tyco's or TIGSA's ability to pay dividends or to transfer assets (even entire businesses) that do not constitute "substantially all" of their assets.

## A.     The Transfer of the Notes from TIGSA to Tyco Complied with the Indentures

Apparently recognizing that the Distribution of the healthcare and electronics businesses did not amount to substantially all of Tyco's assets, the Trustee has opted not to seek summary judgment on that argument, and has, instead, focused on the transfer of the obligation on the Notes from TIGSA to Tyco as part of the Tyco Transfer step (while repeatedly misstating that TIFSA was the recipient).[6]  Relying solely on *Sharon Steel*, the Trustee argues that this transfer

---

[6]  Although Defendants believe that the entire case is ripe for resolution on summary judgment, they have, at the Court's request, deferred moving on the issue of whether the Distribution of Tyco's healthcare and electronics businesses constituted "substantially all" of Tyco's assets.
[Footnote continued on next page]

breached the Indentures because "the Notes ended up being improperly assigned, without Trustee consent, to entities holding far less than fifty percent of the Company's assets at the time the plan of liquidation was announced."  Pl. Br. at 5.  But the facts of this case are dramatically different than those in *Sharon Steel*, and Defendants here acted in strict compliance with the Indentures and the principles announced in *Sharon Steel*.

As explained above, the Indentures permitted TIGSA to transfer "all or substantially all" of its assets, with just one relevant proviso – that the recipient of the assets expressly assume TIGSA's obligations on the Notes and under the Indentures.  Here, TIGSA transferred all of its assets – *i.e.*, the stock in its three subsidiaries – to Tyco, and Tyco executed a supplemental indenture assuming all of TIGSA's obligations.  The real obligor on the Notes, Tyco, engaged in no transaction other than a permitted dividend.  Defendants thus complied with the successor obligor clauses of the Indentures.

*Sharon Steel* is meaningfully different.  There, the board of UV Industries announced a plan to *liquidate* UV by selling off all of its assets and distributing the proceeds to its shareholders.  Pursuant to that plan, UV first sold off its largest line of business, followed by a second line of business.  UV then entered into an agreement to sell its remaining assets to an unrelated company, Sharon Steel, leaving UV with nothing but cash and debt securities issued by

---

[Footnote continued from previous page]

*See* Order, dated January 2, 2008.  But that issue also presents no genuine issue of material fact.  The applicable legal test looks at whether "the portion of the business not sold constitutes a substantial, viable, ongoing component of the corporation"; if so, the assets that were transferred were *not* substantially all of the company's assets.  *Hollinger Inc. v. Hollinger Int'l, Inc.*, 858 A.2d 342, 385 (Del. Ch. 2004).  Thus, even accepting the Trustee's measures of how much of pre-Transaction Tyco continues with the company today – somewhere between 27% and 45% (Pl. 56.1 Statement ¶¶ 6, 7, 50, 59) – Tyco's substantial, viable, ongoing fire and security and engineered products and services businesses mean that the two businesses spun off were, as a matter of law, not substantially all of Tyco's assets.

Sharon Steel.  In connection with this final sale, UV purported to assign all of its liabilities, including its public debt, to Sharon.  Sharon argued that this was permissible, because it had purchased everything UV owned on the date of the acquisition.  The Second Circuit rejected this interpretation, holding that "boilerplate successor obligor clauses do not permit assignment of the public debt to another party in the course of a liquidation unless 'all or substantially all' of the assets of the company at the time the plan of liquidation is determined upon are transferred to a single purchaser."  691 F.2d at 1051.

Applying this holding here:  Tyco announced its Separation Plan on January 13, 2006.[7] At that time, TIGSA indirectly owned Tyco's hundreds of operating subsidiaries in Tyco's four principal lines of business.  TIGSA transferred all four of those businesses, along with its obligations on the Notes and under the Indentures, to Tyco.  Thus, TIGSA transferred all of its assets to Tyco, "a single purchaser" (*id.*), and, in compliance with the Indentures, Tyco assumed TIGSA's debt obligations, and TIGSA was discharged.  *Sharon Steel* requires nothing more.

The Trustee attempts to confuse this Transaction with the liquidation in *Sharon Steel* by dwelling upon one proposed structure for the Transaction, which called for the assignment of TIGSA's obligation on the Notes to TIFSA after initial transfers of the healthcare and electronics businesses to TIGSA's other subsidiaries.  Even under that proposal, there were substantial differences from *Sharon Steel*.[8]  The critical point, however, is that Tyco ultimately used a

---

[7] In addition to the many other differences from *Sharon Steel*, Tyco's Separation Plan was not a "plan of liquidation."  In fact, Tyco did not liquidate at all.

