# EXHIBIT H

---

TYCO INTERNATIONAL GROUP S.A.,
as Issuer

AND

TYCO INTERNATIONAL LTD.,
as Guarantor

AND

THE BANK OF NEW YORK,
as Trustee

# Indenture

Dated as of June 9, 1998

---

TABLE OF CONTENTS

Page

ARTICLE ONE: DEFINITIONS....1

SECTION 1.1 Certain Terms Defined....1

ARTICLE TWO: SECURITIES....7

SECTION 2.1 Forms Generally....7
SECTION 2.2 Form of Guarantee....7
SECTION 2.3 Form of Trustee's Certificate of Authentication....8
SECTION 2.4 Amount Unlimited; Issuable in Series....8
SECTION 2.5 Authentication and Delivery of Securities....9
SECTION 2.6 Execution of Securities....10
SECTION 2.7 Certificate of Authentication....11
SECTION 2.8 Denomination and Date of Securities; Payments of Interest....11
SECTION 2.9 Registration, Transfer and Exchange....11
SECTION 2.10 Mutilated, Defaced, Destroyed, Lost and Stolen Securities....12
SECTION 2.11 Cancellation of Securities; Destruction Thereof....13
SECTION 2.12 Temporary Securities....13
SECTION 2.13 Securities Issuable in the Form of a Global Security....14
SECTION 2.14 CUSIP Numbers....15

ARTICLE THREE: COVENANTS OF THE ISSUER AND THE TRUSTEE....15

SECTION 3.1 Payment of Principal and Interest....15
SECTION 3.2 Offices for Payments, etc....16
SECTION 3.3 Appointment to Fill a Vacancy in Office of Trustee....16
SECTION 3.4 Paying Agent....16
SECTION 3.5 Certificate of the Issuer and the Guarantors....17
SECTION 3.6 Securityholders Lists....17
SECTION 3.7 Reports by the Issuer and Tyco....17
SECTION 3.8 Reports by the Trustee....17
SECTION 3.9 Limitations on Liens....17
SECTION 3.10 Limitation on Sale and Lease-Back Transactions....19
SECTION 3.11 Limitation on Indebtedness of Subsidiaries....20
SECTION 3.12 Notice to Trustee....21

ARTICLE FOUR: REMEDIES OF THE TRUSTEE AND SECURITYHOLDERS ON EVENT OF DEFAULT....21

SECTION 4.1 Event of Default Defined; Acceleration of Maturity; Waiver of Default....21
SECTION 4.2 Collection of Indebtedness by Trustee; Trustee May Prove Debt....24
SECTION 4.3 Application of Proceeds....25
SECTION 4.4 Suits for Enforcement....26
SECTION 4.5 Restoration of Rights on Abandonment of Proceedings....26
SECTION 4.6 Limitations on Suits by Securityholders....27
SECTION 4.7 Unconditional Right of Securityholders to Institute Certain Suits....27
SECTION 4.8 Powers and Remedies Cumulative; Delay or Omission Not Waiver of Default....27

Page

SECTION 4.9 Control by Securityholders....27
SECTION 4.10 Waiver of Past Defaults....28
SECTION 4.11 Trustee to Give Notice of Default, But May Withhold in Certain Circumstances....28
SECTION 4.12 Right of Court to Require Filing of Undertaking to Pay Costs....29

ARTICLE FIVE: CONCERNING THE TRUSTEE ....29

SECTION 5.1 Duties and Responsibilities of the Trustee; During Default; Prior to Default....29
SECTION 5.2 Certain Rights of the Trustee....30
SECTION 5.3 Trustee Not Responsible for Recitals, Disposition of Securities or Application of Proceeds Thereof....31
SECTION 5.4 Trustee and Agents May Hold Securities; Collections, etc....32
SECTION 5.5 Moneys Held by Trustee....32
SECTION 5.6 Compensation and Indemnification of Trustee and Its Prior Claim....32
SECTION 5.7 Right of Trustee to Rely on Officers' Certificate, etc....32
SECTION 5.8 Persons Eligible for Appointment as Trustee....33
SECTION 5.9 Resignation and Removal; Appointment of Successor Trustee....33
SECTION 5.10 Acceptance of Appointment by Successor Trustee....34
SECTION 5.11 Appointment of Co-Trustee....35
SECTION 5.12 Merger, Conversion, Consolidation or Succession to Business of Trustee....36

