UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE BANK OF NEW YORK, as Indenture Trustee,<br><br>              Plaintiff,<br><br>      v.<br><br>TYCO INTERNATIONAL GROUP, S.A., TYCO INTERNATIONAL, LTD., and TYCO INTERNATIONAL FINANCE S.A.,<br><br>           Defendants. | Docket No. 07 CV 4659 (SAS) |

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION
TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

Dechert LLP
30 Rockefeller Plaza
New York, New York 10112
(212) 698-3500

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

Page

Preliminary Statement ...................................................................................................1

Argument ......................................................................................................................6

The Court Should Grant Plaintiff's Motion for Summary Judgment .............................6

    A.    The Asset-Stripping Transaction Violates the Indentures'
    Successor Obligor Clause ..................................................................................6

        1.    Defendants May Not Perform an End-Run Around
        *Sharon Steel*'s Holding .............................................................................6

        2.    Defendants' Arguments Cannot Save the Asset-Stripping
        Transaction..........................................................................................9

    B.    Defendants Breached the Indentures by Going Forward With the
    Asset-Stripping Transaction Without the Trustee's Signature on the
    Supplemental Indentures...............................................................................15

    C.    The Noteholders Are Entitled to the Make-Whole or Redemption
    Premium.......................................................................................................16

Conclusion .................................................................................................................22

## TABLE OF AUTHORITIES

<u>Cases</u>                                                                                    Page(s)

*Charter One Bank* v. *Leone*,
    845 N.Y.S.2d 513 (N.Y. App. Div. 2007) ...........................................................19

*Dallas Aero.* v. *Cis Air Corp.*,
    No. 00-cv-1657, 2002 U.S. Dist. LEXIS 21130
    (S.D.N.Y. Oct. 31, 2002) ................................................................................. 15-16

*In re LHD Realty Corp.*,
    726 F.2d 327 (7th Cir. 1984) .........................................................................19, 21

*Mersman* v. *Werges*,
    112 U.S. 139 (1884)............................................................................................15

*Nw. Mut. Life Ins. Co.* v. *Uniondale Realty Assocs.*,
    816 N.Y.S.2d 831 (N.Y. Sup. Ct. 2006) ............................................................21

*Rodgers* v. *Rainier Nat'l Bank*,
    757 P.2d 976 (Wash. 1988)................................................................................21

*Sharon Steel Corp.* v. *Chase Manhattan Bank*,
    691 F.2d 1039 (2d Cir. 1982).................................................................... *passim*

Defendants' response to our motion attests to its merit.

Certainly, the response shows, no genuine dispute of material fact burdens our summary judgment motion.    No one contests that, when Tyco launched its Asset-Stripping Transaction, TIGSA – the issuer of the Notes – was a $60 billion diversified international conglomerate with four separate lines of business.  No one challenges that, today, as a result of the Asset-Stripping Transaction, TIGSA was liquidated and no longer exists.  Everyone agrees that *at least* a majority of TIGSA's assets (we say up to 80 percent) were transferred to its parent's shareholders for free.   No quarrel exists that a radical transformation occurred in the business to which the public lent billions – that a borrower that was a diversified conglomerate is now but a fire and security company.  All acknowledge that the assets now backing the Notes are less than "all or substantially all" of the assets TIGSA held when the Asset-Stripping Transaction started.  The parties are in accord that these few remaining assets were transferred to Tyco or the newly formed TIFSA, and that the Notes followed these remaining assets.  These facts – all that are needed for judgment – are undisputed.

As a matter of law, *Sharon Steel Corp.* v. *Chase Manhattan Bank*, 691 F.2d 1039 (2d Cir. 1982), holds that this type of asset-stripping transaction breaches the boilerplate successor obligor clauses in common indentures.  In *Sharon Steel*, the Court of Appeals held that an issuer of public debt is prohibited from breaking apart a company and assigning the public debt to whatever the company had left behind.  That is exactly what defendants have done here. If defendants' actions do not violate *Sharon Steel*, then the case means nothing.  To rule that a company can break itself apart in this way without regard to the successor obligor clauses would be to limit the Second Circuit's instructions solely to its facts.  Defendants' argument is but a plea that public borrowers should be allowed to engineer their way around the reasoning of the

Court of Appeals and the important protections *Sharon Steel* has for years provided public lenders.

This plea is unabashed. Defendants *concede* that they restructured their transaction to try to circumvent *Sharon Steel*. Once the Second Circuit's holding came to their attention – obviously as a result of a noteholder action claiming a violation of the securities laws, to which defendants quickly surrendered – defendants admittedly sought to redo their scheme in hopes of evading that decision. Defendants admit that they "made a change to the form [of the transaction] so as to eliminate any argument that either the form or the substance was prohibited" by *Sharon Steel*. (Def. Br. at 10 n.3.) To them, altering the sequence of steps, occurring seconds apart, is just enough to remove them from obligations to the parties from which TIGSA borrowed billions. But *Sharon Steel* is not about the choreography of a transaction, but about the staging of the transaction as a whole. It is not about a particular movement, but the total piece.

