UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE BANK OF NEW YORK,

        Plaintiff,

    v.                                                    07 Civ. 4659 (SAS)

TYCO INTERNATIONAL GROUP S.A., TYCO          ECF Case
INTERNATIONAL LTD., and TYCO
INTERNATIONAL FINANCE S.A.,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TYCO INTERNATIONAL LTD. and TYCO
INTERNATIONAL FINANCE S.A.,

        Counterclaimants,

    v.

THE BANK OF NEW YORK,

        Counterclaim-Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## COUNTERCLAIMANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS THE FIRST AMENDED COUNTERCLAIMS

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 47th Floor
New York, New York 10166-0193
(212) 351-4000

Attorneys for Defendants and
Counterclaimants

January 28, 2008

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF FACTS ...................................................................... 2

ARGUMENT ........................................................................................ 5

I.   The Standard on this Motion................................................... 5

II.  Counterclaimants State Claims for Breach of Contract .......................................... 6

    A.   The Trustee's Refusal to Sign the Supplemental Indentures
         Constitutes a Breach of Contract ................................. 6

    B.   The Trustee's Attempt to Misappropriate Interest Payments
         Due to Noteholders Constitutes a Breach of Contract .............................. 10

        1.   The Indentures Do Not Authorize the Trustee to Collect
             a Litigation Reserve ...................................... 11

        2.   *Petrohawk* Was Decided on Different Facts, Different
             Claims, and Different Indenture Provisions.................................. 15

III. Counterclaimants State a Claim for Breach of the Implied Covenant of
     Good Faith and Fair Dealing.................................................... 17

    A.   The Trustee's Lack of Good Faith Belief that the Spin-Off
         Transaction Violated the Indentures is Sufficient to Establish a
         Claim for Breach of the Implied Covenant............................... 17

    B.   The Implied Covenant Counterclaim is Not Duplicative of the
         Breach Of Contract Claims and is Properly Pleaded in the
         Alternative.................................................... 21

IV.  Counterclaimants' Declaratory Judgment Claim Should Not be
     Dismissed.................................................................. 23

CONCLUSION.................................................................... 24

# TABLE OF AUTHORITIES

<u>Page(s)</u>

## Cases

*Bell Atlantic Corp. v. Twombly*,
  127 S.Ct. 1955 (2007) ........................................................................................ 6

*Castro v. East End Plastic, Reconstructive & Hand Surgery, P.C.*,
  2008 N.Y. Slip Op. 00083, 2008 WL 82684 (2d Dep't Jan. 8, 2008) ..................................... 10

*CIBC Bank & Trust Co. v. Banco Cent. do Brasil*,
  886 F. Supp. 1105 (S.D.N.Y. 1995) ..................................................................... 20

*CompuDyne Corp. v. Shane*,
  453 F. Supp. 2d 807 (S.D.N.Y. 2006) .................................................................... 9

*Cruden v. Bank of New York*,
  957 F.2d 961 (2d Cir. 1992) ............................................................................. 8

*deCiutiis v. Nynex Corp.*,
  No. 95 Civ. 9745 (PKL), 1996 WL 512150 (S.D.N.Y. Sept. 9, 1996) ........................... 17, 19, 20

*Dresner Co. Profit Sharing Plan v. First Fidelity Bank, N.A.*,
  No. 95 Civ. 1924 (MBM), 1996 WL 694345 (S.D.N.Y. Dec. 4, 1996) ................................... 8

*Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.*,
  838 F.2d 66 (2d Cir. 1988) .............................................................................. 8

*ESPN, Inc. v. Office of the Comm'r of Baseball*,
  76 F. Supp. 2d 416 (S.D.N.Y. 1999) ..................................................................... 16

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*,
  375 F.3d 168 (2d Cir. 2004) ............................................................................. 6

*Fantozzi v. Axsys Tech., Inc.*,
  No. 07 Civ. 2667 (LMM), 2007 WL 2454109 (S.D.N.Y. Aug. 20, 2007) ............................... 21

*Galli v. Metz*,
  973 F.2d 145 (2d Cir. 1992) ............................................................................. 7

*Grand Heritage Mgmt., LLC v. Murphy*,
  No. 06 Civ. 5977 (NRB), 2007 WL 3355380 (S.D.N.Y. Nov. 7, 2007) ................................ 21

*Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*,
  17 F. Supp. 2d 275 (S.D.N.Y. 1998) ..................................................................... 17

# TABLE OF AUTHORITIES
### (*Continued*)

Page(s)

*Harris v. Provident Life & Accident Ins. Co.*,
   310 F.2d 73 (2d Cir. 2002) .................................................. 21

*Harris v. Steinem*,
   571 F.2d 119 (2d. Cir. 1978) ............................................... 10

*Harsco Corp. v. Segui*,
   91 F.3d 337 (2d Cir. 1996) .................................................. 6

*Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*,
   723 F. Supp. 976 (S.D.N.Y. 1989) ........................................ 20

*Hirsch Electric Co. v. Community Servs., Inc.*,
   145 A.D.2d 603, 536 N.Y.S.2d 141 (2d Dep't 1988) ................. 16

*Lewis Tree Serv., Inc. v. Lucent Tech., Inc.*,
   No. 99-cv-8556, 2000  WL 1277303 (S.D.N.Y. Sept. 8, 2000) ............. 18

*LNC Invs., Inc. v. First Fidelity Bank, Nat'l Ass'n*,
   935 F. Supp. 1333 (S.D.N.Y. 1996) ..................................... 8, 9

*McCoy Associates, Inc. v. Nulux, Inc.*,
   218 F. Supp. 2d 286 (E.D.N.Y. 2002) ................................... 16

*Medinol Ltd. v. Boston Scientific Corp.*,
   346 F. Supp. 2d 575 (S.D.N.Y. 2004) ................................... 16

*Merrill Lynch & Co. v. Allegheny Energy*,
   No. 02 Civ. 7689(HB), 2005 WL 1663265 (S.D.N.Y. July 18, 2005) ....................... 9

*Newman & Schwartz v. Asplundh Tree Expert Co.*,
   102 F.3d 660 (2d Cir. 1996) ................................................ 3

*Orange County Choppers, Inc. v. Olaes Enters., Inc.*,
   497 F. Supp. 2d 541(S.D.N.Y. 2007) ................................... 22

*Petrohawk Energy Corp. v. Law Debenture Trust Co.*,
   No. 06 Civ. 9404 (DLC), 2007 WL 211096 (S.D.N.Y. Jan. 29, 2007) ....................... 10, 15, 16

*Philip v. L.F. Rothschild & Co. Inc.*,
   No. 90 Civ. 0708 (WHP), 1999 WL 771354 (S.D.N.Y. Sept. 29, 1999) ................. 8

*Richmond Shop Smart v. Jenbar Dev. Center, LLC*,
   32 A.D.2d 423, 820 N.Y.S.2d 124 (2d Dep't 2006) ................. 23

