UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- x
: 
THE BANK OF NEW YORK, :
:
       Plaintiff, :
:
     v. : 07 Civ. 4659 (SAS)
:
TYCO INTERNATIONAL GROUP S.A., TYCO : ECF Case
INTERNATIONAL LTD., and TYCO :
INTERNATIONAL FINANCE S.A., :
:
       Defendants. :
:
------------------------------------- x

# DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 47th Floor
New York, New York 10166-0193
(212) 351-4000

Attorneys for Defendants

February 1, 2008

i

# TABLE OF CONTENTS

Page

I. The Transaction Complied with the Indentures in Both Form and Substance ................... 1

II. Plaintiff's Refusal to Sign the Supplemental Indentures Did Not Prevent Defendants from Consummating the Transaction .............................................................. 6

III. Plaintiff Is Not Entitled to the Redemption Premium.......................................................... 8

IV. Conclusion ........................................................................................................................... 10

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ellenberg Morgan Corp. v. Hard Rock Café Assocs.*,
  116 A.D.2d 266, 500 N.Y.S.2d 696 (1st Dep't 1986) ................................................................ 6

*Hollinger Inc. v. Hollinger Int'l, Inc.*,
  858 A.2d 342 (Del. Ch. 2004) ................................................................................................ 2

*In re LHD Realty Corp.*,
  726 F.2d 327 (7th Cir. 1984) .................................................................................................. 8

*Life Product Clearing, LLC v. Angel*,
  No. 07 Civ. 475 (DC), 2008 WL 170193 (S.D.N.Y. Jan. 22, 2008) ........................................ 10

*Northwestern Mut. Life Ins. Co. v. Uniondale Realty Assocs.*,
  11 Misc. 3d 980, 816 N.Y.S.2d 831 (Sup. Ct. Nassau Co. 2006) ............................................. 9

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*,
  691 F.2d 1039 (2d Cir. 1982) ...................................................................................... 5, 6, 8, 9

*Yiamouyiannis v. Consumers Union of U.S., Inc.*,
  619 F.2d 932 (2d Cir.1980) .................................................................................................. 10

**Statutes & Regulations**

17 C.F.R. § 210.3-10(c) ............................................................................................................. 3

Defendants Tyco International Ltd. ("Tyco"), Tyco International Group S.A. ("TIGSA"), and Tyco International Finance S.A. ("TIFSA") (collectively, "Defendants") respectfully submit this reply memorandum in further support of their cross-motion for summary judgment dismissing portions of the First Amended Complaint. Plaintiff's most recent submission ("Pl. Reply Br.") continues to misstate the facts of the Transaction,[1] misconstrue the law applicable to those facts, and misrepresent Defendants' arguments with respect to the law and the facts.

I.

### THE TRANSACTION COMPLIED WITH THE INDENTURES IN BOTH FORM AND SUBSTANCE

Despite professing a need to focus on the substance of the "transaction as a whole" (Pl. Reply Br. at 2), Plaintiff in fact refuses to grapple with the substance of the Transaction. In *substance*, the effect of the Transaction is that Tyco spun off two of its businesses and the Noteholders are now creditors of a somewhat smaller company (albeit with commensurately smaller liabilities as well). If the substance of the Transaction violated the Indentures, it can only be because the two spun-off businesses constituted "all or substantially all" of Defendants' pre-Transaction assets. Yet that is the very issue that Plaintiff *opposed* having the Court decide on these cross-motions for summary judgment, and that the Court agreed to defer.[2]

---

[1] Unless otherwise noted, capitalized terms have the meanings assigned to them in Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Their Cross-Motion for Summary Judgment, dated January 11, 2008 ("Defs. Opening Br.").

[2] Despite insisting that there are disputed factual matters that preclude summary judgment on this issue, Plaintiff nevertheless argues about the relative size of the distributed assets and Tyco's continuing businesses. *See* Pl. Reply Br. at 9. As is clear from Plaintiff's argument, the financial data necessary to decide that issue are not in dispute. *See also* Defs. Opening Br. at 12 (identifying Tyco's continuing businesses as constituting, by various measures, between 31.8% and 45.4% of pre-Transaction Tyco). Defendants are prepared to

[Footnote continued on next page]

