UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ X

BANK OF NEW YORK, as Indenture
Trustee,

                              Plaintiff,

   - against -

TYCO INTERNATIONAL GROUP, S.A.,
TYCO INTERNATIONAL, LTD., and
TYCO INTERNATIONAL FINANCE
S.A.,

                              Defendants.

------------------------------------------------------ X

**OPINION AND ORDER**

**07 Civ. 4659 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/3/08

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

      Tyco International, Ltd. ("Tyco") is a large corporate conglomerate. This action arises from a spin-off of two of Tyco's four major lines of business (the "Transaction"). Bank of New York ("BNY"), Indenture Trustee with respect to certain notes issued by Tyco and its subsidiaries (the "Notes"), filed the instant action, claiming that the Transaction breached the indentures that govern the Notes. The parties now cross-move for summary judgment on two distinct grounds: (1) that the Transaction is invalid under the holding of the Second

1

Circuit Court of Appeals in *Sharon Steel Corp. v. Chase Manhattan Bank*,[1] and (2)

that the spin-off breached the indentures that govern the Notes because it was a

transfer of substantially all of Tyco's assets.  BNY also moves for summary

judgment on the ground that its refusal to execute certain supplemental indentures

meant that the Transaction could not be consummated.  For the reasons discussed

below, both motions are denied in their entirety.

## II.    BACKGROUND

### A.    Facts[2]

Tyco is a publicly traded Bermuda corporation with several wholly

owned subsidiaries including, until recently, Tyco International Group S.A.

("TIGSA"), a Luxembourg company.[3]  Prior to the Transaction, TIGSA was the

holding company through which Tyco owned its operating businesses.  Thus,

TIGSA controlled substantially all of Tyco's assets and engaged in substantially

all of Tyco's business.[4]  Until June 29, 2007, Tyco, through TIGSA, was engaged

in the design and manufacture of electronics, medical devices and supplies, fire

---

[1]    691 F.2d 1039 (2d Cir. 1982).

[2]    The facts in this section are undisputed unless noted otherwise.

[3]    *See* Defendants' Response to Plaintiff's Local Rule 56.1 Statement ("Def. 56.1") ¶¶ 1, 2.  TIGSA was liquidated in the course of the Transaction.

[4]    *See id.* ¶ 2.

and security systems, and engineered products and services.[5]

In 1998, TIGSA raised over four billion dollars through the issuance of six series of notes pursuant to a single indenture (the "1998 Indenture").[6]  In 2003, TIGSA issued an additional billion dollars of notes in one series pursuant to a new indenture (the "2003 Indenture," and collectively, the "Indentures").[7]  The Indentures are governed by New York State law.[8]  Tyco was a guarantor on the Notes, and BNY was the Indenture Trustee under both indentures.[9]  The Indentures contain clauses providing that both TIGSA and Tyco "will not . . . sell or convey all or substantially all of its assets to any Person, unless . . . the successor entity . . . shall expressly assume the due and punctual payment of the principal of and interest on all the [Notes] or the obligations under the Guarantees,

---

[5]    *See id.* ¶ 5.  "Engineered products" refers to items such as "industrial valves and controls, as well as steel tubular goods . . . ."  *Id.*

[6]    *See id.* ¶¶ 9, 10.  *See also* 1998 Indenture, Ex. E to Declaration of Andrew G. Gordon, Attorney for BNY, in Support of Plaintiff's Motion for Summary Judgment ("Gordon Decl.").  The Notes issued pursuant to the 1998 Indenture bear CUSIP numbers 902118AM0, 902118AJ7, 902118AY4, 902118BC1, 902118AC2, and 902118AK4.

[7]    *See* Def. 56.1 ¶¶ 11, 12.  *See also* 2003 Indenture, Ex. F to Gordon Decl.  The Notes issued pursuant to the 2003 Indenture bear CUSIP number 902118BK3.

[8]    *See* 1998 Indenture § 10.8; 2003 Indenture § 10.04.

[9]    *See* Def. 56.1 ¶¶ 10, 12.