[8] Among other things, *Sharon Steel* involved a true liquidation in which all of UV's operating assets were transferred to an *unrelated* third party, leaving the only obligor with no operating assets.  The Second Circuit recognized that the transaction had "little functional significance other than substituting a new debtor in order to profit on a debenture's low interest rate."  691 F.2d at 1051.  Here, by contrast, the replacement of one Luxembourg subsidiary of Tyco with [Footnote continued on next page]

*different* structure, which clearly complied with the terms of the Indentures and the holding of *Sharon Steel*.

Beyond insisting repeatedly and mistakenly that TIGSA assigned its obligation on the Notes to TIFSA when it assigned the obligation to Tyco, the Trustee makes just one additional argument in its effort to secure *Sharon Steel*'s outcome. With no citation to support such a proposition, the Trustee contends that Defendants cannot attempt to circumvent *Sharon Steel* by "do[ing] in three steps what they could not do in one." Pl. Br. at 21. Such a result, the Trustee contends, would "elevate form over substance." *Id.*

Coming from the Trustee, this argument is particularly ironic, in that the Trustee's argument has *always* been based on form, rather than substance. The only substantive impact of the Transaction is the Distribution of two of Tyco's businesses to its shareholders – which, Defendants contend, is permissible under the terms of the Indentures and consideration of which the Court has deferred to a future date. The Transaction's structure, which includes the assignment of the obligation on the Notes to Tyco along with all of TIGSA's assets, in both form and substance, is beyond challenge.

Moreover, nothing in *Sharon Steel* suggests that a company cannot achieve its desired end through permissible means, simply because an alternative means might be prohibited. *See Law Debenture Trust Co. v. Petrohawk Energy Corp.*, No. 2422-VCS, 2007 WL 2248150, at *7 (Del. Ch. Aug. 1, 2007) ("Issuers of corporate debt do not breach their contractual obligations by

---

[Footnote continued from previous page]
    another Luxembourg subsidiary of Tyco was a mere technicality with no practical effect whatsoever on the Noteholders, particularly since Tyco, as guarantor, remained obligated both before and after the Transaction and was not liquidated. In addition, the proposed structure also differed from *Sharon Steel* in that Tyco (unlike Sharon and UV) sought Noteholder approval before pursuing that structure, and abandoned the proposed structure when that approval was not forthcoming.

structuring transactions to avoid triggering a mandatory redemption provision in favor of Noteholders."). As *Sharon Steel* makes clear, a Noteholder has no protection except through express contractual provisions in the Indentures. 691 F.2d at 1049; *see also Geren v. Quantum Chem. Corp.*, 832 F. Supp. 728, 733 (S.D.N.Y. 1993) ("If the challenged transaction does not violate any express term of the indenture, or prevent the bondholder from obtaining the benefit of an express indenture term, a bondholder may not challenge an action by the corporation on the basis of breach of the indenture contract."). Thus, by structuring the Transaction in strict compliance with the Indentures' successor obligor clauses, Tyco did not "fly in the face of *Sharon Steel*" (Pl. Br. at 21), but adhered to its holding.

Accordingly, because TIGSA's obligation on the Notes was assigned to Tyco along with all of TIGSA's assets, as the Indentures required, the Transaction did not violate the Indentures.

**B.    Defendants Did Not Breach the Indentures Because of the Trustee's Unjustified Failure to Sign the Supplemental Indentures**

The Trustee's unjustified refusal to sign the supplemental indentures did not preclude Defendants from completing the Transaction and cannot constitute a separate basis for an alleged breach of the Indentures. Defendants executed and delivered the supplemental indentures, along with officers' certificates and opinions of counsel concluding that the requirements of the indentures were being complied with, as required by the Indentures. *See* Pl. 56.1 Statement ¶¶ 24, 25 (requiring only that successor entity "execute[] and deliver[]" supplemental indenture to the Trustee); Defs. 56.1 Statement ¶ 31. At no point did the Trustee indicate that the supplemental indentures were not "satisfactory" to it. *Id.* ¶ 32.