ARTICLE SIX: CONCERNING THE SECURITYHOLDERS ....36

SECTION 6.1 Evidence of Action Taken by Securityholders....36
SECTION 6.2 Proof of Execution of Instruments and of Holding of Securities; Record Date....36
SECTION 6.3 Holders to be Treated as Owners....37
SECTION 6.4 Securities Owned by Issuer Deemed Not Outstanding....37
SECTION 6.5 Right of Revocation of Action Taken....37

ARTICLE SEVEN: SUPPLEMENTAL INDENTURES....38

SECTION 7.1 Supplemental Indentures Without Consent of Securityholders....38
SECTION 7.2 Supplemental Indentures With Consent of Securityholders....39
SECTION 7.3 Effect of Supplemental Indenture....40
SECTION 7.4 Documents to Be Given to Trustee....40
SECTION 7.5 Notation on Securities in Respect of Supplemental Indentures....40

ARTICLE EIGHT: CONSOLIDATION, MERGER, SALE OR CONVEYANCE....40

SECTION 8.1 Issuer and Guarantors May Consolidate, etc., on Certain Terms....41
SECTION 8.2 Successor Entity Substituted....41
SECTION 8.3 Opinion of Counsel to Trustee....41
SECTION 8.4 Exception Applicable to Certain Guarantors....42

Page

ARTICLE NINE: SATISFACTION AND DISCHARGE OF INDENTURE; UNCLAIMED MONEYS........................................42

SECTION 9.2 Issuer's Option to Effect Defeasance or Covenant Defeasance...............................43
SECTION 9.3 Defeasance and Discharge...........................................................43
SECTION 9.4 Covenant Defeasance................................................................43
SECTION 9.5 Conditions to Defeasance or Covenant Defeasance.........................................43
SECTION 9.6 Application by Trustee of Funds Deposited for Payment of Securities.......................45
SECTION 9.7 Repayment of Moneys Held by Paying Agent.................................................45
SECTION 9.8 Return of Moneys Held by Trustee and Paying Agent Unclaimed for Two Years.................45
SECTION 9.9 Indemnity for Direct Obligations of the United States.....................................46
SECTION 9.10 Reinstatement.........................................................................46

ARTICLE TEN: MISCELLANEOUS PROVISIONS..............................................................46

SECTION 10.1 Incorporators, Shareholders, Officers and Directors of Issuer and Guarantors Exempt from Individual Liability..................................................46
SECTION 10.2 Provisions of Indenture for the Sole Benefit of Parties and Securityholders..............46
SECTION 10.3 Successors and Assigns of Issuer and Guarantors Bound by Indenture.......................47
SECTION 10.4 Notices and Demands on Issuer, Guarantors Trustee and Securityholders....................47
SECTION 10.5 Officers' Certificates and Opinions of Counsel; Statements to Be Contained Therein........48
SECTION 10.6 Payments Due on Saturdays, Sundays and Holidays..........................................48
SECTION 10.7 Conflict of Any Provision of Indenture with Trust Indenture Act of 1939..................49
SECTION 10.8 New York Law to Govern...............................................................49
SECTION 10.8 Consent to Jurisdiction and Service of Process..........................................49
SECTION 10.8 Judgment Currency....................................................................50
SECTION 10.9 Counterparts.........................................................................50
SECTION 10.10 Effect of Headings...................................................................50

ARTICLE ELEVEN: REDEMPTION OF SECURITIES AND SINKING FUNDS.........................................50

SECTION 11.1 Applicability of Article.............................................................50
SECTION 11.2 Notice of Redemption; Partial Redemptions................................................50
SECTION 11.3 Payment of Securities Called for Redemption.............................................51
SECTION 11.4 Exclusion of Certain Securities from Eligibility for Selection for Redemption............52
SECTION 11.5 Mandatory and Optional Sinking Funds.....................................................52

ARTICLE TWELVE: ADDITIONAL AMOUNTS; CERTAIN TAX PROVISIONS.........................................54

SECTION 12.1 Redemption Upon Changes in Withholding Taxes............................................54
SECTION 12.2 Payment of Additional Amounts............................................................54

ARTICLE THIRTEEN: GUARANTEES.....................................................................56

Page

SECTION 13.1 Guarantee....................................................56
SECTION 13.2 Execution and Delivery of Guarantees....................................................57
SECTION 13.3 Release of Guarantees....................................................58
SECTION 13.4 Additional Guarantors....................................................58

SECTION 3.11 Limitation on Indebtedness of Subsidiaries. (a) The Issuer will not cause or permit any Subsidiary (which is not a Guarantor), directly or indirectly, to create, incur, assume, guarantee or otherwise in any manner become liable for the payment of or otherwise incur (collectively, "incur"), any Indebtedness (including any Acquired Indebtedness but excluding any Permitted Subsidiary Indebtedness) unless such Subsidiary simultaneously executes and delivers a supplemental indenture to the Indenture providing for a Guarantee of the Securities as provided in Section 3.14.