Therein lies the central issue for this Court on this motion. We submit that *Sharon Steel* means that an asset-stripping transaction violates the boilerplate successor obligor clauses in an indenture when the issuer, in the context of a corporate breakup, tries to transfer its notes to an entity that does not hold "all or substantially all" of the issuer's assets as of the date when the transaction began. An issuer cannot – through some orchestrated timing of each step of a breakup transaction -- move its public debt to an entity that does not hold "all or substantially all" the assets at the outset of the transaction. The question, in short, is this: At the end of the transaction, did the Notes ultimately follow "all or substantially all" of the assets in the breakup? The answer to that question here is clearly no. Neither Tyco nor TIFSA hold anywhere near "all or substantially all" of the assets TIGSA had when the Asset-Stripping Transaction began. For that reason, *Sharon Steel* entitles the Trustee to summary judgment.

Nothing in defendants' response demonstrates otherwise.  Defendants say that our argument is based on a "perceived technicality" (Def. Br. at 1) or a "technical breach" (Def. Br. at 3) because the Asset-Stripping Transaction merely substituted one Luxembourg subsidiary for another within Tyco's corporate structure and caused no harm to Tyco's public creditors. Defendants argue that they have continued timely to make their payments to the Noteholders and that the interest payment stream will continue because defendants have substantial assets, revenues, and net cash.  This no-harm-no-foul argument is a legal irrelevancy that also ignores inconvenient facts.

The argument is legally irrelevant because the only issue here is whether or not defendants breached the Indentures under *Sharon Steel*.   Defendants concede that the factual issues germane solely to that question are not in dispute.  The creditworthiness of TIFSA is not among those germane facts.  Indeed, exactly this argument was made in *Sharon Steel* – and with far more potency than here.  In *Sharon Steel*, the Second Circuit never doubted that the company to which the notes there had been assigned (*i.e.*, Sharon Steel) was creditworthy and timely in its payments.  In fact, in contrast to the Asset-Stripping Transaction here, in *Sharon Steel* the issuer had received cash for the assets it transferred rather than giving them away for nothing to its shareholders; what is more, there was a secured escrow for payment of the notes from that cash – far from anything here.   For the Second Circuit, all of this was of no consequence.  The question for the Court of Appeals was not whether the noteholders would *ultimately* be paid, but whether the breakup of the company entitled them to be paid right away under the indentures.  So, too, here.

Only the issue is far more pressing here as a matter of fact.   Defendants' attempt to depict the transaction as merely the substitution of TIFSA for TIGSA is grossly misleading.

The company now making the payments to the Noteholders is a completely different company –
not only in name, but also in business lines and assets. TIGSA had $60 billion in assets and four
diversified businesses with hundreds of operating subsidiaries. TIFSA, by contrast, is solely a
fire and security and engineered products company which even defendants valued at less than a
third of TIGSA's value – a number that itself may be overstated. Whether TIFSA may
eventually satisfy all obligations under the Notes is not the pertinent inquiry. The simple
unadorned fact is that TIFSA does not now own "all or substantially all" of the assets of the
issuer TIGSA. No more is needed to end this case.

  That TIFSA is itself in a precarious position only confirms the wisdom of *Sharon
Steel*, because the Second Circuit was so plainly concerned that an issuer not be permitted to
engage in a calculated asset-stripping transaction, with all the benefits going to the equity
holders, without heed to the debt holders. For instance, today, measured by an important metric
– what the company actually earns – TIFSA earns *less than 20 percent* of the annual income that
TIGSA earned in its final year of existence. TIFSA's income from continuing operations in
2007 was 19.4 percent of the same income reported for TIGSA in Tyco's restated 2006 Form 10-
K. (*See* 11/27/07 10-K of Tyco International Ltd. ("11/27/07 10-K") at 167, Supplemental
Declaration of Andrew G. Gordon ("Gordon Supp. Decl.") Ex. A; 4/20/07 10-K (Restated) of
Tyco International Ltd. at 150, Gordon Supp. Decl. Ex. B.) And, at the end of fiscal year 2006,
TIGSA had more than a billion dollars in cash and cash equivalents; whereas at the end of fiscal
year 2007, TIFSA – which had inherited these funds from TIGSA – had no cash on hand.
(11/27/07 10-K at 172-73, Gordon Supp. Decl. Ex. A.)

  Equally if not more important, defendants ignore that their obligations on the
Notes run for the next twenty years. Just because TIFSA is making the interest payments today

does not mean that defendants have not irreparably damaged TIFSA's and Tyco's ability to do so through 2029. This is not – as defendants seek to portray it – a mere game of "gotcha" played by Noteholders. On the contrary, there is a material concern for the holders that their Notes are no longer backed by the assets of a $60 billion diversified international conglomerate, but rather by a far more limited, far smaller entity. If TIFSA goes under in five, ten or fifteen years, when the Noteholders are still owed $3.7 billion (the entire principal amount on their Notes), the Noteholders will have no remedy to unwind the transaction. Only by challenging the transaction now can the Noteholders guarantee that they will be protected to the degree all parties intended when the Noteholders purchased the Notes.