## TABLE OF AUTHORITIES
### (*Continued*)

Page(s)

*Sharma v. Skaarup Ship Mgmt. Corp.*,
   699 F. Supp. 440 (S.D.N.Y. 1988), *aff'd*, 916 F.2d 820 (2d Cir. 1990) ................................. 20

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*,
   691 F.2d 1039 (2d Cir. 1982) ................................................................................... 2, 9

*Tirone v. New York Stock Exchange, Inc.*,
   No. 05 Civ. 8703 (WHP), 2007 WL 2164064 (S.D.N.Y. July 27, 2007) ................................. 6

*Travellers Int'l A.G. v. Trans World Airlines*,
   41 F.3d 1570 (2d. Cir. 1994) ............................................................................... 17, 19

*United States ex rel. Anti-Discrimination Center of Metro New York, Inc. v.
   Westchester County, New York*,
   495 F. Supp. 2d 375 (S.D.N.Y. 2007) ...................................................................... 5

*US Airways Group v. British Airways PLC*,
   989 F. Supp. 482 (S.D.N.Y. 1997) ........................................................................ 20

*Wallace v. Merrill Lynch*,
   814 N.Y.S.2d 566 (Sup. Ct. N.Y. County 2005), *aff'd*, 816 N.Y.S.2d 412 (App.
   Div. 1st Dep't 2006) ........................................................................................... 23

*Wertheim Schroder & Co. Inc.*,
   91 Civ. 2287 (PKL), 1993 WL 126427 (S.D.N.Y. Apr. 1, 1993) ........................................ 22

*Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc*,
   341 F. Supp. 2d 258 (S.D.N.Y. 2004) ................................................................. 10, 22

### Statutes

Fed. R. Civ. P. 12(b)(6) ......................................................................................... 3, 5, 14

15 U.S.C. § 77ooo(a)(2) ............................................................................................. 8

15 U.S.C. § 77ppp(b) ............................................................................................... 14

Fed. R. Civ. P. 8(e)(2) ............................................................................................. 22

### Other Authorities

American Bar Foundation, Commentaries on Model Debenture Indenture
   Provisions (1971) ................................................................................... 2, 12, 13, 16

iv

## <u>PRELIMINARY STATEMENT</u>

Counterclaimants Tyco International Ltd. ("Tyco") and Tyco International Finance S.A. ("TIFSA") (together, "Counterclaimants") respectfully submit this memorandum in opposition to Plaintiff's motion to dismiss the First Amended Counterclaims ("Counterclaims" or "CC").

The Counterclaims allege breaches of contract and the implied covenant of good faith and fair dealing by Plaintiff Bank of New York ("BONY" or the "Trustee") based on truly egregious conduct:

- The Trustee refused to sign supplemental indentures, despite lacking any belief that either the supplemental indentures or the underlying transaction violated the governing indentures.

- Months later, after filing a declaratory judgment action seeking the court's decision as to whether the transactions violated the indentures, the Trustee amended its complaint to assert that the transaction violated the indentures, but it did so with no change in fact or law and only as a result of cutting a deal with certain noteholders, and not because it changed its position in good faith.

- The Trustee attempted to purloin interest payments due to noteholders, supposedly for the purpose of setting up a war chest to pursue this litigation, without obtaining the consent of all such noteholders.

Not surprisingly, as explained below, this conduct violates both the express terms of the indentures and the implied covenant of good faith and fair dealing.  The indentures do not permit the Trustee to assert positions in bad faith, or to refuse to sign documents without justification, or to steal interest payments belonging to noteholders without their consent.  The Trustee's motion to dismiss argues otherwise, but only by misstating provisions of the governing indentures, omitting key phrases of those contracts, and ignoring Counterclaimants' allegations, which must be accepted as true for purposes of this motion.

For these reasons and others set forth below, the Trustee's motion should be denied.

1

## STATEMENT OF FACTS

On multiple occasions between 1998 and 2003, Tyco raised money by issuing unsecured notes (the "Notes") governed by Indentures dated June 9, 1998 (the "1998 Indenture") and November 12, 2003 (the "2003 Indenture" and, together with the 1998 Indenture, the "Indentures").[1]  Tyco International Group S.A. ("TIGSA"), a wholly owned subsidiary of Tyco, was initially named as Issuer and Counterclaimant Tyco was named as Guarantor.  CC ¶ 95.[2]  Plaintiff BONY was the Trustee under both Indentures.  *Id.*[3]

In May and June 2007, Counterclaimants and TIGSA consummated a series of transactions (the "Spin-Off Transaction") in which (i) TIFSA agreed to become a co-obligor on the Notes with Tyco and TIGSA, (ii) TIGSA transferred all of its assets to Tyco and Tyco assumed all of TIGSA's obligations under the Indentures and on the Notes, and (iii) two of Tyco's businesses were spun off to its shareholders by way of a dividend.  CC ¶ 97.  The details of the Spin-Off Transaction are not relevant to the issues on this motion and are, in any event,

---

[1]  Copies of relevant provisions of the Indentures are attached to the accompanying Declaration of Megan A. Burns ("Burns Decl.") as Exhibits A and B.

[2]  The Trustee repeatedly asserts that the Notes were "backed by" Tyco's assets.  Memorandum of Law in Support of Plaintiff The Bank of New York's Motion to Dismiss the First Amended Counterclaims ("Pl. Br."), at 3, 5.  To the extent that the Trustee means to imply that the Notes were *secured by* Tyco's assets – or in anyway linked to specific assets – the Trustee is plainly wrong.  Indeed, absent specific contractual restrictions in the governing indentures – of which there are very few here – Noteholders and the Trustee have virtually no right to complain about what Tyco does with its assets.  *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1049 (2d Cir. 1982) (citing American Bar Foundation, *Commentaries on Model Debenture Indenture Provisions* (1971) ("*Commentaries*") at 2).

[3]  Last week, on January 24, 2008, BONY resigned from its role as indenture trustee.  BONY's resignation does not affect the viability of the counterclaims asserted against it, although it raises significant issues about the continued prosecution of the claims asserted by BONY, which Defendants are addressing separately.

familiar to the Court from the contemporaneous briefing on the parties' cross-motions for summary judgment.[4]  In connection with the Spin-Off Transaction, Counterclaimants and TIGSA executed and delivered to BONY two supplemental indentures under each of the 1998 and 2003 Indentures, one evidencing TIFSA's agreement to become a co-obligor on the Notes, and one evidencing Tyco's assumption of TIGSA's obligations under the Indentures.  CC ¶ 98. Counterclaimants and TIGSA also delivered to BONY all other documents required under the Indentures in connection with such supplemental indentures.  *Id.*

The Trustee was required under the Indentures to execute the supplemental indentures, but, despite this clear obligation, it refused to do so, thus breaching the express terms of the Indentures and the implied covenant of good faith and fair dealing.  CC ¶¶ 99-100.  When it refused to execute the supplemental indentures, the Trustee did not assert, and did not believe, that a default had occurred or that the Spin-Off Transaction violated the Indentures.  CC ¶ 101. Nevertheless, instead of performing its obligation to sign the supplemental indentures, the Trustee refused to do so, claiming that it was following the instructions of an unidentified group of Noteholders.  CC ¶ 100.