Instead of addressing the substance of the Transaction, Plaintiff focuses exclusively on the form, insisting that this case hinges on *TIGSA's* transfer of assets. *See, e.g.*, Pl. Reply Br. at 2, 4. Plaintiff's singular focus on TIGSA misses the forest for the trees. The fact that TIGSA was the "issuer" was true as a legal matter, but a complete fiction from a practical, business point of view. As Plaintiff concedes, TIGSA was simply "a holding company whose only business was to own indirectly a substantial portion of the operating subsidiaries of Tyco and to perform treasury operations for Tyco companies. Otherwise, *it conducted no independent business*." Defs. 56.1 Statement & Pl. Resp. ¶ 4 (emphasis added). The real party backing the Notes was always Tyco, which unconditionally guaranteed TIGSA's performance, and the markets always recognized it as such. Thus, as Plaintiff admits, the documents offering the Notes for sale included "substantial information" about Tyco's business, its capital structure, and its financial data, but only the barest of information concerning TIGSA. Defs. 56.1 Statement & Pl. Resp. ¶¶ 9-18. And TIGSA, unlike Tyco, had no obligation to file periodic financial reports with the SEC, and did not do so. Defs. 56.1 Statement & Pl. Resp. ¶ 5. In fact, under the terms of the Indentures, TIGSA was required to furnish the Trustee with *Tyco's* annual report and other SEC filings. Declaration of Marshall R. King ("King Decl.") Ex. A (1998 Indenture § 3.7); *id.* Ex. B (2003 Indenture § 5.03(a)).[3] The Trustee and Noteholders thus had reams of information

---

[Footnote continued from previous page]
    demonstrate that, even accepting Plaintiff's measures of the continuing businesses – somewhere between 27% and 45% (Pl. 56.1 Statement ¶¶ 6, 7, 50, 59) – the distributed assets do not meet the legal test of being "substantially all" of Tyco's assets. *See, e.g.*, *Hollinger Inc. v. Hollinger Int'l, Inc.*, 858 A.2d 342, 377 (Del. Ch. 2004) ("[a] fair and succinct equivalent to the term 'substantially all' would . . . be 'essentially everything'").

[3] While the 1998 Indenture also required that the Trustee be provided with copies of all reports "which the Issuer [*i.e.*, TIGSA] . . . may be required to file with the Commission" (1998
[Footnote continued on next page]

2

concerning Tyco, the real party responsible for repayment of the Notes, but virtually no information – either at the time they decided to purchase the Notes or during the ten years that the Notes were outstanding – concerning TIGSA.

Indeed, Tyco's Form 10-K for 1998 – the year that the first of the Notes were issued, and a document that was incorporated into the offering materials for Notes sold in 1999 (Jenkins Decl. Ex. D, at S-3) – could hardly be more explicit: "The Company has not included separate financial statements and footnotes for TIG[SA], because of the full and unconditional guarantee by Tyco and the Company's belief that such information is not material to the holders of the debt securities." King Decl. Ex. C (Form 10-K for year ended September 30, 1998, at 59). In later years, subsequently enacted SEC regulations required nothing more than a footnote in Tyco's financial statements containing "condensed consolidating financial information" for Tyco, TIGSA, and Tyco's other subsidiaries. 17 C.F.R. § 210.3-10(c). In its fiscal year 2000 Form 10-K – Tyco's first disclosure under the new regulation, and a document that was incorporated into offering documents for two series of Notes in 2001 (Jenkins Decl. Ex. E, at S-3; *id.* Ex. F, at S-3) – Tyco disclosed that TIGSA had a mere $3.6 million in cash and cash equivalents. King Decl. Ex. D (Form 10-K for year ended September 30, 2000, at 73). By contrast, consolidated Tyco had more than $1.2 billion in cash. *Id.* No Noteholder had sufficient information concerning TIGSA that would justify a decision to invest in TIGSA securities absent the unconditional

---

[Footnote continued from previous page]
    Indenture § 3.7), TIGSA, as noted above, was not required to file any reports with the SEC. Defs. 56.1 Statement & Pl. Resp. ¶ 5.

3

guarantee by Tyco, and no Noteholder in its right mind could assert that it purchased Notes in reliance on TIGSA's – rather than Tyco's – purported ability to repay the Notes.[4]

Consequently, it makes no sense for Plaintiff to pretend that TIGSA ever mattered in *substance*.