3

as the case may be . . . ." (the "successor obligor clauses").[10]

On January 13, 2006, Tyco announced its intention to spin off its electronics and healthcare businesses.[11]  To effect the separation, TIGSA first offered to repurchase the Notes (the "Tender Offer").[12]  The Tender Offer explained that Tyco would first reorganize its structure so that TIGSA would hold three companies:  Tyco Electronics Group S.A. ("Tyco Electronics"), which would hold Tyco's electronics business; Covidien International Finance S.A. ("Covidien"), which would hold Tyco's healthcare business; and Tyco International Finance, S.A. ("TIFSA"), which would hold Tyco's security and engineered products businesses.[13]  TIGSA would then liquidate, and as a liquidating distribution, distribute all shares of Tyco Electronics, Covidien, and

---

[10]    1998 Indenture § 8.1.  The 2003 Indenture has similar language.  *See* 2003 Indenture § 10.01 (providing that TIGSA cannot "sell or convey all or substantially all of its assets to any Person" unless that entity "expressly assume[s] the due and punctual payment of the principal of, premium, if any, and interest" on the Notes).

[11]    *See* 1/13/06 Investor Relations Press Release, *Tyco Announces Intent to Separate into Three Publicly Traded Companies* ("1/13/06 Press Release"), Ex. I to Gordon Decl.  *See also* Def. 56.1 ¶¶ 28, 29.

[12]    *See* Def. 56.1 ¶ 32.  *See also* 4/27/07 Offer to Purchase and Consent Solicitation Statement ("Offer to Purchase"), Ex. D to Gordon Decl.  Defendants note that TIGSA also offered to purchase additional public debt at that time.  *See* Def. 56.1 ¶ 32.

[13]    *See* Offer to Purchase at 6.

4

TIFSA to Tyco.[14]  Tyco would then distribute all shares of Tyco Electronics and

Covidien to its shareholders.[15]  Thus, Tyco would spin off its electronics and

healthcare businesses into independent public companies and leave Tyco as a

conglomerate that operated security and engineered products businesses through a

holding company, TIFSA (the "Proposed Transaction").

Under the terms of the Proposed Transaction, TIFSA would be the

obligor on the Notes that were not tendered.[16]  To achieve this result, the Tender

Offer was coupled with a solicitation of the noteholders' consent to certain

amendments to the Indentures (the "Proposed Amendments").[17]  The Proposed

Amendments provided that TIGSA's transfers of its electronics and healthcare

assets to Tyco Electronics and Covidien respectively would be deemed not to be a

transfer of "all or substantially all" of TIGSA's assets, while the transfer of the

---

[14]     *See id.*

[15]     *See* Def. 56.1 ¶ 33.  After the Tender Offer was announced, certain noteholders filed an action against TIGSA, alleging that the Tender Offer documentation was false or misleading because it failed to explain that *Sharon Steel* forbid transactions of this type. *See AIG Global Inv. Corp. v. Tyco Int'l Group S.A.*, No. 07 Civ. 3693 (S.D.N.Y., filed May 9, 2007).  Tyco responded by issuing a supplement to the Tender Offer that discussed the suit. *See* 5/10/07 Supplement to Offer to Purchase and Consent Solicitation Statement, Ex. N to Gordon Decl.  That action was dismissed without prejudice.

[16]     *See* Offer to Purchase at 6.

[17]     *See id.* at 10.

5

remaining assets and liabilities to TIFSA would be considered a transfer of substantially all of TIGSA's assets.[18]  These amendments were designed to ensure that the successor obligor clauses would allow TIGSA to transfer the security and engineered products businesses to TIFSA, thereby permitting TIGSA to transfer the Notes to TIFSA without further approval from the noteholders.

The Proposed Amendments required the approval of a majority of noteholders.  Only about one third of the noteholders tendered their Notes.[19]  As a result, the Proposed Amendments never took effect.[20]

TIGSA, TIFSA, Covidien, and Tyco Electronics instead executed the following Transaction.[21]  First, TIGSA contributed its healthcare assets and liabilities (valued by the Contribution Agreement at approximately twenty-four billion dollars, which the parties agree was 37.9% of the total valuation) to

---

[18]    *See id.* at A1.

[19]    *See* Def. 56.1 ¶ 40.

[20]    *See* 5/25/07 Press Release, *Tyco Announces Expiration of Tender Offers and Consent Solicitations*, Ex. O to Gordon Decl.

[21]    This description glosses over certain steps in the Transaction that are not significant for purposes of these motions. *See* Def. 56.1 ¶¶ 46, 50-51. *See also* 5/31/07 Contribution Agreement Between TIGSA as Contributor and Covidien, Tyco Electronics, and TIFSA, as Contributees ("Contribution Agreement"), Ex. J to Gordon Decl.