Rather, the Trustee refused to sign the supplemental indentures only because certain Noteholders allegedly "requested" it not to do so, and only because those Noteholders believed the Transaction would violate the Indentures. Pl. Br. at 15. The Trustee thus concedes that if the

Transaction did not otherwise violate the Indentures, there is no justification for its failure to sign the supplemental indentures.[9]  The Trustee cannot claim that its unjustified refusal to sign the supplemental indentures, at the alleged request of some Noteholders, itself causes an event of default that requires the acceleration of the Notes and the payment of a redemption premium.  Thus, the Trustee's claim rises or falls based on the validity of the Transaction, regardless of the Trustee's refusal to sign the supplemental indentures.  *See Ellenberg Morgan Corp. v. Hard Rock Cafe Assocs.*, 116 A.D.2d 266, 271, 500 N.Y.S.2d 696, 699 (1st Dep't 1986) ("It is a fundamental principle of equity that a party may not insist upon performance of a condition precedent when its nonperformance has been caused by the party himself.").[10]

Accordingly, the Court should hold that the failure to obtain the Trustee's signature does not constitute an independent breach of the Indentures.

## C.     The Reorganization of Tyco's Operating Subsidiaries Did Not Violate the Indentures

Although the Trustee does not press this argument in its motion, the Amended Complaint asserts that the "first step" in the Transaction – the "Reorganization," in which Tyco's operating assets were reorganized under three of TIGSA's wholly owned subsidiaries – violated the Indentures because it involved "a transfer of all or substantially all of [TIGSA's] assets to newly-

---

[9]  Indeed, the 2003 Indenture expressly *requires* the Trustee to execute a supplemental indenture tendered by Tyco.  Pl. 56.1 Statement ¶ 20 ("Upon the request of the Company . . . the Trustee *shall join* with Tyco and the Company in the execution of any such supplemental indenture . . . .") (emphasis added).  Moreover, with respect to the supplemental indentures that added TIFSA as an obligor, we are unable to understand any basis for refusing to agree to the addition of another obligor, an event that could not possibly be deemed adversely to affect the interests of Noteholders.

[10]  In *Sharon Steel*, the trustees also refused to sign the supplemental indentures in which Sharon purported to become the successor obligor.  691 F.2d at 1046-47.  But the Second Circuit never suggested that the absence of the trustees' signatures amounted to an independent breach of the indentures.

formed entities that did not assume the Notes." Am. Compl. ¶ 71. At the October 2, 2007

conference with the Court, however, the Trustee's current counsel conceded that this

Reorganization did *not* violate the Indentures:

> MR. HARPER: . . . . [I]f at the time . . . that . . . the issuer, the obligor, had reorganized all of its assets into three wholly-owned subsidiaries and had at that time transferred the notes to all three of the subsidiaries, I don't think that we would be here. But was the transfer itself sort of reorganizing the furniture internally a violation of the successor obligor clause[?] [P]robably not, because [TIGSA] would have still remained the owner of those assets and the obligor under the notes.

Transcript of Conference, Oct. 2, 2007, at 29.

It is curious that the Trustee's subsequently filed Amended Complaint continued to assert

the Reorganization as a breach, because Mr. Harper's admission is undoubtedly correct. As he

explained, the Reorganization of Tyco's operating subsidiaries was nothing more than a

rearranging of Tyco's deck furniture. Tyco and TIGSA continued to own *all* of these assets, and

the only difference was the grouping of these assets under the appropriate wholly-owned

subsidiary – *i.e.*, all of the healthcare assets under Covidien, all of the electronics assets under

Tyco Electronics, and all of the fire and safety and engineered products and services assets under

TIFSA. *See supra* at 7-8; *see also Resnick v. Karmax Camp Corp.*, 149 A.D.2d 709, 540

N.Y.S.2d 503 (2d Dep't 1989) (transfer of corporation's camping operations and buses to newly

formed subsidiaries was not a transfer of "all or substantially all" of corporation's assets within

the meaning of N.Y. Bus. Corp. Law § 909).

For these reasons, the Court should hold that the Reorganization of Tyco's assets under

TIGSA's subsidiaries did not violate the Indentures.

**D.**    **Even if Defendants Breached the Indentures, Plaintiff is Entitled Only to the Principal Plus Accrued Interest on the Notes**

Even if the Transaction is deemed to have breached the Indentures – and it did not – Plaintiff has demonstrated no harm and no damage arising therefrom.  Under the Indentures, Plaintiff is entitled to collect (if anything) only the principal and accrued interest on the Notes, and not the redemption premium.