(b) Notwithstanding the foregoing, any Guarantee by a Subsidiary of the Securities shall provide by its terms that it (and all liens securing the same) shall be automatically and unconditionally released and discharged upon (i) any sale, exchange or transfer, to any Person not an Affiliate of the Issuer, of all of the Issuer's equity interests in, or all or substantially all the assets of, such Subsidiary, which transaction is in compliance with the terms of this Indenture and such Subsidiary is released from all guarantees, if any, by it of other Indebtedness of the Issuer or any Subsidiaries, (ii) the payment in full of all obligations under the Indebtedness giving rise to such Guarantee and (iii) with respect to Indebtedness described in clause (a) above constituting guarantees, the release by the holders of such Indebtedness of the guarantee by such Subsidiary (including any deemed release upon payment in full of all obligations under such Indebtedness), at such time as (A) no other Indebtedness (other than Permitted Subsidiary Indebtedness) has been guaranteed by such Subsidiary, as the case may be, or (B) the holders of all such other Indebtedness which is guaranteed by such Subsidiary also release the guarantee by such Subsidiary (including any deemed release upon payment in full of all obligations under such Indebtedness).

(c) For purposes of this Section 3.11, any Acquired Indebtedness shall not be deemed to have been incurred until 180 days from the date (A) the Person obligated on such Acquired Indebtedness becomes a Subsidiary or (B) the acquisition of assets in connection with which such Acquired Indebtedness was assumed is consummated.

SECTION 3.12 Notice to Trustee. The Issuer, Tyco or any other Guarantor shall provide written notice to the Trustee within 30 days of the occurrence of any Event of Default under Section 4.1.

## ARTICLE FOUR

## REMEDIES OF THE TRUSTEE AND SECURITYHOLDERS ON EVENT OF DEFAULT

SECTION 4.1 Event of Default Defined; Acceleration of Maturity; Waiver of Default. "Event of Default" with respect to Securities of any series wherever used herein, means each one of the following events which shall have occurred and be continuing (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a) default in the payment of any installment of interest upon or any Additional Amounts in respect of any of the Securities of such series as and when the same shall become due and payable, and continuance of such default for a period of 30 days; or

(b) default in the payment of all or any part of the principal on any of the



Source: TYCO INTERNATIONAL L, POS AM, June 09, 1998

Securities of such series as and when the same shall become due and payable either at maturity, upon redemption, by declaration or otherwise; or

(c) default in the payment of any sinking fund installment as and when the same shall become due and payable by the terms of the Securities of such series; or

(d) default in the performance, or breach, of any covenant or agreement of the Issuer, Tyco or any other Guarantor in respect of the Securities of such series and related Guarantees (other than a covenant or agreement in respect of the Securities of such series and related Guarantees a default in whose performance or whose breach is elsewhere in this Section specifically dealt with), and continuance of such default or breach for a period of 90 days after the date on which there has been given, by registered or certified mail, to the Issuer by the Trustee or to the Issuer and the Trustee by the Holders of at least 25% in principal amount of the Outstanding Securities of all series affected thereby, a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder; or