In a bizarre contention, defendants also assert that the Trustee "apparently recogniz[es]" that the transfer of the healthcare and electronics businesses to Tyco's shareholders "did not amount to" a transfer of "all or substantially all" of TIGSA's assets, supposedly because we do not move for summary judgment on that issue. (Def. Br. at 1, 14.) This contention is untenable. To begin with, the question now is not whether "all or substantially all" of the assets were transferred but whether *the Notes* were transferred with "all or substantially all" of the assets. Defendants' point is also misleading. As defendants surely recall, the Trustee told this Court that summary judgment on that issue would be premature, because the parties clearly dispute the value of the transferred assets. Thus, unless defendants will concede that the assets transferred to Tyco's shareholders comprise as much as 80 percent of Tyco's pre-transaction value, disputed factual issues would preclude summary judgment at this juncture. Indeed, plaintiff discussed these very issues with Your Honor and with defendants at the October 2 pre-motion conference in advance of plaintiff's motion for summary judgment. (*See* 10/2/07 Tr. at 27-28.)

5

Defendants' response likewise shows that the Noteholders are entitled to the make-whole premium – just as the noteholders were in *Sharon Steel* – because defendants have engaged in a scheme to avoid paying the redemption premium. Defendants' reliance on the remedy for an acceleration of debt under the Indentures is simply inapplicable when, as here, the Trustee has not accelerated the debt.

Finally, defendants' cross-motion is meaningless. The tactic – transparently aimed at solely having the last word – can produce nothing that a ruling on our motion would not resolve. The cross-motion cannot resolve liability and cannot resolve damages. It should be denied, and defendants' last word ignored, for that reason alone.

## Argument

### THE COURT SHOULD GRANT
### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**A.    The Asset-Stripping Transaction Violates the Indentures' Successor Obligor Clause**

    **1.    Defendants May Not Perform an End-Run Around *Sharon Steel*'s Holding**

*Sharon Steel*'s holding is simple and undeniable: Based on the boilerplate successor obligor clauses contained in indentures like the ones at issue here, a company may not assign its public debt to another party in the course of a liquidation "unless 'all or substantially all' of the assets of the company at the time the plan of liquidation is determined upon are transferred to a single purchaser." 691 F.2d at 1051. As the Second Circuit explained, the purpose of that ruling was to protect public creditors by requiring either that an obligor's liabilities follow its assets or that the obligor redeem the notes. Thus, while borrowers "are enabled to sell entire businesses and liquidate, to consolidate or merge with another corporation, or to liquidate their operating assets and enter a new field free of debt," "[l]enders . . . are assured a degree of continuity of assets." *Id.*

6

Here, defendants came up with a plan to liquidate TIGSA and transfer its most valuable assets to Tyco's shareholders. Defendants recognized, however, that in order to do so, they would need to circumvent the Indentures' successor obligor clauses. Thus, as defendants acknowledged in their response to the Trustee's Rule 56.1 Statement, defendants first launched a coercive tender offer conditioned upon the Noteholders' acquiescence to proposed amendments that would have declared that the transfer of TIGSA's electronics and healthcare businesses to Tyco Electronics and Covidien, respectively, was not a "sale or conveyance of all or substantially all of Tyco's or [TIGSA's] assets," but that the transfer of TIGSA's fire and security and engineered products and services business to TIFSA was a "conveyance of substantially all of [TIGSA's] assets." (Pl. 56.1 St., and Def. Resp., at ¶¶ 33-36.) As part of this proposed transaction, TIFSA – which was indisputably not acquiring all or substantially all of TIGSA's assets measured at the time that the Asset-Stripping Transaction began – would have assumed TIGSA's obligation on the Notes. (Pl. 56.1 St., and Def. Resp., at ¶ 36.) As we demonstrated in our moving brief, these proposed steps were substantively identical to those in *Sharon Steel* and were therefore unlawful. (Pl. Br. at 10-11, 19-20.)

Defendants do not dispute that this was how this proposed transaction would work. Rather, defendants argue that this proposed transaction is irrelevant, as is any discussion of what defendants intended to take place, because only the transaction that actually took place matters. (Def. Br. at 9-10.) But defendants misunderstand our point: The Asset-Stripping Transaction that actually took place was indistinguishable in substance and in effect from this concededly unlawful proposed transaction, and differed from such transaction only in form. That change in form, however, does not remove the Asset-Stripping Transaction from coming within the holding of *Sharon Steel*.

7

Defendants in fact appear to have been unaware of the *Sharon Steel* case at the time they developed their restructuring plan. In response to a lawsuit by a Noteholder, filed shortly after the solicitation documents for the tender offer, defendants admitted that the "form" of the proposed transaction was the same as *Sharon Steel* but claimed that the "substance" of the proposed transaction was not. However, rather than accept that they could not proceed with the proposed transaction, defendants instead came up with a scheme to rejigger the precise formalistic steps of the proposed transaction to try (unsuccessfully) to evade the limitations of *Sharon Steel*. Defendants contend that this last minute change in form is somehow sufficient to avoid the application of *Sharon Steel*. (Def. Br. at 17.)

The fundamental principal underlying the *Sharon Steel* decision is that investor protections cannot be circumvented by elevating the form of a prohibited transaction over its substance – precisely what defendants are doing here. The Second Circuit's holding would have no meaning if it barred only the precise form in which the transaction in *Sharon Steel* took place, but nevertheless permitted some alternative transaction that would similarly leave public creditors holding the bag. What troubled the Second Circuit in *Sharon Steel* was the notion that a company could, in effect, cheat its public creditors by taking their money and then liquidating its assets, leaving the public creditors with significant risk that they would not recover what they had lent. The purpose of the Second Circuit's ruling was to ensure that the notes would follow the issuing company's assets if there were ever a significant transfer of those assets. *See* 691 F.2d at 1049-50 (focusing on purpose of successor obligor clauses).