More than three months after Tyco completed the Spin-Off Transaction, despite no intervening change in the facts or the law, the Trustee filed its First Amended Complaint,

---

[4]  Although they do not affect the issues for decision on this motion, the Trustee's brief contains numerous erroneous factual assertions concerning the Spin-Off Transaction that are not set forth in the Counterclaims (or, indeed, that directly contradict the Counterclaims). Naturally, on this Rule 12(b)(6) motion, the Court is limited to considering the facts alleged in the Counterclaims and must assume the truth thereof.  *See Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 662 (2d Cir. 1996).  Thus, the Court should ignore, among other things, the Trustee's assertions that:  (a) TIGSA (as opposed to Tyco) announced a plan to separate (Pl. Br. at 4); (b) TIGSA transferred its obligation on the Notes to TIFSA (as opposed to Tyco) (*id.* at 5); and (c) the two businesses that remained with Tyco after the spin-off "were qualitatively and quantitatively the weakest" (*id.*).

contending for the first time that the Spin-Off Transaction violated the Indentures.  At the time it did so, BONY had no reasonable basis to believe, and did not believe in good faith, that the supplemental indentures and the Spin-Off Transaction were prohibited by the terms of the Indentures or that a default had occurred.  CC ¶ 104.  Instead, the Trustee apparently reached an "agreement" with a subset of holders of the Notes to assert claims on the Noteholders' behalf. Transcript of Conference, October 2, 2007, at 12.  Several weeks later, on November 8, 2007, despite still lacking any good faith belief that a default had occurred, the Trustee delivered a Notice of Default under the Indentures.  CC ¶ 103.  BONY's wrongful delivery of this Notice jeopardized Counterclaimants' ability to borrow under their bank and letter of credit facilities. CC ¶ 105.  Counterclaimants were forced to secure renewed bridge facility commitments and incurred costs in doing so.  *Id.*

In addition, BONY attempted to misappropriate money from interest payments that were due to Noteholders.  On or about November 9, 2007, BONY directed The Depository Trust Company Clearing Corporation ("DTC"), the registered holder of the Notes, to withhold $3.25 million from interest payments that were to be distributed to the beneficial owners of the Notes. CC ¶ 107.  BONY supposedly intended to use this $3.25 million as a "reserve" to fund this litigation, pre-empting one of the issues before this Court, to cover fees and costs that the Trustee had not yet even incurred and might never incur.  *Id.*  Worried that they would suffer reputational injuries and be the subject of litigation by beneficial owners who did not receive their full interest payments, Counterclaimants arranged to make interest payments directly to DTC, the record holder, rather than allowing the payments to pass through the Trustee.  CC ¶ 108.  The Trustee then threatened to sue DTC if DTC distributed the full amount of the interest payment to the beneficial owners.  *Id.*  Counterclaimants were forced to advance additional money to DTC

to persuade it to make the distributions that beneficial owners expected. *Id.* Counterclaimants have been without the use of those additional funds since November 2007. In addition, on January 17, 2008, BONY falsely and fraudulently attempted to trick DTC into paying Counterclaimants' funds to it by submitting a written demand that brazenly lied about the nature of the payment.

Based on these facts, Counterclaimants assert two claims for breach of contract – one based on the Trustee's refusal to execute the supplemental indentures, and one based on the Trustee's attempt to misappropriate interest payments for its litigation "reserve." CC ¶¶ 110-23. Counterclaimants also allege that this conduct, as well as the Trustee's assertions of claims for breach and the delivery of a Notice of Default without a good faith belief that the Spin-Off Transaction violated the Indentures, constitutes a breach of the implied duty of good faith and fair dealing. CC ¶ 124-27. Finally, Counterclaimants seek a judgment declaring that no default under the Indentures has occurred, that the Trustee is required to execute the supplemental indentures, that BONY had no right to collect a litigation reserve out of interest payments due to Noteholders, and that BONY must be removed as Trustee (although this last request may now be moot in light of the Trustee's recent resignation). CC ¶¶ 128-30.

## ARGUMENT

### I.    The Standard on this Motion

On a Rule 12(b)(6) motion to dismiss, the Court "must accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *United States ex rel. Anti-Discrimination Center of Metro New York, Inc. v. Westchester County, New York*, 495 F. Supp. 2d 375, 384 (S.D.N.Y. 2007). "A court should not dismiss a complaint for failure to state a claim unless the complaint fails to include 'plausible grounds' for relief." *Tirone v. New York Stock Exchange, Inc.*, No. 05 Civ. 8703 (WHP), 2007

WL 2164064, at *3 (S.D.N.Y. July 27, 2007) (quoting *Bell Atlantic Corp. v. Twombly*, __ U.S.

__, 127 S. Ct. 1955 (2007)).  "The issue on a motion to dismiss is not whether a plaintiff will

ultimately prevail, but whether the claimant is entitled to offer evidence to support [its] claims."

*Id.* (denying motion to dismiss).

## II.    Counterclaimants State Claims for Breach of Contract

The Counterclaims allege two independent causes of action for breach of contract, both

of which must stand.  To make out a viable claim for breach of contract a "complaint need only

allege (1) the existence of an agreement, (2) adequate performance of the contract by the

plaintiff, (3) breach of contract by the defendant, and (4) damages."  *Eternity Global Master*

*Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 177 (2d Cir. 2004) (citing *Harsco Corp. v.*

*Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).  The Counterclaims sufficiently allege each of these

elements with respect to each of the two alleged breaches, and the Trustee's motion must

therefore be denied.

### A.    The Trustee's Refusal to Sign the Supplemental Indentures
### Constitutes a Breach of Contract

The Indentures provide that TIGSA, Tyco and the Trustee may enter into supplemental

indentures without the consent of the Noteholders and require that the Trustee sign such

indentures.  The 2003 Indenture provides that "[u]pon the request of the company, accompanied

by Board Resolutions authorizing the execution of any such supplemental indenture . . . the

Trustee *shall* join with Tyco and [TIGSA] in the execution of such supplemental indenture."