To be sure, Defendants do not contend that the legal form of the Transaction is irrelevant – but as Defendants have demonstrated, both the overall substance *and* each step of the Transaction are in strict compliance with the terms of the Indentures. Contrary to Plaintiff's contention, the two arguments advanced by Defendants are not "inherently contradictory" (Pl. Reply Br. at 12), but live in perfect harmony: (1) as a matter of substance, Tyco is all that matters, and Tyco made no transfer of "all or substantially all" of its assets;[5] and (2) as a matter of legal form, TIGSA transferred all of its assets to Tyco and, as required by the Indentures, Tyco assumed TIGSA's obligation on the Notes. Plaintiff wants to focus narrowly on TIGSA, but then it wants to ignore that TIGSA unquestionably complied with the Indentures when it made its only transfer of assets.[6]

---

[4] For similar reasons, the condensed financial information concerning TIFSA and TIGSA that is cited by Plaintiff, and that purports to compare their respective ability to pay interest and principal on the Notes, is utterly meaningless. Pl. Reply Br. at 4. The only relevant information is Tyco's consolidated financial information. Thus, while TIFSA had no cash on hand at year-end 2007, Tyco had nearly $1.9 billion. Gordon Supp. Decl. Ex. A (Tyco Form 10-K for year ended September 28, 2007, at 172).

[5] At a minimum, whether there was a violation because of the transfer of Tyco's healthcare and electronics businesses to its shareholders is an issue that is not being decided on these motions.

[6] Plaintiff (properly) does not even attempt to rebut Defendants' argument that there was no violation of the Indentures when Tyco's operating subsidiaries were reorganized under three of TIGSA's wholly owned subsidiaries. *See* Defs. Opening Br. at 19-20. Thus, the Court should grant Defendants summary judgment and dismiss the claim based on this theory, which is set forth in Paragraph 71 of the First Amended Complaint.

Plaintiff's approach also distorts the holding in *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039 (2d Cir. 1982), beyond all recognition, asserting that the relevant question is whether Tyco and TIFSA hold "all or substantially all" of the assets that TIGSA held before the Transaction. Pl. Reply Br. at 2, 4, 9, 10. That focus is entirely backward: Neither the Indentures nor *Sharon Steel* requires the obligor to *retain* substantially all of its assets; rather, they impose certain restrictions if (and only if) the obligor *transfers* substantially all of its assets. As we have repeatedly explained, TIGSA transferred all of its assets to Tyco,[7] and it did so in compliance with the Indentures, by also transferring its obligation on the Notes to Tyco. When Tyco subsequently distributed its healthcare and electronics businesses to its shareholders – which it did approximately a month later (not "one second," as Plaintiff contends (Pl. Reply Br. at 10))[8] – it is irrelevant whether or not Tyco's continuing businesses were "substantially all" of its assets. The relevant question is whether the two distributed businesses were substantially all of Tyco's assets.[9] Once again, however, Plaintiff has resisted having the Court decide that issue.

Plaintiff misinterprets *Sharon Steel* in another important respect, when it insists that it is irrelevant that the sale in that case was to an unrelated third party. Pl. Reply Br. at 13. The very

---

[7] Plaintiff is just wrong in asserting that TIGSA transferred its assets "piecemeal." Pl. Reply Br. at 10. To the contrary, it transferred all of its assets to Tyco in one fell swoop. *See* Pl. 56.1 Statement ¶ 52 ("TIGSA then distributed *all of its assets*, which at this point were reorganized under Covidien, Tyco Electronics, and TIFSA, to Tyco.") (emphasis added).

[8] Plaintiff's own Rule 56.1 Statement establishes that TIGSA transferred its assets (and obligations on the Notes) to Tyco on June 1, 2007, and Tyco distributed the two businesses to its shareholders on June 29, 2007. Pl. 56.1 Statement ¶¶ 51-53, 59.

[9] On this point, Plaintiff again misstates *Sharon Steel*, asserting that it requires a transfer of the Notes if there is a "significant transfer" of the obligor's assets. Pl. Reply Br. at 8. Plaintiff is wrong. The successor obligor clause is implicated only if the transfer amounts to "substantially all" of the obligor's assets.