6

Covidien in exchange for ten million Covidien shares.[22]  Next, TIGSA contributed

its electronics assets and liabilities (valued at sixteen billion dollars, which the

parties agree was 25.5% of the total valuation) to Tyco Electronics in exchange for

ten million shares of Tyco Electronics.[23]  Finally, TIGSA contributed all of its

assets and liabilities in its security and engineered products businesses (valued at

twenty-three billion dollars, which the parties agree was 36.6% of the total

valuation) to TIFSA in exchange for ten million TIFSA shares.[24]

TIGSA then distributed all of its assets (primarily the shares of

Covidien, Tyco Electronics, and TIFSA) to Tyco.[25]  In this distribution, Tyco

maintained that the transfer of all of TIGSA's assets to Tyco permitted TIGSA to

assign its obligations under the Notes to Tyco pursuant to the Indentures.  In

accordance with the Indentures, TIGSA, Tyco, and TIFSA executed supplemental

indentures (the "Supplemental Indentures") stating that Tyco and TIFSA agreed to

become obligors under the Indentures.[26]  The Supplemental Indentures also state

---

[22]    *See* Contribution Agreement § 2.1; Def. 56.1 ¶¶ 46, 50.

[23]    *See* Contribution Agreement § 2.1; Def. 56.1 ¶¶ 46, 50.

[24]    *See* Contribution Agreement § 2.1; Def. 56.1 ¶¶ 46, 50.

[25]    *See* Def. 56.1 ¶ 52.

[26]    *See* 5/30/07 Supplemental Indentures, Ex. L to Gordon Decl.  The
parties disagree as to whether the Supplemental Indentures were effective. *See*

7

that they require execution by the Indenture Trustee to become effective.[27]  BNY

never executed the Supplemental Indentures.[28]  On June 29, 2007, Tyco distributed

to its shareholders all of its shares of Tyco Electronics and Covidien.[29]

On November 8, 2007, BNY notified TIGSA that TIGSA had

defaulted on its obligations under the Indentures.[30]  On January 24, 2008, BNY

resigned as Indenture Trustee.[31]

### B.    Procedural Posture

TIGSA was liquidated on June 1, 2007.[32]  Three days later, BNY filed

---

Def. 56.1 ¶ 42.

[27]    *See, e.g.,* 5/30/07 Supplemental Indenture No. 21 § 2.5 ("This Supplemental Indenture No. 21 shall become effective upon execution by the Issuer, TIFSA, Tyco and the Trustee"), Ex. L to Gordon Decl.

[28]    *See* Def. 56.1 ¶ 57.

[29]    *See id.* ¶ 59.

[30]    *See id.* ¶ 61.

[31]    *See* 1/24/08 Letter from Gary S. Bush, Vice President of BNY, to Defendants, attached to 1/28/08 Letter from Marshall R. King, Attorney for Defendants, to the Court.  Because the Indentures provide that an Indenture Trustee that delivers notice of resignation remains trustee until a new trustee is appointed, BNY still has standing to pursue this claim. *See* 1/29/08 Letter from Gerard E. Harper, Attorney for BNY, to the Court (citing 1998 Indenture § 5.9(d); 2003 Indenture § 7.10(d)).

[32]    *See* Def. 56.1 ¶ 58.

the instant action, seeking a declaratory judgment as to whether the Indentures authorized BNY to execute the Supplemental Indentures.[33]   Five months later, after Tyco had completed the Transaction, BNY amended its complaint to allege that the Transaction violated both the holding of *Sharon Steel* and the successor obligor clauses.[34]   On December 4, 2007, BNY moved for summary judgment to declare that the Indentures had been breached on the grounds that the successor obligor clauses prevented TIGSA from assigning the Notes to Tyco and that because BNY refused to execute the Supplemental Indentures, the assignment of the Notes breached the Indentures regardless of whether the successor obligor clauses were violated.   On January 11, 2008, defendants cross-moved for summary judgment on the grounds that *Sharon Steel* did not prevent the Transaction and that defendants had not breached the Indentures.[35]

---

[33]    *See* Complaint.

[34]    *See* Amended Complaint.

[35]    *See* Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Their Cross-Motion for Summary Judgment at 2-3.  The parties also move for summary judgment on the issue of whether the noteholders are entitled to a redemption premium if the Indentures were breached.  Because BNY has not established at this time that defendants breached the Indentures, I do not reach the question of remedies.

## III.  APPLICABLE LAW

### A.  Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[36]  An issue of fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[37]  A fact is material when it "'might affect the outcome of the suit under the governing law.'"[38]  "It is the movant's burden to show that no genuine factual dispute exists."[39]

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.  "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish

---

[36]     Fed. R. Civ. P. 56(c).

[37]     *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quoting *Stuart v. American Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir. 1998)).