As the Trustee itself acknowledges, the redemption premium exists to protect the Noteholders' expected interest stream in the event that the issuer "elects" to redeem the Notes before maturity.  Pl. Br. at 7; *see also* Pl. 56.1 Statement ¶ 26 (Notes are redeemable "at the option of the Company" upon payment of premium); *George H. Nutman, Inc. v. Aetna Bus. Credit, Inc.*, 115 Misc. 2d 168, 169, 453 N.Y.S.2d 586, 587 (Sup. Ct. Queens Co. 1982) (prepayment clauses exist "strictly for the benefit of the mortgagor").  Here, of course, Defendants have made no such "election"; to the contrary, they elected to leave the remaining portion of the Notes outstanding, and, backed by $32 billion in assets and profitable ongoing operations with investment grade credit ratings, have made – and will continue to make – all interest payments when due.  Defs. 56.1 Statement ¶¶ 34-35.  Thus, Noteholders have suffered no harm and no impairment of their expected interest stream (or any other damages), and the redemption and premium provisions do not apply.

To the extent that the Transaction constitutes a breach of the Indentures' merger covenants, the Indentures provide an express contractual remedy that does *not* include payment of a redemption premium.  Rather, the Trustee is permitted to declare the principal of the Notes "to be due and payable immediately."  Defs. 56.1 Statement ¶¶ 23-24.  In the absence of any other damages caused by a technical violation of the Indentures, this remedy of acceleration is all that the Trustee may invoke.

21

The general rule in New York is clear:  "A prepayment premium will not be enforced under default circumstances in the absence of a clause which so states."  *Northwestern Mut. Life Ins. Co. v. Uniondale Realty Assocs.*, 11 Misc. 3d 980, 985, 816 N.Y.S.2d 831, 836 (Sup. Ct. Nassau Co. 2006); *see also In re LHD Realty Corp.*, 726 F.2d 327 (7th Cir. 1984); *D.I.S., LLC v. Sagos*, 38 A.D.3d 543, 832 N.Y.S.2d 581 (2d Dep't 2007); *3C Assocs. v. IC & LP Realty Co.*, 137 A.D.2d 439, 524 N.Y.S.2d 701 (1st Dep't 1988); *Rodgers v. Rainier Nat'l Bank*, 11 Wash. 2d 232, 238, 757 P.2d 976, 979 (1988) ("In summary, this promissory note does not provide for any penalty incident to an acceleration upon default.  The court cannot supply a provision which the parties omitted.").[11]

The logic of this rule was explained by the court in *LHD*:

> [T]he lender loses its right to a premium when it elects to accelerate the debt.  This is so because acceleration, by definition, advances the maturity date of the debt so that payment thereafter is not prepayment but instead is payment made after maturity. . . .
>
> . . . .
>
> The point is, we think, that a lender may abandon or waive its claim to interest payable over a period of years and to what amounts to insurance against a decline in interest rates.  Thus, the lender, by its acts, may establish that it prefers accelerated payment to the opportunity to earn interest over a period of years.  *It is not appropriate, under these circumstances, for the lender to receive a prepayment premium in lieu of the interest foregone since it has voluntarily waived the unpaid interest in the expectation of accelerated payment of the remaining principal.*

---

[11]  Had the Trustee or the Noteholders wanted to collect the premium even upon a default and acceleration, they could have negotiated for such a provision in the Indentures.  *See United Merchants & Mfrs., Inc. v. Equitable Life Assurance Soc.*, 674 F.2d 134, 140 (2d Cir. 1982) (enforcing liquidated damages provision in loan agreement that provided that upon default, "the principal of such Note shall forthwith become due and payable, together with the interest accrued thereon, and, to the extent permitted by law, an amount equal to the pre-payment charge that would be payable if (UM&M) were pre-paying such Note at the time").

726 F.2d at 330-31 (citations and footnotes omitted; emphasis added); *see also Kilpatrick v. Germania Life Ins. Co.*, 183 N.Y. 163, 75 N.E. 1124 (1905) (lender who foreclosed on mortgage following borrower's default had no right to prepayment penalty); *3C Assocs.*, 137 A.D.2d at 440, 524 N.Y.S.2d at 702 ("Given that the accelerated payment here is the result of plaintiffs mortgagees having elected to bring this foreclosure action, they may not exact a prepayment penalty.").

Here, Noteholders would continue to benefit from the favorable interest stream on the Notes, but for the Trustee's attempt to accelerate payment by demanding "all principal and accrued but unpaid interest due and owing under the Notes." Am. Compl. ¶ 74. As such, by its own voluntary conduct, the Trustee has waived its claim to interest payable over the life of the Notes, and it may not collect any redemption premium. *See LHD*, 726 F.2d at 331 ("When a lender has the option to accelerate, it is only necessary that the mortgagee show an *unmistakable intention to exercise the option*, and this may be done by taking steps for foreclosure, filing foreclosure suit, sale pursuant to the mortgage, or advertisement of the property for sale pursuant to the terms of the mortgage.") (citations and internal quotation marks omitted); *Charter One Bank, FSB v. Leone*, 45 A.D.3d 958, 958, 845 N.Y.S.2d 513, 515 (3d Dep't 2007) ("plaintiff's act of commencing the action and the filing of a lis pendens constitutes a valid election to accelerate the maturity of the unpaid principal balance and accrued interest").