(e) an event of default, as defined in any indenture, including this Indenture, or instrument evidencing or under which the Issuer, Tyco or any other Guarantor on the date any determination shall be made under this clause (e), shall have outstanding at least $50,000,000 aggregate principal amount of Indebtedness for borrowed money (other than Non-Recourse Indebtedness), shall happen and be continuing and such event of default shall involve the failure to pay the principal of or interest on such Indebtedness (or any part thereof) on the final maturity date thereof after the expiration of any applicable grace period with respect thereto, or such Indebtedness shall have been accelerated so that the same shall be or become due and payable prior to the date on which the same would otherwise have become due and payable, and such acceleration shall not be rescinded or annulled within ten Business Days after notice thereof shall have been given to the Issuer, Tyco or such Guarantor, as the case may be, by the Trustee (if such event be known to it), or to the Issuer, Tyco or such Guarantor, as the case may be, and the Trustee by the Holders of at least 25% in aggregate principal amount of all of the Securities at the time Outstanding (treated as one class); provided that, if such event of default under such indenture or instrument shall be remedied or cured by the Issuer, Tyco or such Guarantor, as the case may be, or waived by the requisite holders of such indebtedness, then the Event of Default hereunder by reason thereof shall be deemed likewise to have been thereupon remedied, cured or waived without further action upon the part of either the Trustee or any of the Securityholders, and provided further, however, that subject to the provisions of Sections 5.1 and 5.2, the Trustee shall not be charged with knowledge of any such event of default unless written notice thereof shall have been given to the Trustee by the Issuer, Tyco or such Guarantor, as the case may be, by the holder or an agent of the holder of any such Indebtedness, by the trustee then acting under any indenture or other instrument under which such default shall have occurred, or by the Holders of not less than 25% in the aggregate principal amount of the Securities at the time Outstanding (treated as one class);

(f) any Guarantee shall for any reason cease to be, or shall for any reason be asserted in writing by any Guarantor or the Issuer not to be in full force and effect and enforceable in accordance with its terms except to the extent contemplated by the Indenture and any such Guarantee;

(g) a court having jurisdiction in the premises shall enter a decree or order for relief in respect of the Issuer, Tyco or any Significant Subsidiary Guarantor in an

involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee or sequestrator (or similar official) of the Issuer, Tyco or such Significant Subsidiary Guarantor or for any substantial part of its property or ordering the winding up or liquidation of its affairs, and such decree or order shall remain unstayed and in effect for a period of 60 consecutive days; or

(h) the Issuer, Tyco or any Significant Subsidiary Guarantor shall commence a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or consent to the entry of an order for relief in an involuntary case under any such law, or consent to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee or sequestrator (or similar official) of the Issuer, Tyco or such Significant Subsidiary Guarantor or for any substantial part of its property, or make any general assignment for the benefit of creditors; or

(i) any other Event of Default provided in the supplemental indenture or resolution of the Board of Directors under which such series of Securities is issued or in the form of Security for such series.

If an Event of Default described in clauses (a), (b), (c), (d), (f) or (i) above (if the Event of Default under clause (d) or (i), as the case may be, is with respect to less than all series of Securities then Outstanding) occurs and is continuing, then, and in each and every such case, unless the principal of all of the Securities of such series shall have already become due and payable, either the Trustee or the Holders of not less than 25% in aggregate principal amount of the Securities of such series then Outstanding hereunder (each such series voting as a separate class) by notice in writing to the Issuer (and to the Trustee if given by Securityholders), may declare the entire principal (or, if the Securities of such series are Original Issue Discount Securities, such portion of the principal amount as may be specified in the terms of such series) of all Securities of such series and the interest accrued thereon, if any, to be due and payable immediately, and upon any such declaration the same shall become immediately due and payable. If an Event of Default described in clause (d) or (i) (if the Event of Default under clause (d) or (i), as the case may be, is with respect to all series of Securities then Outstanding), (e), (g) or (h) occurs and is continuing, then and in each and every such case, unless the principal of all the Securities shall have already become due and payable, either the Trustee or the Holders of not less than 25% in aggregate principal amount of all the Securities then Outstanding hereunder (treated as one class), by notice in writing to the Issuer (and the to Trustee if given by Securityholders), may declare the entire principal (or, if any Securities are Original Issue Discount Securities, such portion of the principal as may be specified in the terms thereof) of all the Securities then outstanding and interest accrued thereon, if any, to be due and payable immediately, and upon any such declaration the same shall become immediately due and payable.