Even defendants would concede that when all is said and done the Notes did not follow the majority of the assets here. As noted above, the public creditors' Notes went from being backed by a diversified conglomerate with more than $60 billion in assets to being backed

8

by an inferior entity with less than a third of the assets and possibly as little as 20 percent of the assets. As defendants admit, at most TIFSA had only 36.6 percent of TIGSA's pre-transaction assets, 32 percent of TIGSA's pre-transaction operating income, and 27 percent of TIGSA's pre-transaction contingent assets and liabilities. (Pl. 56.1 St., and Def. Resp., at ¶¶ 6, 50, 59.) None of these measures is even close to the 38 percent of operating revenue or 51 percent of book value that the Second Circuit rejected in *Sharon Steel* as being not "even close" to constituting "all or substantially all" of the assets. 691 F.2d at 1051-52. The plain fact is that the issuer was broken up and liquidated, and the Notes followed only a portion of those assets. No amount of arguing about the form of the transaction can distract from the reality that the transaction violated the substantive holding of *Sharon Steel*.

2.    **Defendants' Arguments Cannot Save the Asset-Stripping Transaction**

Defendants offer three primary arguments to support their position that the Asset-Stripping Transaction does not violate the Indentures or the Second Circuit's holding in *Sharon Steel*. For the reasons that follow, the Court should reject defendants' contentions.

*First*, defendants break down the Asset-Stripping Transaction into separate steps and argue that none of those intermediate steps, viewed individually, violated the Indentures. In so doing, defendants ignore one of *Sharon Steel*'s key directives. *Sharon Steel* requires that the "appropriate reference date" for determining what comprises "all or substantially all" of the obligor's assets is the date the obligor's plan is approved. Any contrary reading, the Second Circuit stated, "would severely impair the interests of lenders." 691 F.2d at 1051. Defendants' step-by-step analysis *never* compares the initial, pre-transaction structure to the final, post-transaction structure. That is the comparison required by *Sharon Steel*, and such a comparison makes abundantly clear that the Asset-Stripping Transaction violated *Sharon Steel*.

The reorganization plan was announced on January 13, 2006. (Def. Br. at 16; Def. 56.1 St. at ¶ 29.) At the time, as the Court is by now well aware, TIGSA was a diversified international conglomerate containing four separate lines of business and $60 billion in assets. (Def. 56.1 St. at ¶¶ 2-3.) In the Asset-Stripping Transaction, TIGSA – like the obligor in *Sharon Steel* – disposed of the vast bulk of its assets piecemeal. TIGSA transferred its healthcare business to Covidien; its electronics business to Tyco Electronics; and its remaining assets – the fire and security business and the engineered products business – to TIFSA.[1] (Pl. 56.1 St., and Def. Resp., at ¶¶ 46, 51.) TIGSA then transferred the stock in Tyco Electronics, Covidien, and TIFSA to Tyco, which spun-off Tyco Electronics and Covidien to its shareholders. (Pl. 56.1 St., and Def. Resp., at ¶¶ 52, 59.) The very next day after the final transfer, TIGSA was put into liquidation. (Pl. 56.1 St., and Def. Resp., at ¶ 58.) Thus, at the conclusion of the transaction, TIGSA had been liquidated and its assets had been divided among three entities. The two entities receiving TIGSA's most successful businesses and most valuable assets were spun off to Tyco's shareholders; the Notes were transferred to a new Tyco entity holding the least desirable and remaining assets. As discussed above (at pp. 8-9), viewed at the point when the Asset-Stripping Transaction was concluded, the assets contributed to TIFSA (or transferred to Tyco) do not represent "all or substantially all" of TIGSA's assets as of January 13, 2006, as required by *Sharon Steel*. This result is plainly a violation of both the Indentures and *Sharon Steel*'s controlling precedent.

Defendants' argument boils down to the contention that the Asset-Stripping Transaction is permissible because Tyco assumed the Notes in the instant that TIGSA transferred all of its assets to Tyco and one second before Tyco transferred the stock in Covidien and Tyco

---

[1]    The dispute between the parties as to whether the Notes were transferred to TIFSA or to Tyco (which we discuss below) is irrelevant to this particular analysis.