2003 Indenture § 9.05 (emphasis added).  The 2003 Indenture permits the Trustee not to sign a

supplemental indenture only if "such supplemental indenture affects the Trustee's own rights,

duties or immunities under this Indenture or otherwise."  *Id.*  Similarly, the 1998 Indenture

authorizes the Trustee to "join with [TIGSA], Tyco and any other Guarantor in the execution of

any such supplemental indenture" and it provides that the Trustee may avoid this obligation only where the supplemental indenture "affects the Trustee's own rights, duties or immunities under this Indenture or otherwise."  1998 Indenture § 7.1.[5]

The Trustee asserts that it did not breach the Indentures by refusing to sign the supplemental indentures because it had a "fiduciary duty to the Noteholders" that obligated it to determine whether the supplemental indentures were authorized by the Indentures.  Pl. Br. at 9. But the Indentures specifically negate the existence of any such obligation, providing that the Trustee "may receive an Officers' Certificate and an Opinion of Counsel [from the issuer] as *conclusive evidence* that any supplemental indenture executed pursuant to this Article Seven complies with the applicable provisions of this Indenture."  1998 Indenture § 7.4; *see also* 2003 Indenture § 9.05.  Similarly, as to any purported transfer of substantially all of the issuer's assets, "[t]he Trustee . . . may receive an Opinion of Counsel . . . as *conclusive evidence* that any such consolidation, merger, sale, lease or conveyance, and any such assumption . . . complies with the applicable provisions of this Indenture."  1998 Indenture § 8.3 (emphasis added).  Here,

---

[5]  The Trustee makes much of the difference in language used in the 1998 versus the 2003 Indenture, implying that the 1998 Indenture merely *authorizes* the Trustee to enter into supplemental indentures, but does not *oblige* it to do so.  Pl. Br. at 9.  The Trustee is wrong. By expressly absolving the Trustee of any obligation where the supplemental indenture "affects the Trustee's own rights," both Indentures necessarily require that the Trustee execute all other supplemental indentures when the Trustee, as here, has been supplied with all required documentation.  If the Trustee were not otherwise obligated under the 1998 Indenture to enter into supplemental indentures, then the clause in § 7.1 relieving the Trustee of such obligation in those circumstances where its own rights are affected would be superfluous.  *See Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) ("Under New York law an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.  Rather, an interpretation that gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect.") (quotations and citations omitted). Thus, the only logical interpretation of this clause is that the Trustee may refuse to sign a supplemental indenture only if doing so would implicate its own rights and liabilities.

Counterclaimants delivered to the Trustee all of the required documents. CC ¶ 98. Thus, the Trustee was entitled to rely conclusively on these representations as to the permissibility of the supplemental indentures and it would not have faced any liability to the Noteholders for executing them. *See Cruden v. Bank of New York*, 957 F.2d 961, 969 (2d Cir. 1992) ("the indenture trustee may *conclusively rely,* as to the truth of the statements and the correctness of the opinions expressed therein, in the absence of bad faith on the part of such trustee, upon certificates or opinions conforming to the requirements of the indenture") (quoting 15 U.S.C. § 77ooo(a)(2)).

Moreover, case law makes clear that, at the time it refused to sign the supplemental indentures, BONY did not owe any fiduciary duty to the Noteholders. Under New York law, with minor exceptions not relevant here, "the pre-default duties of an indenture trustee, unlike those of an ordinary trustee, generally are limited to the duties imposed by the indenture." *LNC Invs., Inc. v. First Fidelity Bank, Nat'l Ass'n*, 935 F. Supp. 1333, 1346 (S.D.N.Y. 1996) (citing *Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66, 71 (2d Cir. 1988)). The Trustee does not – and cannot – cite any express duty under the Indentures that it would have breached had it signed the supplemental indentures. *See Philip v. L.F. Rothschild & Co. Inc.*, No. 90 Civ. 0708 (WHP), 1999 WL 771354, at *1-2 (S.D.N.Y. Sept. 29, 1999) (holding that indenture trustee did not have pre-default duty to investigate the impact of a merger on the bondholders; "Plaintiffs cannot cite any provision in the underlying indenture agreement in this case imposing investigatory duties on Morgan prior to default"); *Dresner Co. Profit Sharing Plan v. First Fidelity Bank, N.A.*, No. 95 Civ. 1924 (MBM), 1996 WL 694345 (S.D.N.Y. Dec. 4, 1996) (dismissing breach of fiduciary duty claim against indenture trustee alleged to have taken no steps to inquire into the allegedly deteriorating value of issuer's collateral).

8

In fact, by blindly following the directive of a subset of Noteholders, the Trustee breached its duties to *Counterclaimants*. In performing its obligations under the Indentures prior to an event of default, the Trustee was required to consider not only the Noteholders' interests but also the issuer's. *See LNC Invs.*, 935 F. Supp. at 1347 ("The role of an indenture trustee differs from that of an ordinary trustee because the indenture trustee must consider the interests of the issuer as well as the investors . . . ."); *see also Sharon Steel*, 691 F.2d at 1051 ("We hold, therefore, that protection for borrowers as well as for lenders may fairly be inferred from the nature of successor obligor clauses."). The Trustee violated this duty. At no point prior to October, three months after the Spin-Off Transaction, did the Trustee indicate that the supplemental indentures were not "satisfactory" to it, and it took no position on whether the supplemental indentures were authorized. CC ¶ 102.[6] It simply followed the instructions of certain Noteholders while making no effort at all to consider the issuer's interests.

Finally, the Trustee argues that Counterclaimants have alleged no damages from the Trustee's refusal to sign the supplemental indentures. Pl. Br. at 12. This argument simply ignores paragraph 117 of the Counterclaims, which alleges that, as a result of the Trustee's refusal to sign, "Counterclaimants have suffered damages." This satisfies Counterclaimants' pleading burden. "The standard for pleading damages from a breach of contract . . . [is] satisfied where the damage is alleged to have been proximately caused by the wrongful conduct." *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 832 (S.D.N.Y. 2006) (citing *Merrill Lynch & Co. v. Allegheny Energy,* No. 02 Civ. 7689(HB), 2005 WL 1663265, *6-7 (S.D.N.Y. July 18,

---

[6] This fact further underscores the absurdity of the Trustee's present contention that it had a duty to "determine" whether the supplemental indentures were authorized. If the Trustee had such a duty, it failed to fulfill it, in that it made no determination whatsoever on that issue.

2005)); *see also Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc*, 341 F. Supp. 2d 258, 272 (S.D.N.Y. 2004) ("Under Rule 8(a), Xpedior need only allege that it was damaged; it is not required to specify the measure of damages nor to plead proof of causation.").  Though no more specificity is required, Counterclaimants' damages include expenses that they incurred in convincing rating agencies that the supplemental indentures were valid despite the Trustee's refusal to sign them.[7]

For these reasons, the First Counterclaim adequately states a claim and the Trustee's motion to dismiss must be denied.