point of *Sharon Steel*, as Plaintiff purports to acknowledge, is that one must look at the transaction in its entirety and try to understand its substance.  The substance of Tyco's Transaction is, simply put, very different from the transfer to an unrelated third party that took place in *Sharon Steel*:  Here, Tyco was always obligated on the Notes, and it was always the real party to whom Noteholders looked.  After the Transaction, the Noteholders remain creditors of the same consolidated entity, which in substance differs only because it has shed two businesses that did not constitute substantially all of its assets.  Tyco remains an important player in the world and American economy, with leading brands in its continuing businesses and $32 billion in assets and $18 billion in annual revenues (Defs. 56.1 Statement and Pl. Resp. ¶¶ 37-38) – larger even than when many of the Noteholders purchased the Notes, a fact completely ignored by Plaintiff.  Importantly, and also utterly ignored by the Trustee, the smaller, post-Transaction Tyco has reduced its outstanding debt by more than half.  *Id.* ¶ 38.  While *Sharon Steel* may not have mentioned all of these specific considerations in the factual context of that case, they simply cannot be ignored if one is to adhere to *Sharon Steel*'s teaching to look at the entirety of the transaction.

## II.

### PLAINTIFF'S REFUSAL TO SIGN THE SUPPLEMENTAL INDENTURES DID NOT PREVENT DEFENDANTS FROM CONSUMMATING THE TRANSACTION

As explained in our opening papers, Defendants' argument is simple:  If the Transaction was permitted by the Indentures, then Plaintiff's refusal to sign the supplemental indentures was unjustified.  And if Plaintiff's refusal to sign the supplemental indentures was unjustified, then proceeding with the Transaction in the absence of that signature does not constitute a breach of the Indentures.  *See Ellenberg Morgan Corp. v. Hard Rock Café Assocs.*, 116 A.D.2d 266, 271, 500 N.Y.S.2d 696, 699 (1st Dep't 1986) ("It is a fundamental principle of equity that a party may

not insist upon performance of a condition precedent when its nonperformance has been caused by the party himself."). Everything hinges, therefore, on whether the Transaction was permissible. The signature issue is a red herring.

In reply, Plaintiff focuses on the wrong Indenture provisions. Plaintiff discusses the provisions governing what was required "for the supplemental indentures to go into effect" (Pl. Reply Br. at 15), but the question here is *not*, strictly speaking, when the supplemental indentures became "effective." Rather, the question is merely whether Defendants did what they were required to do in order for TIGSA to transfer all of its assets. And on that question, Plaintiff misstates the relevant provisions, claiming that the Indentures prohibit a transfer of substantially all of the obligor's assets without a supplemental indenture "signed by the Trustee." Pl. Reply Br. at 16 (purporting to cite 1998 Indenture § 8.1 and 2003 Indenture § 10.01).

In fact, those provisions of the Indentures say nothing at all about whether the Trustee must *sign* any document. Section 8.1 of the 1998 Indenture provides that the issuer may transfer all or substantially all of its assets when the recipient assumes the obligation on the Notes in a supplemental indenture "executed and delivered to the Trustee by such corporation." Gordon Decl. Ex. E. Section 10.01 of the 2003 Indenture similarly requires only that the supplemental indenture be "executed and delivered to the Trustee" by the successor. Gordon Decl. Ex. F. There is no dispute here that Tyco, the successor obligor, executed and delivered the required supplemental indentures to the Trustee, along with all other required documents. Defs. 56.1 Statement & Pl. Resp. ¶ 31.

Accordingly, Plaintiff's unjustified refusal to sign the supplemental indentures did not preclude Defendants from proceeding with the Transaction.

### III.

### **PLAINTIFF IS NOT ENTITLED TO THE REDEMPTION PREMIUM**

Although Plaintiff devotes far more space to the issue in its reply brief than it did in its opening brief (*compare* Pl. Reply Br. at 16-21 *with* Pl. Br. at 23-24), Plaintiff's argument in favor of the redemption premium still amounts to nothing more than the following: The premium was awarded in *Sharon Steel*, and so it should be awarded here.

There is no logic or reasoning to this argument, and because the present case is not the same as *Sharon Steel*, Plaintiff is not entitled to an award of the redemption premium, even if the Court finds a technical breach of the Indentures.

*First*: Plaintiff does not – and cannot – explain away the many cases holding that a redemption premium is not enforceable in the event of a default. *See* Defs. Opening Br. at 22-23. Plaintiff insists that its suit to collect the principal and interest on the Notes is not "acceleration," simply because it avoids the use of that word. But the cases make clear that a "lender, *by its acts*, may establish that it prefers accelerated payment to the opportunity to earn interest over a period of years," and that if it does so, it may no longer claim a redemption premium. *In re LHD Realty Corp.*, 726 F.2d 327, 331 (7th Cir. 1984) (emphasis added). Plaintiff's claim here demonstrates just such a preference, and the redemption premium is therefore not available.