[38]     *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005)).

[39]     *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

10

the existence of an element essential to that party's case, and on which that party

will bear the burden of proof at trial.'"[40] To do so, the non-moving party must do

more than show that there is "'some metaphysical doubt as to the material

facts,'"[41] and it "'may not rely on conclusory allegations or unsubstantiated

speculation.'"[42] However, "'all that is required [from a non-moving party] is that

sufficient evidence supporting the claimed factual dispute be shown to require a

jury or judge to resolve the parties' differing versions of the truth at trial.'"[43]

       In determining whether a genuine issue of material fact exists, the

court must construe the evidence in the light most favorable to the non-moving

---

[40]    *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). *Accord In re September 11 Litig.*, No. 21 MC 97, 2007 WL 2332514, at *4 (S.D.N.Y. Aug. 15, 2007) ("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.") (quotation omitted).

[41]    *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[42]    *Jeffreys*, 426 F.3d at 554 (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2002)).

[43]    *McClellan*, 439 F.3d at 144 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)).

party and draw all justifiable inferences in that party's favor.[44]  However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'"[45]  Summary judgment is therefore "only appropriate when there is no genuine issue as to any material fact, making judgment appropriate as a matter of law."[46]

**B.    *Sharon Steel***

**1.    Facts**

In *Sharon Steel*, the Second Circuit held that the validity of a transfer of assets in the course of a liquidation must be evaluated in the context of the overall plan of liquidation.[47]  During 1977 and 1978, the obligor on certain notes, UV Industries, Inc. ("UV"), maintained three lines of business:  electrical equipment, operated through Federal Pacific Electric Company ("Federal"); metal

---

[44]    *See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 456 (2d Cir. 2007) (citing *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)).

[45]    *McClellan*, 439 F.3d at 144 (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)).  *Accord Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986).

[46]    *Karpova v. Snow*, 497 F.3d 262, 270 (2d Cir. 2007) (citing *Tocker v. Philip Morris Cos.*, 470 F.3d 481, 486-87 (2d Cir. 2006)).

[47]    *See* 691 F.2d at 1042, 1044.

12

fabrication, operated through Mueller Brass; and metals mining.[48]  Federal

provided sixty percent of UV's operating revenue and constituted forty-four

percent of the book value of UV's assets.[49]

       As part of a plan of liquidation, UV first sold Federal and certain

other assets to unrelated purchasers.[50]  UV then sold its remaining assets to Sharon

Steel Corp. ("Sharon Steel"), which agreed to assume UV's outstanding notes.[51]

UV did not obtain noteholder approval before transferring the notes to Sharon

Steel, relying instead on the terms of the successor obligor clause.  The assets

transferred to Sharon Steel represented fifty-one percent of the assets that UV held

before it began the liquidation.[52]  To formalize its position as obligor, Sharon Steel

delivered supplemental indentures to the indenture trustees, who refused to

execute them and instead issued notices of default.[53]  The indenture trustees then

sued claiming that the transfer of assets to Sharon Steel was a breach of the

---

[48]    *See id.* at 1045.

[49]    *See id.*

[50]    *See id.*

[51]    *See id.* at 1046.

[52]    *See id.* at 1051.

[53]    *See id.* at 1046-47.

13

indentures.

2.    **Proceedings**

After a jury trial, the district court directed a verdict for the indenture trustees.[54]  On appeal, the Second Circuit first noted that successor obligor clauses are boilerplate and "'[s]ince there is seldom any difference in the intended meaning [boilerplate] provisions are susceptible of standardized expression . . . .'"[55]  Because of the importance of uniformity to the efficient functioning of capital markets, the Second Circuit held that the interpretation of boilerplate provisions is a matter of law and should not be submitted to a jury.[56]

The Circuit then turned its attention to the application of the successor obligor clauses.  Sharon Steel argued that because it purchased all of the assets UV had at the time of the purchase, the transfer fell within the literal language and terms of the successor obligor clauses.  The Circuit rejected this mechanical interpretation of the clauses, instead analyzing them in terms of the

---

[54]      *See id.* at 1047.

[55]      *Id.* at 1048 (quoting American Bar Foundation, *Commentaries on Indentures* (1971)) (hereinafter *Commentaries*).

[56]      *See id.*  The Circuit also held that the district court did not err in rejecting evidence of custom, usage, and practical construction in interpreting the clauses.  *See id.* at 1048-49.