To be sure, some cases recognize that, even in the absence of an express contractual provision, if "the borrower has defaulted intentionally in order to trigger acceleration and thereby avoid or evade a prepayment premium, the prepayment clause may be enforced, notwithstanding substantial authority which requires an explicit agreement to allow a premium after acceleration." *Northwestern Mut.*, 11 Misc. 3d at 985, 816 N.Y.S.2d at 836. But there is

certainly no evidence here that would permit summary judgment holding that Defendants engaged in an "intentional default in order to trigger acceleration and thereby avoid or evade a prepayment premium."  To the contrary, Tyco elected to leave the remaining portion of the Notes outstanding and to continue making the required interest payments to Noteholders.  Defs. 56.1 Statement ¶ 35.  Only the Noteholders' and the Trustee's greed – seeking a redemption premium even where they suffered no harm and their expected interest stream continues uninterrupted – led to the present dispute.

Once again, the Trustee bases its position exclusively on *Sharon Steel*, without even acknowledging the substantial contrary authority.  And, once again, the Trustee fails to acknowledge the significant differences between this case and *Sharon Steel* – most notably, that in *Sharon Steel*, the sole obligor went through a true liquidation, in which all of its operating assets were transferred to an unrelated third-party.  By contrast, Tyco continues as an obligor with substantial global operations and assets, TIGSA's wind up is a technicality under Luxembourg law, and TIFSA, an identical subsidiary, substituted for TIGSA within the same corporate structure.[12]  Both before and after the Transaction, Noteholders are creditors of Tyco and its Luxembourg subsidiary, which continue to operate substantial businesses, which continue to enjoy investment grade credit ratings, which are current on their interest payments, and which are capable of making interest payments throughout the term of the Notes and paying off the

---

[12] In addition, the trustees in *Sharon Steel* expressly sought specific performance of the indentures' redemption  provisions.  691 F.2d at 1047.  Plaintiff here has not sought specific performance, and has not even attempted to show an entitlement thereto.  *See Morgan Stanley High Yield Secs., Inc. v. Seven Circle Gaming Corp.*, 269 F. Supp. 2d 206, 221 (S.D.N.Y. 2003) (specific performance is not available unless, *inter alia*, "plaintiff has no adequate remedy at law").

principal at maturity.  Whether *Sharon Steel* was rightly or wrongly decided on its facts,[13] nothing in that case *requires* an award of the redemption premium in every case of default, where as here, the alleged default is purely technical and where the Noteholders' expected income stream has not been adversely affected in any manner, making any premium a windfall.

For these reasons, the Court should hold that Plaintiff is not entitled to the recover the redemption premium.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's motion for summary judgment and grant Defendants' cross-motion for summary judgment.

Dated: New York, New York
      January 11, 2008

GIBSON, DUNN & CRUTCHER LLP

By:    /s/ Marshall R. King         
        Wesley G. Howell (WH-8660)
        Marshall R. King (MK-1642)
200 Park Avenue, 47th Floor
New York, New York 10166-0193
(212) 351-4000

Attorneys for Defendants

---

[13] In *Sharon Steel*, the Second Circuit gave little explanation for its award of the redemption premium, and it did not discuss the well-established New York law holding that such premiums are ordinarily not available in the event of a default.  Nevertheless, the court seemed to apply the narrow exception, in the context of a plan of liquidation, for a debtor that intentionally defaults so as to provoke acceleration and "avoid" the agreement's redemption provisions.  691 F.2d at 1053.  The only case cited by the *Sharon Steel* court in support of its approach involved a company that "proposes and intends to pay off . . . at par and accrued interest only, all of the bonds outstanding under each of said mortgages without redeeming any of said bonds" at the contractually required rate of 105 percent of par.  *Harnickell v. Omaha Water Co.*, 146 A.D. 693, 696, 131 N.Y.S. 489, 492 (1st Dep't 1911).  Here, by contrast, Tyco elected to leave the remaining Notes outstanding and to continue to pay the expected interest stream, and there is no evidence that it sought to provoke an acceleration to avoid redemption.