The foregoing provisions, however, are subject to the condition that if, at any time after the principal (or, if the Securities are Original Issue Discount Securities, such portion of the principal as may be specified in the terms thereof) of the Securities of any series (or of all the Securities, as the case may be) shall have been so declared due and payable, and before any judgment or decree for the payment of the moneys due shall have been obtained or entered as hereinafter provided, the Issuer, Tyco or any other Guarantor shall pay or shall deposit with the Trustee a sum sufficient to pay all matured installments of interest upon all the Securities of such series (or of all the Securities, as the case may be) and the principal of any and all Securities of such series (or of all the Securities, as the case may be) which shall have become due otherwise than by acceleration (with interest upon such principal and, to the extent that payment of such interest is enforceable under applicable law, on overdue installments of interest, at the same rate



Source: TYCO INTERNATIONAL L, POS AM, June 09, 1998

as the rate of interest or Yield to Maturity (in the case of Original Issue Discount Securities) specified in the Securities of such series (or at the respective rates of interest or Yields to Maturity of all the Securities, as the case may be) to the date of such payment or deposit) and such amount as shall be sufficient to cover reasonable compensation to the Trustee, its agents, attorneys and counsel, and all other expenses and liabilities incurred, and all advances made, by the Trustee except as a result of negligence or bad faith, and if any and all Events of Default under the Indenture, other than the non-payment of the principal of Securities which shall have become due by acceleration, shall have been cured, waived or otherwise remedied as provided herein -- then and in every such case the Holders of a majority in aggregate principal amount of all the Securities of such series, each series voting as a separate class (or of all the Securities, as the case may be, voting as a single class), then outstanding, by written notice to the Issuer and to the Trustee, may waive all defaults with respect to such series (or with respect to all the Securities, as the case may be) and rescind and annul such declaration and its consequences, but no such waiver or rescission and annulment shall extend to or shall affect any subsequent default or shall impair any right consequent thereon.

For all purposes under this Indenture, if a portion of the principal of any Original Issue Discount Securities shall have been accelerated and declared due and payable pursuant to the provisions hereof, then, from and after such declaration, unless such declaration has been rescinded and annulled, the principal amount of such Original Issue Discount Securities shall be deemed, for all purposes hereunder, to be such portion of the principal thereof as shall be due and payable as a result of such acceleration, and payment of such portion of the principal thereof as shall be due and payable as a result of such acceleration, together with interest, if any, thereon and all other amounts owing thereunder, shall constitute payment in full of such Original Issue Discount Securities.

SECTION 4.2 Collection of Indebtedness by Trustee; Trustee May Prove Debt. Each of the Issuer, Tyco and any other Guarantor covenants that (a) in case default shall be made in the payment of any installment of interest on any of the Securities of any series when such interest shall have become due and payable, and such default shall have continued for a period of 30 days or (b) in case default shall be made in the payment of all or any part of the principal of any of the Securities of any series when the same shall have become due and payable, whether upon maturity of the Securities of such series or upon any redemption or by declaration or otherwise -- then upon demand of the Trustee, the Issuer, Tyco and such Guarantor will pay to the Trustee for the benefit of the Holders of the Securities of such series the whole amount that then shall have become due and payable on all Securities of series for principal or interest, as the case may be (with interest to the date of such payment upon the overdue principal and to the extent that payment of such interest is enforceable under applicable law, on overdue installments of interest at the same rate as the rate of interest or Yield to Maturity (in the case of Original Issue Discount Securities) specified in the Securities of such series); and in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including reasonable compensation to the Trustee and each predecessor Trustee, their respective agents, attorneys and counsel, and any expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee except as a result of its negligence or bad faith.

Until such demand is made by the Trustee, the Issuer may pay the principal of and interest on the Securities of any series to the Holders, whether or not the principal of and interest on the Securities of such series be overdue.

In case the Issuer, Tyco or any other Guarantor shall fail forthwith to pay such amounts upon such demand, the Trustee, in its own name and as trustee of an express trust, shall be entitled and empowered to institute any action or proceedings at law or in equity for the



Source: TYCO INTERNATIONAL L, POS AM, June 09, 1998

# EXHIBIT I

QuickLinks -- Click here to rapidly navigate through this document

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended September 28, 2007**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**001-13836**
**(Commission File Number)**

# TYCO INTERNATIONAL LTD.
(Exact name of registrant as specified in its charter)

**Bermuda**
(Jurisdiction of Incorporation)

**98-0390500**
(IRS Employer Identification No.)

**Second Floor, 90 Pitts Bay Road, Pembroke HM 08, Bermuda**
(Address of registrant's principal executive office)

**441-292-8674**
(Registrant's telephone number)

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Name of each exchange on which registered** |
| --- | --- |
| Common Shares, Par Value $0.80 | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III or this Form 10-K or any amendment to this Form 10-K ☐.