Electronics to its shareholders. But, there can be no dispute that if TIGSA had first transferred Covidien and Tyco Electronics to Tyco's shareholders and then one second later transferred TIFSA and the Notes to Tyco, that would be barred by *Sharon Steel*. This sort of timing scheme to evade *Sharon Steel* still yields the same substantive result and thus runs afoul of *Sharon Steel*'s substantive holding. As with the Asset-Stripping Transaction, the offending transaction in *Sharon Steel* was simply an attempt by the issuer to avoid the protective terms of the indenture by structuring its asset-stripping plan in multiple steps. The Second Circuit held that the issuer could not do that; the transaction had to be reviewed in the aggregate, from the beginning to the end. Applying that rule to the facts here is as simple as it is compelling: At the end of the day, just as in *Sharon Steel*, Tyco and TIFSA assumed the Notes, but do not have all or substantially all of the assets. Defendants cannot avoid the purpose of *Sharon Steel* by transferring all assets and liabilities to Tyco and then, in the same transaction, gifting out the stock of two of the three surviving entities to its shareholders.[2]

*Second*, defendants attempt to eliminate TIGSA and TIFSA from the picture in evaluating the Asset-Stripping Transaction. However, the harder defendants try, the more the Asset-Stripping Transaction looks like a scheme of the type prohibited by *Sharon Steel*. Defendants first try to write TIGSA out of the picture by arguing that Tyco was always the real obligor on the Notes by virtue of its status as guarantor and by operation of certain SEC rules. (Def. Br. at 4.) Defendants then try to write TIFSA out of the picture by arguing that Tyco assumed TIGSA's obligations on the Notes at the time of the transfer and TIFSA did not assume

---

[2]  We note that defendants blatantly misquote the Trustee in arguing that the Trustee understands that "[i]f the Notes followed all of the stock up to Tyco, . . . the [Transaction] would not run afoul of *Sharon Steel*." (Def. Br. at 10, purporting to quote Pl. Br. at 20.) In fact, as shown by the part of the quotation that defendants ellipsed out ("the thinking must have gone"), the Trustee was referring to what the defendants must have been thinking in restructuring the transaction in their effort to evade *Sharon Steel*.

either the assets or the Notes.   (Def. Br. at 2, 8.)    Through these arguments, defendants apparently believe that there was no violation of *Sharon Steel* for one of two reasons:

(a)    Tyco was the obligor on the Notes both at the time they were issued and at the end of the Asset-Stripping Transaction; thus, there was no transfer of the assets without a corresponding transfer of the Notes.  Rather, "[t]he real obligor on the Notes, Tyco, engaged in no transaction other than a permitted dividend." (Def. Br. at 15.)

(b)    Even if TIGSA was initially the sole obligor on the Notes, Tyco – not TIFSA – assumed TIGSA's obligation on the Notes in the Asset-Stripping Transaction.  As a result, defendants say, the transfer from TIGSA to Tyco involved all of the Notes and all of the assets.

Defendants' arguments are inherently contradictory and demonstrate that this is nothing more than a shell game.  Defendants' original proposed transaction would have had TIFSA assuming the Notes directly from TIGSA.  (Pl. 56.1 St., and Def. Resp., at ¶ 36.)  As we previously explained, this would have been a violation of *Sharon Steel* (*i.e.*, this was defendants' original – and eventually aborted – structure).  Thus, defendants came up with a scheme to try to get around *Sharon Steel*, but still end up in the same place:  Rather than transferring the Notes directly from TIGSA to TIFSA, TIGSA would first transfer the assets to three separate entities, then transfer the stock in those entities to Tyco.  Then, through supplemental indentures, TIFSA – rather than assume the Notes – would first become a "co-obligor" with TIGSA (whatever that means) on the Notes, and, on the next day, Tyco – already the guarantor – would somehow also now "assume" TIGSA's obligations on the Notes.  The net effect of this series of related transactions is that the assets and the Notes end up in the very same place as they would have in

the initial proposed transaction, a transaction that defendants have tacitly admitted is prohibited under the Indentures.

Defendants' revised scheme was, of course, all a mirage. There is no legitimate purpose that could be served by having Tyco assume TIGSA's obligations on the Notes at the time of the transfer if, as defendants contend, Tyco was always an obligor on the Notes from the time they were issued. The lynchpin of the revised structure – the illusion that TIFSA did not really assume the Notes but merely became a "co-obligor" – is belied by defendants' own subsequent public filings, which report that TIFSA "*has assumed the indebtedness of TIGSA*" (*see, e.g.*, 8/9/07 10-Q of Tyco International Ltd. at 39, 12/4/07 Gordon Decl. Ex. K; 11/27/07 10-K at 167, Gordon Supp. Decl. Ex. A) and that "*TIGSA's remaining debt was contributed to Tyco International Finance S.A. ('TIFSA'), a wholly owned subsidiary of the Company and successor company to TIGSA*" (11/27/07 10-K at 72, Gordon Supp. Decl. Ex. A).

*Third*, unable to sidestep *Sharon Steel*'s holding, defendants next argue that *Sharon Steel* does not apply at all because the factual situation in the present case is different from that at issue in *Sharon Steel*.[3]

Defendants seek to distinguish *Sharon Steel* on the ground that it involved the sale of assets to an *unrelated third party* as part of a plan to liquidate the debtor. (Def. Br. at 2.) That argument is a red herring. The decision in *Sharon Steel* did not turn on the involvement of an unrelated third party, and defendants can point to no language in the opinion limiting its application to transfers involving unrelated third parties. Indeed, the Second Circuit observed

---

[3]   Defendants also resort to denigrating the Trustee's legal argument by criticizing the Trustee for relying only on *Sharon Steel* for "any of its substantive points." (Def. Br. at 2.) In fact, *Sharon Steel* is the only case on which the Trustee need rely, because it is controlling and dispositive authority in this Circuit. No further legal citation is necessary for the Court to rule for the Trustee.

that borrowers could engage in a number of different types of transactions, including sales of entire businesses, liquidations of operating assets, consolidations and mergers, so long as the Notes followed the assets. 691 F.2d at 1051. There is simply no reason why the presence of a related entity in the liquidation plan would alter this holding. In fact, the presence of a third party purchaser could well have benefited the Noteholders in this case, because presumably then the assets at issue would have been sold at arms-length, providing some value for the benefit of Noteholders; instead, the assets were given away for free to shareholders, substantially depleting the financial resources available to support the Notes.