**B.    The Trustee's Attempt to Misappropriate Interest Payments Due to Noteholders Constitutes a Breach of Contract**

In seeking to justify its attempts to collect a litigation "reserve" out of ongoing interest payments due to Noteholders, the Trustee misstates the terms of the Indentures, fails to acknowledge the dispositive differences between the present case and the *Petrohawk* case,[8] and ignores the following important facts:

- The "reserve" that the Trustee seeks to collect is intended to cover costs and expenses that the Trustee *has not yet incurred.*  Thus, provisions of the Indentures that entitle

---

[7] The Trustee's attempt to characterize the First Counterclaim as a "malicious prosecution in masquerade" (Pl. Br. at 7) is unavailing.  A claim for malicious prosecution "arises out of the bringing of the main action."  *Harris v. Steinem*, 571 F.2d 119 (2d. Cir. 1978).  In malicious prosecution cases, an element of the claim is "prosecution of a civil action against the plaintiff."  *Castro v. East End Plastic, Reconstructive & Hand Surgery, P.C.*, 2008 N.Y. Slip Op. 00083, 2008 WL 82684, at *2 (2d Dep't Jan. 8, 2008).  Here, the First Counterclaim arises out of BONY's unlawful refusal to sign the supplemental indentures, *not* the filing of this lawsuit.  Counterclaimants could have sued the Trustee for this breach of the Indentures regardless of whether BONY ever filed its meritless claims.  The mere fact that the supplemental indentures were authorized by the Indentures *also* disposes of the Trustee's affirmative claims does not transform this counterclaim into a malicious prosecution claim.

[8] *Petrohawk Energy Corp. v. Law Debenture Trust Co.*, No. 06 Civ. 9404 (DLC), 2007 WL 211096 (S.D.N.Y. Jan. 29, 2007).

the Trustee under certain cirumstances to be "reimburse[d]" for expenses previously "incurred" are inapplicable – and, in fact, dictate the conclusion that collecting funds *before* such costs are incurred is *not* permitted by the Indentures.

- The Trustee has already brought a claim for a declaration that Defendants are obligated "to pay and reimburse the Trustee for all reasonable expenses, . . . including the fees and expenses of counsel incurred . . . in connection with this action."  Thus, the Trustee's effort to collect a reserve fund is simply an attempt to pre-empt the Court's ruling on this request by exercising unauthorized self-help.

- The Trustee attempted – and continues to threaten – to take interest payments that are due to Noteholders who have not authorized the Trustee to collect a "reserve."  The Indentures expressly prohibit any impairment of a Noteholder's right to receive interest payments without his or her consent.

- The Trustee is still free to accumulate a "reserve" from any Noteholders who wish to contribute to such a litigation war chest after all beneficial owners receive their interest payments.  If the Trustee truly had the support of a majority of the Noteholders for the creation of a reserve, the Trustee's repeated protestations that its "access to funds" is being "cut[] off" would ring hollow indeed.  Pl. Br. at 1, 12.

The Trustee is not entitled to dismissal of the Second Counterclaim for breach of contract.

### 1. The Indentures Do Not Authorize the Trustee to Collect a Litigation Reserve

There are a number of provisions in the Indentures that address the Trustee's costs and expenses.  None of those provisions authorizes the Trustee to amass a litigation reserve for costs not yet incurred, and none authorizes the Trustee to take interest payments from Noteholders who have not consented.  Together, the contract provisions make clear that that the Trustee's attempt to misappropriate interest payments violates the Indentures.

Each of the Indentures entitles the Trustee to be "reimburse[d]" by Tyco for all "reasonable expenses, disbursements and advances *incurred or made* by or on behalf of it in accordance with any of the provisions of this Indenture . . . except to the extent any such expense, disbursement or advance may arise from its negligence or bad faith."  1998 Indenture § 5.6 (emphasis added); *see also* 2003 Indenture § 7.06(a).  Even ignoring the important

11

questions – which this Court must ultimately decide – of whether the Trustee's expenses in connection with this litigation are (a) "reasonable," (b) incurred "in accordance with" the Indentures, and (c) not made through "negligence or bad faith," these Indenture provisions, which use the past tense ("incurred or made"), make clear that the Trustee is *only* entitled to reimbursement *after* such expenses have been incurred.

Those same Indenture provisions also make clear that such reimbursement may *not* be taken from ordinary, periodic interest payments. Thus, to the extent the Trustee is owed money for expenses previously incurred, the Trustee is granted a lien senior to that of the Notes on all funds that it may hold, "except funds held in trust for the benefit of the holders." 1998 Indenture § 5.6; 2003 Indenture § 7.06(b).[9] And the immediately preceding section of each Indenture establishes that "all moneys received by the Trustee shall . . . be held in trust for the purposes for which they were received." 1998 Indenture § 5.5; *see also* 2003 Indenture § 7.05. Thus, in the event that the Trustee were to receive interest payments for distribution to the Noteholders, the Trustee would be obligated to hold those in trust for that purpose (and that purpose only), and could not take its fees, costs or expenses out of such funds.[10]

---

[9] The Trustee's brief cites these contract provisions but, tellingly, omits the exception for "funds held in trust" by the Trustee. *See* Pl. Br. at 16.

[10] This conclusion is supported by the ABF *Commentaries*, which, in commenting on the standard debenture provision granting the Trustee a lien on funds, states:

> The last sentence of Section 607 is a typical provision giving the Trustee a lien upon all properties held by it as Trustee as security for the performance of the obligations of the Company under Section 607. An exception is made with respect to funds held in trust for the benefit of the holders of particular debentures or coupons since, under Section 1003, these would be funds deposited with the Trustee in trust for a particular payment. In fact, *in an unsecured debenture issue there is not likely to be any property held by the Trustee to which such lien would attach*.

*Commentaries* at 263 (emphasis added).

Given that the Trustee has already asserted a claim against Defendants seeking a declaration that they are obligated to reimburse the Trustee for its expenses, the Trustee's efforts to collect its fees *in advance* appear to be nothing more than an unauthorized, self-imposed prejudgment attachment. The Trustee is not entitled to such extraordinary relief. First, taking Counterclaimants' allegations as true, as required on this motion, the Trustee has acted in bad faith in connection with the supplemental indentures and the Transaction (CC ¶¶ 100-04, 125), and it is therefore *not* entitled to reimbursement under the terms of the Indentures. 1998 Indenture § 5.6 ("except to the extent any such expense, disbursement or advance may arise from its negligence or bad faith"); *see also* 2003 Indenture § 7.06(a). Moreover, in any event, if the Court ultimately finds Defendants responsible for the Trustee's expenses, the Trustee will be able to collect its expenses at that time, and there is no need for a litigation reserve.[11]

The Trustee attempts to justify its effort to procure interest payments due to Noteholders by asserting that "holders of 73 percent of the Notes have directed and consented to the fee