The Second Circuit did not discuss New York's long-standing "no-premium-in-case-of-default" rule in *Sharon Steel*, and it has been reaffirmed on numerous occasions subsequent to that decision, as the cases cited in Defendants' opening brief demonstrate. Moreover, even if the redemption premium was properly awarded in the circumstances of *Sharon Steel*, we have repeatedly explained the numerous factual differences that distinguish the present case from *Sharon Steel*.

8

*Second*: Plaintiff claims that it is seeking "damages." Pl. Reply Br. at 19, 21. But there can be no argument that Plaintiff or the Noteholders have suffered any damages – certainly not in the full amount of the principal, interest, and redemption premium.[10] That is because the Noteholders' expected interest stream has continued uninterrupted, and Tyco is capable of continuing those payments into the indefinite future. *See, e.g.*, Defs. 56.1 Statement & Pl. Resp. ¶¶ 36-38, 41 (Tyco has $32 billion in assets, less than half the debt it had before the Transaction, investment grade credit ratings, $1.8 billion in net cash from operating activities, and interest payments on the Notes are just $240.9 million annually). The most Plaintiff can do in response is to speculate that in "five, ten or fifteen years," TIFSA might "go[] under." Pl. Reply Br. at 5. Based solely on numbers concerning TIFSA that, as explained above, are meaningless in view of Tyco's consolidated financials (*see supra* note 4), Plaintiff asserts that it is "not confident" that Tyco can make all payments through 2029. Pl. 56.1 Resp. ¶ 35. Such weak, uninformed, and unsupported speculation cannot possibly establish $4.1 billion of damages.[11]

*Third*: To the extent that the availability of the redemption premium depends on Defendants having "defaulted intentionally in order to trigger acceleration and thereby avoid or evade a prepayment premium," *Northwestern Mut. Life Ins. Co. v. Uniondale Realty Assocs.*, 11 Misc. 3d 980, 985, 816 N.Y.S.2d 831, 836 (Sup. Ct. Nassau Co. 2006), Plaintiff is not possibly

---

[10] In *Sharon Steel*, the Second Circuit awarded the redemption premium in connection with the indenture trustees' request for *specific performance* of the contracts' redemption provisions, *not* as a measure of *damages*. 691 F.2d at 1047, 1053. Defendants made this point in their opening papers (Defs. Opening Br. at 24 n.12), but Plaintiff ignores it in reply. Indeed, given the chance to attempt to recharacterize its claim as requesting specific performance, Plaintiff distinctly eschews that opportunity and emphasizes that it purports to be seeking "damages."

[11] At a minimum, there are clearly disputed issues of fact regarding whether Tyco is at any increased risk of nonpayment as a result of the Transaction.

9

entitled to summary judgment. To begin with, "[c]ases that hinge on an issue relating to state of mind should generally not be disposed of summarily." *Life Product Clearing, LLC v. Angel*, No. 07 Civ. 475 (DC), 2008 WL 170193, at *5 (S.D.N.Y. Jan. 22, 2008) (citing, *inter alia*, *Yiamouyiannis v. Consumers Union of U.S., Inc.*, 619 F.2d 932, 939 (2d Cir.1980)). Moreover, the only "evidence" offered by Plaintiff that Defendants tried to "avoid" the redemption premium is that they first tendered for the Notes and tried to get Noteholders to agree that the transaction, as then structured, did not implicate the successor obligor clause. Pl. Reply Br. at 21. But when certain Noteholders banded together and refused to tender, Tyco was happy to leave the remaining Notes outstanding and to continue to pay interest when due. That hardly smacks of an effort to "trigger acceleration" and "evade" paying a redemption premium. Had that been Tyco's intent, there were far more direct ways to achieve that goal – such as by *stopping* payment of interest to the Noteholders.

Accordingly, Plaintiff is not entitled to the redemption premium.

## IV.

## CONCLUSION

For the foregoing reasons and those set forth in Defendants' opening papers, the Court should grant Defendants' cross-motion for summary judgment.

Dated: New York, New York
February 1, 2008

GIBSON, DUNN & CRUTCHER LLP

By:   /s/ Marshall R. King
     Wesley G. Howell (WH-8660)
     Marshall R. King (MK-1642)
200 Park Avenue, 47th Floor
New York, New York 10166-0193
(212) 351-4000

Attorneys for Defendants