14

interests they were intended to protect.[57]

The Circuit found that successor obligor clauses protect both the borrower, by permitting it to merge, liquidate, or sell its assets, and the lender, by assuring some degree of continuity of assets.[58]  In light of these interests, the Circuit held that "boilerplate successor obligor clauses do not permit assignment of the public debt to another party in the course of a liquidation unless 'all or substantially all' of the assets of the company *at the time the plan of liquidation is determined upon* are transferred to a single purchaser."[59]  Thus, the court looked to UV's assets when the company first decided to liquidate – *i.e.*, prior to the sale of Federal.  Because the assets purchased by Sharon Steel, not including proceeds from the intermediate sales, constituted only fifty-one percent of UV's pre-transaction assets – and fifty-one percent was "[i]n no sense" substantially all – the court held that the transfer of the notes to Sharon Steel was not effective under the successor obligor clauses and UV remained liable on the Notes.[60]

---

[57]      *See id.* at 1049-50.

[58]      *See id.* at 1050 ("We hold, therefore, that protection for borrowers as well as for lenders may be fairly inferred from the nature of successor obligor clauses.").

[59]      *Id.* at 1051 (emphasis added).

[60]      *Id.* at 1051-52.

## IV. DISCUSSION

### A. Validity of the Tyco Transaction

The Transaction comprised two transfers of assets. *First*, TIGSA transferred all of its assets to Tyco and used the successor obligor clauses to make Tyco the obligor on the Notes. *Second*, Tyco transferred Tyco Electronics and Covidien to its shareholders. Tyco maintains that the second transfer did not violate the successor obligor clauses because it was not a transfer of substantially all of Tyco's assets. BNY disagrees, arguing that substantially all of Tyco's assets were transferred. BNY further contends that the Transaction as a whole violates the rule of *Sharon Steel*. These two arguments are addressed separately.

### 1. Distribution of Tyco Electronics and Covidien

The successor obligor clauses prohibit Tyco from transferring substantially all of its assets unless the transferee assumes liability for the Notes. Therefore, if Tyco's transfer of Tyco Electronics and Covidien to its shareholders was in fact a transfer of substantially all of Tyco's assets, the Transaction breached the Indentures.

I cannot determine on this record whether Tyco Electronics and Covidien constituted substantially all of Tyco's assets. However, while BNY

contends that factual disputes will require a trial on issues of valuation,[61] the parties may be able to stipulate to a sufficiently narrow valuation range to permit the Court to resolve the issue on summary judgment. At this time, however, defendants' motion is denied without prejudice.

### 2.    Applicability of *Sharon Steel*

Even if the spin-off of Tyco Electronics and Covidien did not constitute a transfer of substantially all of Tyco's assets, the Transaction would still violate the successor obligor clauses if *Sharon Steel* applies. In *Sharon Steel*, the Second Circuit held that a transfer of assets pursuant to a plan of liquidation had to be evaluated "at the time the plan of liquidation is determined . . . ."[62] If *Sharon Steel* applies here, the transfer is invalid because Tyco clearly does not hold substantially all of the assets originally held by TIGSA.

Before the Transaction, Tyco was a public corporation that

---

[61]    *See* 10/2/07 Transcript at 27:15-22 ("Gerard E. Harper, Attorney for Intervenor Plaintiffs: [I]f your Honor were to decide that *Sharon Steel* [does not apply], then I have the right to assert . . . that the spin-off of Covidien and Tyco Electronics was itself a transfer of all or substantially all of Tyco's assets and, therefore, trigger[ed] the successor obligor clause – a different analytical argument and one that would require an analysis and a trial on the valuation of what was spun off and what was left behind."). Harper entered an appearance as co-counsel for BNY on the same day that certain noteholders, who had intervened as plaintiffs, voluntarily dismissed their claims. *See* 10/17/07 Notice of Appearance.

[62]    *Sharon Steel*, 691 F.2d at 1051.

maintained four lines of business through a single holding company, TIGSA.

TIGSA was the only obligor on the Notes, and Tyco was a guarantor. After the

Transaction, Tyco is a public corporation that maintains two lines of business

through a single holding company, TIFSA. Tyco and TIFSA are co-obligors on

the Notes. The noteholders remain lenders to Tyco, but Tyco divested itself of

two lines of business. In essence, Tyco spun off two of its businesses.