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer" and "large accelerated filer" in Rule 12b-2 of the Exchange Act (check one):

Large accelerated filer ☒ Accelerated filer ☐ Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The aggregate market value of voting common shares held by non-affiliates of the registrant as of March 30, 2007 was approximately $61,353,813,918 or $24,060,223,857, as adjusted for the one for four reverse stock split and Separation described herein. The beneficial common share holdings of all executive officers and directors of the registrant as of October 2, 2006, have been deemed, solely for the purpose of the foregoing calculation, to be holdings of affiliates of the registrant.

The number of common shares outstanding as of November 22, 2007 was 494,815,892.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's proxy statement filed within 120 days of the close of the registrant's fiscal year in connection with the registrant's 2008 annual general meeting of shareholders are incorporated by reference into Part III of this Form 10-K.

See pages 87 to 91 for the exhibit index.

TABLE OF CONTENTS


| | | Page |
|---|---|---|
| **Part I** | | |
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 13 |
| Item 1B. | Unresolved Staff Comments | 26 |
| Item 2. | Properties | 26 |
| Item 3. | Legal Proceedings | 27 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 42 |
| **Part II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 43 |
| Item 6. | Selected Financial Data | 47 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 49 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 81 |
| Item 8. | Financial Statements and Supplementary Data | 83 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 83 |
| Item 9A. | Controls and Procedures | 83 |
| Item 9B. | Other Information | 85 |
| **Part III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 86 |
| Item 11. | Executive Compensation | 86 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 86 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 86 |
| Item 14. | Principal Accountant Fees and Services | 86 |
| **Part IV** | | |
| Item 15. | Exhibits and Financial Statement Schedules | 87 |
| Signatures | | 92 |
| Index to Consolidated Financial Statements | | 94 |

Unless otherwise indicated, references in this Annual Report to 2007, 2006 and 2005 are to Tyco's fiscal year ended September 28, 2007, September 29, 2006 and September 30, 2005, respectively.

**Competitive Strengths**

We believe that we have the following competitive strengths:

- *Leading market positions and brands.* We have leading market positions in each of our segments, and a number of well recognized brands. For example:
  - *ADT Worldwide* is one of the world's largest providers of electronic security systems and services to the commercial and residential markets (*ADT* and*Sensormatic*).
  - *Fire Protection Services* is one of the world's largest providers of fire detection and fire suppression systems and services (*SimplexGrinnell*,*Wormald* and*Mather & Platt*).
  - *Flow Control* is one of the world's largest manufacturers of valves and related products (*Keystone* and*Vanessa*).
  - *Safety Products* is a major designer and manufacturer of fire suppression products (*Ansul* and*Grinnell*), breathing apparatus for emergency workers (*Scott*), intrusion security products (*DSC* and*Bentel*) and video and access control products (*American Dynamics* and*Software House*).
  - *Electrical and Metal Products* is a major manufacturer of galvanized steel tubing and cable products (*Allied Tube & Conduit* and *AFC Cable*).
- *Global reach and significant scale of operations.* We are a global company, in terms of sales, manufacturing and services. We conduct business in more than 60 countries, and 53% of our 2007 net revenue was generated outside the United States, with 29% in Europe, 16% in the Asia-Pacific region and 8% in the Other Americas. We believe the global nature of our businesses and our extensive sales networks allow us to offer our services and products worldwide to our multinational customers, differentiating us from our competitors, and to participate in the higher growth potential of emerging markets. In addition, we have an extensive global manufacturing presence and operate over 200 manufacturing facilities around the world. Our global manufacturing footprint and our significant scale of operations provide us with greater flexibility to reduce our costs through manufacturing efficiencies, purchasing power and resources for product design, marketing and customer management relative to our smaller competitors.
- *Diverse portfolio of services and products.* We offer a broad portfolio of services and products, which allows our customers to fulfill many of their needs by purchasing solely from us. For customers that purchase multiple services or products across many geographic areas, the breadth of our offerings allows us to serve our customers in ways that many of our competitors cannot.
- *Diverse customer base.* Our customers operate in many different industries and countries, which allows us to leverage our skills and experience across many end markets. For example, we provide our electronic security services and products to many of the world's largest retailers, many of the leading banks in North America and to over five million households and over one and a half million business locations globally.
- *Favorable long-term growth opportunities.* We operate businesses in a number of different markets that have attractive characteristics and solid growth prospects. ADT Worldwide continues to experience strong growth rates due to continued commercial, residential and governmental demand for our broad range of market leading security systems and services. We expect that growth in Fire Protection Services will be driven by non-residential construction, by refurbishment and upgrades of existing systems and by increasingly demanding fire codes. We