Inexplicably, defendants then argue that *Sharon Steel* does not apply because Tyco was not liquidated. (Def. Br. at 16 n.7.) This argument conveniently ignores that TIGSA, the actual issuer of the Notes, was in fact liquidated. Indeed, TIGSA was liquidated because defendants wanted to avoid adverse tax consequences under Luxembourg law, precisely the same type of tax consideration facing the liquidating company in *Sharon Steel*. 691 F.2d at 1045 n.9. In any event, the Second Circuit's holding in *Sharon Steel* was clearly directed at a coordinated disposition of valuable assets, as occurred here, whether or not a formal liquidation took place.

Finally, defendants – in another odd twist – use the Noteholders' rejection of the transaction to try to differentiate it from the transaction in *Sharon Steel*. (Def. Br. at 17 n.8.) Neither the transaction here nor the one in *Sharon Steel* had noteholder approval. The fact that defendants sought such approval – by means of a coercive tender offer – and were denied in no way makes the Asset-Stripping Transaction any less a violation of *Sharon Steel*.

14

**B.    Defendants Breached the Indentures by Going Forward With the Asset-Stripping Transaction Without the Trustee's Signature on the Supplemental Indentures**

In our moving brief, we explained that the Asset-Stripping Transaction could not go forward without a supplemental indenture executed by the Trustee. That supplemental indenture must be "satisfactory" to the Trustee under the successor obligor clause. (1998 Indenture § 8.1, 12/4/07 Gordon Decl. Ex. E; 2003 Indenture § 10.01, 12/4/07 Gordon Decl. Ex. F.) Here, the proposed supplemental indentures were not "satisfactory" to the Trustee. Rather than wait for the resolution of the Trustee's declaratory judgment action to determine whether the Trustee was authorized or permitted to sign the proposed supplemental indentures, or even seek to expedite such action, defendants went ahead with the Asset-Stripping Transaction without the Trustee's signature. That was a violation of the Indentures. (Pl. Br. at 21-23.)

Defendants offer two responses. Defendants first suggest in their response to the Trustee's Rule 56.1 Statement that Tyco's, TIGSA's and TIFSA's execution of the supplemental indentures was all that was required, and the signature of the Trustee was not required for the supplemental indentures to go into effect. (Pl. 56.1 St., and Def. Resp., at ¶ 42.) That position is contrary to the plain language of the Indentures, which require *the Trustee*, along with the Issuer, Tyco, and any other Guarantor to sign the supplemental indentures for them to take effect. (1998 Indenture §§ 7.1, 7.2, 12/4/07 Gordon Decl. Ex. E; 2003 Indenture §§ 9.01, 9.02, 12/4/07 Gordon Decl. Ex. F.) That position is also contrary to one of the most basic principles of contract law – that one party cannot amend a contract (which the indentures surely are) without the agreement of the counterparty. Defendants simply have no right to alter their contract with the Trustee without the Trustee's approval. *See, e.g., Mersman* v. *Werges*, 112 U.S. 139, 141 (1884) (express consent of counterparty required for material alteration of contract); *Dallas*

*Aero.* v. *Cis Air Corp.*, No. 00-cv-1657, 2002 U.S. Dist. LEXIS 21130, at *6-7 (S.D.N.Y. Oct. 31, 2002) (same).

Defendants also contend that whether they breached the Indentures by going forward with the Asset-Stripping Transaction without the Trustee's signature rises or falls on the validity of the Asset-Stripping Transaction itself. (Def. Br. at 19.)[4] That is not the case. The Indentures prohibit defendants from transferring the Notes without a supplemental indenture signed by the Trustee. (1998 Indenture § 8.1, 12/4/07 Gordon Decl. Ex. E; 2003 Indenture § 10.01, 12/4/07 Gordon Decl. Ex. F.) Notwithstanding that contractual prohibition, defendants went ahead and transferred the Notes without a supplemental indenture signed by the Trustee, in plain violation of the Indentures. Thus, by going forward with the Asset-Stripping Transaction without the Trustee's signature, defendants clearly breached the Indentures.

**C.    The Noteholders Are Entitled to the Make-Whole or Redemption Premium**

The Noteholders are entitled to the make-whole or redemption premium as a result of defendants' breach of the Indentures. *Sharon Steel* – once again – is dispositive of the issue. As the Second Circuit held:

> The purpose of a redemption premium is to put a price upon the voluntary satisfaction of a debt before the date of maturity. While such premiums may seem largely irrelevant for commercial purposes in times of high interest rates, they nevertheless are part of the contract and would apply in a voluntary liquidation which included plans for payment and satisfaction of the public debt. We believe it undermines the plain purpose of the redemption provisions to allow a liquidating debtor to avoid their terms simply by failing to take the steps necessary to redeem the debentures, thereby creating a default. We hold, therefore, that the redemption premium must be paid.