---

[11] Section 4.3 of the 1998 Indenture and Section 6.03 of the 2003 Indenture, which are cited by the Trustee (*see* Pl. Br. at 16), simply provide that if the Trustee collects money in a proceeding brought following a default, it is entitled to payment of its expenses out of such collections. These provisions do not in any way authorize the Trustee to misappropriate ordinary, periodic interest payments due to Noteholders and, in any event, apply only to expenses previously "incurred." 1998 Indenture § 4.3. For similar reasons, other provisions cited by the Trustee (*see* Pl. Br. at 16-17) that protect the Trustee from personal liability in certain circumstances do not justify the preemptive self-help in which the Trustee engaged. Indeed, the Trustee again omits a key phrase from one of those provisions: Section 5.1 of the 1998 Indenture provides that the Trustee need not expend its own funds, but only "if there shall be reasonable ground for believing that the repayment of such funds or adequate indemnity or security against such liability is not reasonably assured to it." *See also* 2003 Indenture § 7.01(b)(4). This, once again, requires a finding that the Trustee is not entitled to advancement of funds – and certainly not by misappropriating interest payments belonging to the Noteholders – but only, if at all, to reimbursement *after* expenses are incurred.

reserve." Pl. Br. at 16. This "fact" is not alleged in the Counterclaims and, thus, is not properly considered on a Rule 12(b)(6) motion, as even the Trustee appears to recognize. *See id.* at 16 n.2. Even if the Court considers the full text of the Trustee's "direction to DTC" (*id.*), which the Trustee fails to attach to its papers, the Trustee's assertion is not supported; the notice (attached to the Burns Declaration as Ex. C) states only that the owners of a majority in principal amount (*not* "73 percent," as now claimed) instructed the Trustee to commence an action, but says nothing about how many, if any, consented to the withholding of interest payments for a litigation reserve.[12]

Even more importantly, no matter how many Noteholders purportedly directed the Trustee to withhold interest payments, the Trustee is expressly prohibited from doing so with respect to interest due to those Noteholders who did not consent. As required by the Trust Indenture Act of 1939, the 1998 Indenture provides, in no uncertain terms:

> Notwithstanding any other provision in this Indenture and any provision of any Security, the right of any Holder of any Security to receive payment of the principal of and interest on such Security on or after the respective due dates expressed in such Security . . . shall not be impaired or affected without the consent of such Holder.

1998 Indenture § 4.7; *see also* 2003 Indenture § 6.04; 15 U.S.C. § 77ppp(b) ("the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security, . . . shall not be impaired or affected without the consent of such holder"). Thus, even if the Trustee had majority (or 73%) consent to create a litigation reserve, it may not do so by misappropriating

---

[12] Moreover, despite promises to do so, the Trustee has failed to provide Counterclaimants with any communications or other documents that might support its unsubstantiated assertion regarding the alleged "instruction" of a "majority."

interest payments due to nonconsenting Noteholders, and its attempt to do so violates the Trust Indenture Act of 1939 as well as the provisions of the Indentures.

The Trustee repeatedly complains that it will be "cut off" from "funding for this litigation" if it is unable to take interest payments belonging to Noteholders.  Pl. Br. at 12.  Yet if the Trustee truly has the consent of 73% of the Noteholders, then there is a simple solution – those Noteholders can contribute money to the Trustee's litigation reserve *after* the interest payment is received in full by the beneficial owners.  The Trustee thus has nothing about which to complain.

### 2.    *Petrohawk* Was Decided on Different Facts, Different Claims, and Different Indenture Provisions

The *Petrohawk* case provides the Trustee with no refuge for its unlawful conduct, for several reasons.

First, Judge Cote's decision in that case rested entirely on the lack of damages to Petrohawk, the issuer.  Nothing in her decision suggests that what the indenture trustee did there – or what BONY tried to do here – was authorized or permitted by the terms of the governing documents.  For the reasons explained above, the Indentures here preclude any effort by the Trustee to amass a litigation reserve out of interest payments due to the Noteholders.

Second, the claims asserted in *Petrohawk* were exclusively tort claims, and the damages alleged by the issuer depended on it still having ownership or control of the funds misappropriated by the trustee.  Here, by contrast, Counterclaimants allege a breach of contract claim and the damages consist not solely of the potential loss of the interest payments, but also of reputational injuries and litigation costs that Counterclaimants might suffer if beneficial owners of the Notes do not receive the full amount of interest payments that they are expecting, and costs that Counterclaimants have incurred to avoid such injuries.  CC ¶ 123.  In any event, unlike

the tort claims alleged in *Petrohawk*, where "actual damages" were required (2007 WL 211096, at *6), a breach of contract claim does not require proof of loss: "[I]t is a well-settled tenet of contract law that even if the breach of contract caused no loss or if the amount of loss cannot be proven with sufficient certainty, the injured party is entitled to recover as nominal damages a small sum fixed without regard to the amount of the loss, if any." *Hirsch Electric Co. v. Community Servs., Inc.*, 145 A.D.2d 603, 604, 536 N.Y.S.2d 141, 143 (2d Dep't 1988); *see also Medinol Ltd. v. Boston Scientific Corp.*, 346 F. Supp. 2d 575, 599 (S.D.N.Y. 2004); *ESPN, Inc. v. Office of the Comm'r of Baseball*, 76 F. Supp. 2d 416, 421 (S.D.N.Y. 1999); *McCoy Associates, Inc. v. Nulux, Inc.*, 218 F. Supp. 2d 286, 294 (E.D.N.Y. 2002). Similarly, even if Counterclaimants suffered no damages, BONY's egregious breach of contract would justify the Court removing BONY as indenture trustee, which Counterclaimants have also requested. CC ¶ 123. This relief was not requested in *Petrohawk*.[13]

Third, the Trustee fails to acknowledge an important difference in the terms of the Indentures here from those at issue in *Petrohawk*. In *Petrohawk*, the indenture expressly provided that interest payments were "considered paid" upon payment by the issuer to the paying agent. 2007 WL 211096, at *5. As Judge Cote noted, however, such a provision is unusual and "is not found in the Model Provisions" of the ABF *Commentaries* (*id.*), and the Indentures at issue in the present case likewise do not have such a provision. As such, "the Company bears the risk of failure of any of its depositaries." *Commentaries* at 321. Thus, unlike in *Petrohawk*, if Counterclaimants had continued to make interest payments through BONY, and had BONY then

---

[13] As noted earlier, this request may now be moot due to BONY's resignation.

purloined a portion of the interest payments, Counterclaimants would not have satisfied their

obligations to the Noteholders.[14]

* * *

For all of these reasons, the Trustee is not entitled to dismissal of the Second

Counterclaim.

## III. Counterclaimants State a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

### A. The Trustee's Lack of Good Faith Belief that the Spin-Off Transaction Violated the Indentures is Sufficient to Establish a Claim for Breach of the Implied Covenant

The implied covenant of good faith and fair dealing "inheres in every contract."

*deCiutiis v. Nynex Corp.*, No. 95 Civ. 9745 (PKL), 1996 WL 512150, at *3 (S.D.N.Y. Sept. 9,

1996) (citing *Travellers Int'l A.G. v. Trans World Airlines*, 41 F.3d 1570, 1575 (2d. Cir. 1994)).