   *Sharon Steel* does not apply to these facts. The transaction in *Sharon*

*Steel* resulted in Sharon Steel, a company unrelated to UV, holding only one of

UV's three lines of business and all of UV's debt. The transactions were

consummated in the course of the liquidation of UV. Here, Tyco spun off two of

its businesses and retained the remainder. Neither the debt nor the engineered

products and fire systems businesses left the conglomerate. Tyco was

restructured, not liquidated, with TIFSA replacing TIGSA as the holding company

and Tyco changing from a guarantor on the Notes to an obligor.[63] There is no

---

[63] Defendants correctly observe that "[t]he real party backing the Notes was always Tyco," and that TIGSA was at all relevant times merely a holding company. Defendants' Reply Memorandum of Law in Further Support of Their Cross-Motion for Summary Judgment at 2. In support of this assertion, Tyco indicates that the offering documents for the Notes included "substantial information" about Tyco but "only the barest information concerning TIGSA," and that the Indentures required TIGSA to provide the Indenture Trustee with Tyco's annual reports and SEC filings. *Id.*

indication that successor obligor clauses were intended to require consent from the

noteholders for such internal restructuring, even when coupled with a spin-off of

some of the obligor's assets.

In *Sharon Steel*, the Circuit distinguished a "decision to sell off some

properties . . . made in the regular course of business" from a "plan of piecemeal

liquidation . . . ."[64]  In the former situation, the sale is "undertaken because the

directors expect the sale to strengthen the corporation as a going concern."[65]  In

the latter, the sale "may be undertaken solely because of the financial needs and

opportunities or the tax status of the major shareholders."[66]  Tyco divided its

businesses into three entities after its directors determined that

> separating into three independent companies is the best
> approach to enable these businesses to achieve their full
> potential. [Covidien], [Tyco] Electronics and [TIFSA] will
> be able to move faster and more aggressively – and
> ultimately create more value for our shareholders – by
> pursuing their own growth strategies as independent
> companies.[67]

The Transaction clearly resulted from a decision to sell off some

---

[64]     *Sharon Steel*, 691 F.2d at 1050.

[65]     *Id.*

[66]     *Id.*

[67]     1/13/06 Press Release.

19

properties made in the regular course of business. The only liquidation involved in the Transaction was that of TIGSA, a holding company with minimal assets other than Tyco's operating businesses, and TIGSA was replaced by TIFSA, also a holding company with minimal assets other than Tyco's operating businesses.

BNY argues that *Sharon Steel* applies because of the liquidation of TIGSA. But the operative entity with respect to the Notes is Tyco, not TIGSA. TIGSA was simply a holding company, and it has been replaced by another holding company. While UV's noteholders found themselves expecting repayment from an entirely new entity, here the noteholders still look to Tyco for repayment.

BNY does not argue that *Sharon Steel* would apply if TIGSA had spun off Tyco Electronics and Covidien but retained the remaining businesses.[68] Similarly, BNY does not dispute that TIGSA could have transferred the Notes to Tyco without violating the successor obligor clauses at the time that TIGSA distributed its assets to Tyco, had Tyco not then spun off Tyco Electronics and

---

[68]     Apparently TIGSA did not simply spin off these two businesses because it would have incurred substantial tax liability in Luxembourg. *See* Def. 56.1 ¶¶ 62, 64 (noting that dividends of a Luxembourg company are subject to a fifteen percent withholding tax, while liquidating distributions are not); 12/4/07 Declaration of Marc Seimetz, Attorney at Court ("Avocat à la Cour") and Member of the Luxembourg Bar Association, Ex. M to Gordon Decl. (same).

Covidien.  Thus, the crux of BNY's position is that the combination of spin-off

and transfer violated *Sharon Steel*.  But the transfer of TIGSA's assets to Tyco was

essentially a nullity because it merely substituted Tyco as obligor for Tyco as

guarantor.  Notwithstanding the transfer from TIGSA to Tyco, the Transaction is a

spin-off, rather than a liquidation, and *Sharon Steel* does not apply.

### 3.    Successor Obligor Clauses and Spin-Off Transactions

BNY's complaint is essentially that the Notes have lost the protection

of Tyco's healthcare and electronics businesses.[69]  BNY is correct.  However,

successor obligor clauses are not intended to protect this interest.  Successor

obligor provisions have two purposes:  "to leave the borrower free to merge,

liquidate or to sell its assets in order to enter a wholly new business free of public

debt" and to assure the lender "a degree of continuity of assets."[70]  Assuming that

---

[69]    *See* Memorandum of Law in Support of Plaintiff's Motion for
Summary Judgment ("Pl. Mem.") at 4-5 ("Noteholders that made loans (some of
which, here, for thirty years) to a $60 billion conglomerate boasting of how its
diversity could allocate risk over this decades long period now find themselves the
unwilling creditors of a new company concededly confined to limited business
valued, at best, at a third of the Company to which the Noteholders lent their
money.").  *See also* Memorandum of Law in Further Support of Plaintiff's Motion
for Summary Judgment and in Opposition to Defendants' Cross-Motion for
Summary Judgment ("Pl. Rep.") at 8 ("What troubled the Second Circuit in
*Sharon Steel* was the notion that a company could, in effect, cheat its public
creditors by taking their money and then liquidating its assets . . . .").