**TYCO INTERNATIONAL LTD.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**Years ended September 28, 2007, September 29, 2006 and September 30, 2005**
**(in millions, except per share data)**

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| Revenue from product sales | $ 12,095 | $ 10,974 | $ 10,342 |
| Service revenue | 6,686 | 6,362 | 6,323 |
| **Net revenue** | 18,781 | 17,336 | 16,665 |
| Cost of product sales | 8,723 | 7,874 | 7,232 |
| Cost of services | 3,718 | 3,553 | 3,503 |
| Selling, general and administrative expenses | 4,828 | 4,475 | 4,699 |
| Class action settlement, net | 2,862 | — | — |
| Separation costs | 105 | 49 | — |
| Goodwill impairment | 46 | — | — |
| Restructuring and asset impairment charges, net | 210 | 13 | 17 |
| Losses on divestitures | 4 | 2 | 23 |
| **Operating (loss) income** | (1,715) | 1,370 | 1,191 |
| Interest income | 102 | 43 | 39 |
| Interest expense | (313) | (279) | (322) |
| Other expense, net | (255) | — | (296) |
| **(Loss) income from continuing operations before income taxes and minority interest** | (2,181) | 1,134 | 612 |
| Income taxes | (334) | (310) | (29) |
| Minority interest | (4) | (1) | (2) |
| **(Loss) income from continuing operations** | (2,519) | 823 | 581 |
| Income from discontinued operations, net of income taxes | 777 | 2,781 | 2,492 |
| **(Loss) income before cumulative effect of accounting change** | (1,742) | 3,604 | 3,073 |
| Cumulative effect of accounting change, net of income taxes | — | (14) | 21 |
| **Net (loss) income** | $ (1,742) | $ 3,590 | $ 3,094 |
| **Basic earnings per share:** | | | |
| (Loss) income from continuing operations | $ (5.09) | $ 1.64 | $ 1.15 |
| Income from discontinued operations | 1.57 | 5.53 | 4.96 |
| (Loss) income before cumulative effect of accounting change | (3.52) | 7.17 | 6.11 |
| Cumulative effect of accounting change | — | (0.03) | 0.04 |
| Net (loss) income | $ (3.52) | $ 7.14 | $ 6.15 |
| **Diluted earnings per share:** | | | |
| (Loss) income from continuing operations | $ (5.09) | $ 1.60 | $ 1.13 |
| Income from discontinued operations | 1.57 | 5.38 | 4.68 |
| (Loss) income before cumulative effect of accounting change | (3.52) | 6.98 | 5.81 |
| Cumulative effect of accounting change | — | (0.03) | 0.04 |

Source: TYCO INTERNATIONAL L, 10-K, November 27, 2007

| | | | |
|---|---|---|---|
| Net (loss) income | $ (3.52) | $ 6.95 | $ 5.85 |
| **Weighted-average number of shares outstanding:** | | | |
| Basic | 495 | 503 | 503 |
| Diluted | 495 | 521 | 542 |

See Notes to Consolidated Financial Statements.



Source: TYCO INTERNATIONAL L, 10-K, November 27, 2007

**TYCO INTERNATIONAL LTD.**
**CONSOLIDATED BALANCE SHEETS**
**As of September 28, 2007 and September 29, 2006**
**(in millions, except share data)**