---

[4]    On this motion, the issue is not whether the Trustee was obligated to sign, but whether defendants breached the Indentures by going ahead with their transaction without obtaining the Trustee's signature.

691 F.2d at 1053 (citation omitted). The Court thus recognized that a company should not be rewarded for defaulting on its obligations by being permitted to avoid the redemption provision included in its contracts.

Defendants have no answer to *Sharon Steel*. Defendants state that the award of the redemption premium in *Sharon Steel* rested on the debtor's intentional default so as to avoid payment of the redemption premium (Def. Br. at 25 n.13) and assert that there is no evidence here of an intentional default to evade the prepayment premium (Def. Br. at 24). This entire dispute, however, is about defendants' attempt to avoid paying the full make-whole premium.

As described in our moving brief, defendants initially sought to avoid paying the make-whole premium by seeking Noteholder approval of its Asset-Stripping Transaction through its coercive tender offer. (Pl. Br. at 9-12.) Defendants offered most Noteholders a tender price of roughly 80 to 85 percent of the make-whole price, and offered a still lower price to holders of long-term Notes, which would have been more expensive to redeem than the short-term Notes. Defendants' offer failed, as fewer than a third of Noteholders tendered their Notes. (*See generally* Pl. 56.1 St., and Def. Resp., at ¶¶ 32-40.) Once they failed to obtain Noteholders' consent, defendants' only available mechanism in the Indentures that would allow them to proceed with the Asset-Stripping Transaction was the redemption of the Notes in advance of the maturity date, including payment of the entire make-whole premium.[5] By simply going forward with the Asset-Stripping Transaction in violation of the successor obligor clauses and *Sharon Steel*, defendants attempted to avoid having to pay the make-whole premium that was required

---

[5]    The Indentures provide that each series of Notes is redeemable at any time at a redemption price equal to the greater of 100 percent of the principal amount <u>or</u> the sum of the present values of the remaining scheduled principal and interest payments discounted to the date of redemption at the Adjusted Redemption Treasury Rate plus a certain number of basis points. (Pl. 56.1 St., and Def. Resp., at ¶¶ 26-27.)

for any redemption of the Notes. But defendants may not avoid their contractual promise to pay the make-whole premium by deliberately proceeding with the Asset-Stripping Transaction and thus causing a default. As the Second Circuit stated, it "undermines the plain purpose of the redemption provisions to allow a liquidating debtor to avoid their terms simply by failing to take the steps necessary to redeem the debentures, thereby creating a default." 691 F.2d at 1053.

In response, defendants offer two reasons why they should not have to pay the make-whole premium, neither of which is persuasive. *First*, defendants assert that the Trustee's only remedy is to request acceleration of debt (and that the Trustee has done so), entitling the Noteholders only to principal and unpaid interest. Contrary to their suggestion, however, the Trustee has not delivered any written notice to defendants demanding repayment of the principal of the Notes. Any implication that the Trustee has attempted to accelerate the Notes or has forfeited its right to the make-whole premium under the Indentures is simply wrong.

The Indentures provide that, following an event of default, the Trustee may elect to accelerate the Notes and declare the principal of the debt due immediately "by notice in writing to the Issuer." (1998 Indenture § 4.1, 12/4/07 Gordon Decl. Ex. E; *see also* 2003 Indenture § 6.01(b), 12/4/07 Gordon Decl. Ex. F.) No such notice was ever sent. Instead, defendants describe the Trustee's demand in its first amended complaint for "all principal and accrued but unpaid interest due and owing under the Notes" (Am. Compl. at ¶ 74) as an "attempt to accelerate payment" of the Notes. (Def. Br. at 23.) In quoting the Trustee's amended complaint, however, defendants omit the Trustee's demand for the make-whole premium, which appears in the same paragraph as its demand for the principal of and accrued interest on the Notes. (Am. Compl. at ¶ 74 ("[T]he bondholders are entitled to the make-whole amount set forth in the Notes and calculated thereunder.").) In the complaint, the Trustee seeks not acceleration

of the Notes, but rather damages – including the make-whole premium – for defendants' breach of the Indentures. The Trustee's demand for damages in an amount not less than $4.1 billion (Am. Compl., *ad damnum* clause, at 30) represents the amount due to the Noteholders for the redemption of their bonds, not for acceleration of the debt.

Defendants' citations to case law to support their argument that the Trustee has accelerated payment on the Notes are unpersuasive. (Def. Br. at 23.) Those cases addressed the redemption premium in the context of mortgages and held that actions such as filing a *lis pendens*, taking steps for foreclosure, filing a foreclosure suit, selling pursuant to the mortgage, or advertising property for sale pursuant to the terms of the mortgage would suffice to provide "unmistakable intent to exercise the [acceleration] option." *See In re LHD Realty Corp.*, 726 F.2d 327, 331 (7th Cir. 1984) (citing *446 W. 44th St., Inc.* v. *Riverland Holding Corp.*, 44 N.Y.S.2d 766, 768 (N.Y. App. Div. 1943) (requiring an "unequivocal overt act manifesting an election" of acceleration)); *Charter One Bank* v. *Leone*, 845 N.Y.S.2d 513, 514-15 (N.Y. App. Div. 2007). Here, the Trustee has taken no unmistakable or unequivocal step to accelerate payment on the Notes. The Trustee's amended complaint seeks damages, and its Notice of Default does not seek acceleration of the Notes. Because the Trustee has not elected acceleration, defendants' authority holding that acceleration of the debt precludes recovery of the redemption premium is, therefore, inapplicable.