The covenant encompasses "any promises which a reasonable person in the position of the

promisee would be justified in understanding were included, and it prohibits either party from

acting in a manner which will have the effect of destroying or injuring the right of the other party

to receive the fruits of the contract." *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 17 F.

Supp. 2d 275, 305 (S.D.N.Y. 1998) (quotations and citations omitted).

---

[14] For this same reason, the Trustee is just wrong in arguing that Tyco and TIFSA have breached the Indentures by making interest payments directly to DTC. *See* Pl. Br. at 12-13. Indeed, the Indentures provide that interest must be paid "in the manner provided in such Securities" (1998 Indenture § 3.1; *see also* 2003 Indenture § 4.01), and each of the Notes at issue in this action provides that "[t]he interest . . . will be paid to the Person in whose name this Note is registered." Burns Decl. Ex. D through I (form of Notes issued under 1998 Indenture); *see also id.* Ex. J (form of Notes issued under 2003 Indenture) ("The Company will pay interest on the Securities . . . to the persons in whose name such Securities are registered . . . ."). Each of the Notes was issued as a Global Security, and DTC (or its nominee, Cede & Co.) is the lone record holder of all of the Notes. CC ¶ 107. Thus, paying interest to DTC is *precisely* what the Indentures require.

Counterclaimants allege that BONY breached the implied covenant of good faith and fair dealing by "(i) refusing to sign the supplemental indentures without legal justification, (ii) filing the First Amended Complaint and later delivering a Notice of Default despite its lack of good faith belief that the supplemental indentures and the Spin-Off Transaction were prohibited by the terms of the Indentures or that a default has occurred, and (iii) attempting to misappropriate portions of interest payments due to the Noteholders." CC ¶ 125. BONY's actions have the effect of destroying Counterclaimants' right to receive the fruits of the Indentures. As such, these allegations are more than sufficient to support a claim for breach of the implied covenant.

The Trustee contends that Counterclaimants offer no facts to support their allegation that the Trustee lacked a good faith belief that the Spin-Off Transaction violated the Indentures. Pl. Br. at 19. The lone case cited by the Trustee, however, does not require such factual specificity, and merely stands for the proposition that the claim must allege "particular *conduct* that allegedly breached the duty of good faith and fair dealing." *Lewis Tree Serv., Inc. v. Lucent Tech., Inc.*, No. 99-cv-8556, 2000 WL 1277303, at *5 (S.D.N.Y. Sept. 8, 2000) (emphasis added). Here, Counterclaimants have alleged such conduct – the failure to sign the supplemental indentures, the delivery of the Notice of Default, and the attempt to misappropriate interest payments, all without a good faith belief that Defendants breached the Indentures. Moreover, even if specific supporting facts must be alleged, Counterclaimants have satisfied this requirement. The following facts all support an inference that the Trustee acted without good faith:

- At the time that it refused to execute the supplemental indentures, the Trustee did not declare a default under the Indentures. CC ¶ 101.

- Indeed, until the time it filed the First Amended Complaint on October 18, 2007 – more than three months after Tyco concluded the Spin-Off Transaction – the Trustee

did not assert that either the Spin-Off Transaction or the supplemental indentures violated the Indentures.  CC ¶ 102.

- The Trustee refused to execute the supplemental indentures only because it blindly followed the instructions of a subset of Noteholders.  CC ¶ 100; Pl. Br. at 11.

- Between June and October, there was no change in the relevant facts or law that would explain any change in the Trustee's position.

- Rather, the only apparent explanation is that the Trustee cut a deal with certain Noteholders to adopt the position advocated by those Noteholders.  Transcript of Conference, October 2, 2007, at 12.

- Despite promising in October to produce copies of all communications between the Trustee and Noteholders (*id.* at 44) – which might explain what inspired the Trustee's otherwise inexplicable change of position – the Trustee still has not produced those documents, suggesting that, in fact, the Trustee did not act in good faith.

Thus, insofar as Counterclaimants are required to allege additional facts to support their allegation of a lack of good faith, they have clearly done so.

To be sure, BONY is correct that "the implied terms of a contract may not conflict with its explicit provisions" and that "the mere exercise of one's contractual rights, without more, cannot constitute a breach of the implied covenant."   Pl. Br. at 18 (citations omitted).  However, Counterclaimants do not allege that the Trustee's "mere exercise" of its contractual rights, "without more," constitutes a breach of the implied covenant.  Rather, Counterclaimants allege that the Trustee failed to fulfill its contractual duties by, among other things, engaging in conduct *without a good faith belief* that it was warranted.  CC ¶¶ 104, 125.  Thus, the duty implied here does not conflict with the express terms of the Indentures and, indeed, is well supported by the case law.

"Even when a contract confers decision-making power on a single party, the resulting discretion is nevertheless subject to an obligation that it may be exercised in good faith." *deCiutiis*, 1996 WL 512150, at *3 (quoting *Travellers Int'l*, 41 F.3d at 1575).  An implied covenant of good faith does not conflict with a party's "discretion"; instead, it requires the party

"to exercise its discretion in good faith and not to act arbitrarily." *deCiutiis*, 1996 WL 512150, at

*3.  Here, because it lacked a good faith belief that the Spin-Off Transaction violated the

Indentures or the law and blindly followed the instructions of a group of Noteholders, the Trustee

acted arbitrarily in refusing to sign the supplemental indentures, filing the First Amended

Complaint, and issuing the Notice of Default.  *See US Airways Group v. British Airways PLC*,

989 F. Supp. 482 (S.D.N.Y. 1997) (holding that in addition to contract claim, plaintiff stated

claim that defendant breached duty of good faith and fair dealing by misleading plaintiff about

alliances defendant had with competitors and by making decision never to complete transactions

contemplated in agreement with plaintiff).  Because the Trustee was not authorized under the

Indentures to exercise these "contractual rights" without a good faith belief that such exercise

was warranted, the implied covenant of good faith and fair dealing does not conflict with the

express terms of the contract.

The cases cited by the Trustee involve claims where the implied covenant would require

adding or altering substantive contract terms.  *See, e.g., CIBC Bank & Trust Co. v. Banco Cent.*

*do Brasil*, 886 F. Supp. 1105, 1118 (S.D.N.Y. 1995) (dismissing claim for breach of implied

covenant because contract gave bank unconditioned discretion to withhold its consent to the

declaration of an acceleration and plaintiff "failed to even allege that any provision of the

[contract] limits a Bank's discretion to vote for or against an acceleration declaration"); *Hartford*

*Fire Ins. Co. v. Federated Dep't Stores, Inc.*, 723 F. Supp. 976 (S.D.N.Y. 1989) (declining to

find an implied covenant of good faith and fair dealing to bar a merger transaction that caused

the value of issuer's bonds to decline significantly because doing so "would require the court to

add a substantive provision for which the parties did not bargain"); *Sharma v. Skaarup Ship*

*Mgmt. Corp.*, 699 F. Supp. 440, 449 (S.D.N.Y. 1988) (implied term requiring lender not to

20

unreasonably refuse to approve charters for more than three months would not be implied in contract that gave lending bank unconditioned right to refuse to permit owners to accept charters of more than three months), *aff'd*, 916 F.2d 820 (2d Cir. 1990). Here, allowing Counterclaimants' implied covenant claim to proceed would not require any substantive addition or alteration to the Indentures – the implied covenant merely requires that the Trustee exercise its existing rights and duties under the Indentures in good faith.