[70]    *Sharon Steel*, 691 F.2d at 1050.

21

Tyco Electronics and Covidien did not represent substantially all of TIGSA's assets, the lenders have maintained the requisite degree of continuity of assets. The successor obligor clauses require nothing more.

The Indentures could provide for protection for the noteholders in the event that the obligor disposed of less than substantially all of its assets, but they do not.[71]  In the absence of such a provision, the Court will not impose one.[72]

### B.    BNY's Failure to Execute the Supplemental Indentures

BNY also argues that Tyco could not substitute itself or TIFSA for TIGSA as obligors on the Notes without BNY's consent.  BNY refused to execute the Supplemental Indentures that would have permitted such a substitution on the ground that it was unsure whether the Transaction violated the successor obligor

---

[71]    *See* F. John Stark, III, *et al.*, *"Marriot Risk":  A New Model Covenant to Restrict Transfers of Wealth from Bondholders to Stockholders*, 1994 Colum. Bus. L. Rev. 503, 546 ("An expanded or separate covenant limiting dispositions of less than substantially all of the borrower's assets or specified assets outside of the ordinary course of business would address issues raised by transactions such as a spin-off.") (citation omitted); *Commentaries* 423 (discussing covenants that limit the issuer's ability to sell less than substantially all of its assets).

[72]    *See Lui v. Park Ridge at Terryville Assn.*, 601 N.Y.S.2d 496, 498 (2d Dep't 1993) ("A court should not, under the guise of contract interpretation, 'imply a term which the parties themselves failed to insert' or otherwise rewrite the contract.") (quoting *Mitchell v. Mitchell*, 440 N.Y.S.2d 54, 55 (2d Dep't 1981)).

clauses.[73] If the Transaction did violate the clauses, BNY was within its rights in refusing to execute the Supplemental Indentures.

BNY further maintains that it had the authority to refuse to execute the Supplemental Indentures whether or not the Transaction was permitted by the successor obligor clauses. BNY suggests that regardless of why it chose not to execute the Supplemental Indentures, its decision not to do so prevented Tyco from consummating the Transaction.

The Indentures have different language, but they evince the same intent. Article Seven of the 1998 Indenture provides that

> [TIGSA], Tyco, . . . and the Trustee may from time to time and at any time enter into an indenture or indentures supplemental hereto for one or more of the following purposes . . . (b) to evidence the succession of another corporation . . . and the assumption by the successor Person of the covenants, agreements and obligations of the Issuer pursuant to Article Eight . . . . The Trustee is hereby authorized to join with [TIGSA and] Tyco . . . in the execution of any such supplemental indenture . . . but the Trustee shall not be obligated to enter into any such supplemental indenture which affects the Trustee's own rights, duties or immunities under this Indenture or otherwise.[74]

Article Eight provides that TIGSA can convey substantially all of its assets to an

---

[73]    *See* Pl. Mem. at 21-22.

[74]    1998 Indenture § 7.1.

23

entity only if "the successor entity . . . shall expressly assume the due and punctual

payment of the principal of and interest on all the [Notes] . . . by supplemental

indenture satisfactory to the Trustee, executed and delivered to the Trustee by such

corporation . . . ."[75]

Because Article Seven states that the trustee is not obligated to

execute a supplemental indenture that affects its "rights, duties or immunities"

under the Indenture, it implies that the trustee is otherwise obligated to execute

supplemental indentures that comply with the Indenture.[76] The requirement in

Article Eight that the supplemental indenture be "satisfactory to the Trustee" in the

event of a transfer of assets is no different.

BNY argues that the Indentures give the trustee discretionary

authority to halt an otherwise valid transfer of TIGSA's assets pursuant to the

successor obligor clauses. This is implausible. One of the purposes of a successor

obligor clause is to give the borrower freedom to transfer substantially all of its

assets without the consent of the lenders, provided that the borrower also transfers

---

[75]    *Id.* § 8.1. The 2003 Indenture contains similar language. It provides
that upon TIGSA's request, the trustee "*shall* join with Tyco and [TIGSA]" in
executing a supplemental indenture in the appropriate circumstances. 2003
Indenture § 9.05 (emphasis added). The 2003 Indenture also requires that the
supplemental indenture be "satisfactory" to the trustee. *Id.* § 10.01.