| | 2007 | 2006 |
|---|---|---|
| **Assets** | | |
| Current Assets: | | |
| Cash and cash equivalents | $ 1,894 | $ 2,193 |
| Accounts receivable, less allowance for doubtful accounts of $195 and $203, respectively | 3,010 | 2,748 |
| Inventories | 1,835 | 1,619 |
| Class action settlement escrow | 2,992 | — |
| Prepaid expenses and other current assets | 1,178 | 1,158 |
| Deferred income taxes | 467 | 629 |
| Assets of discontinued operations | 969 | 34,224 |
| Total current assets | 12,345 | 42,571 |
| Property, plant and equipment, net | 3,556 | 3,501 |
| Goodwill | 11,691 | 11,293 |
| Intangible assets, net | 2,697 | 2,730 |
| Other assets | 2,526 | 2,916 |
| **Total Assets** | $ 32,815 | $ 63,011 |
| **Liabilities and Shareholders' Equity** | | |
| Current Liabilities: | | |
| Loans payable and current maturities of long-term debt | $ 380 | $ 771 |
| Accounts payable | 1,715 | 1,557 |
| Class action settlement liability | 2,992 | — |
| Accrued and other current liabilities | 2,921 | 3,012 |
| Deferred revenue | 584 | 476 |
| Liabilities of discontinued operations | 509 | 7,997 |
| Total current liabilities | 9,101 | 13,813 |
| Long-term debt | 4,076 | 8,853 |
| Deferred revenue | 1,194 | 1,200 |
| Other liabilities | 2,753 | 3,704 |
| **Total Liabilities** | 17,124 | 27,570 |
| Commitments and contingencies (Note 16) | | |
| Minority interest | 67 | 54 |
| Shareholders' Equity: | | |
| Preference shares, $4 par value, 31,250,000 shares authorized, none outstanding | — | — |
| Common shares, $0.80 par value, 1,000,000,000 shares authorized; 496,301,846 and 498,030,095 shares outstanding, net of 1,277,449 and 26,245,695 shares owned by subsidiaries, respectively | 397 | 398 |
| Capital in excess: | | |
| Share premium | 9,189 | 8,787 |
| Contributed surplus, net | 5,439 | 14,493 |
| Accumulated earnings | 34 | 10,692 |
| Accumulated other comprehensive income | 565 | 1,017 |
| **Total Shareholders' Equity** | 15,624 | 35,387 |
| **Total Liabilities and Shareholders' Equity** | $ 32,815 | $ 63,011 |

See Notes to Consolidated Financial Statements.

a $20 million payment by Tyco, $10 million of which was paid to Mr. Walsh with the balance paid to a charity of which Mr. Walsh is trustee. The payment was purportedly made for Mr. Walsh's assistance in arranging our acquisition of The CIT Group, Inc. On December 17, 2002, Mr. Walsh pleaded guilty to a felony violation of New York law in the Supreme Court of the State of New York, (New York County) and settled a civil action for violation of federal securities laws brought by the SEC in United States District Court for the Southern District of New York. Both the felony charge and the civil action were brought against Mr. Walsh based on such payment. The felony charge accused Mr. Walsh of intentionally concealing information concerning the payment from Tyco's directors and shareholders while engaged in the sale of Tyco securities in the State of New York. The SEC action alleged that Mr. Walsh knew that the registration statement covering the sale of Tyco securities as part of the CIT Group acquisition contained a material misrepresentation concerning fees payable in connection with the acquisition. Pursuant to the plea and settlement, Mr. Walsh paid $20 million in restitution to Tyco on December 17, 2002. Our claims against Mr. Walsh are still pending.

## 13. Debt

Debt at September 28, 2007 and September 29, 2006 is as follows ($ in millions):

| | 2007 | 2006 |
|---|---|---|
| 6.125% Euro denominated public notes due 2007[2] | $ — | $ 762 |
| Revolving bank credit facility due 2007 | — | 700 |
| 364-day senior bridge loan facility due 2008[1] | 367 | — |
| 6.125% public notes due 2008 | 300 | 399 |
| 5.5% Euro denominated notes due 2008 | — | 869 |
| 6.125% public notes due 2009 | 215 | 399 |
| 6.75% public notes due 2011 | 516 | 999 |
| 6.375% public notes due 2011 | 849 | 1,500 |
| 6.5% British pound denominated public notes due 2011 | — | 373 |
| Revolving senior credit facility due 2012 | 308 | — |
| 6.0% notes due 2013 | 654 | 997 |
| 3.125% convertible senior debentures due 2023 | 21 | 750 |
| 7.0% public notes due 2028 | 437 | 497 |
| 6.875% public notes due 2029 | 723 | 790 |
| 6.5% British pound denominated public notes due 2031 | — | 536 |
| Other[1][2] | 66 | 53 |
| Total debt | 4,456 | 9,624 |
| Less current portion | 380 | 771 |
| Long-term debt | $ 4,076 | $ 8,853 |

(1) These instruments, plus $13 million of the amount shown as other, comprise the current portion of long-term debt as of September 28, 2007.

(2) These instruments, plus $9 million of the amount shown as other, comprise the current portion of long-term debt as of September 29, 2006.