Defendants' argument that the Trustee has elected its remedy also fails because the Indentures expressly provide that "no right or remedy herein conferred upon or reserved to the Trustee or to the Securityholders" – such as the acceleration remedy – "is intended to be

exclusive of any other right or remedy."[6] (1998 Indenture § 4.8, 12/4/07 Gordon Decl. Ex. E;

2003 Indenture § 6.05, 12/4/07 Gordon Decl. Ex. F.) Thus, even if the Trustee is deemed to have

accelerated the Notes by prosecuting this action, the Noteholders are still entitled to payment of

the make-whole premium. Again, *Sharon Steel* is binding precedent on this point. The

indentures in *Sharon Steel* contained the same substantive language, *see* 691 F.2d at 1053

(acceleration provisions are "not exclusive of other remedies"), and the Second Circuit – relying

in part on that language – reversed the district court on this very issue:

> Judge Werker held that the redemption premium under the indentures need
> not be paid by [defendants]. His reasoning was essentially that
> [defendants] defaulted under the indenture agreement and that the default
> provisions provide for acceleration rather than a redemption premium.
> We do not agree. The acceleration provisions of the indentures are
> explicitly permissive and not exclusive of other remedies. We see no bar,
> therefore, to the Indenture Trustees seeking specific performance of the
> redemption provisions where the debtor causes the debentures to become
> due and payable by its voluntary actions.

691 F.2d at 1053. Accordingly, whether or not the Trustee is deemed to have accelerated the

Notes is irrelevant to defendants' obligation to pay the make-whole premium. The only relevant

issue is whether defendants would have had to pay the make-whole premium in order to effect

the Asset-Stripping Transaction without violating the Indentures. As explained above, the only

compliant manner in which that could have been accomplished was through redemption of the

Notes, which clearly would have required payment of the make-whole premium.

Ironically, as noted in the cases defendants cite, several courts in addition to the

Second Circuit have recognized that a debtor's intentional default triggers the redemption

---

[6] The Indentures continue: "[E]very right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy." (1998 Indenture § 4.8, 12/4/07 Gordon Decl. Ex. E; 2003 Indenture § 6.05, 12/4/07 Gordon Decl. Ex. F.)

premium, regardless of whether the lender had demanded acceleration of the debt. *See Nw. Mut. Life Ins. Co.* v. *Uniondale Realty Assocs.*, 816 N.Y.S.2d 831, 836 (N.Y. Sup. Ct. 2006) ("In the event that a court concludes that the borrower has defaulted intentionally in order to trigger acceleration and thereby avoid or evade a prepayment premium, the prepayment clause may be enforced, notwithstanding substantial authority which requires an explicit agreement to allow a premium after acceleration.") (citations omitted); *see also In re LHD Realty Corp.*, 726 F.2d at 331 (holding that redemption premium may be available where debtor intentionally defaults); *Rodgers* v. *Rainier Nat'l Bank*, 757 P.2d 976, 237-38 (Wash. 1988) (addressing lender's argument that intentional default "should not negate the prepayment penalty," but finding no evidence of purposeful default). Considering defendants' attempts to avoid the make-whole premium with the coercive tender and simply proceeding with the Asset-Stripping Transaction, the Court should – as the Second Circuit held in *Sharon Steel* – award the Noteholders the make-whole premium.

  *Second*, defendants assert that the Court should not impose a punitive remedy of the make-whole premium when the Trustee and Noteholders have suffered no harm. (Def. Br. at 24-25.) This argument need not detain us long. As an initial matter, defendants continue to ignore the detrimental effect that the Asset-Stripping Transaction has had on the Noteholders' investments. (*See* pp. 4 to 5, *supra*.) Far from being the consequence of "the Noteholders' and the Trustee's greed" (Def. Br. at 24), the payment of the redemption premium will provide the Noteholders with their contractually bargained for price for redemption prior to maturity. This is not, as defendants contend, a punitive remedy. Rather, it is the damage measure that the Second Circuit recognized is appropriate for this type of breach of an indenture by an issuer of public debt. 691 F.2d at 1053.

**Conclusion**

For all the foregoing reasons, this Court should grant plaintiff's motion for summary judgment and deny defendants' cross-motion for summary judgment.

Dated: January 25, 2008
New York, New York

Respectfully submitted,

DECHERT LLP

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP

By: /s/ Kevin O'Brien
Kevin O'Brien
Glenn Siegel
Alissa Rossman

By: /s/ Gerard E. Harper
Gerard E. Harper
Andrew G. Gordon
Andrew N. Rosenberg

kevin.obrien@dechert.com

gharper@paulweiss.com

30 Rockefeller Plaza
New York City, New York 10112
(212) 698-3500

1285 Avenue of the Americas
New York City, New York 10019
(212) 373-3000

*Co-Counsel for the Trustee*

*Co-Counsel for the Trustee*

22