### B. The Implied Covenant Counterclaim is Not Duplicative of the Breach Of Contract Claims and is Properly Pleaded in the Alternative

The Trustee erroneously contends that Counterclaimants' claim for breach of the duty good faith and fair dealing is "duplicative" of their breach of contract claim. *See* Pl. Br. at 17. Under New York law, however, breach of the implied covenant of good faith and fair dealing is recognized as a separate cause of action when it is "based on allegations different from those underlying the accompanying breach of contract claim." *Grand Heritage Mgmt., LLC v. Murphy*, No. 06 Civ. 5977 (NRB), 2007 WL 3355380, at *6 (S.D.N.Y. Nov. 7, 2007) (quoting *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002)).

Here, the counterclaim for breach of the implied covenant is based not only on the Trustee's refusal to sign the supplemental indentures and its attempt to misappropriate interest payments (the conduct underlying the two breach of contract claims), but also upon the additional allegation that BONY "fil[ed] the First Amended Complaint and delivered the Notice of Default despite its lack of good faith belief that the supplemental indentures and the Spin-Off Transaction were prohibited by the terms of the Indentures or that a default has occurred." CC ¶ 125. Because the counterclaim for breach of the implied covenant is based on separate facts from the breach of contract counterclaims, they are not duplicative and the motion to dismiss should be denied. *See Grand Heritage Mgmt.*, 2007 WL 3355380, at *6; *Fantozzi v. Axsys*

*Tech., Inc.*, No. 07 Civ. 2667 (LMM), 2007 WL 2454109, at *3 (S.D.N.Y. Aug. 20, 2007)

(denying motion to dismiss claim for breach of implied covenant because "plaintiffs' claim of a

breach of the covenant of good faith and fair dealing depends on facts in addition to those that

might support a breach of contract claim, and their claim is not duplicative of the breach of

contract claim").

Further, insofar as there may be overlap in the factual allegations of the different claims,

it is well established that "a party may be in breach of its implied duty of good faith and fair

dealing even if it is not in breach of its express contractual obligations."  *Orange County*

*Choppers, Inc. v. Olaes Enters., Inc.*, 497 F. Supp. 2d 541, 559-60 (S.D.N.Y. 2007) (denying

motion to dismiss claim for breach of covenant of good faith and fair dealing as duplicative of

breach of contract claim).  Here, the Trustee has argued that there are no express contractual

terms that prohibit the conduct in which it engaged.  *See, e.g.*, Pl. Br. at 7-8.  Because BONY has

raised arguments – albeit meritless – as to why it has not breached any express contractual

obligations, it is entirely proper for Counterclaimants to pursue, in the alternative, a counterclaim

for breach of the implied covenant of good faith and fair dealing, which "is violated when a party

to a contract acts in a manner that, although not expressly forbidden by any contractual

provision, would deprive the other of the right to receive the benefits under the agreement."

*Orange County*, 497 F. Supp. 2d at 559-60; *see also* Fed. R. Civ. P. 8(e)(2) ("A party may set

forth two or more statements of a claim . . . alternately or hypothetically, either in one count or

defense or in separate counts or defenses"); *Xpedior*, 341 F. Supp. 2d at 272 (denying motion to

dismiss claim for breach of implied covenant because, though the "good faith claims are

indistinguishable from its contract claims . . . the Federal Rules explicitly permit a party to plead

causes of action in the alternative"); *Wertheim Schroder & Co., Inc. v. Avon Prod., Inc.*, 91 Civ.

22

2287 (PKL), 1993 WL 126427, at *11-12 (S.D.N.Y. Apr. 1, 1993) (denying summary judgment

to defendants on breach of contract claim and alternative claim for breach of implied covenant);

*Richmond Shop Smart v. Jenbar Dev. Center, LLC*, 32 A.D.3d 423, 424, 820 N.Y.S.2d 124, 125

(2d Dep't 2006) (denying motion to dismiss claim for breach of implied covenant); *Wallace v.*

*Merrill Lynch*, 814 N.Y.S.2d 566 (Sup. Ct. N.Y. County 2005) (same), *aff'd*, 816 N.Y.S.2d 412

(App. Div. 1st Dep't 2006).

The Trustee is not entitled to dismissal of the Third Counterclaim.

## IV.    Counterclaimants' Declaratory Judgment Claim Should Not be Dismissed

The Trustee's motion to dismiss the Fourth Counterclaim is *not* based on any assertion

that Counterclaimants have not adequately pled a claim for a declaratory judgment.  Rather, the

Trustee simply asserts that the Fourth Counterclaim is "redundant" and the "mirror image" of the

Trustee's own request for a declaratory judgment.  Pl. Br. at 21.

But the Trustee simply ignores an entire branch of the relief requested by

Counterclaimants:  Counterclaimants seek a declaration "that BONY has no right to collect any

costs or expenses out of interest payments due to Noteholders, and that BONY should be

removed as Trustee under the Indentures."  CC ¶ 130.  A declaration on this subject is nowhere

contained in the Trustee's own claims and, therefore, the Trustee is simply wrong in the premise

to its argument.

Moreover, even as to the supplemental indentures, the declaration that the

Counterclaimants seek is not merely a "mirror image" of the relief sought by the Trustee.  The

Trustee has asked for a judgment declaring that it "may not sign" the proposed supplemental

indentures.  If the Court were to find for Defendants on the Trustee's claim, it might result only

in the denial of the declaration requested by the Trustee, or only in a declaration that the Trustee

"may" sign the supplemental indentures.  Counterclaimants, however, seek an affirmative

declaration that the Trustee "is required by law and under the Indentures" to sign the supplemental indentures (CC ¶ 129) – that is, not merely that the Trustee "may" sign the supplemental indentures, but that it "must."

In any event, even if the declaratory judgment counterclaim were redundant, there is no harm to the Trustee from leaving it in place, and nothing to be gained by dismissing it.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Plaintiff's motion to dismiss the First Amended Counterclaims.

Dated:  New York, New York
        January 28, 2008

                                            GIBSON, DUNN & CRUTCHER LLP

                                            By: ____/s/ Marshall R. King_____
                                                   Wesley G. Howell (WH-8660)
                                                   Marshall R. King (MK-1642)
                                            200 Park Avenue, 47th Floor
                                            New York, New York 10166-0193
                                            (212) 351-4000

                                            Attorneys for Defendants and
                                            Counterclaimants

100374334_4.DOC