[76]    1998 Indenture § 7.1.

the obligation on the notes.[77]  Requiring the consent of the noteholders'

representative would be directly contrary to that purpose.[78]

The Indentures are best read to permit the Indenture Trustee to

decline to execute supplemental indentures only if it has a good-faith basis to

conclude that the proposed transfers violate the successor obligor clauses.  The

trustee's role under the Indentures is simply to review the supplemental indentures

to ensure that they and the transfer in question comply with the Indentures.  If they

do so, and if the supplemental indentures do not alter the "rights, duties or

immunities" of the trustee, then the trustee must execute them.[79]

---

[77]    *See supra* text accompanying note 58 (discussing the purposes of
successor obligor clauses).

[78]    In *Sharon Steel*, the trustee declined to execute the supplemental
indentures. *See* 691 F.2d at 1046-47.  The Second Circuit only addressed the
successor obligor clause, and did not address whether the transaction would have
been invalid even had it complied with the clause because of the trustee's failure
to execute the supplemental indentures.

[79]    *Cf.* Restatement (Third) of the Law of Trusts § 76(1) ("The trustee
has a duty to administer the trust, diligently and in good faith, in accordance with
the terms of the trust and applicable law."); *id.* cmt. b ("[A] trustee may commit a
breach of trust by improperly failing to act, as well [as] by improperly exercising
the powers of the trusteeship.").  I note that "[u]nlike the ordinary trustee, who has
historic common-law duties imposed beyond those in the trust agreement, an
indenture trustee is more like a stakeholder whose duties and obligations are
exclusively defined by the terms of the indenture agreement." *Meckel v.
Continental Res. Co.*, 758 F.2d 811, 816 (2d Cir. 1985) (citing *Hazzard v. Chase
Nat'l Bank*, 287 N.Y.S. 541 (Sup. Ct. N.Y. Co. 1936), *aff'd*, 14 N.Y.S.2d 147 (1st

If a trustee has a good-faith basis for declining to execute a supplemental indenture (because the trustee reasonably believes that it violates a successor obligor clause), but the transfer is ultimately determined not to violate the clause, the fact that the trustee did not approve is insufficient to prevent the transaction from proceeding.[80] If the Supplemental Indentures did not otherwise breach the Indentures, BNY cannot argue that they are invalid for want of BNY's execution.[81]

## V.    CONCLUSION

For the reasons stated above, the parties' motions are denied. The Clerk of the Court is directed to close these motions (documents no. 34 and 49 on

------------------------------------------

Dep't 1939), *aff'd*, 282 N.Y. 652 (1940)).

[80]    A trustee that refused to execute the supplemental indenture without a good-faith basis for doing so might face liability for this refusal, and certainly would not be able to delay the transaction.

[81]    BNY argues that "the issue is not whether the Trustee was obligated to sign, but whether defendants breached the Indentures by going ahead with their transaction without obtaining the Trustee's signature." Pl. Rep. at 16 n.4. But "it has been established for over a century that 'a party may not insist upon performance of a condition precedent when its non-performance has been caused by the party [it]self.'" *Lomaglio Assocs. v. LBK Marketing Corp.*, 892 F. Supp. 89, 93 (S.D.N.Y. 1995) (quoting *Ellenberg Morgan Corp. v. Hard Rock Cafe*, 500 N.Y.S.2d 696, 699 (1st Dep't 1986)). BNY cannot assert that Tyco should have obtained an executed supplemental indenture before performing the Transaction while demurring on whether it had an obligation to execute the Supplemental Indentures.

26

the docket sheet).  A status conference is scheduled for March 25, 2008, at 4:30.




SO ORDERED:


Shira A. Scheindlin
U.S.D.J.


Dated:      New York, New York
            March 3, 2008




27

**- Appearances -**

**For Plaintiff:**

Kevin J. O'Brien, Esq.
Glenn E. Siegel, Esq.
Alissa Rossman, Esq.
Ronald Allan Hewitt, Esq.
Dechert, LLP
30 Rockefeller Plaza
New York, NY 10112
(212) 698-3500

Gerard E. Harper, Esq.
Andrew Garry Gordon, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3553

**For Defendants:**

Marshall Ross King, Esq.
Gibson, Dunn & Crutcher LLP
200 Park Avenue, 48th Floor
New York, NY 10166
(212) 351-3905